# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| **GREGORY MCKNIGHT** | ) | **Case No. 2:09-CV-059** |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **District Judge Susan J. Dlott** |
| | ) | **Magistrate Judge Michael R. Merz** |
| | ) | |
| **DAVID BOBBY, Warden** | ) | |
| | ) | <u>**THIS IS A DEATH PENALTY CASE**</u> |
| **Respondent,** | ) | |

---

## PETITION FOR WRIT OF HABEAS CORPUS
### PURSUANT TO 28 U.S.C. § 2254

---

**David Stebbins (0005839)**
Assistant Federal Public Defender
Lead/Trial Counsel
david_stebbins@fd.org

**Sharon A. Hicks (0076178)**
Assistant Federal Public Defender
Co-Counsel
sharon_hicks@fd.org

**Justin C. Thompson ( 0078817)**
Assistant Federal Public Defender
Co-Counsel
justin_thompson@fd.org

Federal Public Defender's Office
for the Southern District of Ohio
Capital Habeas Unit
10 West Broad Street, Suite 1020
Columbus, Ohio 43215
Phone: (614) 469-2999

**Counsel for Petitioner**

## TABLE OF CONTENTS

PREFACE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

GROUNDS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    First Ground for Relief:

        A SEARCH WARRANT BASED ON AN AFFIDAVIT CONTAINING
        FALSE INFORMATION MADE KNOWINGLY AND INTENTIONALLY
        OR WITH RECKLESS DISREGARD FOR THE TRUTH VIOLATED
        GREGORY MCKNIGHT'S RIGHT AGAINST AN UNREASONABLE
        SEARCH AND SEIZURE IN VIOLATION OF THE FOURTH, FIFTH,
        SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . 36

    Second Ground for Relief

        GREGORY MCKNIGHT WAS DENIED A FAIR TRIAL, IMPARTIAL
        JURY AND DUE PROCESS AS GUARANTEED BY THE FIFTH, SIXTH,
        EIGHTH AND FOURTEENTH AMENDMENTS WHEN THE TRIAL
        COURT FAILED TO CHANGE VENUE, DESPITE PERVASIVE
        PRETRIAL PUBLICITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    Third Ground for Relief

        GREGORY MCKNIGHT WAS DEPRIVED OF DUE PROCESS, A FAIR
        TRIAL AND A FAIR SENTENCING HEARING IN VIOLATION OF HIS
        FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS
        DUE TO THE TRIAL COURT'S FAILURE TO CHANGE VENUE IN
        LIGHT OF THE PERVASIVE RACIAL BIAS IN THE VINTON COUNTY,
        OHIO COMMUNITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

    Fourth Ground for Relief

        FAILURE TO PROVIDE GREGORY MCKNIGHT WITH THE EXPERT
        RESOURCES TO CONDUCT A SCIENTIFIC JURY SURVEY DENIED
        HIM INFORMATION CRUCIAL TO ESTABLISHING THE NECESSITY

**FOR A CHANGE OF VENUE, THEREBY DEPRIVING HIM OF THE EFFECTIVE ASSISTANCE OF COUNSEL, A FAIR TRIAL, A FAIR AND IMPARTIAL JURY AND DUE PROCESS IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**  . . . . . 56

Fifth Ground for Relief

**THE TRIAL COURT'S DISMISSAL AND SUBSEQUENT REINSTATEMENT OF THE CAPITAL SPECIFICATIONS OF STATUTORY AGGRAVATING CIRCUMSTANCES IN GREGORY MCKNIGHT'S TRIAL VIOLATED MCKNIGHT'S RIGHT TO DUE PROCESS, A FAIR TRIAL AND A FAIR AND IMPARTIAL JURY IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Sixth Ground for Relief

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS, FAIR TRIAL, AND FAIR AND RELIABLE SENTENCING DETERMINATION UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WHEN THE TRIAL COURT TRIED THE TWO UNRELATED MURDERS JOINTLY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Seventh Ground for Relief

**GREGORY MCKNIGHT WAS DENIED  DUE PROCESS AND A FAIR TRIAL BECAUSE THE "COURSE OF CONDUCT" SPECIFICATION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND FAILED TO NARROW THE CLASS OF MURDERS ELIGIBLE FOR THE DEATH PENALTY IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Eighth Ground for Relief

**MCKNIGHT WAS DENIED THE RIGHT TO DEFEND AGAINST THE STATE'S CHARGES AND TO CONFRONT THE STATE'S WITNESSES, AS WELL AS HIS RIGHTS TO DUE PROCESS AND EQUAL PROTECTION WHEN THE TRIAL COURT INSTRUCTED THE JURY IN A MANNER CALCULATED TO DEFEAT THE EFFECTIVENESS OF CROSS-EXAMINATION IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS** . . . . . . 78

Ninth Ground for Relief

MCKNIGHT'S  RIGHTS TO A FAIR TRIAL, DUE PROCESS, AND A
RELIABLE DETERMINATION OF GUILT AS GUARANTEED BY THE
FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WERE
VIOLATED WHEN THE TRIAL COURT PERMITTED THE
INTRODUCTION AND ADMISSION OF NUMEROUS GRUESOME
PHOTOGRAPHS WITH NO PROBATIVE VALUE BUT WHICH WERE
HIGHLY PREJUDICIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Tenth Ground for Relief

GREGORY MCKNIGHT'S RIGHT TO A FAIR TRIAL AND DUE
PROCESS WERE VIOLATED WHEN STATE INTRODUCED AND THE
TRIAL COURT ADMITTED EVIDENCE TO PROVE THE VICTIM
ACTED IN CONFORMITY WITH HABITUAL BEHAVIOR IN
VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Eleventh Ground for Relief

THE ADMISSION OF IRRELEVANT AND INFLAMMATORY
EVIDENCE DEPRIVED GREGORY MCKNIGHT OF A
FUNDAMENTALLY FAIR TRIAL AND DUE PROCESS IN VIOLATION
OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Twelfth Ground for Relief

GREGORY McKNIGHT'S RIGHT TO DEFEND AND TO REBUT THE
STATE'S EVIDENCE WAS DENIED WHEN THE TRIAL COURT
PRECLUDED THE ADMISSION OF RELEVANT EVIDENCE DENYING
HIM HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR
TRIAL UNDER THE FIFTH SIXTH, EIGHT AND FOURTEENTH
AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Thirteenth Ground for Relief

MCKNIGHT WAS DENIED HIS RIGHT TO A FAIR TRIAL AND
IMPARTIAL JURY UNDER THE FIFTH, SIXTH AND FOURTEENTH
AMENDMENTS, WHEN A MEMBER OF HIS JURY IGNORED THE
TRIAL COURT'S ADMONITIONS AND ENGAGED IN DISCUSSIONS
ABOUT THE CASE WITH MEMBERS OF THE COMMUNITY. . . . . . 105

Fourteenth Ground for Relief

**GREGORY MCKNIGHT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL BY A FAIR AND IMPARTIAL JURY WAS DENIED WHEN THE TRIAL COURT PERMITTED A JUROR TO REMAIN ON THE JURY AFTER THE JUROR WAS SLEEPING DURING THE PRESENTATION OF EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

Fifteenth Ground for Relief

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS RIGHT AND A FAIR TRIAL,  IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS WHEN THE TRIAL COURT FAILED TO TAKE CURATIVE ACTION AFTER HIS TRIAL WAS DISRUPTED DURING CLOSING ARGUMENTS OF THE TRIAL PHASE.** . . . . . . . 115

Sixteenth Ground for Relief

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS AND A FAIR TRIAL AND IMPARTIAL JURY WHEN HE WAS SHACKLED IN THE COURTROOM IN FRONT OF THE JURY IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS** . . . . . 119

Seventeenth Ground for Relief

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE TRIAL COURT'S INSTRUCTIONS THAT DID NOT REQUIRE UNANIMOUS JURY VERDICTS IN VIOLATION OF THE FIFTH, SIXTH,  EIGHTH, AND FOURTEENTH AMENDMENTS WHEN THE VERDICT WAS PREDICATED ON ALTERNATIVE THEORIES OF GUILT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Eighteenth Ground for Relief

**GREGORY MCKNIGHT'S RIGHT TO DUE PROCESS, A FAIR TRIAL AND IMPARTIAL JURY WERE DENIED UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS WHEN IT INSTRUCTED THE JURY ON OHIO REV. CODE. § 2905.01(C) MITIGATING FACTOR WHEN MCKNIGHT DID NOT RAISE THIS AFFIRMATIVE DEFENSE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Nineteenth Ground for Relief

> **GREGORY MCKNIGHT WAS DENIED A FAIR TRIAL, DUE PROCESS AND THE RIGHT TO CONFRONT WITNESSES AGAINST HIM  IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS WHEN HE WAS EXCLUDED FROM CRITICAL PORTIONS OF HIS CAPITAL TRIAL.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Twentieth Ground for Relief

> **GREGORY MCKNIGHT'S WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE STATE WAS PERMITTED TO CONVICT UPON A STANDARD OF PROOF BELOW PROOF BEYOND A REASONABLE DOUBT IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Twenty-First Ground for Relief

> **GREGORY MCKNIGHT WAS DENIED DUE PROCESS, EQUAL PROTECTION, AND A FAIR AND RELIABLE CAPITAL SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH , EIGHTH, AND FOURTEENTH AMENDMENTS BECAUSE THE TRIAL COURT EXCLUDED VICTIM IMPACT EVIDENCE ABOUT THE EFFECT OF A HOMICIDE ON THE VICTIM'S FAMILY, AND RELEVANT MITIGATING EVIDENCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

Twenty-Second Ground for Relief

> **GREGORY MCKNIGHT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE TRIAL COURT'S INSTRUCTION ON AN  INVALID AGGRAVATING CIRCUMSTANCE THAT IS NOT AUTHORIZED BY OHIO'S CAPITAL SENTENCING STATUTE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS** . . . . . 135

Twenty-Third Ground for Relief

> **MCKNIGHT'S DUE PROCESS RIGHTS TO A FAIR AND RELIABLE TRIAL AND SENTENCING WERE VIOLATED WHEN THE TRIAL COURT'S ERRONEOUS INSTRUCTIONS TO THE JURY ALLOWED THE JURY TO DETERMINE WHAT EVIDENCE WAS RELEVANT FOR CONSIDERATION AND WEIGHING DURING THE PENALTY PHASE IN VIOLATION OF HIS FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Twenty-Fourth Ground for Relief

**GREGORY MCKNIGHT WAS DENIED TO DUE PROCESS AND FAIR AND RELIABLE SENTENCING DETERMINATION WHEN THE TRIAL COURT PROVIDED THE JURY WITH VERDICT FORMS THAT SERVED TO MISLEAD THE JURY AS TO ITS ESSENTIAL ROLE DURING PENALTY PHASE DELIBERATIONS IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS** . . . . . 143

Twenty- Fifth Ground for Relief

**THE TRIAL COURT CONSIDERED INVALID AGGRAVATING CIRCUMSTANCES ITS SENTENCING OPINION AND IMPOSED DEATH WITHOUT AN INDIVIDUALIZED CONSIDERATION OF MITIGATING FACTORS. GREGORY MCKNIGHT WAS DENIED A FAIR AND RELIABLE SENTENCING DETERMINATION UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.** . . . . 145

Twenty- Sixth Ground for Relief

**MCKNIGHT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL DURING THE TRIAL PHASE OF HIS CAPITAL TRIAL IN VIOLATION OF HIS FOURTH, FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

Twenty-Seventh Ground for Relief

**MCKNIGHT'S DUE PROCESS, FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL WAS DENIED BY COUNSEL'S DEFICIENT PERFORMANCE DURING THE PENALTY PHASE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Twenty-Eighth Ground for Relief

**MCKNIGHT'S WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO OBJECT TO THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY WHICH TRIAL PHASE EVIDENCE WAS RELEVANT TO THE JURY'S WEIGHING PROCESS AT THE PENALTY PHASE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

Twenty- Ninth Ground for Relief

      **GREGORY MCKNIGHT'S WAS DENIED DUE PROCESS, A FAIR TRIAL AND RELIABLE SENTENCING DETERMINATION AND THE EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO OBJECT TO THE TRIAL COURT'S VERDICT FORMS TO THE JURY THAT WERE MATERIALLY INACCURATE.** . . . . . . . . . . . . . . . 202

Thirtieth Ground for Relief

      **GREGORY MCKNIGHT'S WAS DENIED DUE PROCESS, A FAIR TRIAL AND RELIABLE SENTENCING DETERMINATION AND THE EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO OBJECT TO THE TRIAL COURT'S FLAWED INSTRUCTIONS GIVEN DURING THE TRIAL AND PENALTY PHASE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

Thirty-First Ground for Relief

      **GREGORY MCKNIGHT WAS DENIED DUE PROCESS, A FAIR TRIAL AND RELIABLE SENTENCING DETERMINATION BY THE MISCONDUCT OF THE PROSECUTORS DURING TRIAL AND PENALTY PHASES UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Thirty-Second Ground for Relief

      **GREGORY MCKNIGHT'S RIGHTS TO A FAIR TRIAL, DUE PROCESS AND A RELIABLE SENTENCING DETERMINATION WERE DENIED UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WHEN MEMBERS OF HIS JURY ENGAGED IN MISCONDUCT BY FAILING TO FOLLOW THE TRIAL COURT'S INSTRUCTIONS OF LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Thirty-Third Ground for Relief

      **GREGORY MCKNIGHT WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL ON HIS SOLE APPEAL OF RIGHT TO THE SUPREME COURT OF OHIO UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

Thirty-Fourth Ground for Relief

**MCKNIGHT'S DUE PROCESS, EQUAL PROTECTION, FAIR TRIAL
AND FAIR AND RELIABLE SENTENCING DETERMINATION WERE
DENIED WHEN HE WAS CONVICTED OF KIDNAPING AND
AGGRAVATED MURDER WITHOUT LEGALLY SUFFICIENT
EVIDENCE, AND CONTRARY TO THE MANIFEST WEIGHT OF THE
EVIDENCE UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Thirty-Fifth Ground for Relief

**GREGORY MCKNIGHT'S RIGHTS WERE VIOLATED WHEN HE WAS
CONVICTED AND SENTENCED TO DEATH UNDER OHIO'S DEATH
PENALTY SYSTEM WHICH FAILS TO PROVIDE AN ADEQUATE
SYSTEM OF APPELLATE AND PROPORTIONALITY REVIEW IN
DEATH PENALTY CASES IN VIOLATION OF THE FIFTH, SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENTS**. . . . . . . . . . . . . . . . . . . 220

Thirty-Sixth Ground for Relief

**WHEN THE AGGRAVATING CIRCUMSTANCES DO NOT OUTWEIGH
THE MITIGATING FACTORS, A SENTENCE OF DEATH IS
INAPPROPRIATE. ADDITIONALLY, THE DEATH SENTENCE MUST
BE VACATED WHERE IT IS NOT PROPORTIONATE TO OTHER CRIMES.**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Thirty-Seventh Ground for Relief

**GREGORY MCKNIGHT'S CONSTITUTIONAL RIGHTS UNDER THE
FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION WERE VIOLATED WHEN HE WAS
CONVICTED AND SENTENCED TO DEATH UNDER OHIO'S
UNCONSTITUTIONAL DEATH PENALTY SCHEME.** . . . . . . . . . . . . . 232

Thirty-Eighth Ground for Relief

**THE PRACTICE OF EXECUTION BY LETHAL INJECTION VIOLATES
GREGORY MCKNIGHT'S RIGHT TO BE FREE FROM CRUEL AND
UNUSUAL PUNISHMENT UNDER THE EIGHTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION.** . . . . . . 235

9

Thirty-Ninth Ground for Relief

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS, EQUAL PROTECTION, AND A FAIR AND RELIABLE TRIAL AND SENTENCING REVIEW BY OHIO'S INADEQUATE STATE POST-CONVICTION PROCESS THAT FAILS TO PROVIDE AN ADEQUATE REMEDY FOR MCKNIGHT TO FULLY AND FAIRLY VINDICATE HIS FEDERAL CONSTITUTIONAL CLAIMS IN THE STATE COURTS UNDER PRINCIPLES OF COMITY AND FEDERALISM, UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS**. . . . . 237

Fortieth Ground for Relief

**THE CUMULATIVE EFFECTS OF THE ERRORS AND OMISSIONS SET FORTH IN THE PRECEDING CLAIMS FOR RELIEF PREJUDICED MCKNIGHT AND DEPRIVED HIM OF HIS RIGHT DUE PROCESS,  A FAIR TRIAL AND A FAIR AND RELIABLE SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

EXHIBIT A: VERIFICATION

## **PREFACE**

Petitioner Gregory McKnight uses the following abbreviations to reference the state-court proceedings:

Transcript of trial proceedings:  (Tr. _____.)

Post-conviction exhibits submitted with the state-court petition: (PC Ex. _____.)

Supplemental Hearing on Motion to Suppress: (Supp. Hrg. _____.)

Trial court's sentencing decision: (Sent. Dec. _____.)

Application to Reopen Direct Appeal pursuant to Supreme Court Practice Rule XI(6): (App. to Reopen _____.)

All state-court post-conviction exhibits are incorporated into this pleading by reference.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| **GREGORY MCKNIGHT** | ) | **Case No. 2:09-CV-059** |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **District Judge Susan J. Dlott** |
| | ) | **Magistrate Judge Michael R. Merz** |
| | ) | |
| **DAVID BOBBY, Warden** | ) | |
| | ) | **THIS IS A DEATH PENALTY CASE** |
| **Respondent,** | ) | |

**JURISDICTION**

Gregory McKnight invokes the jurisdiction of this Court under 28 U.S.C. § 2241, *et seq.*,

including 28 U.S.C. § 2254.McKnight is being restrained of his liberty by Warden David Bobby

and the Ohio Department of Rehabilitation and Correction at the Ohio State Penitentiary, 878

Coitsville-Hubbard Road, Youngstown, Ohio, 44505, on death row. McKnight has been under

such restraint since his transfer to the Ohio Department of Rehabilitation and Correction in 2002,

following his convictions and sentences which arose in Vinton County, Ohio. McKnight, through

counsel, respectfully files this Petition under 28 U.S.C. §§ 2241 and 2254 requesting a Writ of

Habeas Corpus.

Gregory McKnight petitions this Honorable Court to be relieved of his convictions and

sentences imposed on October 14, 2002 and October 25, 2002 respectively because said

convictions and sentences violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the

United States Constitution.

9

## PROCEDURAL BACKGROUND

**CHARGES, CONVICTIONS AND SENTENCES**

A Vinton County, Ohio Grand Jury returned a seven count indictment against McKnight.

The original indictment was amended and McKnight was subsequently indicted on eight counts.

In Count One, McKnight was charged with the aggravated murder of Emily Murray premised

upon the underlying felony of kidnaping in violation of Ohio Revised Code § 2903.01 (B).

Attached to the first count were four capital specifications:

- McKnight committed the aggravated murder for the purpose of escaping detection, apprehension, trial or punishment for another offense he committed in violation of Ohio Revised Code § 2929.04(A)(3);

- McKnight engaged in a course of conduct involving the purposeful killing of two or more persons by him in violation of Ohio Revised Code § 2929.04(A)(5);

- McKnight committed the aggravated murder while he was committing or attempting to commit or fleeing immediately after committing or attempting to commit kidnapping of Emily Murray and McKnight was the principal offender of the aggravated murder in violation of Ohio Revised Code § 2929.04(A)(7);

- McKnight committed the aggravated murder while he was committing or attempting to commit or fleeing immediately after committing or attempting to commit aggravated robbery of Emily Murray and McKnight was the principal offender of the aggravated murder in violation of Ohio Revised Code § 2929.04(A)(7).

In Count Two, McKnight was charged with the kidnaping of Emily Murray in violation of

Ohio Revised Code § 2905.01(A)(3). Count Three charged McKnight with aggravated robbery

and a firearm specification in violation of Ohio Revised Code § 2911.01(A)(1). Counts Four and

Seven charged McKnight with tampering with evidence in violation of Ohio Revised Code §

2921.12(A)(1). In Counts Five and Eight, McKnight was charged with gross abuse of a corpse in violation of Ohio Revised Code § 2927.01(B) . And, Count Six charged McKnight with the murder of Gregory Julious in violation of Ohio Revised Code § 2903.02(A). On September 26, 2002, the State entered a *Nolle Prosequi* on Counts Four, Five, Seven and Eight, the counts involving tampering with evidence and gross abuse of a corpse.

Herman Carson, K. Robert Toy and Robert A. Miller represented McKnight at trial.  The trial began on September 20, 2002.   On October 10, 2002, the jury found McKnight guilty on Counts One, Two, Three, and Six, including all specifications attached to Counts One and Three. On October 14, 2002, the jury returned a death verdict on Count One. (TR. 2069-71).  On October 25, 2002, after a final sentencing hearing, the court sentenced McKnight to death for the aggravated murder of Emily Murray.

**DIRECT APPEAL - SUPREME COURT OF OHIO**

Following imposition of his death sentence, McKnight filed a Notice of Appeal to the Supreme Court of Ohio on December 13, 2002.  The direct appeal merit brief was filed on November 3, 2003.  Counsel for the State missed their filing deadline and were therefore prohibited from filing a response to McKnight's merit brief or participating in oral argument. Appointed counsel Joseph Wilhelm, Kelly Culshaw and Robert Lowe, from the Ohio Public Defender, raised the following issues in the Supreme Court of Ohio on behalf of McKnight:

**PROPOSITIONS OF LAW**:

 **Proposition of Law One**

WHEN THE STATE FAILS TO INTRODUCE SUFFICIENT EVIDENCE
OF KIDNAPPING, A RESULTING CONVICTION DEPRIVES A
CAPITAL DEFENDANT OF SUBSTANTIVE AND PROCEDURAL DUE

11

PROCESS. U.S. CONST. AMENDS. VIII, XIV; OHIO CONST ART I §§ 9,16.

**Proposition of Law Two**

TO DISTINGUISH CAPITAL CRIMES FROM OTHER MURDERS, A NARROWING CONSTRUCTION MUST APPLY TO THE "COURSE OF CONDUCT" AGGRAVATING CIRCUMSTANCE WHEN A DEFENDANT IS CHARGED WITH THE PURPOSEFUL KILLING OF OR ATTEMPT TO KILL TWO OR MORE PERSONS. THE FAILURE TO APPLY THIS REQUIRED NARROWING CONSTRUCTION TO THE "COURSE OF CONDUCT" SPECIFICATION IN A CAPITAL CASE VIOLATES THE DEFENDANT'S SUBSTANTIAL RIGHTS UNDER THE FEDERAL AND STATE CONSTITUTIONS. U.S. CONST. AMENDS VIII, XIV; OHIO CONST. ART. 1, §§ 9, 16.

**Proposition of Law Three**

ADMISSION OF IRRELEVANT EVIDENCE DURING A CAPITAL DEFENDANT'S TRIAL DEPRIVES HIM OF A FAIR TRIAL AND DUE PROCESS. U.S. CONST. AMEND. XIV; OHIO CONST. ART. I, § 16.

**Proposition of Law Four**

A CAPITAL CONVICTION TAINTED BY THE WEIGHT OF CUMULATIVE ERRORS CANNOT STAND. U.S. CONST. AMENDS V, VI, VIII, XIV; OHIO CONST. ART. I, §§ 2, 5, 9, 10, 16.

**Proposition of Law Five**

A SEARCH WARRANT OBTAINED ON AN AFFIDAVIT CONTAINING FALSE INFORMATION WHICH WAS MADE KNOWINGLY AND INTENTIONALLY OR WITH DISREGARD FOR THE TRUTH VIOLATES THE ACCUSED'S RIGHT AGAINST AN UNREASONABLE SEARCH AND SEAIZURE. U.S. CONST. AMEND. IV; ART. I, § 14 OF THE OHIO CONSTITUTION

**Proposition of Law Six**

THE DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL IS INFRINGED WHEN UNRELATED CHARGES ARE JOINTLY TRIED U.S. CONST. AMEND. XIV, OHIO CONST. ART. I, § 16.

**Proposition of Law Seven**

THE TRIAL COURT MAY IN ITS DISCRETION DISMISS THE
CAPITAL SPECIFICATIONS ATTACHED TO AN AGGRAVATING
MURDER CHARGE TO AVOID THE RISK OF AN UNRELIABLE
DEATH SENTENCE. U.S. CONST. AMENDS. VI, VIII, XIV, OHIO
CONST. ART. 1 §§ 5, 9, 16.

**Proposition of Law Eight**

THE RIGHTS OF THE ACCUSED TO A FAIR TRIAL, TO A FAIR AND
IMPARTIAL JURY, AND TO DUE PROCESS ARE VIOLATED WHEN
PRETRIAL PUBLICITY IS SO PERVASIVE THAT PREJUDICE TO THE
ACCUSED MUST BE PRESUMED, AND WHEN THE VOIR DIRE OF
THE PROSPECTIVE JURORS REINFORCES THE PREJUDICE CAUSED
BY THE PUBLICITY. U.S. CONST. AMENDS. VI, XIV. MOREOVER
WHERE THE PERVASIVE NATURE OF THE PUBLICITY IS
APPARENT TO THE TRIAL COURT, A DEFENDANT IS ENTITLED TO
EXPERT ASSISTANCE TO DEMONSTRATE THE NECESSITY OF A
CHANGE OF VENUE. FAILURE TO GRANT SUCH ASSISTANCE
DEPRIVES THE DEFENDANT OF HIS RIGHTS TO A FAIR TRIAL, TO
A FAIR AND IMPARTIAL JURY, AND TO DUE PROCESS US
CONST. AMENDS VI, XIV; OHIO CONST. ART. I, §§ 5, 16.

**Proposition of Law Nine**

A CAPITAL DEFENDANT'S RIGHTS TO DEFEND AGAINST THE
STATE'S CHARGES AND TO CONFRONT THE STATE'S WITNESSES,
AS WELL AS HIS RIGHTS TO DUE PROCESS AND EQUAL
PROTECTION ARE VIOLATED WHEN THE TRIAL COURT
INSTRUCTS THE JURY IN A MANNER CALCULATED TO DEFEAT
THE EFFECTIVENESS OF CROSS-EXAMINATION. U.S. CONST.
AMENDS. V, VI, AND XIV.

**Proposition of Law Ten**

ADMISSION, DURING A CAPITAL DEFENDANT'S TRIAL, OF
EVIDENCE TO PROVE THE VICTIM ACTED IN CONFORMITY,
WHICH DOES NOT MEET THE REQUIREMENTS OF OHIO R. EVID.'
406, DEPRIVES HIM OF A FAIR TRIAL AND DUE PROCESS. U.S
CONST. AMEND. XIV; OHIO CONST. ART. I, § 16.

13

**Proposition of Law Eleven**

A CAPITAL DEFENDANT'S RIGHT TO A FAIR AND IMPARTIAL
JURY IS DENIED WHEN THE TRIAL COURT PERMITS A JUROR TO
SLEEP DURING THE PRESENTATION OF EVIDENCE. U.S. CONST
AMEND. VI; OHIO CONST. ART. I, § 5.

**Proposition of Law Twelve**

THE INTRODUCTION OF GRUESOME PHOTOGRAPHS WITH NO
PROBATIVE VALUE BUT WHICH ARE HIGHLY PREJUDICIAL
VIOLATES A CAPITAL DEFENDANT'S RIGHT TO A FAIR TRIAL,
DUE PROCESS, AND A RELIABLE DETERMINATION OF GUILT AS
GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION AND §§ 9,
10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

**Proposition of Law Thirteen**

THE DEFENDANT'S RIGHTS TO A FAIR TRIAL AND TO A TRIAL BY
AN IMPARTIAL JURY ARE VIOLATED WHEN A JUROR DISCUSSES
THE CASE WITH SOMEONE OUTSIDE OF THE JURY. U.S. CONST.
AMENDS. V, VI, AND XIV; OHIO CONST. ART. I, §§ 10 AND 16.

**Proposition of Law Fourteen**

A CAPITAL DEFENDANT HAS A RIGHT TO BE PRESENT AT ALL
PROCEEDINGS. U.S. CONST. AMENDS. V, VI, VIII, AND XIV" ART I
§§ 2, 5, 9, 10, 16 AND 20.

**Proposition of Law Fifteen**

THE DEFENDANT'S RIGHTS TO DEFEND AND TO REBUT THE
STATE'S CASE, AS WELL AS HIS RIGHTS TO DUE PROCESS AND A
FAIR TRIAL, ARE DENIED WHEN THE TRIAL COURT PRECLUDES
THE ADMISSION OF RELEVANT EVIDENCE. U.S. CONST. AMENDS.
V AND XIV; OHIO CONST. ART. I, §§ 10 AND 16.

**Proposition of Law Sixteen**

THE ACCUSED'S DUE PROCESS RIGHT TO A FAIR TRIAL IS
VIOLATED WHEN THE TRIAL COURT FAILS TO TAKE CURATIVE
ACTION AFTER HIS TRIAL IS DISRUPTED. U.S. CONST. AMENDS.
VI, XIV; OHIO CONST. ART. I, § 10.

**Proposition of Law Seventeen**

A CAPITAL DEFENDANT'S RIGHT TO A FAIR AND IMPARTIAL
JURY IS VIOLATED WHEN THE DEFENDANT IS SHACKLED IN THE
COURTROOM IN FRONT OF THE JURY IN VIOLATION OF THE
FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THIS
UNITED STATES CONSTITUTION AND ARTICLE 1, §§ 1, 2, 5, 9, 10,
16, 20 OF THE OHIO CONSTITUTION.

**Proposition of Law Eighteen**

A VERDICT PREDICATED ON ALTERNATIVE THEORIES CANNOT
STAND BECAUSE IT IS DUPLICITOUS AND ALSO DEPRIVES A
DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO UNANIMOUS
JURY VERDICTS. U.S. CONST. AMENDS. V, VI, AND XIV.

**Proposition of Law Nineteen**

O.R.C. § 2901.01(A)(5)(E) IS UNCONSTITUTIONALLY VAGUE IN
VIOLATION OF THE DUE PROCESS CLAUSE BOTH FACIALLY AND
AS APPLIED TO APPELLANT. U.S. CONST. AMEND. XIV.

**Proposition of Law Twenty**

INSTRUCTING A JURY ON O.R.C. § 2905.01(C) MITIGATING FACTOR
WHEN A DEFENDANT DOES NOT RAISE THIS AFFIRMATIVE
DEFENSE VIOLATES A CAPITAL DEFENDANT'S RIGHT TO A FAIR
TRIAL AND A IMPARTIAL JURY. U.S. CONST. AMEND. VI, XIV;
OHIO CONST. ART. I, §§ 5, 10, 16.

**Proposition of Law Twenty-One**

 A DEATH SENTENCE IS UNRELIABLE AND UNCONSTITUTIONAL
WHEN IT RESTS UPON AN INVALID AGGRAVATING CIRCUMSTANCE THAT
IS NOT AUTHORIZED BY OHIO'S CAPITAL SENTENCING STATUTE. U.S. CONST.
AMENDS. VIII, XIV; OHIO CONST. ART. I §§ 9, 16.

15

**Proposition of Law Twenty-Two**

A TRIAL COURT INFRINGES ON A DEFENDANT'S RIGHTS TO DUE
PROCESS, EQUAL PROTECTION, AND A RELIABLE CAPITAL
SENTENCING DETERMINATION WHEN IT EXCLUDES VICTIM
IMPACT EVIDENCE ABOUT THE EFFECT OF A HOMICIDE ON THE
VICTIM'S FAMILY, AND WHEN IT EXCLUDES RELEVANT
MITIGATING EVIDENCE FROM THE CAPITAL SELECTION
CALCULUS. U.S. CONST. AMENDS. VIII, XIV; OHIO CONST., ART 1
§§ 2, 9, 16.

**Proposition of Law Twenty-Three**

A DEFENDANT'S RIGHT TO A RELIABLE CAPITAL SENTENCING
HEARING IS VIOLATED WHEN THE TRIAL COURT FAILS TO
PROPERLY INSTRUCT THE JURY AT THE PENALTY PHASE. U.S.
CONST. AMENDS. VIII, XIV; OHIO CONST. ART. 1 §§9, 16.

**Proposition of Law Twenty-Four**

A DEFENDANT'S RIGHTS TO DUE PROCESS AND A RELIABLE
CAPITAL SENTENCING DETERMINATION ARE VIOLATED WHEN THE
JURY IS MISLED AS TO ITS ESSENTIAL ROLE AT THE
PENALTY PHASE. U.S. CONST. AMENDS. VIII, XIV; OHIO CONST.
ART. 1 §§ 9, 16.

**Proposition of Law Twenty-Five**

A DEFENDANT'S RIGHT TO A RELIABLE SENTENCING
DETERMINATION, AND HIS RIGHT TO DUE PROCESS, ARE
VIOLATED WHEN THE SENTENCING COURT MISCONSTRUES THE
CAPITAL SELECTION FACTORS AND FAILS TO CONFORM ITS
INDEPENDENT SENTENCE ASSESSMENT TO THE GUIDED
DISCRETION OF THE OHIO CAPITAL SENTENCING STATUTE. U.S.
CONST. AMENDS. VIII, XIV; OHIO CONST. ART. 1, §§ 9, 16

**Proposition of Law Twenty-Six**

THE ACCUSED'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL
IS VIOLATED WHEN COUNSEL FAILS TO CONDUCT AN
ADEQUATE VOIR DIRE, FAILS TO REQUEST THE REMOVAL OF A
SLEEPING JUROR, FAILS TO REQUEST A HEARING PURSUANT TO
REMMER V. UNITED STATES. FAILS TO OBJECT TO PROSECUTOR

MISCONDUCT, FAILS TO REQUEST THAT IRRELEVANT EVIDENCE
BE STRICKEN, FAILS TO OBJECT THE INTRODUCTION OF VICTIM
IMPACT AND VICTIM CHARACTER EVIDENCE, FAILS TO OBJECT
TO THE INTRODUCTION OF GRUESOME PHOTOGRAPHS, AND
FAILS TO OBJECT TO IMPROPER INSTRUCTIONS, COUNSELS'
PERFORMANCE IS DEFICIENT AND THE ACCUSED IS THEREBY
PREJUDICED. U.S. CONST. AMENDS. VI, XIV; OHIO CONST ART I
§ 10.

### Proposition of Law Twenty-Seven

 A CAPITAL DEFENDANT IS DENIED HIS SUBSTANTIVE AND
PROCEDURAL DUE PROCESS RIGHTS TO A FAIR TRIAL AND
RELIABLE SENTENCING WHEN A PROSECUTOR COMMITS ACTS
OF MISCONDUCT DURING THE TRIAL PHASE AND THE
SENTENCING PHASE OF HIS CAPITAL TRIAL. U.S. CONST
AMENDS. VIII, XIV; OHIO CONST. ART. I, §§ 9, 16.

### Proposition of Law Twenty-Eight

WHEN THE AGGRAVATING CIRCUMSTANCES DO NOT OUTWEIGH
THE MITIGATING FACTORS, A SENTENCE OF DEATH IS
INAPPROPRIATE. ADDITIONALLY, THE DEATH SENTENCE MUST
BE VACATED WHERE IT IS NOT PROPORTIONATE TO OTHER
CRIMES.

### Proposition of Law Twenty-Nine

A CAPITAL DEFENDANT'S RIGHT TO DUE PROCESS IS VIOLATED
WHEN THE STATE IS PERMITTED TO CONVICT UPON A
STANDARD OF PROOF BELOW PROOF BEYOND A REASONABLE
DOUBT. U.S. CONST. AMEND. XIV; OHIO CONST. ART. I, § 16.

### Proposition of Law Thirty

OHIO'S DEATH PENALTY LAW IS UNCONSTITUTIONAL. OHIO
REV. CODE ANN. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023,
2929.03, 2929.04, AND 2929.05 DO NOT MEET THE PRESCRIBED
CONSTITUTIONAL REQUIREMENTS AND ARE UNCONSTITUTIONAL
ON THEIR FACE AND AS APPLIED TO GREGORY MCKNIGHT. U.S.
CONST. AMENDS. V, VI, VIII, AND XIV;OHIO CONST. ART. I, §§ 2, 9, 10,
AND 16. FURTHER, OHIO'S DEATH PENALTY STATUTE VIOLATES
 THE UNITED  STATES' OBLIGATIONS UNDER INTERNATIONAL LAW.

In an opinion issued November 30, 2005, the Supreme Court of Ohio affirmed

McKnight's's convictions and sentences. *State v. McKnight,* 107 Ohio St. 3d 101, 837 N.E.2d

315 (2005).

Following the Supreme Court of Ohio's affirmation of McKnight's convictions and death

sentence, a Petition for Writ of Certiorari was filed with the United States Supreme Court on May

1, 2006. On June 26, 2006, the United States Supreme Court denied Certiorari.

**APPLICATION FOR REOPENING**

On February 27, 2006, Jennifer Prillo and Ruth Tkacz, also from the office of the Ohio

Public Defender, filed an Application for Reopening pursuant to Ohio Sup. Ct. Prac. R. XI, § 6

alleging ineffective assistance of appellate counsel. Two propositions of law were raised:

**Proposition of Law Number One**

 Appellant's Sixth Amendment right to effective assistance of counsel
was violated when his attorneys failed to bring to the trial court's attention
all the false statements in the probable cause affidavit which was the
basis for the search warrant for Appellant's property and trailer, and
 when his attorneys failed to present the testimony of another deputy
who knew that the statements in the affidavit were false.
U.S. Const, amends. VI, VIII, XIV; Ohio Const. Art. I, §§ 9, 16.

**Proposition of Law Number Two**

Appellant's Sixth Amendment right t effective assistance of counsel was
violated when his attorneys failed to seek a change of venue based on the
racial bias in the county as evidenced by comments made by venire persons
during voir dire. U.S. Const, amends. VI, VII, XIV; Ohio Const. Art. I, §§ 9, 16.

On June 7, 2006 the Supreme Court of Ohio denied McKnight's application for reopening

without comment. *State v. McKnight*, 109 Ohio St.3d 1492, 848 N.E.2d 855 (2006).

**POST-CONVICTION LITIGATION**

Pursuant to Ohio Rev. Code § 2953.21 *et seq.*, McKnight timely filed his Petition for Post-Conviction Relief on January 9, 2004.  Ruth Tkacz and Jennifer Prillo, Assistant State Public Defenders with the Office of the Ohio Public Defender, represented McKnight in his post-conviction litigation and the appeals there from.

In his Petition, McKnight raised the following issues demonstrating that his convictions and sentences were void or voidable under the United States and Ohio Constitutions:

**GROUNDS FOR RELIEF**

**First Ground for Relief**

PETITIONER'S CONVICTION AND DEATH SENTENCE ARE VOID OR VOIDABLE BECAUSE THE TRIAL COURT ERRED WHEN IT DENIED HIS MOTION FOR A CHANGE OF VENUE, DESPITE THE FACT THAT THERE WAS AN OVERWHELMING AMOUNT OF PUBLICITY SURROUNDING THE CRIMES.  AS A RESULT, PETITIONER'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED.

**Second Ground for Relief**

PETITIONER'S CONVICTION AND DEATH SENTENCE ARE VOID OR VOIDABLE BECAUSE HE RECEIVED, AND WAS PREJUDICED BY, INEFFECTIVE ASSISTANCE OF HIS TRIAL COUNSEL.  TRIAL COUNSEL WERE INEFFECTIVE BECAUSE THEY FAILED TO PRESENT AVAILABLE, COMPELLING EVIDENCE IN SUPPORT OF THEIR MOTION FOR CHANGE OF VENUE TO THE TRIAL COURT.  AS A RESULT, PETITIONER'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED.

**Third Ground for Relief**

PETITIONER'S CONVICTION AND DEATH SENTENCE ARE VOID OR VOIDABLE BECAUSE HE DID NOT RECEIVE HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO A FAIR TRIAL, DUE PROCESS, AND A RELIABLE SENTENCING HEARING. THE CIRCUMSTANCES OF PETITIONER'S CAPITAL CASE WERE SUCH THAT HE COULD NOT GET A FAIR TRIAL AND SENTENCING HEARING AS A BLACK MAN IN A RURAL COUNTY THAT IT OVERWHELMINGLY CAUCASIAN, PARTICULARLY WHEN

19

THE VICTIM IN THE CAPITAL CASE WAS WHITE. PETITIONER'S JURORS WERE ALL CAUCASIAN.

**Fourth Ground for Relief**

PETITIONER'S DEATH SENTENCE IS DISPROPORTIONATE TO A SIMILAR CASE IN VINTON COUNTY: STATE V. MCMILLEN, CASE NO. 01-CR-7229. (EX. D) PETITIONER WAS INDICTED FOR A CAPITAL OFFENSE; EDWARD MICHAEL MCMILLEN WAS NOT, EVEN THOUGH HE WAS ELIGIBLE FOR THE DEATH PENALTY BY THE CIRCUMSTANCES OF THE CRIMES. THE DISPARATE TREATMENT OF THESE TWO SIMILARLY SITUATED PERSONS IN VINTON COUNTY UNDERSCORES THE ARBITRARY APPLICATION OF THE DEATH PENALTY ON FACTORS SUCH AS RACE.

**Fifth Ground for Relief**

PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS TO A FAIR TRIAL, DUE PROCESS, AND A RELIABLE SENTENCE WERE VIOLATED WHEN MEMBERS OF HIS JURY ENGAGED IN MISCONDUCT BY FAILING TO FOLLOW THE TRIAL COURT'S INSTRUCTIONS OF LAW.

**Sixth Ground for Relief**

IN PETITIONER'S CASE, MEMBERS OF HIS JURY EITHER MISUNDERSTOOD OR COMPLETELY DISREGARDED THE TRIAL COURT'S INSTRUCTIONS, RESULTING IN A DEATH SENTENCE THAT IS VOID OR VOIDABLE. PETITIONER'S CASE IS AN EXAMPLE OF A CAPITAL TRIAL SYSTEM THAT IS DEFECTIVE. PETITIONER'S RIGHTS UNDER THE UNITED STATES CONSTITUTION'S FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS WERE VIOLATED, AND HE WAS THEREBY PREJUDICED.

**Seventh Ground for Relief**

THE STATE INTRODUCED MANY PHOTOGRAPHS OF THE VICTIM, EMILY MURRAY. THE STATE PRESENTED PHOTOGRAPHS TAKEN INSIDE PETITIONER'S TRAILER, AS WELL AS PHOTOGRAPHS TAKEN AT THE MORGUE. THE PHOTOGRAPHS WERE EXTREMELY GRAPHIC IN THEIR DISPLAY OF VARIOUS VIEWS OF THE GUNSHOT WOUND AND THE DECOMPOSING BODY. BECAUSE THE PREJUDICE FAR OUTWEIGHED ANY MINIMAL PROBATIVE VALUE, THE TRIAL COURT SHOULD HAVE EXCLUDED THE PICTURES. THE FAILURE TO EXCLUDE THE PHOTOGRAPHS VIOLATED PETITIONER'S FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS, A FAIR TRIAL AND A RELIABLE DETERMINATION OF GUILT AND SENTENCE.

**Eighth Ground for Relief**

PETITIONER WAS CONVICTED OF AGGRAVATED MURDER WITH DEATH
SPECIFICATIONS, KIDNAPPING, AGGRAVATED ROBBERY AND MURDER.
EVIDENCE USED TO PROVE THE CRIMES WAS DISCOVERED AFTER A SEARCH
WARRANT WAS ISSUED FOR PETITIONER'S PROPERTY AND TRAILER IN RAY,
OHIO.  THE SEARCH WARRANT WAS ISSUED BASED ON THE AFFIDAVIT OF THEM-
CPL. CHARLES BOYER.  THE AFFIDAVIT CONTAINS FALSE INFORMATION, WHICH
WAS MADE KNOWINGLY AND INTENTIONALLY OR WITH RECKLESS DISREGARD
FOR THE TRUTH, IN VIOLATION OF PETITIONER'S FOURTH AMENDMENT RIGHTS
AS GUARANTEED BY THE UNITED STATES CONSTITUTION AND

**Ninth Ground for Relief**

THE DEATH SENTENCE IMPOSED ON PETITIONER IS VOID OR VOIDABLE BECAUSE
HE DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL DURING THE PENALTY
PHASE OF HIS CAPITAL TRIAL.  DEFENSE COUNSEL'S FAILURE TO PRESENT
AVAILABLE, RELEVANT AND COMPELLING MITIGATING EVIDENCE TO THE
SENTENCER PREJUDICED PETITIONER.

 **Tenth Ground for Relief**

PETITIONER'S JUDGMENT AND SENTENCE ARE VOID OR VOIDABLE BECAUSE,
ASSUMING ARGUENDO THAT NONE OF THE GROUNDS FOR RELIEF IN HIS POST-
CONVICTION PETITION INDIVIDUALLY WARRANT RELIEF SOUGHT FROM THIS
COURT, THE CUMULATIVE EFFECTS OF THE ERRORS AND OMISSIONS PRESENTED
IN THE PETITION'S FOREGOING PARAGRAPHS HAVE BEEN PREJUDICIAL AND
HAVE DENIED PETITIONER HIS RIGHTS SECURED BY THE FIFTH, SIXTH, EIGHTH
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND
ARTICLE I, SECTIONS 1,2,5,9,10,16 AND 20 OF THE OHIO CONSTITUTION.

On January 14, 2004, Petitioner filed a Motion for Discovery.  On February 9, 2004,

McKnight amended his petition to include his Eleventh Ground for Relief.

**Eleventh ground for relief**

THE JUDGMENT AND SENTENCE AGAINST PETITIONER ARE VOID OR VOIDABLE
BECAUSE THE DEATH PENALTY AS ADMINISTERED BY LETHAL INJECTION IN THE
STATE OF OHIO VIOLATES HIS CONSTITUTIONAL RIGHT TO PROTECTION FROM
CRUEL AND UNUSUAL PUNISHMENT AND TO DUE PROCESS OF LAW.

21

On February 27, 2004, the State filed a motion to dismiss the petition. On June 21, 2005,

the trial court granted limited discovery by allowing McKnight to take the depositions of his trial

attorneys. Those depositions were taken on September 26, 2005. Based on information obtained

through those depositions, McKnight filed additional amendments to his post-conviction petition

on November 4, 2005.

**Twelfth Ground for Relief**

PETITIONER MCKNIGHT'S JUDGMENT AND DEATH SENTENCE ARE VOID OR
VOIDABLE BECAUSE HE DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL
DURING HIS CAPITAL TRIAL PROCEEDINGS. DEFENSE COUNSEL'S FAILURE TO
INVESTIGATE AND PRESENT AVAILABLE, RELEVANT EVIDENCE IN SUPPORT OF
THEIR MOTION TO SUPPRESS PREJUDICED PETITIONER.

**Thirteenth Ground for Relief**

PETITIONER MCKNIGHT'S JUDGMENT AND DEATH SENTENCE ARE VOID OR
VOIDABLE BECAUSE HE DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL
DURING HIS CAPITAL TRIAL PROCEEDINGS. THE STATE INTERFERED WITH
PETITIONER'S ABILITY TO INVESTIGATE AND PRESENT HIS CASE ON A MOTION TO
SUPPRESS EVIDENCE.

**Fourteenth Ground for Relief**

PETITIONER MCKNIGHT'S JUDGMENT AND DEATH SENTENCE ARE VOID OR
VOIDABLE BECAUSE HE DID NOT RECEIVE HIS SIXTH AND FOURTEENTH
AMENDMENT RIGHTS TO DUE PROCESS AND EFFECTIVE ASSISTANCE OF
COUNSEL. DEFENSE COUNSEL FILED A MOTION FOR A CHANGE OF VENUE BASED
EXCLUSIVELY ON EXTENSIVE PRE-TRIAL PUBLICITY. COUNSEL FAILED TO ARGUE
THAT VENUE SHOULD BE CHANGED ALSO ON ACCOUNT OF RACE.

**Fifteenth Ground for Relief**

THE DEATH SENTENCE IMPOSED ON PETITIONER MCKNIGHT IS VOID OR
VOIDABLE BECAUSE HE DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL
DURING THE PENALTY PHASE OF HIS CAPITAL TRIAL. DEFENSE COUNSEL'S
FAILURE TO REASONABLY INVESTIGATE AND PRESENT RELEVANT MITIGATING
EVIDENCE TO THE JURORS PREJUDICED PETITIONER.

McKnight requested discovery and an evidentiary hearing in regard to each of his grounds for relief. He attached to his Petition exhibits, affidavits and other documentary evidence. On November 4, 2005 he filed a motion requesting an evidentiary hearing on all grounds set forth in the Petition pursuant to O.R.C. § 2953.21(E)   On March 10, 2006 the trial court issued its Decision and Entry summarily denying McKnight's petition for post-conviction relief without an evidentiary hearing.

Gregory McKnight timely appealed the dismissal of his Petition to the Ohio Fourth District Court of Appeals. The Fourth District dismissed McKnight's appeal for lack of a final appealable order due to the trial court's failure to enter sufficient findings of fact and conclusions of law. *See State v. McKnight*, Vinton App. No. 06CA645, 2006-Ohio-7104. On remand, the State submitted proposed findings of fact and conclusions of law. The trial court adopted them and dismissed McKnight's petition.

On his appeal to the Fourth District Court of Appeals, McKnight raised the following Assignment of Errors concerning the dismissal of his Petition for Post-Conviction Relief:

**Assignment of Error One**

THE TRIAL COURT VIOLATED APPELLANT'S RIGHT TO DUE PROCESS IN HIS POST-CONVICTION PROCEEDINGS WHEN IT ADOPTED FULLY THE STATE'S RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW, FAILING TO INDEPENDENTLY DETERMINE THE ISSUES PRESENTED.

**Assignment of Error Two**

THE TRIAL COURT ERRED BY DISMISSING APPELLANT'S POST-CONVICTION PETITION, WHERE HE PRESENTED SUFFICIENT OPERATIVE FACTS AND SUPPORTING EXHIBITS TO MERIT AT MINIMUM DISCOVERY AND AN EVIDENTIARY HEARING.

**Assignment of Error Three**

OHIO'S POST-CONVICTION PROCEDURES NEITHER AFFORD AN ADEQUATE
CORRECTIVE PROCESS NOR COMPLY WITH DUE PROCESS AND EQUAL
PROTECTION UNDER THE FOURTEENTH AMENDMENT.

**Assignment of Error Four**

CONSIDERED TOGETHER, THE CUMULATIVE ERRORS SET FORTH IN APPELLANT'S
SUBSTANTIVE GROUNDS FOR RELIEF MERIT REVERSAL OR REMAND FOR A
PROPER POST-CONVICTION PROCESS.

Following oral argument, the Ohio Fourth District Court of Appeals, affirmed the trial

court's dismissal of McKnight's Petition for Post-Conviction Relief.  *State v. Gregory McKnight*,

Case No. 07 CA 665. (10/25/2007)

On July 1, 2008 McKnight filed a timely  Memorandum in Support of Jurisdiction in the

Supreme Court of Ohio.

In his Memorandum in Support of Jurisdiction, McKnight argued that his case presented a

substantial constitutional question and a question of great and general public interest. The

following propositions of law were raised:

**Proposition of Law One**

A PETITIONER'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS IN HIS POST-
CONVICTION PROCEEDING IS VIOLATED WHEN THE TRIAL COURT FAILS TO
INDEPENDENTLY DETERMINE THE ISSUE PRESENTED AND INSTEAD FULLY
ADOPTS THE STATE'S RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF
LAW

**Proposition of Law Two**

THE DOCTRINE OF RES JUDICATA DOES NOT BAR MERITORIOUS POST-
CONVICTION CLAIMS THAT ARE SUPPORTED BY SUFFICIENT EVIDENCE DEHORS
THE RECORD.

24

**Proposition of Law Three**
IN AN ACTION FOR POST-CONVICTION RELIEF, A PETITION THAT PRESENTS
SUFFICIENT OPERATIVE FACTS SUPPORTED BY EVIDENCE DEHORS THE RECORD
MEETS THE REQUIRED PLEADING STANDARD AND, TO COMPORT WITH DUE
PROCESS, MUST NOT BE SUMMARILY DISMISSED WITHOUT AN EVIDENTIARY
HEARING.

**Proposition of Law Four**

OHIO'S POST-CONVICTION PROCEDURES NEITHER AFFORD AN ADEQUATE
CORRECTIVE PROCESS NOR COMPLY WITH DUE PROCESS AND EQUAL
PROTECTION UNDER THE FOURTEENTH AMENDMENT.

**Proposition of Law Five**

CONSIDERED TOGETHER, THE CUMULATIVE ERRORS SET FORTH IN APPELLANT'S
SUBSTANTIVE GROUNDS FOR RELIEF MERIT REVERSAL OR REMAND FOR A
PROPER POST-CONVICTION PROCESS.

The Supreme Court of Ohio declined to accept McKnight's discretionary appeal for

review, without comment. *State v. McKnight,* 119 Ohio St.3d 1487, 2008-Ohio-1271, on October

15, 2008.

**FEDERAL HABEAS CORPUS LITIGATION**

Following the exhaustion of his federal constitutional challenges to his convictions and

sentence in the Ohio state courts, McKnight filed a Notice of Intent to file a habeas petition (ECF

1), a Motion to Proceed *In Forma Pauperis* (ECF 2), and a Motion to Appoint Counsel (ECF 4)

on January 23, 2009. The Motion to Appoint Counsel was granted on January 23, 2009. By

Notation Order on January 23, 2009, the Court appointed David Stebbins and Sharon Hicks, from

the Federal Public Defenders Office as counsel for Gregory McKnight. On October 9, 2009,

Justin Thompson, also with the Federal Public Defender, filed his Notice of Appearance as

counsel for Mr. McKnight..(ECF 7) On September 8, 2009, the Court ordered the parties to

25

submit a Fed. R. Civ. P. 26(f) Report and scheduled a Scheduling Conference for October 19,

2009 at 9:30 a.m. (ECF 6)

## FACTUAL BACKGROUND

Emily Murray was a twenty-one year old student at Kenyon College in Gambier, Ohio. (Tr. 356).Ms. Murray had attended Kenyon for two years before she took time off to recover from two separate suicide attempts. (TR, 64, 137-38, 356) Prior to the fall of 2000, Murray returned to Kenyon, although she was not registered for classes. She planned to re-register as a student for the following semester. During this period of time she worked part-time at a local restaurant, The Pirate's Cove. (Tr. 119, 180, 215, 311, 335, 400, 488) Murray had decided to quit her job at the restaurant, and her final day of work was the closing shift on November 2, 2000. (Tr. 121, 360-61).

On the night of November 2, 2000, Murray went to the Pirate's Cove to work her last shift. She would normally walk to work, rather than drive the Green Subaru Outback her parents had given her. (TR 101, 115). Some of Murray's friends visited her at work during her last shift, and were making plans for a party that was to take place on November 3, 2000. (Tr. 113-14, 121, 488)

Gregory McKnight was also employed at the Pirate's Cove and was working a shift on November 2, 2000. Records indicate that he clocked out of work at 2:59 AM on November 3, 2000. (Tr. 218) Murray clocked out of work at 3:07 AM on November 3.(Tr. 216) On November 3, 2000, Murray's father received a call from his other daughter informing him that Ms. Murray had not shown up for the November 3, 2000 party. (Tr. 59) At this point, her father called the Knox County Sheriff's Office and Kenyon College security to report that his daughter had been missing since November 3, 2000 at approximately 3:00 AM ( *Id*.) The Green Subaru Outback was also missing. (Tr. 90). A missing person's report was filed and the Subaru Outback was also listed as missing and linked to a missing person report. (Tr. 70)

27

In October of 1999, Gregory Julious and Dana Bostic began living together in Chillicothe, Ohio. (Tr. 993). Although their relationship began as roommates, they started dating several months later. ( Tr. 993). In May of 2000, Julious disappeared.(Tr.  993, 1014).

On the day of Julious's disappearance, Bostic came home from work and saw Julious and Gregory McKnight in the kitchen. (Tr. 1023). Then, Bostic left to get her son from daycare. (Tr. 1024). After returning home, she saw that Julious and McKnight had left. (*Id.*). Bostic thought that Julious would be gone a short time because a candle was still burning and his identification card was still on the mantel. (Tr. 1024-25).Bostic called Lisa Perkins for McKnight's pager number and subsequently paged him. (Tr. 1026-27). McKnight called Bostic back and he put Julious on the phone. (Tr. 1027-28). Julious indicated that he and McKnight were going to a party in Columbus. (*Id* ). Two days later, McKnight went to Bostic's home looking for Julious. (Tr.1015, 1032).When Bostic inquired about Julious's whereabouts, McKnight indicated that he took him to Cincinnati to see some friends. (Tr. 1032).

On December 9, 2000, Vinton County Deputy Sheriff Matt Kight attempted to serve an indictment upon Gregory McKnight at 36070 Clark Road, Ray, Ohio for receiving stolen property. (Supp. Hrng., November 19, 2001, Tr. 9). Although McKnight was not there, Deputy Kight wrote down a license plate number from New York on a green Subaru Outback parked behind McKnight's trailer. ( *Id* ) . He then ran the license number through LEADS. (*Id.*). The results indicated that the car was associated with a missing person. (*Id.*).Fellow Deputy Charles Boyer and Kight went back to the property and verified the vehicle information. (*Id.*) Deputy Boyer drafted and signed an affidavit and sought and obtained a search warrant for the green Subaru Outback at McKnight's residence. (*Id.*). The warrant was issued on the facts that the green Subaru Outback was

28

listed as missing, located on McKnight's property, and a missing person was associated with the missing car.

On December 9. 2000, Deputy Sheriff Boyer executed the search warrant for McKnight's trailer. Boyer entered McKnight's trailer through a plastic window. (Tr. 734). Boyer returned to escort the Knox County Deputy Sheriffs and FBI agents to the trailer. (Tr. 738). They entered the trailer through the front door. An FBI agent picked up a towel that was lying on a floor covering a brown stain. (Tr. 742). Once the stain was discovered, they left the trailer and BCI was called. ( Tr. 743).

BCI searched the trailer and collected evidence. (Tr. 745-46). Murray's body was found rolled up in a rug in the back bedroom. The following day, BCI agents began a search for weapons on McKnight's property. (Tr. 750). BCI agents used a backhoe and found a bone which led them to seek a subsequent search warrant to perform further digging.(Tr. 750-51). This search led to the discovery of more bones. (*Id.*). Bones were discovered in a cistern and trash bag outside of the trailer. (Tr. 583-88).

On March 23, 2001, a Vinton County Grand Jury returned a seven count indictment against Gregory McKnight. The original indictment was amended and McKnight was subsequently indicted on eight counts. In Count One, McKnight was charged with the aggravated murder of Emily Murray premised upon the underlying felony of kidnaping. Attached to the first count were four capital specifications, Ohio Rev.Code. §§ 2929.04(A)(3); 2929.04(A)(5); 2929.04(A)(7) (kidnaping); 2929.04(A)(7) (aggravated robbery), and one firearm specification. In Count Two, McKnight was charged with the kidnaping of Emily Murray. Count Three charged McKnight with aggravated robbery and a firearm specification. Counts Four and Seven charged McKnight with tampering with evidence. In Counts Five and Eight, McKnight was charged with gross abuse of a corpse. And, Count

29

Six charged McKnight with the murder of Gregory Julious. On September 26, 2002, the State entered a Nolle Prosequi on Counts Four, Five, Seven and Eight.

On August 8, 2002, the trial court granted McKnight's Motion to Dismiss Capital Components. The trial court reasoned in its entry that the financial considerations of Vinton County posed an unacceptable risk that could affect McKnight's due process rights. This decision by the trial court generated a substantial amount of local, and even national, publicity. On August 14, 2002, the State sought reconsideration of the trial court's entry dismissing the capital specifications. The trial court subsequently sustained the State's motion to reconsider.

On August 22, 2002, McKnight filed a motion to sever Count Six, the murder of Julious, from the other charges because these were against Murray. On September 2, 2002 the trial court held a hearing on the motion to sever. Counsel argued that the facts did not establish a murder of two people in a "course of conduct." (Hrng. Sept. 4, 2002, Tr. 4). The Court denied the motion to sever Count Six. (Hrng. Sept. 4, 2002,TR 7).

In the wake of the discovery of Murray's and Julious's bodies, the media saturated Vinton County residents with stories of the gruesome crimes, McKnight's troubled past, and the good character of the victims. (Exhibit A-43-108). The sheer volume of the pre-trial publicity ensured that virtually every potential juror called was aware of the facts and circumstances surrounding these crimes. Moreover, an extraordinary number of potential jurors, over thirty percent, were removed because they held a fixed opinion that McKnight was guilty of the crimes charged despite the fact that the State had yet to present a single piece of evidence. Additionally, Vinton County has no racial diversity. Gregory McKnight was a Black, Caribbean American man being tried in a county with virtually an all white jury pool, and known racial biases. Every petit juror had been exposed to

30

extensive media coverage about the facts of the case. Despite the pervasive publicity and the pervasive community exposure to the facts, the trial court denied McKnight's request to change venue to another county.

The court's ruling was compounded by the fact that the capital specifications had been dismissed at one point, and reinstated after national media attention brought focus to McKnight's case.

McKnight's trial began on September 20, 2002. The State presented forty-four witnesses. Several witnesses testified over defense objection. The State began McKnight's trial by presenting evidence that Emily had a habit of notifying family and friends of her whereabouts. (Tr. 59-60, 67-69, 88-89, 127-28). This testimony was admitted over defense objection. (*Id*.).

The State then called several witness to testify about McKnight's marital infidelities and evidence of Murray's good character. Specifically, five witnesses were called and asked about McKnight's marital infidelities. (Tr.332, 377, 387, 397, 384, 403; Tr.1000, 1004-06, 1036-37, 1040, 1124, 1235-36). The trial court permitted this testimony over defense objection. (Tr.328, 331, 381, 406-07, 1000-01, 1236). Even though, this evidence had no relevance to any of the charges.

Dana Bostic testified that McKnight, his wife, Julious, and herself went to Columbus to a reggae club where they saw a police cruiser. (Tr. 1009-11). Bostic said that the McKnight's decided to leave the parking lot immediately upon seeing the police car.(*Id*.). This testimony also was permitted over defense objection. (Tr.1012). The State clearly wanted to depict McKnight as a career criminal who had reason to fear the police.[1]

---

[1] The Supreme Court of Ohio held that it was error to admit this evidence, however the evidence was deemed harmless. *State v. McKnight*, 107 Ohio St. 3d 101, 837 N.E.2d 315 (2005).

The State elicited victim impact evidence at the trial phase. The State's first witness was Murray's father, who testified as to the effects of her disappearance on the family. (Tr. 59, 65, 67-68, 74). This tone was re-established later during Murray's mother's testimony. (Tr. 355-56). The State also elicited evidence regarding Emily's good character through the testimony of her friends. (Tr. 86, 130, 136,183, 185; Tr. 286).

The police hired an anthropologist to assist in the recovery of bones located on McKnight's property. The anthropologist testified where the remains were found, (Tr. 918-27), gave a description of the bones, (Tr. 929-36), described the areas of trauma, (Tr. 936-40, 949-56), and the effects of decomposition on the bones, (Tr. 957). The anthropologist also indicated that the skull fragments were consistent with a gunshot wound. (Tr. 956).

One of the bones found was the lower right jaw which was compared to X-rays from Department of Rehabilitation and Correction's records of Gregory Julious. (Tr.258). The dental expert concluded that the mandible bone and teeth found on McKnight's property came from Julious. (Tr. 277).

The State also presented testimony regarding DNA testing conducted at BCI. ( Tr. 1325). The State theorized that a set of brush cutters was used to dismember Julious. BCI tested the brush cutter which did not reveal any blood. (Tr. 1343). Kathy McKnight acknowledged that she did own a red Mazda car for a couple of months. (Tr. 840-41).However, Mcknight's wife's red Mazda was eventually linked to a car dealer in Columbus, Ohio. (Tr. 763; 367). The dealer fixed up the car and sold it. (Tr. 1370). The new owner of the Mazda consented to a search of it. (Tr. 1376). A search of the car revealed blood under the rear seat. (Tr. 765). Carpet samples from Kathy McKnight's Mazda were also tested. (Tr. 1335). Those results did indicate a match to Julious. (Tr. 1342, 1398).

Furthermore, samples taken from Murray's bra, panties, and rape kit were compared to samples of McKnight and other items of McKnight. (Tr. 1331-34). There was no semen found on Murray's panties and bra or from the rape kit. (Tr.1335-36). No blood was found on any item seized from McKnight. (Tr. 1316, 1339). Murray, was in fact, found fully clothed and still in her coat. (Tr.745-46)

The State presented a latent print examiner regarding prints taken from inside the green Subaru Outback. (Tr. 1437). Prints lifted were compared to McKnight. (Tr. 1448). None of the prints lifted belong to McKnight. ( Tr. 1462).

Heather Zollman, BCI forensic scientist testified regarding ballistic comparisons. (Tr. 1281). Comparisons were made of bullets found in a tree on McKnight's property, (Tr.1285), and bullets found in McKnight's trailer and residence in Gambier, (Tr.1293-94, 1296), to fragments found from Murray's head. (Tr. 1298). Those results indicated that she was shot with a heavier type of bullet. (Tr. 1299). Furthermore, no ballistics match was found on any of the remains of Julious. (Tr. 1304). Zollman also testified that tests were done to compare tool type markings on Julious's remains. (Tr.1311). Those results indicated no conclusive findings. (Tr. 1312).

Additionally, BCI tested a section of McKnight's trailer floor where a brown stain was located. (Tr. 1313). Analysis of this subflooring revealed a hole, but it could not be determined whether a bullet made the hole. (Tr. 1314).The coroner who performed the autopsy of Murray testified as to her findings. (Tr. 878-912). Her examination revealed damage to the skull but decomposition ruled out any indication whether she was shot at close range. (Tr. 884-85). The coroner also testified that there was no evidence of a sexual trauma. (Tr. 894). Results of the autopsy led to the conclusion that Murray died from a single gunshot wound to the head. (Tr. 904).

The State also presented John Perry, a special investigator with BCI. (Tr.1532). On cross-examination, Perry admitted that a Department of Natural Resource Officer Robert Barr wrote a report which indicated that he saw a car similar to the Murray's green Subaru Outback at a park in Ross County on November 5, 2000. (Tr. 1544-48). Barr also reported that he thought he saw three people fitting the description of Murray, McKnight and Mcknight's wife in that car. (Tr. 1545).

The defense presented one witness, Donald Doles, who lived down the road to the McKnight property. (Tr. 1595). Doles stated that he told Deputy Boyer that Doles saw Murray driving her Subaru Outback at least twice in Vinton County. (Tr. 1600, 1607-10).

On October 10, 2002, the jury found McKnight guilty on Counts One, Two, Three, and Six, including all specifications attached to Counts One and Three.

In the trial court's preliminary instructions at the penalty phase, the jury was told that there was one aggravating circumstance containing three components, the "course of conduct" and two (A)(7) capital specifications. However, the State's attorney argued to the jury that there were plural "aggravating circumstances." (Tr. 1929). Later, the State told the jury that there was only one aggravating circumstance for the weighing purpose. (Tr. 1932).

Defense counsel objected because the State had misled the jury as to the merger of the aggravating circumstance. (Tr. 1935-36). The trial court then merged the (A)(3) specification into the (A)(7) kidnaping specification. (Tr. 1954). Defense counsel moved for a mistrial before the final instructions arguing that "the jury [was] hopelessly confused . . . between one aggravator, three aggravators, four aggravators." (Tr. 1996). The trial court overruled the request. (Tr. 1997).

The State then requested that the two (A)(7) specifications be merged and the jury be instructed that there were two aggravating circumstances, (A)(5) and (A)(7) (kidnaping), to

34

weigh against the mitigating factors. (Tr. 2009-11). Defense counsel renewed the motion for mistrial, and removed the death penalty as an option, arguing that "there's no way that this jury can return a verdict with the guided discretion [that is required] . . . ." ( Tr. 2013-14). The trial denied both requests. (Tr. 2021). Instead, it merged the (A)(5) and both (A)(7) specifications into one aggravating circumstance. (*Id*.). The trial court subsequently instructed the jury to weigh one aggravating circumstance containing three elements. (Tr. 2053).

McKnight presented only two witnesses at the penalty phase. His wife, testified that McKnight was a good husband and a good father who cared and provided for his family. (Tr.1976, 1981). McKnight's mother-in-law also stated that he was a good father and that he was a loving son-in-law that cared and assisted her during her health problems. ( Tr. 1988-89). McKnight was loved and supported by his family. At the age of twenty-four, McKnight took responsibility for his family by obtaining employment. (Tr.161, 178, 214, 407). McKnight was a good employee that was in line for a promotion after three months. (Tr.170, 228).

Trial counsel failed to investigate or present any mitigation evidence with respect to McKnight's childhood, family background or history. Apparently because McKnight was convicted of a juvenile murder at the age of 15, and spent 6 years in the Department of Youth Services. Trial counsel did not investigate or present compelling and meaningful mitigation with respect to any of this information due to the fact that the judge indicated that any information regarding McKnight's childhood, history or background, would open the door to evidence of the juvenile murder adjudication in rebuttal by the state.(See PC Ex. P ) Yet, no Motion in Limine was ever filed by counsel to determine, what evidence would be permitted in rebuttal, nor was any evidence proffered with respect to the juvenile adjudication.

35

No reasonable investigation was ever conducted by counsel to determine the circumstances surrounding this juvenile adjudication. Had even a minimal investigation been conducted, counsel would have uncovered compelling mitigation evidence with respect to McKnight's juvenile crime and incarceration that would have been compelling and meaningful.

McKnight's family in New York, or family friends were never contacted and asked to testify, despite the fact that they were available and willing to assist in any way needed. McKnight's mother, aunt and family friends and caretakers were never contacted by counsel, which left McKnight with little to no mitigating evidence to present at his penalty phase hearing.

Furthermore, Kathleen Murray, Emily Murray's sister, submitted an affidavit requesting that McKnight's life be spared based upon her sister's long-held opposition to the death penalty and on the impact that a death sentence would have on the Murray family. (Appendix to McKnight's Direct Appeal Merit Brief, Ex. A-32-33). Kathleen also stated that McKnight is a father to young children who would suffer from the loss of their father if he were executed. (*Id.*). The trial court also received letters from various relatives and friends of Emily Murray expressing the view that McKnight should be spared execution. (A-34-42). The trial court excluded Kathleen Murray's affidavit and the letters in support of McKnight's character and background. (Tr. 1095-98)

On October 14, 2002, the jury returned a death verdict on Count One. (Tr.  2069-71). On October 25, 2002, the trial court imposed the death penalty. (Tr. 2118). The trial court found that McKnight's evidence of employment history, age, love and support for his  family and the support from his family deserved weight in mitigation. (Tr.  2114-15). However, it weighed one super aggravating circumstance against the mitigating factors, and found that the mitigating factors were outweighed by this aggravating circumstance. (Tr. 2117).

36

October 25, 2002, the trial court imposed terms of ten years for kidnaping in Count Two, ten years for the aggravated robbery in Count Three, three years for the gun specification to Count Three, three years for the gun specification to Count One and fifteen to life for the murder conviction in Count Six. (Tr. 2107). These terms were imposed consecutively. (Tr. 2108).On November 1, 2002, the trial court issued its written sentencing opinion.

Following imposition of his death sentence, McKnight pursued his appellate and state-post-conviction remedies. On direct appeal, the Supreme Court of Ohio affirmed the charges and specifications, and affirmed his sentence. The court denied McKnight's motion for reconsideration. The Supreme Court of Ohio also subsequently refused to reopen McKnight's direct appeal. (See Procedural Background, *supra*.)

McKnight was similarly unable to obtain relief by way of his petition for state post-conviction relief. All of McKnight's claims were ultimately dismissed at the trial court level, with the dismissals being affirmed by the appellate court. The Supreme Court of Ohio declined to hear McKnight's state post-conviction case, with a final denial issuing on October 15, 2008. (See Procedural Background, *Supra*)

37

## GROUNDS FOR RELIEF

**First Ground for Relief:**

**A SEARCH WARRANT BASED ON AN AFFIDAVIT CONTAINING FALSE INFORMATION MADE KNOWINGLY AND INTENTIONALLY OR WITH RECKLESS DISREGARD FOR THE TRUTH VIOLATED GREGORY MCKNIGHT'S RIGHT AGAINST AN UNREASONABLE SEARCH AND SEIZURE IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

1.       Evidence used to convict McKnight was discovered after a search warrant was issued for his property and trailer in Ray, Ohio. The search warrant was issued based on an affidavit that contained false information, made knowingly and intentionally or with reckless disregard for the truth, in violation of McKnight's Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights.

**A.       Warrant Obtained and McKnight's Property Illegally Searched**

2.       On December 9, 2000, Vinton County, Ohio Deputy Sheriff Matt Kight attempted to serve a Grand Jury Indictment upon Gregory McKnight at 36070 Clark Road, Ray, Ohio. (Supp. Hrng., Nov. 19, 2001, Tr. 9). Deputy Kight was unable to serve the indictment because McKnight was not present at the address. Deputy Kight observed several cars on the property and wrote down their license plate numbers. One of the cars, a green Subaru Outback, had a New York license plate. Deputy Kight returned to the Sheriff's Department and ran the license numbers through LEADS. The results on the Subaru Outback with New York plates came back with an alert for a missing person, Emily Murray. The vehicle had been missing since Murray was last seen on November 3, 2000. (Supp. Hrg Nov. 19, 2001, Tr. 17)

3.       Deputy Kight then attempted to call the Knox County Sheriff's Office without success. Kight shared this information with Corporal Charles Boyer, and both of them returned to McKnight's

38

property.  They knocked on the door, but no one was apparently at the property.

4.      While Deputy Kight and Corporal Boyer were at McKnight's property, a dispatcher from Vinton County informed the Knox County Sheriff's Office that they had located Murray's green Subaru Outback.  The Knox County Sheriff's Office indicated that they were in route in would arrive in Vinton County in approximately two hours.  (Supp. Hrg. Tr. 11)

5.      While Knox County officials were traveling to Vinton County, Corporal Boyer left to obtain a search warrant for the green Subaru Outback and McKnight's trailer and all outbuildings located at 36070 Clark Rd., Ray OH 45672..  Deputy Kight remained on the property.  Corporal Boyer went to the Vinton County courthouse and met with Prosecutor Tim Gleeson. (Supp.Hrg Tr. 24) Prosecutor Gleeson typed out an affidavit for Boyer to sign.  (Supp. Hrng Tr. 38)

Boyer's affidavit in support of the warrant stated:

> Emily Sarah Murray is listed as an endangered missing person by the Knox County, Ohio Sheriff's Office, as of November 3, 2000.  Earlier today while attempting to serve an indictment of Gregory McKnight at his residence, I saw a vehicle with New York license plates on it.  Mr. McKnight was not at home, neither was anybody else.  Prior to leaving, I ran the license plate number.  It came back to Cynthia Murray with an alert for Emily Sarah Murray as an endangered and missing person.  The vehicle came up missing the same time Emily did.  I obtained confirmation from Knox County officials whom are traveling to Vinton County at this time.

(Affidavit for search warrant, filed Dec. 10, 2000) ( Supp. Hrng. November 19, 2001, Ex. A.)

6.      In the provision of law violation section, Boyer indicated: "Abduction, R.C. 2905.02; Kidnaping, R.C. 2905.01; ENDANGERED MISSING PERSON." (Id.) Attached to the affidavit, was a missing persons flier of Emily Murray that had been published by Knox County officials investigating the case.

7.    After executing the affidavit, Corporal Boyer traveled to the Allensville Junior High School to meet with Judge Grillo, who was coaching a basketball game. (Tr. 24.) Corporal Boyer met with Judge Grillo in the hallway of the school during a break. Corporal Boyer spent five to ten minutes talking with Judge Grillo prior to obtaining the search warrant. (Supp. Hrng. Tr. 24-25). No record was made of the events and information given to Judge Grillo before he signed the search warrant. (Supp Hrng. Tr. 25-26).

8.    Corporal Boyer returned to McKnight's property, executed the search warrant and searched McKnight's trailer along with officials from Vinton County, Knox County, BCI and FBI. Five hours into the search, Emily Murray's body was found inside the trailer. Subsequent search warrants were obtained which led to the discovery of Greg Julious' remains.

9.    Based on the evidence obtained in the trailer and surrounding property, Greg McKnight was charged with and convicted of aggravated murder with death specifications, kidnaping, aggravated robbery and murder.

**B.    Pre-Trial Suppression Issues**

10.   On September 13, 2001, trial counsel filed a Motion to Suppress Evidence based on (a) the affidavit mentioned no commission of a crime, and (b) the affidavit failed to give supporting facts of a crime as listed in the provision of law violation section. Based on these factors, trial counsel argued that the state lacked sufficient probable cause to conduct a search of McKnight's residence and surrounding property.

11.   The trial court scheduled a suppression hearing for November 19, 2001. In preparation for the suppression hearing, Deputy Kight was shown the affidavit signed by Corporal Boyer to obtain

the warrant.[2]  Kight questioned his superior officers why Corporal Boyer signed an affidavit stating

that Boyer had done things that in actuality, Kight had done.  Because of this inquiry, Deputy Kight

faced internal disciplinary measures.

   At the suppression hearing, Boyer testified that:

   (1) Deputy Kight was at the McKnight residence to serve an indictment, not Corporal Boyer.

   (2) It was Deputy Kight who initially saw the Subaru Outback and ran the license plate
   through LEADS, not Corporal Boyer.

   (3) All discussions with Knox County Sheriff's Office were through a dispatcher, not
   Corporal Boyer.

   (4) Boyer on his own added the crimes of kidnaping, abduction and endangered missing
   person to the warrant even though he had no knowledge that this was anything but a missing
   persons case or that any crime had been committed.

(Supp. Hrng. Nov. 19, 2001, Tr. 9 ).

12.   Upon hearing that Boyer did not actually perform the tasks he had sworn to in his affidavit,

McKnight moved for a hearing under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), because

knowingly false information was contained in the affidavit upon which the search warrant was

issued.[3]   The trial court denied McKnight's request for a *Franks* hearing.  In denying McKnight's

request, the trial court ruled that the scope of the  hearing was limited to the four corners of the

---

   [2] Deputy Kight was never called to testify at the suppression hearing. Defense counsel
were ineffective for failing to fully support their Motion to Suppress. This is raised in
McKnight's <u>Twenty-Sixth Ground for Relief.</u>

   [3]Once a "defendant makes a substantial preliminary showing that a false statement
knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant
in the warrant affidavit, and if the allegedly false statement is necessary to finding of probable
cause, the Fourth Amendment requires that a hearing be held at the defendant's request."
*Franks*, 438 U.S. at 155-56.

affidavit, i.e., "the information that was presented through the affidavit as testified here by Corporal Boyer to Judge Grillo and upon which he would have either issued or not issued the search warrant." (Supp. Hrng Nov. 19, 2001  Tr. 33).

13.     Given the trial court's limitation on testimony and the denial of a *Franks* hearing, defense counsel proffered fifteen exhibits. (Defense Exhibits 2-16 Supp. Hrng. Tr. 63).  The trial court "did not think it appropriate" to accept the proffered exhibits into evidence and denied defense counsel the opportunity to call the subpoenaed witnesses to testify. (Id. Tr. 64).  On January 9, 2002, the trial court denied McKnight's Motion to Suppress.  (Order 1-9-2002).

14.     Defense Counsel filed a Supplement to Motion to Suppress on December 5, 2001.  In this motion, McKnight again sought a *Franks* hearing based on the above information from the suppression hearing. On March 26, 2002, the trial court heard counsel's arguments for a *Franks* hearing.  (Hrng. March, 26, 2002,Tr. 1-7).  Again, the scope of the hearing was limited.[4]

15.     Defense counsel sought to present the testimony of Dispatcher Gerben and Detective Brenneman,  based only on discrepancies as to who received confirmation from Knox County about Emily Murray's status and the "Provision of law violation" section of the search warrant affidavit. (Hrng. March 26, 2002, Tr. 3)  The prosecutor argued that defense counsel would have to show Cpl. Boyer lied to get a search warrant: "So what we're really looking at is the one issue did Corporal Boyer lie when he said in the affidavit I obtained confirmation from Knox County."  Id.

16.     After hearing arguments from defense counsel and the state, the trial court admitted no evidence, denied defense counsel's request to call witnesses and denied McKnight's supplemental

---

[4] Defense counsel was constitutionally ineffective for failing to fully support their Motion To Suppress. See McKnight's <u>Twenty-Sixth Ground for Relief</u>

motion to suppress. The trial court also denied a *Franks* hearing. ( Hrng. March 26, 2002, Tr. 7). The trial court filed an entry denying the Supplemental Motion to Suppress on August 23, 2002. (Order, August 23, 2002)

17.     Although two suppression hearings were scheduled, the trial court prevented defense counsel from presenting any evidence of the deliberate falsehoods, even though such evidence had been proffered to the court. Defense counsel was barred from presenting evidence, calling witnesses or challenging the veracity and integrity of the information contained in the affidavit in any way. The trial court's limitation on the scope of the suppression hearing to the four corners of the affidavit ignored the principal that probable cause cannot be established by false statements and ensured that the illegally obtained evidence would be admitted at trial. [5]

**C.     Illegally obtained evidence admitted at trial and used to convict McKnight**

18.     The United States Supreme Court has traditionally interpreted the Fourth Amendment right against unreasonable searches as requiring probable cause for searches and seizures. In determining the sufficiency of a probably cause affidavit, "the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

19.     The evidence used to convict McKnight on charges of aggravated murder with death

---

[5]"Because it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment." *Franks v. Delaware*, 438 U.S. 154 , 165 (1978)

specifications, aggravated robbery, kidnaping and murder was discovered after a search warrant was issued for McKnight's property and trailer in Ray, Ohio.

20.     The search warrant was obtained based upon the affidavit of Corporal Charles Boyer. Boyer's affidavit contained false information which was made knowingly and intentionally or with reckless disregard for the truth in violation of McKnight's Fourth Amendment rights.

21.     McKnight made the substantial preliminary showing to require a *Franks* hearing. First Boyer admitted that he did not personally perform the acts he swore to in the factual portion of the affidavit. (Supp. Hrng. Tr. 9 ) Secondly, he admitted that he added the crimes of kidnaping and abduction in the "provisions of law violations" section when this was a missing persons case. (Id.) Boyer knowingly and intentionally misled the issuing judge with reckless disregard for the truth in order to obtain a search warrant to permit law enforcement officers to search McKnight's property and trailer for evidence of a crime.

22.     Knowingly and intentionally representing false statements in a search warrant affidavit violates the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments. All evidence thereby obtained is inadmissible at trial. *Franks*, 438 U.S. at 155-56. Furthermore, all evidence obtained in subsequent searches must be considered "fruit of the poisonous tree" and therefore inadmissible at trial. *Wong Sun, et al. v. United States*, 371 U.S. 471 (1963).

23.     To the extent the Ohio courts ruled on the merits of McKnight's claim relative to the invalid search warrant, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

**Second Ground for Relief**

**GREGORY MCKNIGHT WAS DENIED A FAIR TRIAL, IMPARTIAL JURY AND DUE PROCESS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS WHEN THE TRIAL COURT FAILED TO CHANGE VENUE, DESPITE PERVASIVE PRETRIAL PUBLICITY**

24.     The discovery of the bodies of Emily Murray and Greg Julious was a shock to the small, rural Vinton County, Ohio community. Media coverage of the two murders and the chief suspect, Gregory McKnight, saturated the community through local media outlets as well the larger Columbus, Ohio media market.  The media publicity surrounding the discovery of two bodies on McKnight's property was overwhelming.

25.     Murray had been missing from her college for over a month.  No one had seen or heard anything from Murray since her last night of work at the Pirate's Cove restaurant in Gambier, Ohio. When her body was found in an isolated trailer in far away Vinton County, Ohio it was, understandably, big news.

26.     The Columbus Dispatch, the major paper serving the Vinton County area, ran approximately twenty-eight (28) articles relating to the crimes.  (See Appendix to McKnight's Direct Appeal Merit Brief, PC Ex. A)  The Athens Messenger, also distributed in the Vinton County area, ran thirty-four (34) articles.  (*Id.*)  Papers throughout Ohio, as well as TV and radio media also ran extensive stories regarding the two bodies being discovered. (See Juror questionnaires at Questions 52, 95).

27.     The vast majority of these articles detailed the facts surrounding the discovery and recovery of the remains of Emily Murray and Greg Julious. The media repeatedly assaulted residents of Vinton County, including prospective jurors, with the images of the facts and circumstances of these crimes. Newspapers frequently published photographs of Emily Murray with

45

accompanying emotional stories of her life cut short.  This was in sharp contrast to the pictures of McKnight being shackled and forced to wear a bullet proof vest during his transportation to and from the courthouse.

28.      The media firestorm that transcended on Vinton County also included stories of McKnight's past convictions, including that McKnight had a prior juvenile adjudication for murder at the age of fifteen. On December 23, 2000, the Columbus Dispatch ran a detailed account of McKnight's juvenile murder, as told by an eyewitness.  (PC Ex. A) The witness expressed outrage that McKnight was able to beat the system and never served serious time for the murder.  (*Id*.).  The media also ran stories about a recent eight year sentence imposed on McKnight for an unrelated theft offense in Vinton County. This evidence was not otherwise admissible at trial and would not have been made known to the jurors but for the pretrial publicity.

29.      Further, a ruling by the trial court drew extensive national media attention.  On August 8, 2002, the trial court granted Gregory McKnight's "Motion to Dismiss Capital Components."  The trial court's entry stated:

> This Court is regularly called upon to authorize expenditures, and capital cases in particular require additional resources. While the Court has the authority to approve expenses, it would be disingenuous to suggest that a trial judge can consider such requests without an awareness of the financial impact on this County. The Court finds that the potential impact of financial considerations could compromise the Defendant's due process rights in a capital murder trial. The Court finds that this risk is unacceptable in this case.
>
> It is therefore ORDERED that the capital components of this case are hereby DISMISSED.

30.      In addition to the local media who were already extensively covering the case, the trial court's decision was covered by the New York Times, Los Angeles Times, Cleveland Plain Dealer, Time

46

Magazine, Channel 10 News from Columbus, Channel 4 News from Columbus, the NBC Today Show and CNN, among others.

31.     Commentary denouncing the judge's actions was pervasive.  On August 15, 2002, a Columbus Dispatch editorial expressed outrage that the trial court dismissed the capital specifications in McKnight's case, noting that "justice" in the case took "a holiday." (PC Ex. A).  In an August 22, 2002, Columbus Dispatch editorial, Vinton County residents expressed concern that justice would not prevail.  (*Id*.)  "Justice" in this case, meant nothing short of McKnight's execution.

32.     On August 14, 2002, the State sought reconsideration of the trial court's decision to dismiss the capital specifications from the indictment.  The State's Motion for Reconsideration was subsequently sustained, and the death penalty specifications were reimposed.

33.     The news media carried extensive coverage that Emily Murray's parents welcomed the trial court's decision to reimpose the capital specifications.  "You do not need to be a supporter of capital punishment to regard the prospect that this man would be eligible for parole in his 40s as both a grave injustice and a palpable danger to the community."(PC Ex. A).

34.     Another repeated topic of the media coverage, was the costs to be borne by Vinton County and its taxpayers.  After the trial court dismissed the death penalty specifications because the county could not afford to provide McKnight with a defense, the newspapers reported the costs associated with McKnight's defense, his attorneys' fees, as well as the costs for experts, travel fees, and consultants.  Prospective jurors were exposed to stories detailing that much of the county's budget would be used up in defending McKnight.

35.     Because of the pervasive publicity surrounding these murders, defense counsel filed a Motion

for Change of Venue on July 10, 2002.[6]  Counsel attempted to supplement evidence supporting their request with a scientific jury survey.  The trial court denied both requests.[7]

36.     How deeply the media publicity penetrated McKnight's prospective jury was apparent from voir dire and from review of the jury questionnaires. Of the fifty-eight (58) jurors questioned regarding pre-trial publicity, ninety-two percent (92%) of the venire (or 53 jurors) had heard about the case, with many of the prospective jurors being aware of a great many details of the facts surrounding the crimes charged.[8] (See Voir Dire Tr. 87, 138-144, 172, 176, 216, 245-47, 271, 291-96, 302, 321, 327, 344, 352, 354, 362-63, 375, 405, 410, 421-24, 430, 442-45, 472, 481-82, 485-86, 499, 507, 524, 529-30, 539-40, 552, 603, 609, 617, 632-33, 647, 665, 700, 709, 718, 737-39, 755, 757, 763, 774, 781-82, 796-99, 823, 839-40, 896-97, 912, 919-21, 944, 956-57, 976-77, 997-98, 1008, 1022, 1060, 1076-79, 1103-04, 1122-23, 1143, 1156-57, 1182-83, 1211, 1230, 125S, 1267-70, 1289, 1314-15,1340,1356,1379-80).

37.     Thirty-five percent (35%) of the venire (or 19 jurors) held the opinion that McKnight was guilty of the crimes charged. (See Voir Dire Tr. 60-61 (Juror 1-20), Tr. 69, 90, Tr. 104 (Juror 1-2), Tr. 218, (Juror 1-9), Tr. 279-80, 288 (Juror 1-25), Tr. 303 (Juror 1-26), Tr. 348 (Juror 1-29), Tr. 411 (Juror 1-35), Tr. 472 (Juror 1-19), Tr. 530 (Juror 1-46), Tr. 552 (Juror 1-49), Tr. 574, 576 (Juror J-3),

---

[6] Defense counsel failed to attach any supporting documentation of the media blitz to the motion to change venue.  This error is addressed in McKnight's Twenty-Sixth Ground for Relief.

[7] The trial court's denial of funds for a scientific jury survey is raised in McKnight's Twenty-Sixth Ground for relief.

[8] Sixty-three (63) jurors were  questioned in the voir dire transcripts.  However, jurors I-10, K-2, K-10, K-27 and K-30 were not questioned regarding pre-trial publicity.  The trial court excused them on other grounds.

Tr. 739 (Juror J-19), Tr. 735, 758-59 (Juror J-20), Tr. 763-64, 768 (Juror J-21), Tr. 774-75 (Juror J-22), Tr. 793 (Juror J-24), Tr. 1060 (Juror J-43), Tr. 1104 (Juror J-47), Tr. 1183 (Juror K-18), Tr. 1340-41 (Juror J-23).

38.     Of those nineteen prospective jurors with an opinion, ten, or eighteen percent (18%) of the venire, indicated they could not set that opinion aside. (See Voir Dire Tr. 60-61, 65-66 (Juror 1-20), Tr. 69-70 (Juror 1-2), Tr. 218-19 (Juror 1-9), Tr. 280, 289, 299 (Juror 1-25), Tr. 488 (Juror I-19), Tr. 578 (Juror J-3), Tr. 719, (Juror J-18), Tr. 759 (Juror J-20), Tr. 784 and Tr. 804 (Juror J-24), Tr. 1067 (Juror J-43).

39.     The numbers respecting pretrial publicity are more astounding when the jury venire as a whole is reviewed. Of the 168 juror questionnaires that were returned, 160 prospective jurors indicated that they had been exposed to pretrial publicity.[9] Ninety-five percent of the venire was aware of the facts and circumstances surrounding the case. Moreover, sixty-six of the prospective jurors had the opinion that McKnight was guilty of the crimes with which he was charged.  Forty percent of the prospective jurors already thought he killed Emily Murray and/or Greg Julious before hearing any evidence.

40.     The prospective jurors themselves described the pervasiveness of the publicity.  "[I]t's kind of a big deal around here so its something that comes up quite a bit." (Juror I-26, Voir Dire Tr. 303); "[Everybody in the counties [sic] heard of it." (Juror I-32, Voir Dire Tr. 405); "I think everybody knows... I don't think you're going to find anybody that don't know about it." (Juror J-10, Voir Dire Tr. 648).

---

[9]See juror questionnaires at Question Number 52.

Mk41. All the jurors who ultimately served on McKnight's jury were familiar with the case. (Voir Dire Tr. 138-44, 321, 327, 354, 552, 609, 823, 956-57, 976-77, 998, 1008.)  Juror Responses to Question Number 52 also indicate:

- Juror J-7 - Read about the case in the Columbus Dispatch.

- Juror J-15 - Heard about the case on a radio broadcast.

- Juror J-17 - Read about the case in newspapers.

- Juror J-28 - Read about the case in newspapers and heard television/radio broadcasts.  She also heard conversations about the case and engaged in discussions.

- Juror J-31 - Heard about the case from discussions with other people in the community.

- Juror J-38 - Read about the case in newspapers and heard about in radio broadcasts.

- Juror J-40 - Read about the case in newspapers and also gained information about the case from television and radio broadcasts.

- Juror I-5 - Read and heard about the case in newspapers and television broadcasts.

- Juror I-27 - Read about the case in newspapers and also saw television broadcasts. Juror I-27 also engaged in conversations with people about the case.  "From what I have heard, he mite (sic) have done it."  (See response to question 53).  Juror I-27 also expressed reservations about his ability to remain fair based on everything he knew.  (See response to question 105).

- Juror I-30 - Read about the case in newspapers.  "In the case of the death of the girl, I believe the body was found on his premises, although this does not mean he did it, it doesn't look good for him."  (See response to Question 53).

- Juror I-49 - Heard about the case on television, radio, and read newspaper articles.  Juror I-49 also had conversations with people about the case.

50

42.     Moreover, jurors continued to be assaulted with publicity, or at least the opinions of what should happen in McKnight's case from the Vinton County community.  Juror I-49 engaged in prejudicial discussions with friends outside of the courtroom.  Upon questioning from the trial court Juror I-49 admitted that "anybody that knows I'm a juror all says something to do with it."  (Tr. 988-89).  "Everybody around has got their own opinion formed about it, you know.  It's not just them; it's everybody that does it, anybody that knows I'm a juror."  (*Id*.)

43.      In addition to publicity, racial bias in the venire was evident during voir dire. Prospective jurors—those willing to admit it aloud—expressed their racism:

● "My father's very racist. I've been brought up with that." (Voir Dire, Tr. 220).

● Most [African Americans] that I've met personally I don't like." (Voir Dire, Tr. 224).

● "Just the way that [African Americans] act they think they're better." (Voir Dire, Tr. 224).

● "It'd be hard" to set aside that the defendant is black. (Voir Dire, Tr. 226).

● "Yes" it would be difficult to give the black defendant a fair trial. (Voir Dire, Tr. 227-28).

● "I don't believe in interracial marriages." (Voir Dire, Tr. 835).

● "Yes I do" have problems with blacks other than interracial marriages. (Voir Dire, Tr. 836).

● "I've never been raised around [blacks] and they bother me." (Voir Dire, Tr. 836).

● "Yes I do" have a problem with the fact that the defendant is black." (Voir Dire, Tr. 837).

● "I have prejudice." (Voir Dire, Tr. 853)

44.     Although defense counsel failed to include pervasive racial bias as a basis for a change of venue, the trial court should have acted.[10]  The "ultimate responsibility" for protecting McKnight's

_____

[10] Defense counsel's failure to ask for a change of venue on account of race is raised in McKnight's <u>Twenty-Sixth Ground for Relief.</u>

due process rights and ensuring him a fair trial rested with the trial court.  *See Powell v. Alabama*, 287 U.S. 45 (1932).

45.     The Vinton County, Ohio community had been saturated with news stories concerning McKnight's case so that community sentiment rendered it impossible for him to receive a fair trial before impartial jurors who learned of the case only through the evidence properly admitted during trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments and who are free from personal and community expressions of attachment and grief.  "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence."  *Patterson v. Colorado*, 205 U.S. 454, 462 (1907).

46.     In light of the extensive publicity, coupled with the racial bias expressed during voir dire, it was not possible for McKnight to have received a fair trial and an impartial jury in Vinton County, Ohio.[11]   The gruesome details were repeated regularly in the months before trial. McKnight immediately was named as the perpetrator. Moreover, he was identified as a repeat offender who killed before. He was pictured shackled and wearing a bullet proof vest upon arrival at the courthouse. McKnight's guilt was presumed and there was a strong community outcry for the imposition of a death sentence on a black defendant who had killed a young white woman. A change of venue was required to permit McKnight to have a fair trial by a fair and impartial jury.

47.     The right to an impartial jury may be denied by a presumption of prejudice arising from extensive pretrial publicity.  *Irvin v. Dowd*, 366 U.S. 717, 725-28 (1961).  Because this was a capital case, heightened due process demanded that all possible steps necessary to ensure McKnight received

---

[11] Even the one witness called to testify on behalf of the defense admitted to spitting on McKnight's car and referring to him as a "nigger". (Tr. 1599)

52

a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments were taken. *See Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280 (1976). The trial court erred in failing to grant McKnight a change of venue, as it deprived him of his right to due process, a fair trial, and a trial by a fair and impartial jury.

48.     Perhaps the most fundamental of rights the criminal justice system recognizes is the defendant's right to a fair trial by a fair and impartial jury. *Patterson v. Colorado*, 205 U.S. 454, 462 (1907). The pervasiveness of the media coverage in this case was such that a change of venue was constitutionally mandated. *Sheppard v. Maxwell*, 384 U.S. 333 (1966). In some cases, as was McKnight's, adverse publicity can be so pervasive and so prejudicial that jury prejudice is presumed. *Rideau v. Louisiana*, 373 U.S. 723 (1963).[12]

49.     Whether or not it was likely that McKnight may have be convicted in another venue is irrelevant. The right to a fair and impartial jury is fundamental. The denial of that right is a structural error that is never harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 290 (1991).

50.     To the extent the Ohio courts ruled on the merits of the trial court's failure to change venue, their rulings were an unreasonable application of clearly established federal law as stated by the Supreme Court of the United Sates, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts. 28 § U.S. C. 2254 (d).

---

[12] Should this Court find a deficiency in McKnight's evidence, that deficiency is attributable solely to the trial court's denial of his requested expert assistance. See McKnight's <u>Fourth Ground for Relief</u>

**Third Ground for Relief**

**GREGORY MCKNIGHT WAS DEPRIVED OF DUE PROCESS, A FAIR TRIAL AND A FAIR SENTENCING HEARING IN VIOLATION OF HIS FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS DUE TO THE TRIAL COURT'S FAILURE TO CHANGE VENUE IN LIGHT OF THE PERVASIVE RACIAL BIAS IN THE VINTON COUNTY, OHIO COMMUNITY.**

51.     The discovery of the bodies of Emily Murray and Greg Julious was a shock to small, rural Vinton County, Ohio. Media coverage of the two murders and the chief suspect, Gregory McKnight, saturated the community through local media outlets as well the larger Columbus, Ohio media market that served Vinton County.  The media publicity surrounding the discovery of two bodies on McKnight's property was overwhelming.[13]

52.     Because of the pervasive publicity surrounding these murders, defense counsel did move for a change of venue. McKnight's Motion for a Change of Venue was filed on July 10, 2002.[14] Defense counsel attempted to supplement evidence supporting their request with a scientific jury survey.  The trial court denied both requests.[15]  Although defense counsel did file a motion for a change of venue, it was based exclusively on extensive pretrial publicity. Counsel failed to argue that venue should be changed also on account of race.[16]

_____

[13] McKnight raised the trial court's failure to change venue, due to extensive media coverage, in his Second Ground for Relief.

[14] Defense counsel failed to attach any supporting documentation of the media blitz to the motion to change venue.  This error is addressed in McKnight's Twenty-Sixth Ground for Relief.

[15] The trial court's denial of funds for a scientific jury survey is raised in McKnight's Fourth Ground for Relief.

[16]Defense counsel was ineffective for failing to argue racial bias as further justification for a change of venue.  This failure is addressed in McKnight's Twenty-Sixth Ground for Relief.

53.     Defense counsel's failure to argue racial bias as justification for a change of venue did not alleviate the trial court of its responsibilities to ensure McKnight was given a fair trial by an impartial jury. "It is the judge, not counsel, who has the ultimate responsibility for the conduct of a fair and lawful trial." *Lakeside v. Oregon*, 435 U.S. 333, 34-42 (1978). The trial court in this matter abdicated its responsibility and failed to ensure that McKnight was given what the Constitution mandates, a fair trial and impartial jury.

54.     Racial bias in the venire was evident during voir dire. Prospective jurors—those willing to admit it aloud—expressed their racism:

- "My father's very racist. I've been brought up with that." (Voir Dire, Tr. 220).

- Not allowed to "watch a television show with any African Americans on it." (Voir Dire, Tr.221).

- Most [African Americans] that I've met personally I don't like." (Voir Dire, Tr. 224).

- "Just the way that [African Americans] act they think they're better." (Voir Dire, Tr. 224).

- "It'd be hard" to set aside that the defendant is black. (Voir Dire, Tr. 226).

- "Yes" it would be difficult to give the black defendant a fair trial. (VD, Tr. 227-28).

- "I don't believe in interracial marriages." (Voir Dire, Tr. 835).

- "Yes I do" have problems with blacks other than interracial marriages. (Voir Dire, Tr. 836).

- "I've never been raised around [blacks] and they bother me." (Voir Dire, Tr. 836).

- "Yes I do" have a problem with the fact that the defendant is black." (Voir Dire, Tr. 837).

- "I have prejudice." (Voir Dire, Tr. 853)

---

55.     Despite racially biased feelings expressed during voir dire, the trial court took no action to uncover how pervasive such hostility was in the Vinton County, Ohio community.[17]  In fact, the trial court did just the opposite and denied defense counsel's motion for a scientific jury survey.     The United States Supreme Court has observed "more subtle, less consciously held racial attitudes" - unconscious racism - "could also influence a juror's decision" in a case despite their assurances to the contrary.  *Turner v. Murray*, 476 U.S. 28, 35 (1976).

56.     The trial court needed to investigate the racial bias issue further.  Instead it denied funds that would have revealed a community unsuitable for a racially charged capital trial.   Racial bias was a critical issue that was an impediment to a fair trial and impartial jury.  Vinton County, Ohio is rural and overwhelmingly Caucasian.  The U.S. Census Bureau's 2000 population statistics for Vinton County, Ohio (PC Ex. B) shows the statistical disparity between the number of Caucasian and minority residents.   In a county of approximately 12,806 persons, Caucasians comprised 98.1% of the total population, while Blacks or African Americans made up 0.4%. (Id.)

57.     These figures indicate a social climate inherently hostile to a black capital defendant, particularly when the victim in the capital case was a white female. This is not simply an assumption based on numbers.  In addition to the racism expressed in voir dire, inflammatory racial rhetoric about this case was expressed on the internet. (PC Ex. C.)  McKnight was referred to as an "animal." (Id.)  Others expressed hope that an "all white jury put the nigger to death" and that this be "done as quickly as possible."  (Id.)   It was ultimately the trial court's duty, to ensure that such racial hostility did not infiltrate McKnight's jury.  *See Powell v. Alabama*, 287 U.S. 45, 58  (1932).

---

[17] Even the one witness called to testify on behalf of the defense admitted to spitting on McKnight's car and referring to him as a "nigger". (Tr. 1599)

58.     There is no more settled rule in the United States Constitution than the principle that due process requires that every defendant be given a fair trial.  This principal is further embodied in the Constitution's requirement that every juror must be impartial.  "The right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors.  The failure to accord an accused a fair hearing violates even the minimal standards of due process.  'A fair trial in a fair tribunal is a basic requirement of due process." *Irvin v. Dowd* 366 U.S. 717, 721-23(1961).  The trial court in this matter failed to protect McKnight's right to a fair trial by a panel of indifferent jurors.  A change of venue on account of racial bias was warranted and justified, yet ignored by the trial court.[18]   As a result, McKnight was denied due process and a fair trial by a fair and impartial jury as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.

59.     To the extent the Ohio courts ruled on the merits of the trial court's failure to change venue on account of racial bias prevalent in Vinton County, Ohio, their rulings were an unreasonable application of clearly established federal law as stated by the Supreme Court of the United Sates, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254 (d).

---

[18] Should this Court determine insufficient evidence exists to establish racial bias in Vinton County, Ohio, that finding should be attributed to the trial court's denial of defense counsel's Motion for Scientific Jury Survey. McKnight raised this claim in his Fourth Ground for Relief.

**Fourth Ground for Relief**

**FAILURE TO PROVIDE GREGORY MCKNIGHT WITH THE EXPERT RESOURCES TO CONDUCT A SCIENTIFIC JURY SURVEY DENIED HIM INFORMATION CRUCIAL TO ESTABLISHING THE NECESSITY FOR A CHANGE OF VENUE, THEREBY DEPRIVING HIM OF THE EFFECTIVE ASSISTANCE OF COUNSEL, A FAIR TRIAL, A FAIR AND IMPARTIAL JURY AND DUE PROCESS IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

**A.      Pervasive pretrial publicity saturated Vinton County, Ohio.**

60.      The discovery of the bodies of Emily Murray and Greg Julious was a shock to small, rural Vinton County, Ohio. Media coverage of the two murders and the chief suspect, Gregory McKnight, saturated the community through local media outlets as well the larger Columbus, Ohio media market. The media publicity surrounding the discovery of two bodies on McKnight's property was overwhelming.

61.      Murray had been missing from her college for over a month.  No one had seen or heard anything from Murray since her last night of work at the Pirate's Cove restaurant in Gambier, Ohio. When her body was found in an isolated trailer in Vinton County, Ohio it was, understandably, big news.

62.      The Columbus Dispatch, the major paper serving the Vinton County area, ran approximately twenty-eight (28) articles relating to the crimes.  (See PC Ex. A and Appendix to McKnight's Direct Appeal Merit Brief to the Supreme Court of Ohio)  The Athens Messenger, also distributed in the Vinton County area, ran thirty-four (34) articles.  (Id.)  Papers throughout Ohio, as well as TV and radio media also ran extensive stories regarding the two bodies being discovered. Counsel were aware of this coverage.  (See Juror questionnaires at Questions 52, 95).

58

63. The vast majority of these articles detailed the facts surrounding the discovery and recovery of the remains of Emily Murray and Greg Julious.  The media repeatedly assaulted residents of Vinton County, including prospective jurors, with the images of the facts and circumstances of these crimes. Newspapers frequently published photographs of Emily Murray with accompanying stories of her life cut short.  This was in sharp contrast to the pictures of McKnight being shackled and forced to wear a bullet proof vest during his transportation to and from the courthouse.

64. This media firestorm that surrounded this case included stories of McKnight's past convictions, including that McKnight had a prior murder conviction at the age of fifteen. On December 23, 2000, the Columbus Dispatch ran a detailed account of McKnight's juvenile murder from an eyewitness.  (PC Ex. A) The witness expressed outrage that McKnight was able to beat the system and not serve any serious time for the earlier murder.  (Id.).  The media also ran stories on a recent eight year sentence imposed on McKnight for an unrelated theft charges committed in Vinton County. This evidence was not otherwise admissible at trial and would not have been made known to the jurors but for the pretrial publicity.

65. Further, a ruling by the trial court drew extensive national media attention.  On August 8, 2002, the trial court granted Gregory McKnight's "Motion to Dismiss Capital Components." The trial court's entry stated:

> This Court is regularly called upon to authorize expenditures, and capital
> cases in particular require additional resources. While the Court has the authority
> to approve expenses, it would be disingenuous to suggest that a trial judge can
> consider such requests without an awareness of the financial impact on this
> County. The Court finds that the potential impact of financial considerations
> could compromise the Defendant's due process rights in a capital murder
> trial. The Court finds that this risk is unacceptable in this case.

59

It is therefore ORDERED that the capital components of this case are hereby DISMISSED.

66.     In addition to the local media who were already extensively covering the case, the trial court's decision was covered by the New York Times, Los Angeles Times, Cleveland Plain Dealer, Time Magazine, Channel 10 News from Columbus, Channel 4 News from Columbus, the NBC Today Show and CNN, among others.

67.     Commentary denouncing the judge's actions was pervasive. On August 15, 2002, a Columbus Dispatch editorial expressed outrage that the trial court dismissed the capital specifications in McKnight's case. The editorial noted that "justice" in the case took "a holiday." (PC Ex. A). In an August 22, 2002, Columbus Dispatch article, Vinton County residents expressed concern that justice would not prevail. (Id.) "Justice" in this case, meant nothing short of McKnight's execution.

68.     On August 14, 2002, the State sought reconsideration of the trial court's decision to dismiss the capital specifications of the case. The State's Motion for Reconsideration was sustained, and the capital specifications were reinstated.

69.     The news media carried extensive coverage that Murray's parents welcomed the trial court's decision to reimpose the capital specifications. "You do not need to be a supporter of capital punishment to regard the prospect that this man would be eligible for parole in his 40s as both a grave injustice and a palpable danger to the community."(PC Ex. A).

70.     Another repeated topic of the media coverage, was the costs to be borne by Vinton County and its residents. After the trial court dismissed McKnight's capital specifications because the county could not afford to provide him with a defense, the newspapers reported the costs associated with

McKnight's defense. Attorneys' fees were published as were the costs for experts, travel fees, and consultants. Prospective jurors were told that much of the county's budget would be used up in defending McKnight.

71.     Race was also an issue. Vinton County, Ohio is rural and overwhelmingly Caucasian. The U.S. Census Bureau's 2000 population for Vinton County, Ohio (PC Ex. B) shows the statistical disparity between the number of Caucasian and minority residents. In a county of approximately 12,806 persons, Caucasians comprised 98.1% of the total population, while Blacks or African Americans made up 0.4%.

72.     These figures indicated a social climate inherently hostile to a Black capital defendant, particularly when the victim in the capital case was a white female. This is not simply an assumption based on numbers. Inflammatory racial rhetoric about this case was expressed on the internet. (PC Ex. C.)

**B.      Despite pervasive publicity, the trial court denied defense counsel's request for a scientific jury survey.**

73.     Because of the pervasive publicity surrounding these murders, defense counsel did move for a change of venue. Defendant's Motion for a Change of Venue was filed on July 10, 2002.[19] In accordance with the ABA Guidelines, defense counsel attempted to supplement evidence supporting their request with a scientific jury survey.[20] McKnight required such assistance because a scientific

---

[19] Defense counsel failed to attach any supporting documentation of the media blitz to the Motion to Change Venue. This error is addressed in McKnight's Twenty-Sixth Ground for Relief

[20] The ABA *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, Guideline 10.4.C and D and 10.10.2 likewise require counsel to sell and employ expert assistance whenever necessary. See also Guideline 4.1.B, which requires a plan to provide "All expert, investigative, and other ancillary professional services reasonably necessary or

jury survey was essential to assessing and demonstrating that a fair trial could not be had in Vinton County, Ohio. The trial court denied both requests.

74.     The Fifth, Sixth, Eighth, and Fourteenth Amendments guaranteed McKnight the right to a fair trial by a fair and impartial jury, due process, and the effective assistance of counsel. *See, Strickland v. Washington*, 466 U.S. 668 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003). In order for counsel to effectively represent McKnight, it was essential to conduct a thorough and complete investigation not only into the facts of the state's case, any potential defenses, and McKnight's history, character, and background, but also into the factual basis for any legal claims, such as change of venue. See Guideline 10.4.d, 10.8, 10.10.2., ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, (2003). The underlying constitutional premise for the right to expert assistance is best articulated by the United States Supreme Court in *Ake v. Oklahoma.* 470 U.S. 68 (1985). "When a state brings its judicial powers to bear on an indigent defendant in a criminal proceeding, it must take steps to insure that the defendant has a fair opportunity to present his defense." (*Id*. at 105).

75.     To insure the reliability of the proceedings, it was essential that McKnight received a fair trial by an impartial jury that could decide the issues in the case based solely on the evidence presented in the courtroom. A scientific jury survey would have determined the effect of the exposure to this adverse pretrial publicity on the community attitudes towards the guilt of McKnight or the appropriate sentence for him.

76.     The level of community sentiment concerning presumptions of McKnight's guilt or the appropriate sentence would have provided strong indicators as to whether a fair and impartial jury

_____

appropriate to provide high quality legal representation at every stage of the proceedings."

could determine the case based solely on the evidence presented in the courtroom. Conversely, the survey would have demonstrated the Vinton County community's level of knowledge about the facts of the case and illustrated the difficulty of finding a jury capable of putting all these "facts" they have heard or read out of their minds. "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907).

77.     The services of this expert was necessary for the defense of Gregory McKnight and especially reasonable given what was at stake. The right to an impartial jury may be denied by a presumption of prejudice arising from extensive pretrial publicity. *Irvin v. Dowd*, 366 U.S. 717, 725-28 (1961). Because this was a capital case, heightened due process demanded that steps to ensure McKnight received a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments. *See Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280 (1976). The trial court erred in failing to grant McKnight's request for a scientific jury survey, as it deprived him of his right to a trial by a fair and impartial jury. In denying the request, the trial court abdicated its "ultimate responsibility" to protect McKnight's due process rights and ensure him a fair trial. *See Powell v. Alabama*, 287 U.S. 45 (1932). Whether or not it was likely that McKnight may have be convicted in another venue is irrelevant. The right to a fair and impartial jury is fundamental. The denial of that right is a structural error that is never harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 290 (1991).

**C.     Voir dire provided further evidence that a scientific survey was needed.**

78.     How deeply the media publicity penetrated McKnight's prospective jury was apparent from voir dire and from review of the jury questionnaires. Of the fifty-eight (58) jurors questioned regarding pre-trial publicity, ninety-two percent (92%) of the venire (or 53 jurors) had heard about

the case, with many aware in great detail of the facts surrounding the crimes charged.[21] (See Voir Dire Tr. 87, 138-144, 172, 176, 216, 245-47, 271, 291-96, 302, 321, 327, 344, 352, 354, 362-63, 375, 405, 410, 421-24, 430, 442-45, 472, 481-82, 485-86, 499, 507, 524, 529-30, 539-40, 552, 603, 609, 617, 632-33, 647, 665, 700, 709, 718, 737-39, 755, 757, 763, 774, 781-82, 796-99, 823, 839-40, 896-97, 912, 919-21, 944, 956-57, 976-77, 997-98, 1008, 1022, 1060, 1076-79, 1103-04, 1122-23, 1143, 1156-57, 1182-83, 1211, 1230, 125S, 1267-70, 1289, 1314-15,1340,1356,1379-80).                                    9

    Thirty-five percent (35%) of the venire (or 19 jurors) held the opinion that McKnight was guilty of the crimes charged. (See Voir Dire Tr. 60-61 (Juror 1-20), Tr. 69, 90, Tr. 104 (Juror 1-2), Tr. 218, (Juror 1-9), Tr. 279-80, 288 (Juror 1-25), Tr. 303 (Juror 1-26), Tr. 348 (Juror 1-29), Tr. 411 (Juror 1-35), Tr. 472 (Juror 1-19), Tr. 530 (Juror 1-46), Tr. 552 (Juror 1-49), Tr. 574, 576 (Juror J-3), Tr. 739 (Juror J-19), Tr. 735, 758-59 (Juror J-20), Tr. 763-64, 768 (Juror J-21), Tr. 774-75 (Juror J-22), Tr. 793 (Juror J-24), Tr. 1060 (Juror J-43), Tr. 1104 (Juror J-47), Tr. 1183 (Juror K-18), Tr. 1340-41 (Juror J-23).

80.    Of those nineteen prospective jurors with an opinion, ten, or eighteen percent (18%) of the venire, indicated they could not set that opinion aside. (See Voir Dire Tr. 60-61, 65-66 (Juror 1-20), Tr. 69-70 (Juror 1-2), Tr. 218-19 (Juror 1-9), Tr. 280, 289, 299 (Juror 1-25), Tr. 488 (Juror I-19), Tr. 578 (Juror J-3), Tr. 719, (Juror J-18), Tr. 759 (Juror J-20), Tr. 784 and Tr. 804 (Juror J-24), Tr. 1067 (Juror J-43).

81.    The numbers respecting pretrial publicity are more astounding when the jury venire as a whole is reviewed. Of the 168 juror questionnaires that are part of the record, 160 questionnaires

---

    [21] Sixty-three (63) jurors are questioned in the voir dire transcripts.  However, jurors I-10, K-2, K-10, K-27 and K-30 were not questioned regarding pre-trial publicity.  The trial court excused them on other grounds.

reflect exposure to pretrial publicity.[22] Ninety-five percent of the venire was aware of the facts and circumstances surrounding this case. Moreover, sixty-six of the juror questionnaires reflect prospective jurors' opinion that McKnight was guilty of the crimes with which he was charged. Some forty percent of McKnight's prospective jurors already thought he killed Emily Murray and/or Greg Julious.

82.     The prospective jurors themselves described the pervasiveness of the publicity thoroughly. Juror I-26 noted, "[i]t's kind of a big deal around here so its something that comes up quite a bit." (Voir Dire Tr. 303). Juror 1-32 stated, "[everybody in the counties [sic] heard of it." (Voir Dire Tr. 405). Finally, Juror J-10 observed, "I think everybody knows... I don't think you're going to find anybody that don't know about it." (Voir Dire, Tr. 648).

83.     All the jurors who ultimately served on McKnight's jury were familiar with the case. (Voir Dire Tr. 138-44, 321, 327, 354, 552, 609, 823, 956-57, 976-77, 998, 1008.)  Juror Responses to question 52 also indicate:

- Juror J-7 - Read about the case in the Columbus Dispatch.

- Juror J-15 - Heard about the case on a radio broadcast.

- Juror J-17 - Read about the case in newspapers.

- Juror J-28 - Read about the case in newspapers and heard television/radio broadcasts.  She also heard conversations about the case and engaged in discussions.

- Juror J-31 - Heard about the case from discussions with other people in the community.

- Juror J-38 - Read about the case in newspapers and heard about in radio broadcasts.

---

[22]See juror questionnaires at Question Number 52.

- Juror J-40 - Read about the case in newspapers and also gained information about the case from television and radio broadcasts.

- Juror I-5 - Read and heard about the case in newspapers and television broadcasts.

- Juror I-27 - Read about the case in newspapers and also saw television broadcasts. Juror I-27 also engaged in conversations with people about the case. "From what I have heard, he mite (sic) have done it." (See response to question 53). Juror I-27 also expressed reservations about his ability to remain fair based on everything he knew. (See response to question 105).

- Juror I-30 - Read about the case in newspapers. "In the case of the death of the girl, I believe the body was found on his premises, although this does not mean he did it, it doesn't look good for him." (See response to question 53).

- Juror I-49 - Heard about the case on television, radio, and read newspaper articles. Juror I-49 also had conversations with people about the case.

    Extensive pre-trial publicity was especially prejudicial given the racial dynamics of this case.

84.    Racial bias in the venire was evident during voir dire. Prospective jurors—those willing to admit it aloud—expressed their racism:

- "My father's very racist. I've been brought up with that." (Voir Dire, Tr. 220).

- Most [African Americans] that I've met personally I don't like." (Voir Dire, Tr. 224).

- "Just the way that [African Americans] act they think they're better." (Voir Dire, Tr. 224).

- "It'd be hard" to set aside that the defendant is black. (Voir Dire, Tr. 226).

- "Yes" it would be difficult to give the black defendant a fair trial. (Voir Dire, Tr. 227-28).

- "I don't believe in interracial marriages." (Voir Dire, Tr. 835).

- "Yes I do" have problems with blacks other than interracial marriages. (Voir Dire, Tr. 836).

66

- "I've never been raised around [blacks] and they bother me." (Voir Dire, Tr. 836).

- "Yes I do" have a problem with the fact that the defendant is black." (Voir Dire, Tr. 837).

- "I have prejudice." (Voir Dire, Tr. 853)

85.     In light of the extensive publicity, coupled with the racial bias expressed during voir dire, it was not possible for McKnight to have received a fair trial and an impartial jury in Vinton County, Ohio.   The gruesome details were repeated regularly in the months before trial. McKnight immediately was named as the perpetrator. Moreover, he was identified as a repeat offender who killed before. He was pictured shackled and wearing a bullet proof vest upon arrival at the courthouse. McKnight's guilt was presumed and there was a strong community outcry for the imposition of a death sentence on a black defendant who had killed a young white woman. A change of venue was necessary.

86.     A scientific jury survey would have aided McKnight's motion for a change of venue. That a fire storm of publicity followed in the wake of these crimes cannot be denied.  Presenting its impact on prospective jurors, however, was not so easily discernible. By conducting a scientific jury survey, defense counsel would have strengthened their arguments that seating a fair and impartial jury in Vinton County was not possible. Coupling scientific evidence with that already available to counsel, in addition to evidence developed during voir dire, would have secured McKnight a change of venue.

87.     Providing for necessary expert assistance to McKnight would have benefitted the "proper functioning of the adversary system," in that it would have enabled the trial court to hear different opinions on issues of fact and thereby resolve contested issues. *See, e.g. Ford v Wainwright*, 477 U.S. 399, 414 (1986) (without any adversarial assistance from the defendant's representatives the factfinder loses the substantial benefit of potentially probative information).

88.   Failure to provide McKnight with the resources to conduct this survey denied him information crucial to establishing the necessity of a change of venue, thereby depriving him of a fair trial, a fair and impartial jury, and due process in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

89.   To the extent the Ohio courts ruled on the merits of the trial court's denial of expert funding, their rulings were an unreasonable application of clearly established federal law as stated by the Supreme Court of the United Sates, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts.  28 § 2254 (d).

**Fifth Ground for Relief**

**THE TRIAL COURT'S DISMISSAL AND SUBSEQUENT REINSTATEMENT OF THE CAPITAL SPECIFICATIONS OF STATUTORY AGGRAVATING CIRCUMSTANCES IN GREGORY MCKNIGHT'S TRIAL VIOLATED MCKNIGHT'S RIGHT TO DUE PROCESS, A FAIR TRIAL AND A FAIR AND IMPARTIAL JURY IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

90.   The trial court denied McKnight due process, a fair trial and an impartial jury by dismissing and subsequently reinstating the capital specifications of statutory aggravating circumstances in the midst of a media blitz that bombarded the Vinton County, Ohio community with inflammatory facts and demands that justice be done for the victims.

91.   The discovery of the bodies of Emily Murray and Greg Julious was a shock to the small, rural Vinton County, Ohio community.  Media coverage of the two murders and the chief suspect, Gregory McKnight, saturated the community through local media markets, as well as the Columbus, Ohio media market, that also served Vinton County.

92.   The gruesome details were repeated regularly in the months before trial.   McKnight

68

immediately was named as the likely perpetrator. Moreover, McKnight was identified as a repeat offender who had killed before. He was pictured shackled and wearing a bullet proof vest upon arrival at the courthouse. McKnight's guilt was presumed and there was a strong community outcry for the imposition of a death sentence on this black defendant who had killed a young white woman.

93.     On February 7, 2002 defense counsel filed a motion to dismiss the capital specifications of statutory aggravating circumstances.  Because of the extensive publicity, defense counsel filed a Motion for a Change of Venue on July 10, 2002.  The trial court denied defense counsel's request for a change of venue.  However, on August 8, 2002, the trial court granted McKnight's motion to dismiss the capital specifications, stating:

> This Court is regularly called upon to authorize expenditures, and capital
> cases in particular require additional resources. While the Court has the authority
> to approve expenses, it would be disingenuous to suggest that a trial judge can
> consider such requests without an awareness of the financial impact on this
> County. The Court finds that the potential impact of financial considerations
> could compromise the Defendant's due process rights in a capital murder
> trial. The Court finds that this risk is unacceptable in this case.
>
> It is therefore ORDERED that the capital components of this case are hereby DISMISSED.

94.     In the throws of a media blitz that bombarded Vinton County residents with stories surrounding the discovery of two bodies on Gregory McKnight's property, the trial court dismissed the death penalty specifications.  This meant that McKnight was no longer eligible for the death penalty.  The trial court's ruling drew extensive local and national media attention.

95.     In addition to the local media who were already extensively covering the case, the trial court's decision was covered by the New York Times, Los Angeles Times, Cleveland Plain Dealer, Time Magazine, Channel 10 News from Columbus, Channel 4 News from Columbus, the NBC Today

Show and CNN, among others.

96.     Commentary denouncing the judge's actions were pervasive.  On August 15, 2002, a Columbus Dispatch editorial expressed outrage that the trial court dismissed the capital specifications in McKnight's case.  The editorial noted that "justice" in the case took "a holiday." (PC Ex. A).  In an August 22, 2002, Columbus Dispatch article, Vinton County residents expressed concern that justice would not prevail.  (Id.)  "Justice" in this case, meant McKnight's execution.

97.     The costs to be borne by Vinton County and its taxpayers was a noted reported focus of the media blitz.  After the trial court dismissed McKnight's capital specifications because the county could not afford to provide him with a defense, the newspapers reported the costs associated with McKnight's defense, including attorneys' fees, and costs for experts, travel fees, and consultants. Prospective jurors were constantly exposed to how much of the county's budget would be used up in defending McKnight.

98.     On August 14, 2002, the State moved for reconsideration of the trial court's decision to dismiss the capital specifications.  The State's Motion for Reconsideration was granted, and the capital specifications were reimposed.

99.     The extensive news media coverage of the reinstatement of the specifications including stories that Emily Murray's parents welcomed the trial court's decision:  "You do not need to be a supporter of capital punishment to regard the prospect that this man would be eligible for parole in his 40s as both a grave injustice and a palpable danger to the community."(PC Ex. A).

100.     Because of the trial court's dismissal and subsequent reinstatement of capital specifications, the Vinton County, Ohio community had once again been saturated with inflammatory news stories concerning McKnight's case.  McKnight was deemed a guilty man who would escape justice because

70

of the county's financial plight. (PC Ex. A)

101.    This community outrage, fueled by coverage of the trial court's dismissal of the capital specifications, rendered it impossible for McKnight to receive a fair trial before impartial jurors when the prospective jurors learned of the case through these extensive media reports.  They would not be able to consider only the evidence properly admitted during trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907).

102.    In light of the extensive publicity generated by the trial court's dismissal and subsequent reinstatement of capital specifications, it was not possible for McKnight to have received a fair trial by a fair and impartial jury in Vinton County, Ohio.

103.    The "ultimate responsibility" for protecting McKnight's due process rights and ensuring him a fair trial rested with the trial court.  *See Powell v. Alabama*, 287 U.S. 45 (1932).  The trial court properly dismissed McKnight's capital specifications to eliminate the risk of imposing an unreliable and arbitrary death sentence upon McKnight.  Ironically, the decision to reinstate the specifications guaranteed just the opposite.  Local and national media focused on McKnight's case and expressed outrage that he was not death eligible.

104.    After the trial court reinstated the capital specifications, defense counsel attempted to supplement the evidence supporting their request for a change of venue with a scientific jury survey.[23]

---

[23] The ABA *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, Guideline 10.4.C and D and 10.10.2 likewise require counsel to sell and employ expert assistance whenever necessary.  See also Guideline 4.1.B, which requires a plan to provide "All expert, investigative, and other ancillary professional services reasonably necessary or appropriate to provide high quality legal representation at every stage of the proceedings."

McKnight required such assistance because a scientific jury survey was essential to assessing and demonstrating that a fair and impartial jury could not be seated in Vinton County, Ohio. The trial court denied the request.[24]

105.    Extensive pretrial publicity gives rise to a presumption of prejudice which denied McKnight the right to a fair and impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 725-28 (1961). Because this was a capital case, heightened due process demanded additional steps to ensure that McKnight received a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments. *See Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280 (1976). The trial court's dismissal and later reinstatement of the capital components of McKnight's case denied McKnight due process, and a fair trial by a fair and impartial jury.

106.    Perhaps the most fundamental of rights the criminal justice system recognizes is the defendant's right to a fair trial by an impartial jury. *Patterson v. Colorado*, 205 U.S. 454, 462 (1907). The vitriol expressed in local and national media coverage over the possibility of McKnight escaping "justice" in this case was such that the dismissal of the capital specifications was warranted. In some cases such as this, adverse publicity can be so pervasive and so prejudicial that jury prejudice is presumed. *Rideau v. Louisiana*, 373 U.S. 723 (1963).

107.    Whether or not it was likely that McKnight may have be convicted in another venue is irrelevant. The right to a fair and impartial jury is fundamental. The denial of that right is a structural error that is never harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 290 (1991).

---

[24] A scientific jury survey was essential to assessing and demonstrating that a fair trial could not be had in Vinton County, Ohio in light of the trial court's dismissal and reinstatement of the capital specifications. Should this Court determine a lack of evidence exists to support this claim, the lack of evidence is directly related to the trial court's denial of funding for a scientific jury survey.

108.    To the extent the Ohio courts ruled on the merits of the trial court's failure to change venue, their rulings were an unreasonable application of clearly established federal law as stated by the Supreme Court of the United Sates, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254 (d).

### Sixth Ground for Relief

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS, FAIR TRIAL, AND FAIR AND RELIABLE SENTENCING DETERMINATION UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WHEN THE TRIAL COURT TRIED THE TWO UNRELATED MURDERS JOINTLY**

109.    Gregory McKnight's rights to a fair trial and due process were violated when the trial court denied trial counsel's motion to sever count six of the indictment, charging McKnight with purposely causing the death of Gregory Julious under O.R.C. § 2903.02. All of the other charges in the indictment alleged crimes by McKnight against Murray.

110.    On August 22, 2002, trial counsel filed a Motion for Relief from Prejudicial Joinder. On September 4, 2002, the trial court held a hearing on the motion to sever count six. Trial counsel asserted that there was no justification to try the charges jointly since the offenses against Julious and Murray were not part of any course of conduct by McKnight:

> And they argue, of course, conduct, but this is not a course in conduct
> case. They're not going to be able to prove that the course of conduct in this case
> involved anything to with Mr. Julious or Emily Murray. They're going to tell you
> the evidence going to show that these are two unconnected cases. They don't have
> one thing to do with another. Please tell me if I'm wrong. I want to hear from the
> State today how these two are connected. I know the answer the answer is they're
> not. What they're doing like a good Prosecutor would do and try to convict him
> on what they view as their strong case Emily Murray then have that supposed
> upon Mr. Julious. Again, no motive, no evidence of a violent act on Mr. Julious.
> Act of dismemberment by somebody. We don't know who. They can't prove
> how he died. We don't know. Was it natural causes? Was it some disease?
> What was it? They have not given us any information in that regard. And again I

73

> want to hear the State tell me how these two are connected under their course of
> conduct. It isn't. They're piggy backing Mr. Julious' case and Murray's case in
> the hopes that if he's found guilty of Emily Murray the jury's going to come back;
> and say well he must have done this one to [sic]. I think that that's it in a nutshell.

(Hrng. Sept. 4, 2002, Tr. 4). Following the prosecutor's response, the trial court overruled this

motion. (Hrng. Sept. 4, 2002, Tr. 7)

111.    It was prejudicial error for the trial court to deny McKnight's motion to sever count six, the

charges involving the murder of Gregory Julious, from the charges involving offenses against

Murray.  (See related discussion Seventh Ground for Relief)

112.    Joining offenses at one trial is proper under either of two circumstances. First,

separate charges against a single defendant may be tried jointly "where the state can argue that it

could have introduced evidence of one offense in the trial of the other, severed offense under the

other acts' portion of Evid. R. 404(B)."[25] *State v. Franklin*, 62 Ohio St. 3d 118, 122, 580 N.E.2d

1, 6 (1991) (citations omitted). Second, separate charges against a defendant may be joined for

trial "where the state is merely required to show that evidence of each of the crimes joined at trial

is simple and direct." *Id.*

113.    Neither of the tests for joining offenses at one trial apply here. The "other acts" rationale does

not support the joining of charges in this case. The prosecutor was allowed to poison the jury with

much irrelevant evidence about Gregory McKnight's sexual advances toward various women as part

of a *modus operandi*. (See Eleventh Ground for Relief ) This evidence of McKnight's alleged sexual

motivation was admitted despite the absence of any charges alleging a sex offenses committed by

---

[25]Federal Rule of Evidence 404(B) reads essentially the same as the corresponding Ohio
Rule 404(B)

McKnight against Emily Murray. However, assuming *arguendo* that evidence of McKnight's alleged

sexual motive was somehow proper, such evidence certainly had no bearing upon the murder of Greg

Julious, for whom McKnight had no alleged sexual interest.

114.    Nor does the "simple and direct" test for joinder apply here. Accordingly, there is a

manifest risk that this jury stacked the evidence offered in support of count six with the remaining

evidence in order to convict Gregory McKnight of all charges.

115.    Further, the State's presentation of evidence as to count six overlapped with its presentation

of evidence as to the other charges. The State presented testimony on DNA evidence, ballistics, and

crime scene investigation techniques that applied to both murders. (See, Tr. 555-95, 667-77; Tr.

720-81, 878-905;  Tr. 1130-38; Tr.1280-1306, 1324-51, 1377-1419,  Tr. 1522-37). It is true that this

method of presenting evidence may have made joining the charges convenient for the State. But this

method of presenting the evidence also created an unacceptable risk that the jury would lose its way

and fail to separate the evidence offered for count six from the other evidence that was inapplicable

to count six. And, the mere convenience of the State is not a substitute for fairness and reliability in

a capital trial. Cf *Beck v. Alabama*, 447 U.S. 625, 637 (1980) (need for heightened reliability in

capital case extends to culpability phase as well as penalty phase).

116.    Proof that McKnight caused two deaths would inflame the jury and make it more prone to

convict him of all the charges and sentence him to death. Moreover, evidence of two murdered

victims would tend to make the jury overlook serious deficiencies in the State's proof of the kidnaping

charge and of the "course of conduct"specification.

117.    The trial court violated Gregory McKnight's rights to due process and fair trial when it denied the Motion for Relief from Prejudicial Joinder in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

118.    The Ohio court's decision on McKnight's claims relative to this erroneous trial court instruction was contrary to, or an unreasonable application of, clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts.

28 U.S.C. § 2254(d).

**Seventh Ground for Relief**

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS AND A FAIR TRIAL BECAUSE THE "COURSE OF CONDUCT" SPECIFICATION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND FAILED TO NARROW THE CLASS OF MURDERS ELIGIBLE FOR THE DEATH PENALTY IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS**

119.    Gregory McKnight was charged, convicted, and sentenced to death for the aggravated murder of Emily Murray and the statutory aggravating circumstance as "part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons [Murray and Greg Julious] . . . ." Ohio Rev. Code § 2929.03(A)(5).

120.    The (A)(5) specification of a statutory aggravating circumstance should dismissed because it was  not supported by any evidence. ( September 4, 2002, Hrg. Tr. 2-5) McKnight's conviction of the (A)(5) specification violated the Due Process Clause as it rests upon insufficient evidence, and is against the manifest weight of the evidence.

121.    The (A)(5) specification as it is applied to this case is too vague to achieve the  constitutional

76

narrowing function required of statutory aggravating circumstances for death eligibility. See *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990); *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980); *Lowenfield v.Phelps*, 484 U.S. 231, 244 (1988)

122.    Under Ohio law the statutory aggravating circumstance not only is required to narrow the category of persons eligible for the death penalty, the specification is also weighted against mitigating factors at the penalty phase.

123.    The phrase "course of conduct" narrows some, but not all, multiple murder offenses into the realm of death penalty eligible offenses. Any application of the "course of conduct" specification to a particular case must therefore guide the jury in a manner that is neither vague nor over-inclusive, and genuinely narrow the class of murderers eligible for the death penalty. See, e.g. *McCleskey v. Kemp*, 481 U.S. 279, 305 (1987); *Godfrey*, 446 U.S. at 428.

124.    There are three instances when it is appropriate to narrow construction of the "course of conduct" specification to distinguish capital murders from other murders:

      1.    When the multiple murder is part of one criminal transaction or directly associated with one criminal transaction.
      2.    When the multiple murder involves victims of a particular group, or victims who share a common association with each other and the defendant.
      3.    When the multiple murders are all done in furtherance of a common criminal purpose, motive or objective.

*State v. Sapp*, 105 Ohio St. 3d 104, 112; 822 N.E. 2d 1239, 1250 (2004)

125.    None of these three narrowing constructions for the "course of conduct" specification apply here. There is no evidence to suggest that Emily Murray and Greg Julious were killed during one criminal transaction. The two victims in this case were not killed at the same time. There is no

evidence to show that these two people were even killed in the same place.

126.    The two victims were also not part of the same group or otherwise associated with each other, except that each apparently knew McKnight. Emily Murray was a student at Kenyon College in Gambier, Ohio. (Tr. 56-57), and Greg Julious was a resident of Chillicothe. (Tr. 993-94). Further, Murray was a Caucasian woman, and Julious was an African-American man. McKnight was Murray's co-worker. (Tr. 201-226). Julious was McKnight's acquaintance. (Tr. 1008-12). Murray and Julious shared no common trait or association to support the "course of conduct" specification.

127.    The State presented evidence and argued that Gregory McKnight had a motive to kidnap and murder Murray based on his *modus operandi* of stalking young women.( Tr. 332-22, Tr. 1000-02) (See also Eleventh Ground for Relief ) The State inundated the jury with "other acts" evidence to show that McKnight pursued Murray for sexual purposes. However, there is no evidence that McKnight had any sort of sexual motive toward Julious.  Under this set of facts, the "course of conduct" specification is wholly improper as McKnight's purported modus operandi did not extend to both victims.

128.    Lastly, there is no evidence to suggest that the two victims were killed in furtherance of any common criminal purpose or objective. The State charged McKnight with committing the aggravated murder of Murray during and aggravated robbery and kidnaping. (Tr. 335). The state did not charge him with any felonies associated with the murder of Julious.

129.    Clearly, the State presented insufficient to convict Gregory McKnight of the (A)(5) "course of conduct" specification. See *Jackson v. Virginia,* 443 U.S.307, 319(1979). Moreover, this (A)(5) specification does not meet the genuine narrowing requirements for death penalty eligibility as required by the Fifth, Sixth, Eighth and Fourteenth Amendments. See *Lowenfield*, 485 U.S.

231;*Godfrey*, 446 U.S. at 428-31. This invalid (A)(5) specification skewed the jury's weighing process because it was included in the weighing calculus at the penalty phase. See *Stringer*, 503 U.S. at 232.

130. McKnight was denied due process and a fair trial because the court permitted the jury to weigh the "course of conduct" specification at the penalty phase. This is particularly egregious due to the fact that these murders occurred many months apart, and have no apparent connection to one another. This error is further exacerbated by the fact that the jury considered this specification in its penalty phase deliberations. Had this specification not been part of the weighing calculus, there is a reasonable probability that the outcome would have been different.

131. The merits decision of the Ohio courts on McKnight's claims was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

**Eighth Ground for Relief**

**MCKNIGHT WAS DENIED THE RIGHT TO DEFEND AGAINST THE STATE'S CHARGES AND TO CONFRONT THE STATE'S WITNESSES, AS WELL AS HIS RIGHTS TO DUE PROCESS AND EQUAL PROTECTION WHEN THE TRIAL COURT INSTRUCTED THE JURY IN A MANNER CALCULATED TO DEFEAT THE EFFECTIVENESS OF CROSS-EXAMINATION IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS**

132. Gregory McKnight constitutional rights were violated when the court gave instructions telling the jury before testimony began that inconsistencies among and between a witness's testimony did not impact on his or her credibility. As a result, the court's instructions denied McKnight his rights to confront the witnesses on such inconsistencies, due process and equal protection.

133.    During the trial phase of McKnight's capital trial, the court gave preliminary instructions:

> Also, discrepancies in a witness' testimony, or between his testimony and that of others, if there are any, does not necessarily mean that you should disbelieve the witness, as people commonly forget facts or recollect them erroneously after the passage of time.[26]

(Tr. 18-19).

134.    Shortly thereafter, the State offered the testimony of Megan DiCarlo, as its second witness. Ms. DiCarlo's testimony contained significant and important discrepancies from earlier statements she had given to the authorities. Ms. DiCarlo was Emily Murray's roommate at Kenyon College. She provided significant testimony for the State, including testimony that Ms. Murray purchased items for a party the day she disappeared (Tr. 87); that Ms. Murray's new alarm clock went off at 10 a.m. on the Sunday morning after she disappeared (Tr. 88), and that it was Ms. Murray's habit to leave a message for Ms. DiCarlo if she were leaving town ( Tr. 89). However, in a prior statement, Ms. DiCarlo told the FBI that on November 30,the day Ms. Murray went missing, someone entered her dorm room in the early morning hours and left shortly after. (Tr. 92). Moreover, Ms. DiCarlo told the FBI that some of Ms. Murray's CDs were missing. (Tr. 92). Detective Brenneman testified that DiCarlo made the statement that someone entered the dorm room on the morning Ms. Murray came up missing and that DiCarlo thought it was Ms. Murray. (Tr.456). Later, however, DiCarlo changed her statement indicating that no one entered the room. (Tr. 456).

---

[26]This flawed instruction is notably absent from the trial court's final jury charges during the trial and mitigation phases.

80

135.    Ms. DiCarlo's testimony was offered to support the State's theory that Ms. Murray had been kidnaped. McKnight attempted to demonstrate that it was Ms. Murray who entered the dorm room voluntarily and retrieved some personal items at the same time the State alleged she was kidnaped. The trial court's instruction minimized the importance of McKnight's ability to demonstrate this glaring discrepancy. Moreover, its position as a preliminary instruction does not minimize its importance to the jury, particularly because the trial court gave the instruction in close proximity to Ms. DiCarlo's testimony.

136.    Additional inconsistencies are apparent from the record. Several witnesses testified to Ms. Murray's positive mood on the night she disappeared. (See e.g. Tr. 87, 121).However, Sergeant Brenneman testified that Ms. DiCarlo described Ms. Murray's mental state as irritable and stated that Ms. Murray had not been taking her antidepressants. (Tr. 452-53). Brenneman also testified that one witness described Ms. Murray as upset and distraught the last night she worked. (Tr.1530).

137.    Lucia Neibarger and Michael Corrigan also offered differing opinions on McKnight's character at work. Neibarger described McKnight as a good worker and indicated that he was being considered for a supervising cook position. (Tr.164). However, Corrigan indicated that it was "tenuous" whether McKnight would remain at the Pirate's Cove and that they were looking to replace him. (Tr. 185). While perhaps a minor inconsistency, it could reflect negatively on either witness's credibility.

138.    Further, Dana Bostic testified that she went to a reggae club with McKnight, his wife, and Greg Julious. (Tr. 1008-09). It was during this testimony that the State introduced prejudicial testimony regarding McKnight's reaction to the police. (Tr. 1008-09) However, Kathy McKnight testified that she never met Greg Julious. (Tr. 839). Mrs. McKnight's testimony directly contradicted

81

Bostic's reggae story. If the jury believed Bostic was willing to embellish her testimony on this point, the jury might doubt her credibility on other points.

139.    The trial court's instruction to ignore such discrepancies crippled McKnight's defense against these crimes. While McKnight was able to demonstrate these discrepancies during cross-examination, the trial court's instruction rendered his efforts futile. Rather than leaving the issue solely to the jury, the trial court unduly influenced the jury to ignore these glaring discrepancies in assessing the credibility of witnesses via the flawed instruction.

140.    Not only was the court's instruction fatally flawed, it was also illogical. The court's instruction minimized discrepancies in the witnesses' testimony. In essence, the court told the jury that inconsistencies were normal, thus eviscerating the impact of significant disparities in witnesses' testimony. However, the court's instructions failed to recognize that an untruthful witness can tell a very consistent lie. Moreover, a witness can make the same mistake repeatedly. Just as a witness's inconsistency might not demonstrate a lack of veracity, a witness's consistent story does not necessarily prove that he or she is being truthful. The trial court's instruction ignored the latter reality.

141.    It is a jury's duty to determine the significance of any inconsistences or contradictions without misleading instructions from the trial court. Here, the trial court's instructions stacked the deck against McKnight by protecting the State's witnesses from any weaknesses based on discrepancies in its case found in witness's testimony. Before any testimony was proffered, the jury was told that it is "normal" to have inaccuracies in one's memory. Conversely, the jury was not told that a witness can tell the same lie consistently, or be repeatedly mistaken.

142.    Gregory McKnight presented one witness to defend against the State's charges. The crux

82

of his defense plainly was discrediting the State's case through the cross-examination of witnesses. The trial court's instruction was fatal to McKnight's defense.

143.    The trial court's instruction rendered McKnight's right to cross-examination a futile act. The evisceration of McKnight's right to confrontation and cross-examination "calls into question the ultimate integrity of the fact - finding process." *Chambers v. Mississippi*, 410 US 284, 295 (1973.) The trial court's instruction infringed on McKnight's confrontation rights and his right to present a meaningful defense as well as his rights to due process and equal protection. McKnight was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. As such, the writ must issue.

144.    The merits decision of the Ohio courts on McKnight's claims was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

**Ninth Ground for Relief**

**MCKNIGHT'S RIGHTS TO A FAIR TRIAL, DUE PROCESS, AND A RELIABLE DETERMINATION OF GUILT AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WERE VIOLATED WHEN THE TRIAL COURT PERMITTED THE INTRODUCTION AND ADMISSION OF NUMEROUS GRUESOME PHOTOGRAPHS WITH NO PROBATIVE VALUE BUT WHICH WERE HIGHLY PREJUDICIAL.**

145.    Gregory McKnight's rights to a fair trial, due process and a reliable determination of guilt or innocence under the Fifth, Sixth, Eighth, and Fourteenth Amendments were denied when the trial court permitted the state to introduce and later admitted numerous gruesome photographs with no probative value but which were highly prejudicial and inflammatory.

146.    During the trial phase, the State introduced numerous photographs of the crime scene and

83

body of Murray taken inside the trailer, where her body was found, as well as photographs taken at the morgue during the autopsy. The photographs were extremely graphic in their display of various views of the gun shot wound and a decomposition of the body. These photographs clearly had a strong, emotional impact on the jury. Because this prejudice far outweighed their minimal probative value, the trial court should have excluded them. McKnight was denied due process and a fair trial by their admission.

147.    State's Exhibit's 47-49, 112, 116, 117, 119, 126, 144-49 all depict the body at the trailer and later at the morgue. State's Exhibit's 47-49 each depict the body rolled up in the rug with the left side of the face exposed. The State also introduced two photographs depicting a decomposing left hand. (State's Exhibits 119, 148). In general, the photographs depict a decomposing body with mold. (See State's Ex. 47-49, 112, 116, 117, 119, 126, 144-49).

148.    Trial counsel filed a put the State and Court on notice of its objections by filing a Motion to Exclude all Photographs of the Deceased. Counsel strenuously objected to the admission of the photographs of Murray because of the gruesome nature in which she was found and the horrific depiction of her decomposed body. (Defendant's Motion In Limine to Exclude Photographs of the Deceased, filed march 25, 2002) [27]

149.    During the penalty phase, the trial court re-admitted these photographs over counsel's objection. (Tr. 1970, 1971, 2054);

150.    Ohio Rule of Evidence 403, provides for mandatory exclusion of gruesome evidence where the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice,

---

[27] Trial counsel failed to object to the admission of these photographs during the trial phase. See Twenty -Sixth Ground for Relief

or confusion of the issues, or of misleading the jury. *State v. Thompson*, 33 Ohio State 3d 1, (1987)

151.     The failure of the State to enforce its own long-established rules constitutes a denial of the due process and fair trial under the Fifth , Sixth, Eighth and Fourteenth Amendments. Federal Rule of Evidence 403 likewise requires the exclusion if its probative value is substantially outweighed by the danger of unfair prejudice.  Although the Federal Rule does not use the language "mandatory," capital cases require a stricter standard and construction.

152.     Here, the cause of death was indisputably a single gun shot wound to the head. (Tr. 904). The multiple photographs of the gun shot wound were cumulative. (State's Ex. 146, 147). Further, the multiple photographs of the decomposing body were neither relevant nor necessary to prove any element of the charged crimes. Therefore, the photographs were rendered unnecessary and had little or no probative value.

153.     The prejudice produced by the photographs was substantial. These photographs depict a decomposed body with mold. These images were truly gruesome. The trial court failed to balance the minimal probative value versus the minimal (if any) probative value. All of these gruesome photographs were again admitted for the jury's consideration at the penalty phase.

154.     The introduction of these numerous gruesome photographs prejudiced McKnight because there was little evidence to support the charge of kidnaping and the statutory aggravating circumstance based on the kidnaping.  The photographs helped the State obtain convictions on all charges by playing upon the passions and prejudices of the jury. There was a very real danger that these photographs inflamed the jurors' emotions and thus prejudiced McKnight. The unfair prejudice generated by these photographs substantially outweighed whatever minimal probative value the photographs possessed.

155.     McKnight also was prejudiced by the introduction of these gruesome photographs in the penalty phase. The photographs were again admitted in their entirety during the penalty phase. (Tr.1971). These images had a tendency to stay with the jury during its sentencing decision, thus the "carry-over" effect of the evidence violated the Fifth, Sixth, Eighth and Fourteenth Amendment guarantees "that any decision to impose the death penalty be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977).

156.     One of the jurors "described the crime scene photos of the victim, Emily Murray, as 'gross.'concluding that the prosecution used too many photos—most of which were not necessary for the jury to decide the case. The photos were disturbing and seemed to seal McKnight's conviction and death sentence." (PC Ex. E) The prejudicial impact of the jury's exposure to inflammatory photographs deprived McKnight of his right to a fair trial, due process, and a reliable determination of his guilt in a capital case as guaranteed by the Fifth, Sixth, and Fourteenth Amendments.

157.     The merits decision of the Ohio courts on McKnight's claims was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**Tenth Ground for Relief**

**GREGORY MCKNIGHT'S RIGHT TO A FAIR TRIAL AND DUE PROCESS WERE VIOLATED WHEN STATE INTRODUCED AND THE TRIAL COURT ADMITTED EVIDENCE TO PROVE THE VICTIM ACTED IN CONFORMITY WITH HABITUAL BEHAVIOR IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS**.

158.     Gregory McKnight was denied his due process and a fair trial when the State was permitted

86

to introduce evidence that the victim would have acted in conformity with her usual habit in order to bolster its case for kidnaping.

159.    The State introduced irrelevant and inflammatory evidence in attempt toprove the elements of kidnaping. The State presented several witnesses who it asserted would establish Emily Murray's habit of regularly notifying family and friends of her whereabouts. However, the State's evidence did not meet the requirements of Ohio R. Evid. 406. Its admission deprived Gregory McKnight of a fair trial and his rights to due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments..

160.    During its case in chief, the State presented testimony that it was Emily Murray's "habit" to notify family and friends of her whereabouts. This testimony began with her father:

> Q. Do you know whether or not Emily had a tendency of taking trips - whether short or long — without -
>
> MR. CARSON: Objection, your Honor. May we approach.

(TR 59-60).

161.    Defense counsel objected, arguing that the testimony was inadmissible pursuant to Ohio R. Evid. 406. (Tr.60). The prosecution specifically noted that "[a]t this juncture, we're trying to establish her habits[.]" (Tr.61). The State agreed to rephrase its question. (Tr.63).

162.    Mr. Murray continued his testimony recalling two times that Ms. Murray had been away in the fall of 2000. (Tr.67). Mr. Murray indicated he heard from Ms. Murray via email when she traveled to Tokyo. (Tr.67). He did not recall if he heard from her when she went to St. Louis, but indicated they heard from he when she returned. (Tr. 68). The prosecution continued, asking Mr. Murray:

> Q. Did she tell you before she went?

87

A. Oh, yes.

Q. Was that common, for her to tell you where she was going before she went?

MR. CARSON: Objection, your Honor, same basis we discussed at the bench.

May we approach again?

(Tr. 68). The trial court did not permit counsel to approach and overruled their objection. (Tr. 68).

The State elicited testimony from Mr. Murray:

Q. Was it common for Emily to tell you where she might be going
before she left?


A. Anything of significance, yes, sir.

(Tr. 69).

163.   Defense counsel again objected. (Tr. 69).The trial court overruled this objection as well. (Tr.

69). The State had Mr. Murray repeat his testimony:.

Q. Could you restate your answer?

A. Emily was in very close touch with us, and also with her
friends, so if it was anything significant, we would have known
about it, she would have told us, and she certainly would have told
her friends.
(Tr. 69).

164.   During Megan DiCarlo's testimony, the State pursued questions about the dry erase board

DiCarlo and Murray had in their room.

Q. Did Emily use the board when she took a trip, maybe a weekend or two
before?

A. Uh-huh. She had gone to see a friend in Cleveland a couple weeks
beforehand...and had left a message like filling almost the entire board about
where she was going, when she was planning on leaving, when she was planning
on being back, who she was going to see, and a phone number for that person.

88

(Tr. 88-89). The State elicited from DiCarlo further testimony that Ms. Murray did not leave a note on November 2 or 3, 2000. (Tr. 89).

165. The State questioned Ms. Murray's previous roommate, Kate Murray, about similar subjects:

> Q. While you were roommates with Emily, or since you had known Emily, did she ever disappear like a one-night stand and not tell you guys about it, just disappear, unaccountable for whether she returned?
>
> A. No.

(Tr. 127)

The trial court overruled defense counsel's objection, (Tr. 127) and the State's questioning of Kate Murray continued:

> Q. I'm not talking about guessing what she might do in the future. While you were her roommate, while you knew her, did she ever disappear unaccounted for and then reappear and say, "Well, I'm sorry, sorry."
>
> A. No.
>
> Q. How do you know that?
>
> A. I would - - from personal experience of living with her, it's a very small campus, you see people a lot, and if she had disappeared for any amount of time, we would have noticed.
>
> Q. Did she ever leave when - - before - - unexpectedly?
>
> A. Yes, one night she drove up to Cleveland to see a friend, but then when she did go that time - - and no on knew she was going - - she left us a note saying where she was going.
>
> Q. Where did she leave the note?

A. I assume in her room. I don't know.

(Tr. 127-28).

166.    Generally, Ohio R. Evid. 404(A) precludes the admission of character evidence or evidence

of a particular character trait to prove a person acted in conformity therewith. Rule 404(B) also

precludes the admission of other acts evidence to prove that a person acted in conformity therewith.

An exception to Rule 404 is found in Ohio R. Evid. 406, which provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

167.    Because Rule 406 can be used to circumvent Rule 404's prohibitions, courts "are

somewhat cautious in admitting the evidence." *United States v. Angwin*, 271 F.3d 786, 799 (9th Cir.

2001).

168.    As a result, habit is strictly defined. A habit is a "type of nonvolitional activity that occurs

with invariable regularity." *Weil v. Seltzer*, 873 F.2d 1453 (D.C. Cir. 1989). "A habit is a consistent

method or manner of responding to a particular stimulus. Habits have a reflexive, almost instinctive

quality." *Id*. To decide whether a person's conduct is a "habit," consideration must be given to the

"adequacy of sampling and uniformity of responses." *Id.* (citing Fed. R.Evid. 406, advisory committee

notes). See also *United States v. Newman*, 982 F.2d 665, 668  (1st Cir. 1992) (internal citations

omitted); *Thompson v. Boggs*, 33 F.3d 847 (7th Cir. 1994); *Angwin*, 271 F.3d at 799 (internal

citations and footnote omitted).[28] Thus, there must be sufficient examples of the conduct to allow for

the "inference of systematic conduct to establish one's regular response to a repeated situation."

---

[28]Ohio R. Evid. 406 is identical lo Fed. R. Evid. 406. See Ohio R. Evid. 406, staff notes.

*Newman*, 982 F.3d at 668 (internal citations and quotations omitted). Conduct must be "semi-automatic in nature" to be treated as habit. *Thompson*, 33 F.3d at 854. See also *Angwin*, 271 F.3d at 799 (internal citations and footnote omitted); *United States v. Rangel-Arreola*, 991 F.2d 1519, 1523 (10th Cir. 1993) ("Habit is defined as a regular practice of meeting a particular kind of situation with a certain type of conduct, or a reflex behavior in a specific set of circumstances.") (internal citations and quotations omitted).

169.    The State presented three witnesses to testify regarding Emily Murray's alleged "habit" of notifying her parents and/or friends of her whereabouts at all times. Her father testified generally that Murray would not have disappeared without notifying her family and friends. (See Tr. 69) However, her father's testimony does not support his conclusion. Mr. Murray testified that Ms. Murray only alerted her parents twice that she was going on a trip, not that she did it invariably. (Tr. 67-68)

170.    Similarly, Kate Murray, her roommate, testified that Murray never "disappeared" without telling her. (TR 127). Interestingly, Kate Murray could cite to only one instance to support this testimony. (Tr. 128) Additionally, Megan DiCarlo testified that Emily Murray left her a note <u>one</u> time when she took a trip. (Tr. 88-89). This testimony is insufficient to prove an invariable habit.

171.    Reliability is always an issue when determining whether evidence presented meets the stringent standards required to satisfy the requirements surrounding habit evidence. See *Weil*, 873 F.2d at 1460. Three factors are generally considered. *Angwin,* 271 F.3d at 799. First, whether the conduct is reflexive/semi-automatic or volitional. *Id* Second, "the specificity or particularity of the conduct." *Id*. Third, the number and regularity of "examples of the conduct." *Id*. None of these factors support the admissibility of the State's purported habit evidence in this case.

172.    First, the act at issue here, notifying her friends and family of her whereabouts, is not a

91

reflexive action. Rather, it is a volitional act. Murray had to decide to alert her family and/or friends as to her whereabouts and then take affirmative steps to alert one or both of these groups. The volitional nature of the act renders it implausible as "habit" evidence and therefore renders it inadmissible.

173.    Second, this purported habit was not sufficiently specific or particular.  Murray's parents did not identify the manner by which Emily Murray notified them of her whereabouts before  taking a trip. (Tr. 67-58). Megan DiCarlo testified to one instance of leaving a note on a dry erase board. (Tr. 88-89). Kate Murray testified to Emily Murray leaving a note one time, although she did not know where Emily left that note. (Tr. 127-28). The actions Mr. Murray, DiCarlo, and Kate Murray testified to did not identify a particular or specific manner through which Emily Murray notified her family and friends of her whereabouts. Mr. Murray's testimony was too vague to allow any conclusion as to Emily's habits. Similarly, Kate Murray had no first hand knowledge of the note left by Emily and could identify no specifics regarding it. These four instances are neither specific nor particular enough to establish a habit on Emily's part.

174.    Third, there were insufficient examples of Emily Murray's conduct to demonstrate a habit. The State presented the testimony of four instances where Murray notified her parents or friends about her whereabouts. Mr. Murray could only testify to two such instances. Each of Emily's friends could testify to only one. Conduct must occur often enough to make "it more probable than not that [the action] would be carried out in every instance or in most instances."*Weil*, 873 F.2d at 1460.

175.    None of the three *Angwin*/*Sapp* factors weigh in favor of finding that the State established that it was Emily Murray's habit to notify her family and/or friends of her whereabouts. Additionally, problems with Kate Murray's testimony weigh against the admissibility of this purported "habit"

92

evidence. First, Abigail Williams' testimony contradicts Kate Murray's assertion that it was Emily Murray's habit to notify her friends of her whereabouts. Williams testified that she accompanied Kate Murray to Emily Murray's dorm room where they searched for driving directions when Emily Murray did not return. (Tr.495). These actions are nonsensical if it was Emily Murray's habit to always alert her friends to her whereabouts.

176.    Secondly, while Kate Murray claimed that Emily Murray once left a note when she took a trip to Cleveland, it does not appear Kate had personal knowledge of this note. In response to the State's inquiry as to where Emily left that note, Kate responded "I assume in her room. I don't know." (Tr.28). Kate lacked any personal knowledge of the alleged habit, and therefore should not have been permitted to testify.

177.    There was no specificity or particularity of the conduct. This combined with the limited number of examples presented, and the volitional nature of the conduct, required the trial court to reject this evidence of Emily Murray's habit.

178.    Further, the introduction of this inadmissible evidence was inflammatory and therefore highly prejudicial to McKnight's case. The State's evidence that Gregory McKnight kidnaped Emily Murray was extremely weak.(See Thirty-Fourth Ground for Relief ) Rather than present affirmative evidence of kidnaping,  the State sought to prove through  speculation that McKnight kidnaped Murray. This purported "habit" evidence clearly influenced the jury's decision on the kidnaping charges. Believing that it was appropriate to presume Murray acted in conformity with these limited examples of prior actions, the jury necessarily drew the conclusion that Murray would have alerted her family or friends if she had gone somewhere willingly. Because this testimony did not meet the requirements of Ohio R. Evid 406, the jury drew precisely the type of conclusion prohibited by Ohio R. Evid. 404. This

93

"evidence was admitted for an improper purpose and was undoubtedly prejudicial" to McKnight. See *Weil*, 873 F.2d at 1461. The Ohio Rules of Evidence provide a state given right. The trial court's decision to arbitrarily deny this right violates due process and the right to a fair trial. *Evitts v. Lucey*, 469 U.S. 387 (1985)

179.    The evidence presented by the State did not prove a habit of Emily Murray. Thus, its admission allowed the jury to make an improper propensity inference, to presume that Murray acted in conformity with four prior instances of conduct, making it more likely that McKnight kidnaped Emily Murray. The trial court's admission of this evidence deprived McKnight of his constitutional rights to a fair trial and due process.

180.    The merits decision of the Ohio courts on McKnight's claims was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**Eleventh Ground for Relief**

**THE ADMISSION OF IRRELEVANT AND INFLAMMATORY EVIDENCE DEPRIVED GREGORY MCKNIGHT OF A FUNDAMENTALLY FAIR TRIAL AND DUE PROCESS IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

181.    The trial court admitted irrelevant, inflammatory, and prejudicial evidence. In particular, the trial court permitted the introduction of testimony that McKnight was a bad husband as well as testimony that McKnight hurriedly exited a club after seeing police officers in the parking lot. The trial court's admission of such evidence deprived McKnight of his rights to a fair trial and due process in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

A.    The Introduction of Evidence Relating to Mcknight's Marital Infidelities Was Irrelevant, Inflammatory and Deprived Him of a Fundamentally Fair Trial.

182.    The State called Amber Hammers as a witness. Defense counsel immediately objected to Hammers' testimony. (Tr. 323). The prosecution asserted, however, that it had evidence that would be presented that McKnight was doing the same thing with Murray that he did with Hammers.  (Tr. 328). The trial court overruled counsels' objection. (Tr. 328). Counsel then requested a continuing objection. (Tr.331).

183.    Subsequently, Hammers testified that McKnight had invited her to go ballroom dancing in Columbus. (Tr. 332). Hammers also indicated that McKnight told her she did not have

to tell her fiance about the dancing. ( Tr. 332).

184.    On cross- examination,  Hammers conceded that she knew nothing about the case for which she was testifying: Trial counsel posed the question "Okay. So in essence, you're called by the State here, you don't know anything about this case, you met Greg, you got along with him, and he was friendly to you; is that correct?"She responded  "Yes."  (Tr. 334)

185.    The state also called Gloria Ressler to testify about McKnight's sexual advances. Ressler testified that McKnight called her home and wanted to know her address. (Tr. 377). She indicated that McKnight wanted to come over and "hang out." (Tr. 377).Ressler also testified that McKnight made sexual comments to her. (Tr. 377). Defense counsel objected to Ressler's testimony as being irrelevant and continued to argue that the jury was being prejudiced with evidence of  McKnight's alleged sexual misconduct. (Tr. 378, 381).

186.    The trial court overruled counsels' objection, finding the evidence was relevant to motive

and opportunity. (Tr. 382). Moreover, the calls occurred within a month of Murray's disappearance so the Court ruled this was within the same time period. (Tr. 386).

187.    Subsequent to counsels' objections, Ressler repeated her testimony about McKnight calling her and wanting to "hang out." (Tr. 387). Ressler indicated that McKnight encouraged her to "sneak out" while her boyfriend was at work. (Tr. 387). Ressler continued indicating that McKnight was worse at work and had gone so far as to say that they could have a "quickie" in the kitchen and her boyfriend would never know. (Tr. 397).

188.    On cross-examination, Ressler testified to what little she knew about McKnight or the facts of the case.  "He was married, had a couple of children. Other than that, not too much other than being a co-worker." (Tr. 376).

189.    The State also called Paul Amstutz similarly to portray McKnight as a bad husband. Amstutz testified that he once delivered food to McKnight's wife. Prior to making that delivery, Amstutz saw McKnight at the Pirate's Cove drinking. (Tr. 403). Amstutz testified, over defense objection, that Mrs. McKnight seemed to think that Greg McKnight was working. (Tr. 406-07).

190.    The State called Dana Bostic to testify about McKnight's extramarital affair with Lisa Perkins. Bostic testified that McKnight was dating Perkins. (Tr.1000). Defense counsel objected, indicating that the testimony did not go to modus operandi, but was being offered to show McKnight was a bad husband and adulterer. (Tr. 1000-01). The trial court overruled counsel's objection, to "the extent he understands it." (Tr. 1002)

191.    Bostic continued her testimony indicating she had seen McKnight and Perkins together at her house in Chillicothe. (Tr. 1004). McKnight indicated that he was going to leave his wife. (Tr. 1005, 1036-37). Counsel again objected when the prosecutor asked if McKnight spent the night.

(Tr. 1006). The trial court overruled the objection, (Tr. 1006), and Bostic indicated that McKnight came at different hours of the night, stayed in Perkins's bedroom, and that he slept there one night and left early. (Tr. 1006, 1040). Bostic further testified that McKnight said he was going to leave his wife and move into her apartment. (Tr. 1124).

192.    The State concluded its attack on McKnight's character with the testimony of Lisa Perkins. Perkins testified that McKnight took her to her grandparents' home one time. (Tr. 1235). They did not come straight back, but stopped to have sex in the car. (Tr.1235-36). Defense counsel objected to this line of questioning. (Tr. 1236). The prosecution responded that they wanted to show how McKnight worked her over, that this was what he tried on Ressler and Hammers, and what they believed he was doing with Murray. (Tr. 1239). The trial court overruled the objection, and defense counsel requesting a standing objection. (Tr. 1238-39).

193.    Collectively, the evidence introduced through Hammers, Ressler, Amstutz, Bostic and Perkins established that McKnight needed a ride home from work and had a penchant for seeking extramarital sex.  There were insufficient similarities to connect these so called behavioral patterns to a  motive or opportunity to have killed Murray.  These other acts should not have been admitted into evidence.

194.    The State insisted testimony on McKnight's infidelities was relevant because  "evidence and information" would "be presented later that he was doing the same thing with Emily, and it will be all tied up." (Tr. 328).  Despite that promise, the prosecution never linked this inflammatory testimony about McKnight's character to the facts and circumstances of the crime. In fact, the prosecutor later admitted "there wasn't any evidence that they were doing anything outside of work." ( Tr.1764).

195.    Despite the complete absence of probative value, the prosecutor returned to these themes in closing argument. The prosecution reminded the jury that McKnight gave Lisa Perkins a ride to her grandparents and pulled over to have sex.(Tr. 1710).  The jury was also reminded that McKnight invited Hammers dancing and told her she did not have to tell her fiance. (Tr. 1710). Finally, the prosecutor reminded the jury that McKnight asked Ressler for a quickie. (Id.).

196.    The witnesses who testified to infidelities never indicated they were victims of any violence or threats of violence from McKnight.   No one saw McKnight make a sexual advance towards Murray. The prosecution could not even offer hearsay evidence that such ever occurred. Absent any evidence that a similar scenario occurred between McKnight and Murray, this evidence was completely inappropriate and wholly inadmissible. The testimony regarding McKnight's sexual infidelities served only to paint him as a bad husband and a bad person who would have committed this type of crime. The prosecution should not have offered this evidence knowing that it could not be tied to Murray's disappearance and should not have admitted by the trial court. (Tr. 1764).

197.    Introduction of such testimony demonstrated the prosecution's strategy of flooding the jury with a great deal of speculation about what might have happened on the night that Emily Murray disappeared, in the absence of any proof of what happened.

198.    The admission of this irrelevant and inflammatory evidence also tainted the sentencing phase. By thus infuriating the passions and prejudices of the jury, the prosecution created a climate in which the jury was unable to dispassionately weigh the aggravating circumstances against the mitigating factors.   The jury would find it difficult, if not impossible, to not consider this evidence in its weighing process, as the prosecutor reminded the jury of the women McKnight made sexual advances to and referred to him as a "Venus fly trap." (Tr. 2031-32)

98

199. The prejudicial effect of this evidence was especially significant given the dislike the jury was encouraged to feel towards this serial adulterer. The prosecution's stirring up of this resentment towards McKnight was especially high for the eight jurors who were married.

**B.  Testimony Related to Mcknight's Reaction to Seeing a Police Officer in Columbus, Ohio Was Irrelevant, Inflammatory and Deprived Him of a Fundamentally Fair Trial.**

200. Dana Bostic testified that she and Greg Julious went out with McKnight and his wife once to a reggae club in Columbus. (Tr. 1009). However, there was a police cruiser in the club parking lot. (Tr. 1011). Bostic testified, over objection, that McKnight and his wife discussed the police car and then left the club parking lot immediately. (Tr. 1012).

201. Perhaps if this occurred after Greg Julious or Emily Murray disappeared, it might suggest something. But McKnight's reaction to seeing the police occurred before either the disappearance of Greg Julious or Emily Murray. Permitting this testimony about discomfort around police prior to either murder only caused prejudice to McKnight by insinuating he had something to hide, that he was a criminal, even before the murders were committed.

202. The prosecution did not, because it could not, attempt to allege there was a connection between McKnight's reaction to the police and the charged offenses.

**C.  Victim Impact Evidence Introduced at Mcknight's Trial Was Irrelevant and Deprived Mcknight of a Fundamentally Fair Trial.**

203. The prosecution's case also was replete with victim impact evidence.[29] Beginning with

---

[29]To the extent defense counsel failed to object to the introduction of this irrelevant and inflammatory victim impact evidence, counsel's performance fell far below the prevailing professional norms, thus depriving McKnight of the effective assistance of counsel. See Twenty-Sixth Ground for Relief

opening statement, the prosecutor told the jury: "Two years ago, Emily S. Murray was attending

Kenyon College in Gambier, Ohio. She was in her junior year, and she was 20 years young."

(Tr. 24). At work, Emily was well-liked. She was outgoing, she was helpful, she was a

good waitress. (Tr. 25).

204.     The emphasis on Murray's character and the impact of her disappearance on her

family continued during the prosecution's direct examination of witnesses. Murray's father testified

as the State's first witness. The prosecutor elicited from Mr. Murray the devastation his family felt

when they learned Emily had disappeared, "it was like somebody hit us in the stomach with a

sledgehammer." (Tr. 59). Mr. Murray testified about their close family relationship. (Tr. 65, 67).

205.     The prosecutor also elicited character evidence about Ms. Murray from her father, including

that she was responsible and honest and that she intended to be priest. (Tr. 68, 74). Murray's mother,

added to the emotional tone of the prosecution's case echoing her husband's testimony about the

family's good relationship. (Tr. 356).  She indicated her daughter  was "easy to love," and that she

wanted to become an Episcopal priest. (Tr. 355).

206.     The prosecutor continued to focus on Murray's character during direct examination of her

friends Megan DiCarlo and Kate Murray. DiCarlo described Ms. Murray as being outgoing, social,

independent, open, and trusting. (Tr. 86). DiCarlo indicated that Ms. Murray always looked for the

best in people. (Tr. 86).

207.     Kate Murray described Ms. Murray as very intelligent, outgoing, happy, cheerful, and trusting.

(Tr. 130). Kate Murray also discussed the tattoo of a dove on Ms. Murray's back and testified that

Emily had strong religious beliefs, which the dove symbolized. (Tr. 136). Ms. Murray's co-workers

at the Pirate's Cove repeated this same description of her as "upbeat," "happy," "courteous," and "car[ing] for people." (Tr. 183, 185, 286).

208.    The prosecution returned to these inflammatory and emotional themes in closing argument. The prosecutor described the fall of 2000 as a "parent's worst nightmare" and echoed Mr. Murray's testimony that it "felt as if they had been hit in the stomach with a sledgehammer." (Tr. 1676). Moreover, the prosecutor noted that the pain had stayed with the Murray family, at that time. (Tr. 1676). The prosecution again reminded the jury that Ms. Murray was a "great person," "kind-hearted," and that she "helped out." (Tr. 1693).

209.    While McKnight does not dispute the accuracy of the State's presentation regarding Ms. Murray's character, he does dispute its relevancy. The comments did not focus on any essential element of crimes charged on Gregory McKnight's identity as the perpetrator.

**D.      The Irrelevant Evidence Should Have Been Excluded.**

210.    The critical considerations at trial included whether Gregory McKnight kidnaped, robbed, and purposefully killed Murray. (See Indictment Counts One, Two, and Three). Moreover, the jury had to consider whether McKnight purposefully killed Julious. (See Indictment Count Six).

211.    However, the prosecutor presented evidence designed to inflame the jurors' passions and create sympathy for the victim and her surviving family. Thus, it was likely to mislead the jury and to prejudice McKnight.  The evidence of sexual infidelities, fear of the police, and victim impact evidence sent a subtle message to the jurors that McKnight was a bad and secretive person. The jurors gleaned from this testimony that McKnight was a cheater, a bad husband, and a bad person. Moreover, the jury gleaned that, even before Greg Julious or Emily Murray went missing that McKnight had reason to fear the police. Neither message was relevant or proper.

212.     The trial court was obligated, but failed to step in and preclude its presentation.  The improper use of this evidence was not merely a violation of state evidentiary law.  It denied McKnight a fundamentally fair trial and therefore rose to the level of a due process violation. Introduction of this type of testimony was not harmless as it served to confuse the jury. The jury likely made the same mistake that the prosecution did, believing it was appropriate to speculate about facts that the State simply could not prove.  The trial court's ruling was patently erroneous and denied McKnight his right to a fundamentally fair trial granted him under the Fourteenth Amendment.

213.     The requirement of due process has always ensured that "no man's life, liberty or property be forfeited as criminal punishment for violation of [the] law until there has been a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power." *Chambers v. Florida*, 309 U.S. 227, 236-237 (1940).   The Supreme Court has made clear that when a state court admits evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808,  825 (1991).

214.     McKnight's trial was devoid of the minimal fundamental fairness guaranteed by the due process clause of the Fourteenth Amendment. The constitutionally mandated result is to have McKnight's conviction vacated and sentence set aside.

215.     To the extent the Ohio courts ruled on the merits of McKnight's claim, relative to the irrelevant and inflammatory evidence introduced during the trial and penalty phase, their rulings were an unreasonable applications of clearly established federal law as stated by the Supreme Court of the United States, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

102

**Twelfth Ground for Relief**

**GREGORY McKNIGHT'S RIGHT TO DEFEND AND TO REBUT THE STATE'S EVIDENCE WAS DENIED WHEN THE TRIAL COURT PRECLUDED THE ADMISSION OF RELEVANT EVIDENCE DENYING HIM HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH SIXTH, EIGHT AND FOURTEENTH AMENDMENTS.**

216.    Gregory McKnight's was denied due process and a fair trial when the trial court denied his attempt to introduce into evidence several notebooks belonging to Emily Murray.

217.    At trial, McKnight sought to introduce several notebooks that belonged to Emily Murray. These notebooks contained writings by Murray. The notebooks portrayed a very different dark and troubled Emily Murray from the responsible happy go-lucky person portrayed in the State's case-in-chief. In particular, the notebooks showed Murray's depression and her fixation on death. (See Proffered Defense Ex. G and H).

218.    The State vehemently opposed defense counsel's request to introduce these notebooks into evidence.(Tr. 1617). The trial court ultimately sustained the State's objection and denied the introduction of most of Emily Murray's writings. (Tr. 1669-70). The trial court excluded Defense Exhibit G as well as two components of Exhibit H. (Tr. 1669-70). Defense counsel objected and requested that the trial court seal these materials for appellate review, which the trial court did. (Tr.1671).

219.    At trial, the need for development of all "relevant facts" is both "fundamental and

103

comprehensive." *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988) (citing *United States v. Nixon*, 418 U.S. 683, 709 (1974)). Thus, the defendant's right to be heard in his own defense is a basic component of due process and a fair trial. *In re Oliver*, 333 U.S. 257, 273 (1948). This means the criminal defendant must have a "meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)). "[A] defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense." *Powell v. Alabama,* 287 U.S. 45, 59 (1932). The opportunity to be heard is essential to procedural fairness. See *Crane*, 476 U.S. at 690 (internal citations omitted).

220.    Further, due process requires that McKnight had the right to present evidence in rebuttal of the State's case. The trial court's refusal to admit Murray's notebooks, denied him this very basic right.

221.    In its case-in-chief, the State introduced a substantial amount of evidence tending to demonstrate Murray's mental state at the time of her disappearance. The State questioned Murray's family and friends about her carefree, yet responsible personality. To this questioning her father described Emily as "renewed and excited." (Tr.68). Roommate Megan DiCarlo testified that Murray was excited about working her last day at the Pirate's Cove and about a party the following day. (Tr. 87).She described Murray as happy that last night. (Tr. 121, 139). Other Pirate's Cove employees Lucia Neibargerr and Michael Corrigan also testified that Murray seemed happy her last of night of work. (Tr. 160, 183).Murray's mother described her as "doing well" after her second suicide attempt. (Tr. 357). She testified that her daughter was excited and enthused as well as "very happy." (Tr. 360).

222.    The State presented this evidence in an effort to demonstrate that Murray was happy and was

104

not suicidal despite her earlier suicide attempts. By presenting this evidence, the State put Murray's mental state at issue in the trial. Due process mandates that McKnight had an absolute right to defend against the State's case and to present rebuttal evidence pertaining to Murray's mental state at the time she disappeared since the State had put her mental state at issue. See *Grinnell*, 112 Ohio St. 3d at 147, 678 N.E.2d at 246 (citing *Phung*, 71 Ohio St. 3d 408, 644 N.E.2d 286). See also *Crane*, 476 U.S. at 690 (citing *Trombetta*, 467 U.S. at 485).

223.    Not only did McKnight have a right to rebut the State' evidence, proffered Defense Exhibits G and H would have directly contradicted the State's case-in-chief. Proffered Defense exhibits G and H present a very different image of Murray's mental state. The writings portray a depressed young woman, fixated on death. (See Proffered Exs. G and H). The writings are not happy, upbeat or enthusiastic but instead demonstrate that Murray still focused on death and suicide. Given the State's case-in-chief, McKnight had a right to counter this evidence.

224.    These journals were also specifically relevant to discrediting the testimony of Megan DiCarlo. Ms. DiCarlo testified that Murray had been in good spirits. (See Tr. 87, 121, 139). Defense counsel cross-examined Ms. DiCarlo about statements made to police indicating that she thought Emily was not taking her antidepressant medication and that she was irritable the last night she saw her. (Tr. 94-95). Ms. DiCarlo denied making these statements. (See Tr. 100). Ms. DiCarlo's credibility already was suspect because of her inconsistent statements. The notebooks would have further discredited Ms. DiCarlo's testimony by providing the jury with additional information regarding Murray's mental state.

225.    The State of Ohio put Murray's mental state at issue at trial. As such, McKnight had a right to defend against and rebut the State's case. The trial court denied Gregory McKnight due process and

a fair trial when it refused to admit proffered Defense Exhibits G and H in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. McKnight was thus deprived of his fundamental right to defend against the charges brought by the State as well as his rights to a fair trial and due process.

226.    The merits decision of the Ohio courts on McKnight's claims was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**Thirteenth Ground for Relief**

**MCKNIGHT WAS DENIED HIS RIGHT TO A FAIR TRIAL AND IMPARTIAL JURY UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS, WHEN A MEMBER OF HIS JURY IGNORED THE TRIAL COURT'S ADMONITIONS AND ENGAGED IN DISCUSSIONS ABOUT THE CASE WITH MEMBERS OF THE COMMUNITY.**

227.    Gregory McKnight's rights to  due process, fair trial and by a fair and impartial jury was violated when a member of his jury ignored the trial court's admonitions and engaged in prejudicial discussions about the case with members of the community.

228.    At the beginning of voir dire, the trial court correctly instructed the venire that they "must be as free as humanly possible from bias, prejudice or sympathy and must not be influenced by preconceived ideas either as to the facts or as to the law."  (Voir Dire, Tr. 3-4).  The trial court informed the jury that the purpose of voir dire was "to obtain a fair and impartial jury." (Id. at Tr. 4).

229.    The venire was also instructed that a fair and impartial jury was one that did not engage in outside discussions or judge the case prior to receiving all the evidence:

> Listen closely.  This is very important.  Do not permit anyone to discuss the case with you or in your presence.  Do not form or express any opinion on the case until it is finally submitted to you.  It may be difficult for you to understand why you may not discuss this case among

106

yourselves until it is finally submitted to you. You will receive the opening statements, the evidence, the arguments of counsel, and the law from the court in that order.  It would be unfair to discuss the case among yourselves before you receive everything necessary to reach an informed decision.  (Voir Dire,  Tr. 8-9).

230.    Despite the clarity of the instructions, they were not followed. On October 4, 2002, the prosecution alerted the trial court and defense counsel to allegations of juror misconduct (Tr. 981). Amy Warrix reported to the Vinton County Sheriff's Office and to the Vinton County Prosecutor's Office that Juror I-49 had been talking about the case.  (Tr. 981-82).  Ms. Warrix remained at the courthouse in the event the trial court, prosecution or defense counsel wished to interview her.

231.    All parties retired to the judge's chambers.[30]  The trial court then proceeded to question Juror I-49.  He denied discussing the facts of the case with Ms. Warrix, but did admit to talking about the food served to the jury for lunch.  When asked why anyone would make such serious allegations if they were not true, Juror I-49 referred to Ms. Warrix as a "mean, hateful girl." (Id. at 983).

232.    The previous night, Juror I-49 and Ms. Warrix had been "riding around drinking" until about midnight.  (Id. at 984). According to Juror I-49, he had been involved in a relationship with Ms. Warrix that recently ended.  Juror I-49 believed Ms. Warrix was trying to do anything she could to send him to prison because she was "despiteful."  (Id. at 983).

233.    The trial court asked Juror I-49 if he had acquired any information about the case as a result of being around Ms. Warrix.  Although Juror I-49 denied this with certainty, he followed up by noting; "What she told me is nothing that's gone on in that courtroom.  I don't know where she got her stuff from that they was saying."  (Id at  987).  Juror I-49's responses clearly indicate that he and

---

[30]Counsel waived McKnight's presence at this point.  McKnight asserts this as error under his Nineteenth and Twenty-Sixth Grounds for Relief

Ms. Warrix had discussed facts about the case.

234.    The prosecution also inquired about the possibility of any pressure being exerted upon Juror I-49 as a result of his status as a juror in a high profile case. Juror I-49 admitted the question was difficult to answer, given that "anybody that knows that I'm a juror all says something to do with it." (Id. at 988-89). Based on Juror I-49's response, it is clear the Vinton County community was not shy about voicing their opinions about the trial to him. "Everybody around has got their own opinion formed about it, you know. It's not just them; it's everybody that does it, anybody that knows I'm a juror. (Id. at 988). It is clear from these responses that Juror I-49 was unable or unwilling to follow the court's admonitions and to refrain from any discussions of the case.

235.    Despite Ms. Warrix's serious allegations and immediate availability, the trial court, prosecution and defense counsel never questioned her.[31] Everyone was apparently satisfied with Juror I-49's responses, despite his clear admissions that he had discussed the case with Ms. Warrrix and others. The trial resumed.

236.    "The right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). In *Remmer v. United States*, 347 U.S. 227, 229 (1954), the Supreme Court expanded upon bias and impartiality in the context of unauthorized communication with a member of a jury:

> In a criminal case, any private communication, contact, or tampering, directly or
> indirectly, with a juror during a trial about the matter pending before the jury is,
> for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of

---

[31] To the extent that defense counsel failed to question Ms. Warrix, their performance fell far below prevailing professional norms and deprived McKnight of the effective assistance of counsel. McKnight asserts this claim in his Twenty-Sixth Ground for Relief.

known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

237.    The remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias. *Id*. "The integrity of jury proceedings must not be jeopardized by unauthorized invasions," *Id.*

238.    In light of Ms. Warrix's allegations, coupled with Juror I-49's clear responses that he had discussed the case and revelations about the community pressure exerted upon him, further exploration was essential to ensure that Mcknight received a fair trial by a fair and impartial jury.

239.    Confining the misconduct and community pressure questions to Juror I-49 was woefully inadequate in light of the following:

- Juror I-49 referred to Ms. Warrix as mean, hateful and despiteful. But this was his former girlfriend who only one night before, was "riding around drinking" with him till around midnight. ( Tr. 983-84).

- Juror I-49 twice voiced fear that he would be sent to prison or arrested for violating the trial court's instructions. (Tr. 983, 986). Given this fear, Juror I-49 had a vested interest in denying any misconduct to the trial court. His admission that he "registered to vote and everything so [he] could be a jury member and everything" and that he'd "been 29 years trying to be" a juror indicates he had an additional incentive to do whatever he could to try to remain on the jury in the case. (Id. at 989).

- Juror I-49 statement that he acquired no outside information about the case when talking with Ms. Warrix was conflicted by the next two sentences to come out of his mouth. "What she told me is nothing that's gone on in that courtroom. I don't know where she got her stuff from that they was saying." (*Id*. at 987). It is clear from this statement that the two had discussed the case.

- Juror I-49 claimed that he "never discussed the case with [Ms. Warrix] at all," but his statement appeared to be limited to a denial that *he* conveyed any information *to* Ms. Warrix. He never denied, however, that Ms. Warrix had shared information about the case *with him*, and in fact, indicated that she had done so. (*Id.* at 985).

- Juror I-49 confirmed that Ms. Warrix had "commented to [him] about what she thinks about the case," indicating that her comments consisted of "what she [had] seen on TV" about it. Indeed, Juror I-49's later statement that "[w]hat she told me is nothing that's gone on in that courtroom" is consistent with his earlier statement that Ms. Warrix shared details of television coverage of the case with him, and clearly indicates they discussed the case. (*Id*. at 987).

- Moreover, he admitted that her information went beyond the evidence that was presented during the trial proceedings when he explained that Ms. Warrix revealed information different from the evidence he had heard during what went "on in that courtroom" during the trial, noting that he "d[id]n't know where she got her stuff from," a comment that suggests Mr. Warrix shared information with Juror I-49 that was available to television viewers in the community, but excluded from the jurors hearing the evidence at trial. (*Id*.)

- Juror I-49 admitted that the Vinton County community continued to exert pressure on him during the trial.  Juror I-49's failure to deny that "anybody [had] told [him] how [he] should decide this case, on way or the other" proves the point.  Instead of denying receiving information and opinions about the case from Mr. Warrix and others in the community, Juror I-49 answered that the question was a "hard" one, "because *anybody that knows I'm a juror all says something to do with it*."  (*Id*. at 988).

- After alerting the Vinton County Sheriff and Prosecutor about the misconduct, Ms. Warrix remained at the courthouse to be available for questioning.  Absent inquiry of Ms. Warrix, the trial court had no means to judge the credibility of Juror I-49's answers.

240.   Despite inconsistent and alarming answers from Juror I-49, red flags that screamed for further exploration, the trial court failed to conduct a full *Remmer* hearing.  Juror I-49 was never asked what exactly Ms. Warrix or other members of the community shared with him about the case.  He was never specifically asked who the members of the community were that felt free to voice their opinions to members of the jury.  No questions were asked of Juror I-49 about whether he shared this information with other members of the jury.  Ms. Warrix was never questioned, even though the prosecutor pointed out she was present at the courthouse and "available to be heard from." (Tr. 881-82)

241.   Besides Juror I-49, no other member of the jury was individually questioned.  This was especially troubling, given Juror I-49's admission that "anybody that knows I'm a juror all says

something to do with it." (Tr. 888) The trial court neglected to individually question the entire jury to see if Juror I-49 had shared the information he obtained outside of the courtroom with them, or to determine whether other members of the community were exerting similar pressure on other members of the jury.

242. The trial court violated McKnight's right to due process and a fair trial by impartial and indifferent jurors by failing to conduct a full evidentiary hearing, accompanied by extensive questioning of Ms. Warrix and the entire jury, after the prosecution alerted it to potential juror misconduct.

243. Regardless of the trial court's failure to hold a *Remmer* hearing, prejudice from Juror I-49's misconduct should be presumed. Far from rebutting any presumption of prejudice, Juror I-49's answers reinforced it. Based on the answers given, the record is clear that McKnight's jury had at least one juror who engaged in prejudicial communications with multiple members of the community, including Ms. Warrix, who apparently told him what she had heard on television.

244. Any assurances from Juror I-49 about his ability to judge the case fairly are flatly contradicted by his own subsequent statements. The failure to remove Juror I-49 and question other members of the jury in light of his troubling admissions tainted the entire trial, and denied McKnight due process and a fair trial by an impartial jury.

245. The allegations of juror misconduct required the court to declare a mistrial, remove the juror from the panel, or minimally, conduct a *Remmer* hearing. The failure of the trial court to adequately address the allegations of juror misconduct violated McKnight's rights to a fair trial and to a trial by an impartial jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

111

Therefore, McKnight's conviction and sentence must be vacated. The writ must issue. Alternatively, this Court should conduct a full evidentiary hearing.

246.    To the extent the Ohio Courts ruled on the merits of this issue, those rulings were unreasonable applications of clearly established federal law as stated by the Supreme Court of the United States, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

**Fourteenth Ground for Relief**

**GREGORY MCKNIGHT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL BY A FAIR AND IMPARTIAL JURY WAS DENIED WHEN THE TRIAL COURT PERMITTED A JUROR TO REMAIN ON THE JURY AFTER THE JUROR WAS SLEEPING DURING THE PRESENTATION OF EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

247.    On October 1, 2002, after Detective Richard Brenneman testified, the State notified the court that jurors were sleeping and sweltering during the presentation of evidence. (Tr. 446). "Of course, I think they're sleeping, and its not even cross yet." (Id.) The trial court simply noted that it was hot in the courtroom and inquired about how long cross-examination would take. (Id.) "We can do cross and call it a day." (Id.)

248.    Six days later, during BCI forensic scientist Heather Zollman's testimony, the State once again notified the trial court that a juror was sleeping. (Tr. 1321-22). Prior to approaching the bench, the State assured the trial court that their discussion on the sleeping juror would take "no more than 15 seconds." (Tr. 1321). The following dialogue then took place between the trial court and the State's attorneys:

> MR. GLEESON: Your Honor, I take full responsibility for this because my presentation was probably not very exciting, but Melissa Trivette, one of our jurors, is like asleep. She's not now, she's wide awake. The cross must have

been exciting, woke her up. But I would just ask the Court to pay attention to her to see if she is dozing off, and if we need to take any corrective measures because of that--

THE COURT: Okay. Well, the Court would note she doesn't really look around that much anyway. It's her position pretty much to just sit there and look straight ahead.

MR. GLEESON: Well, she was sleeping.

THE COURT: I'm not doubting that. I'm not doubting that. I'm just saying that she does not look around - move around like the other jurors typically do, or even other the other jurors here do. She just pretty much just kind of maintains a fixed position as she has throughout.

MR. CANEPA: Yeah, Judge. Tim actually said the same thing to me, but I said, "Well, that's usually true, except she had her eyes closed and her head down."

THE COURT: The Court will certainly take note of that, and be aware of that.

(Tr. 1321-22).

249.    The record reflects the trial court initially disagreed that the juror was sleeping during testimony, then subsequently noted the incident without taking any corrective action. (Id.)

250.    Despite two separate allegations of juror misconduct, McKnight's jury was never admonished to stay awake and alert, nor were any steps taken to remove the sleeping juror.  The trial court never indicated it would monitor the jury to see if the misconduct continued.   No action was taken to cure what may have been causing the problem. This juror misconduct was simply never addressed by the trial court.[32]

251.    This failure is even more egregious considering the significance of the State's witnesses who

_____

[32] Trial counsel failed to object to the trial court's failure to take any corrective action, or to request that the sleeping juror be removed and replaced with an alternate juror.  This claim is raised in McKnight's Twenty-Sixth Ground for Relief.

testified while the jurors slept. Detective Brenneman introduced and testified in detail about the photographs of McKnight's trailer and Ms. Murray's Subaru Outback, in addition to personal items found in Ms. Murray's dorm room. (Tr. 415-45).

252.     Moreover, Ms. Zollman testified about bullets found in a tree and grey matter within the bullet jacket. (Tr. 1286). She concluded that bullets and bullet jackets were fired from the same gun. (Tr. 1288-89). She testified about bullet fragments from Ms. Murray and the type and caliber to cause skull fragmentation. (Tr. 1297-99). She also testified that the hole in the floor of trailer was caused by a bullet. (Tr.1301-02).

253.     During cross-examination, Zollman testified that the tests performed on the bullets offered nothing to determine when they were fired. (Tr. 1306). Zollman also admitted that her lab tests were not one hundred percent verified. (Tr. 1307). Upon further questioning from defense counsel, Zollman admitted no determination could be made with respect to the caliber of bullet that was found in Ms. Murray. (Tr. 1310). She also testified on cross that no conclusive results were found from tests on a knife or brush cutter belonging to Kim Zimmerman, McKnight's sister-in-law, who lived across the street from McKnight's trailer. (Tr. 1312). She further testified on cross-examination about BCI's inconclusive findings on items attempting to connect McKnight to these crimes. (Tr. 1317).

254.     Since Juror J-40 was sleeping during this crucial testimony, she would have been unable to deliberate about the evidence presented in court. It is axiomatic that a juror who sleeps during the presentation of evidence cannot have listened to that evidence and could not therefore deliberate about that evidence. It is imperative that a juror hear all of the evidence because a juror sleeping effectively reduces the number of jurors participating in the deliverance of the verdict. *See Parker v. Gladden*, 385 U.S. 363, 366 (1966) (defendant "entitled to be tried by 12, not 9 or even 10, impartial and

114

unprejudiced jurors"). A sleeping juror is no juror.

255.    One of the basic tenets a criminal defendant has is the right to a trial by a fair and impartial jury.  A juror is unable to perform his or her duties once he or she becomes biased, incapacitated, or substantially impaired from performing the duties of a juror as commanded by the instructions and oath. *Adams v. Texas*, 448 U.S. 38, 45 (1980). A juror who sleeps during the presentation of evidence is incapacitated from performing the duties expected of a juror, i.e. deliberating about the significance of evidence presented. *United States v. Warner*, 690 F.2d 545, 555 (6th Cir. 1982).

256.    The trial court's inaction was unreasonable and violated McKnight's right to a fair and impartial jury determination as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.

257.    The State informed the court that a juror or jurors were sleeping on two occasions. (Tr. 446; Tr. 1321-22). Twice the court did nothing to cure the sleeping problem or to remove the sleeping juror. (Id.) Jurors who slept during the presentation of evidence decided whether Gregory McKnight was guilty of the capital crimes for which he was charged and whether he should live or die at the penalty phase.  Here, the trial court's failure to address the sleeping jurors in any manner or to remove the sleeping juror denied McKnight due process and a fair trial by a fair and impartial jury.

258.    The trial court had a duty to protect the rights of McKnight in his capital case. *Powell v. Alabama*, 287 U.S. 45 (1932). Sleeping jurors affected the integrity of both phases of McKnight's capital trial, and also denied him a fair, reliable, and impartial jury determination. The trial court should have dismissed the sleeping jurors because of their inability to stay awake during critical testimony.   This failure denied McKnight the right to a jury determination based on all of the evidence.

259.    McKnight's conviction and death sentence violates the Fifth, Sixth, Eighth, and Fourteenth

Amendments because a juror slept during the presentation of evidence in the culpability phase.  This error affects the fundamental fairness of the trial and the right to a reliable, fair, and impartial jury

under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  The constitutionally mandated result is to have McKnight's conviction vacated and sentence set aside.

260.    To the extent the Ohio courts ruled on the merits of McKnight's claim, relative to the irrelevant and inflammatory evidence introduced during the trial and penalty phase, their rulings were an unreasonable applications of clearly established federal law as stated by the Supreme Court of the United States, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**Fifteenth Ground for Relief**

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS RIGHT AND A FAIR TRIAL,  IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS WHEN THE TRIAL COURT FAILED TO TAKE CURATIVE ACTION AFTER HIS TRIAL WAS DISRUPTED DURING CLOSING ARGUMENTS OF THE TRIAL PHASE.**

261.    An emotionally charged outburst during defense counsel's closing argument disrupted Gregory McKnight's capital trial.  Given the tenor of the community, both prior to and during the trial, this outburst further prejudiced the jury against McKnight. Confronted with this situation, the trial court failed to take any curative action. The public disruption, coupled with the trial court's failure to act, deprived McKnight of a fair trial in front of a fair and impartial jury.

262.    During closing argument, counsel argued McKnight had no reason or motive to kidnap and murder Emily Murray.  McKnight and Murray were co-workers and by all accounts friendly with one another.  The following transpired during defense counsel's closing argument:

> DEFENSE COUNSEL: Why would he want to kill Emily? No. 3, Emily liked Greg, according to Abigail Williams. Emily and Greg were considering a relationship, according to Nate Justice.
>
> AUDIENCE MEMBER: No.

(Tr. 1722).  Following this outburst, the trial court took no curative action.[33]

263.    The spectator's outburst was an attack on the sincerity and integrity of the argument put forth by McKnight's defense counsel, as well as an affront to the credibility of McKnight himself.  A public disruption, of sufficient magnitude for the court reporter to take report it in the official transcript, occurred during a critical phase of McKnight's trial.  Yet, the trial court failed to address this emotional disruption or to give any curative instruction.

264.    Once inappropriate contact with a juror occurs, the trial court must conduct a hearing to determine if the actions violated the defendant's rights to a fair trial by an impartial jury, a reliable sentencing determination, and due process.  *Remmer v. United States,* 347 U.S. 227, 229-30 (1954).  *Remmer* addressed the question of whether third party contact with a deliberating juror violated the Sixth Amendment right to a fair trial by an impartial jury.  However, the central holding of *Remmer* has been extended to any "communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury..." *White v. Smith*, 984 F.2d 163, 166 ( 6th Cir. 1993).

265.    Despite its "ultimate responsibility" for ensuring McKnight a fair trial and protecting his due process rights, the trial court took no curative action.  *See Lakeside v. Oregon*, 435 U.S. 333, 341-42

---

[33]Defense counsel also failed to request curative action after the emotional outburst from a spectator in the courtroom.  This failure is raised in McKnight's Twenty-Sixth Ground for Relief under ineffective assistance of counsel.

(1978). The trial court failed to ensure that the disruption would not infringe on McKnight's rights to a fair trial by a fair and impartial jury. The trial court failed to admonish the jury or individually question jurors to ensure that the disruption would not impact on the jury's ability to be fair and impartial. The jury was not instructed to disregard the outburst.

266. The jury was not instructed that spectators in the courtroom know nothing about the facts relevant to the issue of guilt or innocence. The trial court did not ask the jurors if the outburst would influence their opinion or influence their conduct in the penalty phase of the trial. The jury should have been instructed to act on their conscience, not the conscience of angry courtroom spectators. "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907).

267. The trial court should have acted to ameliorate the effect of this outburst. Many remedies existed to address this disruption, yet the trial court failed to do anything. The jury assembled to decide McKnight's guilt/innocence and punishment was exposed to an inflammatory and extraneous outburst from a courtroom spectator. The outburst was a direct attack on McKnight's defense which required further investigation by the trial court. *See Remmer*, 347 U.S. at 229-30. All parties involved in McKnight's case needed to know whether the jurors' exposure to this extraneous contact would impact on the enormous decisions they were about to make. Far short of conducting a *Remmer* hearing, the trial court did not even question or admonish the jury.

268. The extensive and inflammatory pre-trial publicity surrounding McKnight's case compounded the court's failure to act. In the months preceding McKnight's trial, the media saturated

118

Vinton County with stories of the deaths of Murray and Julious.[34] The articles were emotionally charged and prejudicial. The State echoed this presentation by eliciting victim impact and victim character evidence, further inflaming the jury. The State also introduced extensive bad character evidence, portraying McKnight as an evil black male who preyed on white women.

269.     Moreover, jurors continued to be assaulted with publicity, or at least the opinions of what should happen in McKnight's case from the Vinton County community. Juror I-49 engaged in prejudicial discussions and upon questions from the trial court, admitted that "anybody that knows I'm a juror all says something to do with it." (Tr. 988-89). "Everybody around has got their own opinion formed about it, you know. It's not just them; it's everybody that does it, anybody that knows I'm a juror." (Id.)

270.     The highly charged and emotional atmosphere surrounding McKnight's trial is demonstrated further by the second public disruption of McKnight's trial, which occurred post-sentence. Following the imposition of death upon McKnight, a courtroom spectator shouted and expressed approval of the sentence. (Tr. 2118). Again, the trial court failed to address this disruption. Although defense counsel failed to ask for a *Remmer* hearing or other corrective action, the trial court was required to remedy this outburst. The "ultimate responsibility" for protecting McKnight's due process rights and ensuring him a fair trial rested with the trial court. *See Powell v. Alabama*, 287 U.S. 45 (1932).

271.     The culmination of the pretrial publicity, inflammatory evidence, and direct contact with jurors from members of the community, coupled with the public disruptions of McKnight's trial, deprived him of a fair trial and a verdict rendered by an impartial and unbiased jury in violation of

---

[34] For full analysis of this issue, see McKnight's Second Ground for Relief where he argues a change of venue was necessary due to the extensive and inflammatory pre-trial publicity.

the Fifth, Sixth, Eighth and Fourteenth Amendments.

272.    To the extent the Ohio courts ruled on the merits of the trial court's failure to change venue, their rulings were an unreasonable application of clearly established federal law as stated by the Supreme Court of the United Sates, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C.  § 2254 (d).

**Sixteenth Ground for Relief**

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS AND A FAIR TRIAL AND IMPARTIAL JURY WHEN HE WAS SHACKLED IN THE COURTROOM IN FRONT OF THE JURY IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS**

273.    Gregory McKnight's was denied due process, a fair trial and the right to a fair and impartial jury when he was shackled in the courtroom in front of the jury, without any finding by the trial court of a necessity for such shackling.

274.    Gregory McKnight was shackled in plain view of the jury during his capital trial. This was inherently prejudicial as shackling may only be used as a last resort to prevent escape or to protect individuals in the courtroom. *Illinois v. Allen*, 397 U.S. 337, 344 (1970). The shackling of McKnight in the presence of a jury without cause deprived him of due process and a fair trial by a fair and impartial jury.

275.    On May 14, 2001, McKnight filed a motion to appear at all proceedings without restraints. The trial court granted McKnight's motion on August 23, 2002. (See Ordered Entered August 23, 2001)

276.    After the trial court gave the jury its trial phase instructions, McKnight was placed in handcuffs in the presence of the jury. (Tr. 1852). Trial counsel promptly moved for a mistrial because McKnight was shackled in front of the jury while in the courtroom. (Id). However, McKnight never

120

caused any disturbances or posed any special security risks at any time during the trial. The trial court denied McKnight's motion for a mistrial. (Tr. 1854) The State advised that it would work on a proposed curative instruction. (Id.)

277.    The following day, the trial court advised the defense that it would give a curative instruction unless the defendant withdrew the previous motion for a mistrial. (Tr. 1858). The defense declined to withdraw their motion for a mistrial because it had already been ruled upon and requested that "no curative instruction be given because it only amplifies or brings further attention to it." (Tr. 1858-62). The parties disagreed whether the curative instruction would cure the problem or draws more attention it. (Id.). Over defense objection, the trial court gave the following instruction:

> Ladies and gentlemen, the Court hereby gives you the following additional instructions: If you have seen Gregory B. McKnight in any type of restraints at any time during this proceeding, you are hereby instructed to disregard it, as it does not bear on his guilt or innocence in any manner. That is the additional instruction.

(Tr.1869).

278.    The right to a fair trial is a fundamental right secured by the Fourteenth Amendment to the United States Constitution. *Drope v. Missouri*, 420 U.S. 162. 172 (1975). The United States Supreme Court uniformly has recognized that certain practices pose a threat to the fairness of the judicial process. Among these practices is that of shackling the defendant in the presence of the jury. *United States v. Moreno*. 933 F.2d 362, 368 (6th Cir. 1991). Shackles are a constant reminder of the accused's condition, which may affect a juror's judgment. *Estelle v. Williams*, 425 U.S. 501, 503-504 (1976). Thus, the United States Supreme Court has determined that shackling the defendant is an inherently prejudicial practice. *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986); See also *Moreno*, 933 F.2d at 368.

121

279.    The shackling of McKnight denied him due process and a fair trial precisely because it was inherently prejudicial. McKnight was shackled in the courtroom while jury members were still present. (Tr. 1852). This is not a case where McKnight was shackled for security purposes or in other parts of the courthouse for transportation purposes. The trial court did not conduct a hearing to determine whether McKnight needed to be shackled while in the courtroom. The trial court previously ruled that he should not be shackled. *See Holbrook, 475 U.S. at 569.* McKnight was shackled in front of the jury absent any necessity for such shackling him. However inadvertent this incident may have been, the jury saw McKnight being shackled while still in the courtroom. (Tr. 1852)

280.    The trial court's denial of McKnight's motion for a mistrial and its giving of a curative instruction over objection, denied McKnight due process and fair trial by a fair and impartial jury.

281.    The fundamental fairness of McKnight's trial was undermined when officers placed shackles on McKnight within the view of the jury while still in the courtroom. The prejudicial harm that the jury unmistakably branded McKnight as a dangerous individual posed an unacceptable threat to his right to due process and a fair trial, under the   Fifth, Sixth, Eighth, and Fourteenth Amendments.

282.    The merits decision of the Ohio courts on McKnight's claims was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**Seventeenth Ground for Relief**

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE TRIAL COURT'S INSTRUCTIONS THAT DID NOT REQUIRE UNANIMOUS JURY VERDICTS IN VIOLATION OF THE FIFTH, SIXTH,  EIGHTH, AND FOURTEENTH**

## AMENDMENTS WHEN THE VERDICT WAS PREDICATED ON ALTERNATIVE THEORIES OF GUILT

283.    Gregory McKnight was indicted on one count of aggravated murder with five specifications of statutory aggravating circumstances, one count of kidnaping, one count of aggravated robbery, and one count of murder. The first specification, under Ohio Rev. Code 2929.04(A)(3) charged him with the committing the aggravated murder for the purpose of escaping detection for commission of another crime. The trial court later instructed the jury with two distinctive substantive offenses under that specification.(Tr.1812-13)  Furthermore, the trial court instructed the jury with alternative means of committing each felony.(Id.)

284.    Joining these two distinct substantive offenses for purposes of finding escaping detection permitted the jury to return a guilty verdict without the unanimous agreement of all twelve jurors. Some members of the jury may have voted for conviction based on one theory, while others may have voted for a conviction based on another theory. The convictions cannot stand.

285.    The first specification under Ohio Rev. Code § 2929.04(A)(3) was that the "offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender." (See Indictment, filed April 11, 2001). The trial court subsequently instructed the jury on the specification as: "you must decide whether the State has proved beyond a reasonable doubt that Gregory McKnight committed the aggravated murder for the purpose of escaping detection, apprehension, trial or punishment for kidnaping **and/or** a theft offense." (Tr. 1812). (Emphasis added)

286.    McKnight was charged in Count 2 of violating Ohio Rev. Code. § 2905.01(A)(3), the kidnaping of Emily S. Murray. (See Indictment, filed April 11, 2001). As to this count, the trial court

123

instructed the jury: "Gregory McKnight, by force, threat or deception, did remove Emily Murray from the place where she was found or restrain Emily Murray of her liberty for the purpose of terrorizing or inflicting serious physical harm on Emily Murray." (Tr. 1821).

287.    In Count 3, McKnight was charged with aggravated robbery. (*See* Indictment, filed April 11, 2001). The trial court instructed the jury that: "Gregory McKnight, with purpose to deprive the owner of a green Subaru Outback, knowingly obtained or exerted control over the green Subaru Outback without the consent of the owner or person authorized to give consent or by threat" (Tr. 1824-25)

### A. Escaping Detection Instruction

288.    The joinder of "kidnaping and/or theft offense" in the (A)(3) escaping detection specification violated McKnight's due process rights. Just as it would be improper to charge a defendant with embezzlement, reckless driving, murder, burglary, tax evasion, and littering in a single count, so too was it a violation of a fundamental principle of due process to charge McKnight with "kidnaping and/or theft offense" in a single specification. ( *Schad v. Arizona*, 501 U.S. 624, 632.(1991) ( if the statutory alternatives constituted independent elements then they must be charged in separate counts of the indictment, and their existence must be separately determined by the fact finder). (citing *Cabana v. Bullock*, 474 U.S. 376, 384) (1986)).The indictment and jury instructions, joining the separate offense of kidnaping and a theft offense, lacked the requisite specificity that fundamental due process requires to avoid duplicity. *Id*. at 633.

289.    McKnight was convicted of "kidnaping and/or theft offense." People of common intelligence would be relegated to different guesses as to whether this meant that he was found guilty of kidnaping but not a theft offense, a theft offense but not kidnaping, or both kidnaping and a theft offense. The

124

"requirement of proof of specific illegal conduct" is absent because individuals are left guessing as to which theory the jury predicated its finding of *Id.* The requirement of specificity is not avoided even though the jury was instructed separately on those charges. *Id.* at n.4.

290. Additionally, by charging McKnight with "kidnaping and/or theft offense," the State deprived him of his right to a unanimous jury verdict, thus denying him due process and a fair trial. *Duncan v. Louisiana*, 391 U.S. 145, 152 (1968) The jury could have returned a verdict of guilty as to this specification even though some jurors based this on the kidnaping element, while others based their finding on a theft offense. Some jurors may have based it on both. Therefore, McKnight's conviction and death sentence for "kidnaping and/or a theft offense" in the escaping detection specification violates the due process principle against duplicity and lack of unanimity.

### B. Kidnaping Instruction

291. The kidnaping instruction standing alone likewise violates the due process principle against duplicity. The jury was instructed to determine "if by force, threat or deception, [McKnight] did remove Emily Murray from the place where she was found or restrain Emily Murray or her liberty for the purpose of terrorizing or inflicting serious physical harm on Emily Murray." ( Tr.1821).

292. The statutory alternatives of Ohio's kidnaping offense violate the Constitutional limits against duplicity. See *Schad*, 501 U.S. at 633. One juror could have found him guilty because he or she believed that McKnight used threat, force or deception to remove Murray from the place she was found. Other jurors could have found that McKnight restrained the liberty of Murray in Vinton County. Due to the uncertainty upon which alternative theory the jury convicted McKnight, his conviction for kidnaping lacks the specificity required under fundamental principles of due process.

293. Furthermore, by charging McKnight with alternative means of committing kidnaping, the

125

State deprived him of his right to a unanimous jury verdict in violation of due process.

### C. Robbery Instruction

294.   In Count 3, McKnight was charged with aggravated robbery. As applied to McKnight, this charge likewise violated rules against duplicity. McKnight was charged and the jury was instructed that aggravated robbery is established if the Subaru Outback was knowingly obtained **or** if he exerted control over the car without consent or by threat. Once again, McKnight's jury was left with alternative means of convicting him of aggravated robbery.

295.   Just as in the charge of kidnaping, the alternative means by which McKnight's jury could have convicted him on the charge of aggravated robbery is duplicative thereby violating due process. See *Schad*, 501 U.S. at 632. It is unknown whether the jury convicted McKnight of knowingly obtaining the Subaru Outback or simply exerting control over the car. It is simply unknown whether the jury believed McKnight controlled the Subaru Outback without consent or obtained control by threat.

296.   By charging McKnight with alternative means of committing aggravated robbery, the State deprived him of his right to a unanimous verdict denying him due process and a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

297.   Based on the verdicts obtained in the trial court on these charges and instructions, it is impossible to know which element of any of these charges was found, or if there was a unanimous verdict as to any individual element. This violated McKnight's rights against duplicity and his right to unanimous verdicts and denying him due process and a fair trial. As such, the writ must issue.

298.   The merits decision of the Ohio courts on McKnight's claims was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in

126

light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**Eighteenth Ground for Relief**

**GREGORY MCKNIGHT'S RIGHT TO DUE PROCESS, A FAIR TRIAL AND IMPARTIAL JURY WERE DENIED UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS WHEN IT INSTRUCTED THE JURY ON OHIO REV. CODE. § 2905.01(C) MITIGATING FACTOR WHEN MCKNIGHT DID NOT RAISE THIS AFFIRMATIVE DEFENSE**

299.    Trial Court erred in instructing the jury on a mitigating factor of an offense when

McKnight did not raise this mitigating factor.

300.    The trial court's instruction and required the jury to make a specific finding whether Emily

Murray was "released in a safe place unharmed" when considering the kidnaping charge under Ohio

Rev. Code. § 2905.01( C ) The trial court required this finding because the State indicted McKnight

with this affirmative defense factor in subsection( C ). The trial court's instruction rendered

McKnight's convictions void in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

301.     In the Count 2, McKnight was charged with the kidnaping of Emily Murray:

> Gregory B. McKnight did by force, threat or deception, remove Emily S. Murray
> from the place where Emily S. Murray was found, or restrained the liberty of
> Emily S. Murray, with purpose to: terrorize or inflict serious physical harm on
> Emily S. Murray, and McKnight did not release Emily S. Murray in a safe place
> unharmed.

(See Indictment, filed April 11, 2001).

302.     The State's bill of particulars, further alleged that "McKnight did not release

127

Emily S. Murray in a safe place unharmed. Instead, he shot her in the head with a firearm." (Bill of Particulars, June 5, 2002).

303.    The trial court's instructions contained this same language when defining kidnaping in Count 2. (Tr.1821-23). The trial court further instructed the jury in Count 2 that: "[i]f you find that the State proved beyond a reasonable doubt all the essential elements of the offense of kidnaping, your verdict must be guilty. You must then go on to decide whether Emily Murray was or was not released in a safe place unharmed." (Tr. 1823).

304.    On October 4, 2002, McKnight filed proposed trial phase jury instructions. McKnight did propose a kidnaping instruction which did not include the affirmative defense of releasing Murray unharmed in a safe place. The jury made a specific finding that Murray was not released unharmed in a safe place. (Verdict Form, Filed October 10, 2002)

305.    In Ohio, a kidnaping conviction is a felony of the first degree. Ohio Rev. Code § 2905.01 ( C ). However, 2905.01(C)contains a mitigating provision to reduce the conviction to a felony of the second degree. Id. "If the offender releases the victim in a safe place unharmed," then the conviction will be reduced to a second-degree felony. *Id.* This mitigating provision of Ohio Rev. Code. § 2905.01( C ) is an affirmative defense.

306.    The State presented insufficient evidence that Murray had been kidnaped. (See Thirty-Fourth Ground For Relief). The State sought to prove this crime by implying that McKnight took Murray to Vinton County after work on November 3, 2000 by force, threat, or deception and restrained her liberty at that location. McKnight did not present any evidence that Murray was released in a safe place unharmed. It was error for the trial court to instruct McKnight's jury on the Ohio Rev. Code § 2905.01( C ) mitigating factor.

128

307.    McKnight was prejudiced by the trial court's instruction and the State's use of the
§ 2905.01 ( C ) mitigating factor as an aggravating element. When a victim is killed, it is impossible, as a matter of law, to present evidence that the victim was released in a safe place unharmed. Thus, the jury could have used this element as proof for the underlying felony. By giving this instruction, the trial court instructed the jury to make a determination on an improper element to McKnight's prejudice. In fact, the jury made a specific finding on the mitigating factor of Ohio Rev. Code §2905.01 ( C ) (Verdict forms, filed October 24, 2002). The instructions coupled with the State's arguments that Murray was not released in a safe place unharmed turned this mitigating factor into an aggravating element.

308.    Instructing the jury on the mitigating factor of Ohio Rev. Code § 2905.01( C ) as an element of kidnaping was error. Furthermore, the trial court compounded this error by instructing the jury and requiring the jury to make a specific finding on this affirmative defense when McKnight did not present any evidence violated his due process rights.

309.    The merits decision of the Ohio courts on McKnight's claims was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**Nineteenth Ground for Relief**

**GREGORY MCKNIGHT WAS DENIED A FAIR TRIAL, DUE PROCESS AND THE RIGHT TO CONFRONT WITNESSES AGAINST HIM  IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS WHEN HE WAS EXCLUDED FROM CRITICAL PORTIONS OF HIS CAPITAL TRIAL.**

310.    On the fifth day of trial, the State informed the trial court and defense counsel that Amy

Warrix reported that Juror I-49 was talking to her about Gregory McKnight's trial.(Tr. 981). Warrix was available and willing to be questioned about the issue. (Id.). The trial court brought Juror I-49 into chambers to voir dire him on the issue. (Tr. 982). Defense counsel waived McKnight's presence at this voir dire. (Id.) This waiver was done by defense counsel rather than by McKnight. (Id.)  The trial court, State, and defense counsel proceeded to voir dire Juror I-49 in McKnight's absence. Juror I-49 stated that Warrix was "despiteful" because he broke up with her the previous night. He denied talking to her about McKnight's trial. (Tr. 983). All parties declined to voir dire Warrix. (Tr. 989-90).

311.    Later in the trial, McKnight was once again excluded from a hearing to review the proposed jury instructions. (Tr. 1640). The record simply indicates that McKnight was not present without any mention of a waiver by him or counsel. (Id.).[35]

312.    One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial.  *Lewis v. United States*, 146 U.S. 370 (1892).  A defendant is required to be present at every stage of the trial except when he voluntarily declines to attend the proceedings. *Hopt v. Utah*, 110 U.S. 574 (1884).

313.    At trial, McKnight's counsel unilaterally waived his presence during the questioning of Juror I-49 to determine whether there had been juror misconduct. (Tr. 982). Although McKnight was available and in the courtroom, he was not present for the voir dire of Juror I-49, nor did he waive his presence. (Id.)  The trial court and defense counsel simply failed to secure McKnight's voluntary waiver to attend these proceedings. A waiver of such constitutional rights must be made part of the record in order to demonstrate that the waiver was done knowingly, intelligently and voluntary.

---

[35] See McKnight's Twenty-Sixth Ground for Relief for discussion of ineffective assistance of counsel for waiving his presence.

Furthermore, McKnight's absence from the proposed hearing on juror instructions was apparent from the record which does not contain any waiver of McKnight's presence. Without a written or oral waiver in the record, it can not be presumed that a knowing, intelligent and voluntary waiver of appearance was secured.

314.    Proceedings resolving questions of juror misconduct based on credibility and decisions on what persons should be examined are necessarily critical proceedings that require the presence and input of the accused.  The hearing on proposed jury instructions likewise was critical as those instructions defined the parameters within which the jury decided whether he should live or die

315.    As a result, McKnight was denied Due Process, his right to Confrontation and right to be present as guaranteed by the Fifth, Sixth. Eighth and Fourteenth Amendments.

316.    The merits decision of the Ohio courts on McKnight's right to be present at all proceedings was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(D).

**Twentieth Ground for Relief**

**GREGORY MCKNIGHT'S WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE STATE WAS PERMITTED TO CONVICT UPON A STANDARD OF PROOF BELOW PROOF BEYOND A REASONABLE DOUBT IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS**

317.    The trial court instructed the jury with the statutory definitions of reasonable doubt found in §2901.05 of the Ohio Revised Code.

318.    During the trial phase, the court instructed the jury on "reasonable doubt" as follows:

> Reasonable doubt is present when, after you have carefully considered and compared

131

all evidence, you cannot say you are firmly convinced of the truth of the charges.  Reasonable doubt is a doubt based on reason and common sense.  Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending upon moral evidence is open to some possible or imaginary doubt.  Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

If, after a full and impartial consideration of all the evidence, you are firmly convinced of the truth of the charge, the State has proved its case beyond a reasonable doubt. If you are not firmly convinced of the truth of the charge, you must find Gregory McKnight not guilty.

(Tr. 1797-98)

319.    During the sentencing phase, the court instructed the jury on "reasonable doubt"

as follows:

Reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced that the aggravating circumstances of which the defendant was found guilty outweigh the mitigating factors.  Reasonable doubt is a doubt based upon reason and common sense.  Reasonable doubt is not mere possible doubt because anything relating to human affairs or depending upon moral evidence is open to some possible or imaginary doubt.  Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

(Tr. 1925)

320.    These instructions did not adequately convey to the jurors the stringent "beyond a reasonable

doubt" standard of proof required under the Fifth, Sixth, Eighth and Fourteenth Amendments.

321.    "[I]t is critical that the moral force of the criminal law not to be diluted by a standard of proof

that leaves people in doubt whether innocent men are being condemned.." *In re Winship*, 397 U.S.

358, 369 (1970).  The Court has expressed strong disapproval of the "willing to act" language when

defining proof beyond a reasonable doubt. *Holland v. United States*, 348 U.S. 121, 140 (1954).

322.    The § 2901.05 definition of reasonable doubt given to the jury permits jurors to find guilt on

132

proof below that required by the Due Process Clause of the Fourteenth Amendment and to sentence to death on a standard below that required by the Eighth Amendment. The jury convicted and sentenced Gregory McKnight to death on a "clear and convincing evidence" standard.

323.    The "willing to act" language contained in § 2901.05, provided to the jury, did not properly guide the jury because it is too lenient.

324.    The statutory definition of reasonable doubt is further flawed because the "firmly convinced" language in the first sentence of § 2901.05(D) does not define the reasonable doubt standard required by the Constitution as articulated in *Winship*, 397 U.S. at 369. Instead this standard is nearly identical to the impermissibly lower civil standard for "clear and convincing" evidence. *See Holland*, 348 U.S. at 140; *Scurry v. United States*, 347 F.2d 468, 470 (D.C. Cir. 1965).

325.    As a result, the jury convicted and sentenced McKnight on an unconstitutionally low standard of proof. This was a fundamental, structural error that requires reversal of McKnight's convictions and sentences.

326.    As a result of these improper instructions, there is a reasonable probability that Gregory McKnight was convicted and sentenced to death on proof that did not reach the high standards of proof beyond a reasonable doubt in violation of McKnight's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. As such a writ of habeas corpus should issue.

327.    The decision of the Ohio courts on McKnight's claims relative to this claim was contrary to, or an unreasonable application of, clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts. Therefore, the writ should issue. 28 U.S.C. § 2254(d).

**Twenty-First Ground for Relief**

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS, EQUAL PROTECTION, AND A FAIR AND RELIABLE CAPITAL SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH , EIGHTH, AND FOURTEENTH AMENDMENTS BECAUSE THE TRIAL COURT EXCLUDED VICTIM IMPACT EVIDENCE ABOUT THE EFFECT OF A HOMICIDE ON THE VICTIM'S FAMILY, AND RELEVANT MITIGATING EVIDENCE**

328.     On October 14, 2002, defense counsel filed a motion seeking a continuance to develop mitigating evidence. This mitigation evidence was in the form of victim impact evidence from Emily Murray's family that McKnight should be sentenced to life in prison. (Tr. 1902-03; Tr.1997.)The trial court denied McKnight's motion. (Tr. 1919.) On October 24, 2002, counsel also filed a supplemental memorandum in support with an affidavit from Kathleen Murray, the sister of Emily Murray attached. (Tr. 2095-98 ) (See A-24, A-32).

329.     Kathleen Murray's affidavit asked the trial court to spare McKnight's life because Emily was staunchly opposed to capital punishment. (A-32). However, Kathleen Murray also expressed her belief that McKnight's life should be spared because "more court proceedings may tear our family apart, within ourselves, and perhaps even from each other." Id. Kathleen Murray also requested mercy for McKnight because he was the father of young children who could suffer from the loss of their father if he were executed. *Id.*

330.     The trial court excluded this evidence from the jury's consideration. (Tr. 1919). The trial court did not consider this evidence itself when it conducted its independent sentencing assessment. (Tr. 2095-98). The exclusion of this relevant evidence denied McKnight a fair and reliable sentencing determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Both the jury and judge should have considered and weighed this evidence in mitigation.

331.    The Supreme Court of Ohio has held that mere opinions expressed by surviving victim's are improper in capital sentencing proceedings because such opinions usurp the function of the jury and judge. *State v. Huertas*, 51 Ohio St. 3d 22, 553 N.E.2d 1058, syl. (1990). But the proposed testimony of Kathleen Murray did not merely offer an unvarnished opinion against the death penalty. Instead, her opinion that McKnight deserved a life sentence was linked to evidence of his "history" and "background". See Ohio Rev. Code § 2929.04(B). Her appeal for mercy was based, in part, on the fact that McKnight is the father of young children who would miss him. *See State v. Smith* 89 Ohio St. 3d 323, 339, 731 N.E.2d 645, 660 (2000) (love and support of family members is entitled to weight as mitigation). Kathleen Murray's opinions bore upon McKnight's personal history and record, as well as upon the effect the murder and ongoing court proceedings would have on their family. See *Skipper v. South Carolina*. 476 U.S. 1, 7-8 (1986); *Lockett v. Ohio*, 438 U.S.586, 604-05 (1978). Indeed, considering the source of this mitigation, it cannot be said that its exclusion was harmless error. See *Brown v. Luebbers*, No. 02-1845 EM, unreported at 15-17 (8th Cir. Sept. 19, 2003) (trial court excluded letter offered by habeas petitioner's brother at penalty phase expressing request for mercy; source of mitigation was unique since petitioner's brother was on active military duty; error not harmless)

332.    The trial court's error in not admitting this crucial mitigating evidence also violated McKnight's right to equal protection. See generally, *Yick Wo v. Hopkins*. 118 U.S 356 (1986) Evidence about the impact or effect of a capital crime on surviving victims may be considered without constitutional constraints. *Payne v. Tennessee*, 501 U.S. 808 827(1991) Such evidence is permissible when presented to the sentencer in capital cases in Ohio. See *State v. Fautenberry* , 72 Ohio St. 3d 435, 439-40, 650 N.E.2d 878, 882-83 (1995).

135

333.    McKnight sought to present true victim impact evidence, the type approved of in *Payne*; and the type of evidence that may be considered by a capital sentencer in Ohio when it has been offered by the State. See *Fautenberry,* 72 Ohio St. 3d at 439-40, 65- N.E.2d at 882-83. The main thrust of Kathleen Murray's affidavit was devoted to explaining that further litigation of McKnight's death sentence would adversely impact on her and her family.

334.    Because this evidence constituted true victim impact evidence, it could not be excluded without violating his right to due process and equal protection under the Fifth, Sixth, Eighth and Fourteenth Amendments. It is a denial of due process to permit victim impact evidence in capital sentencing proceedings only when such evidence is presented by and benefits the State.

335.    The merits decision of the Ohio courts on McKnight's claims was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**Twenty-Second Ground for Relief**

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE TRIAL COURT'S INSTRUCTION ON AN INVALID AGGRAVATING CIRCUMSTANCE THAT IS NOT AUTHORIZED BY OHIO'S CAPITAL SENTENCING STATUTE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS**

336.    Gregory McKnight was convicted of four aggravating circumstances, attached to count one of the indictment: Ohio Rev. Code §§ 2929.04(A)(3)(escaping detection); 2929.04(A)(5) (course of conduct); 2929.04(A)(7) (aggravated robbery), and; 2929.04(A)(7) (kidnaping). In the trial court's preliminary instructions at the penalty phase, however, the jury was informed that there was

136

one aggravating circumstance containing three elements comprised of the (A)(5) and two (A)(7) capital specifications. (Tr. 1923).

337.    Despite the instruction that there was one aggravating circumstance, (Tr. 1923), the prosecutor referred to "aggravating circumstances" in the plural form during his opening statement to the jury at the penalty phase. (Tr. 1929). The prosecutor then told the jury that all four capital specifications from the trial phase made up one aggravating circumstance for the weighing process. (Tr.1932). This one aggravating circumstance included the (A)(3) specification, according to the prosecutor. (Tr. 1932). Defense counsel objected on the grounds that the State had misled the jury as to the merger of the aggravating circumstance. (Tr. 1935-36).

338.    After a lengthy side-bar discussion, the trial court instructed the jury "that the Court had determined that those four [capital specifications] will be merged or considered as three." ( Tr. 1954). The trial court told the jury that the (A)(3) "escape" specification "overlapped fleeing after the commission of an offense", as found in both of the (A)(7) felony murder specifications. (Tr. 1954).

339.    Before the jury received its final instructions, defense counsel moved for a mistrial. ( Tr. 1996), because "the jury is hopelessly confused now between one aggravator, three aggravators, four aggravators." (Id) The trial court overruled the motion. (Tr. 1997).

340.     Later in the proceedings the State requested that the trial court merge the two (A)(7) specifications, so that the jury would have only the (A)(7) kidnaping and (A)(5) aggravators to weigh against McKnight's mitigation. (Tr.2009-11). Defense counsel renewed McKnight's motion for a mistrial by asserting "that there's no way that this jury can return a verdict with the guided discretion [that is required by the capital jurisprudence of the Supreme Court]. . . ." ( Tr. 2013). Defense counsel again reminded the trial court that the jury had been told there were either

137

four or three or one aggravators to be weighed at the penalty phase against the mitigation. (Tr. 2013-14).

341.    Defense counsel asked the trial court "to remove this matter from the jury's consideration and . . . render . . . a life sentence, because there's no way we can get straight before this jury when they've been told, '[i]t's one, it's four, it's three, it's two, it's one'." (Tr. 2014). The trial court denied this motion, and it stated that it would combine the (A)(5) and two (A)(7) specifications "into a single aggravating circumstance." (Tr. 2021).

342.        The trial court instructed the jury, in pertinent part:

> You also found him guilty of specifications of aggravating circumstances. There were four of them, but to ensure that the weighing process is not influenced by mere numbers, **the aggravating circumstances of which you found Gregory B. McKnight guilty have been merged into one aggravating circumstance**. It is as follows: The aggravated murder was committed while Gregory B. McKnight was committing or attempting to commit or fleeing immediately after committing or attempting to commit kidnaping and aggravated robbery of Emily S. Murray and Gregory B. McKnight was the principal offender, and the aggravated murder was part of a course of conduct by Gregory B. McKnight involving killing two or more persons.

(Tr. 2053) (*emphasis added*).

343.    McKnight's motion for a mistrial at the penalty phase should have been granted. As defense counsel argued, the jury was bound to be confused as to what constituted a proper aggravating circumstance to be weighed against the mitigating factors.. (Tr. 2013). The jury was given contradictory direction that there were either four, or three, or one aggravating circumstances to be weighed. (Tr. 2014). Where the jury is weighing whether to impose a sentence of death, more reliability and accuracy is required by the Constitution. *See Woodson v. North Carolina*, 428 U.S. 280, 304, 305 (1976) (heightened need for reliability in capital sentencing proceedings); *California v. Ramos*, 463 U.S. 992, 1010 (1983) (Eighth Amendment requires that capital juries must receive

materially accurate sentencing information); *Caldwell v. Mississippi*, 472 U.S. 320, 341-43 (1985) (O'Connor, J., concurring) (same).

344.    The trial court's instructions to the jury did not cure this error and in fact further confused the jury. This merger was not invited by McKnight. Trial counsel's objections and motion for mistrial were well taken and should have been granted.

345.    The trial court created an aggravating circumstance that does not exist under Ohio's statutory capital sentencing scheme. Because the resulting specification was not authorized by the Ohio Legislature, the instructions did not provide the constitutionally required guided discretion under the Fifth, Sixth, Eighth, and Fourteenth Amendments. There is a substantial risk that McKnight's jury was confused by the contradictory instructions as to the number of aggravating circumstances it had to weigh. The jury was instructed to weigh and aggravating circumstance that did not exist under Ohio law. This violated McKnight's right to due process in that his jury had no clear instruction as to what exactly it was to consider. The resulting sentence of death is not reliable.

346.    The merits decision of the Ohio courts on McKnight's claims was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

139

**Twenty-Third Ground for Relief**

**MCKNIGHT'S DUE PROCESS RIGHTS TO A FAIR AND RELIABLE TRIAL AND SENTENCING WERE VIOLATED WHEN THE TRIAL COURT'S ERRONEOUS INSTRUCTIONS TO THE JURY ALLOWED THE JURY TO DETERMINE WHAT EVIDENCE WAS RELEVANT FOR CONSIDERATION AND WEIGHING DURING THE PENALTY PHASE IN VIOLATION OF HIS FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION.**

347. The trial court failed to instruct the jury which trial phase evidence was relevant to the jury's weighing process at the penalty phase.

348. At the penalty phase the trial court instructed Gregory McKnight's jury as follows:

> The procedure that you must follow in arriving at your verdict in this phase of the trial is prescribed by law, and in this regard, you shall consider all of the testimony and **evidence relevant to the aggravating circumstance** Gregory B. McKnight was found guilty of committing and mitigating factors raised at both phases of the trial and final arguments of counsel.

(Tr. 2054-55) (emphasis added).

349. Although defense counsel failed to object to this instruction, it was in direct violation of Ohio case law. *See State v. Getsy*, 84 Ohio St. 3d 180 (1998). The trial court is required to determine what evidence is relevant and admissible and not leave it to the jury. *Id.* The failure of the trial court to give the correct instruction so infected McKnight's sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process. [36]

350. The "Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally

---

[36] See McKnight's <u>Twenty-Sixth Ground for Relief</u> dealing with ineffective assistance of counsel.

unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (citing *Darden v. Wainwright*, 477 U.S. 168, 179-83 (1986)).

351.    The death penalty can only be constitutional where the jury's discretion is carefully guided. *Gregg v. Georgia*, 428 U.S. 153 (1976).  The jury instruction in question here failed to guide the jury's discretion according to Ohio law, because the trial court has the responsibility to determine the admissibility of evidence.  *See* OHIO REV. CODE § 2929.03(D)(1)-(2); OHIO R. EVID. 104(A); *State v. Cornwell*, 86 Ohio St. 3d 560, 567 (1999) (citing *State v. Getsy*, 84 Ohio St. 3d 180, 201 (1998)); *Getsy*, 84 Ohio St. 3d at 201 (explaining that Ohio's Rules of Evidence, and Revised Code section 2929.03(D)(1) and (2), along with the holding in *State v. Gumm*, 73 Ohio St. 3d 413 (1995), require the trial court to determine what evidence is relevant).

352.    Juries "must first be properly instructed," so that they may be capable of understanding the issues posed in capital sentencing proceedings.  *Mills v. Maryland*, 486 U.S. 367, 377, n.10 (1988).

353.    The trial court's jury instruction violated McKnight's constitutional rights in that the instruction improperly permitted the jury to determine what evidence it deemed "relevant" to proving aggravating circumstances.  Once the trial court breached its duty to determine what evidence was relevant, and to limit the re-introduction of non-relevant evidence, the jury was free to consider irrelevant and prejudicial evidence from the trial phase which tipped the scales on the side of death. Without further clarification or direction, the jury was free to deem any testimony or exhibit probative of the aggravating circumstances or the weighing of statutory aggravating circumstances against mitigating factors.

354.    As instructed, the jury could have considered all of the autopsy and crime scene photos as well as other inflammatory matter as relevant to the aggravating circumstances. The trial court's

instruction likewise prevented the jury from giving full effect to McKnight's mitigating evidence by improperly stacking the "death" side of the weighing scale with improperly admitted, irrelevant evidence.  At such a critical stage of the proceedings, the Fifth, Sixth, Eighth, and Fourteenth Amendments require that the jury be provided greater guidance than the trial court did in the present case.

355.    The Supreme Court of Ohio concluded  that the trial court's instruction was error.  *State v. McKnight*, 107 Ohio St. 3d 101,139 (2005); 837 N.E. 2d 315, 356 ("To the extent that the jury might have interpreted the trial court's instructions as allowing them to determine relevancy, the trial court erred.")

 356.    Because of the trial court's erroneous instruction, the jury had full, unfettered discretion, not the carefully guided discretion mandated under the Fifth, Sixth, Eighth, and Fourteenth Amendments, to consider and weigh evidence in its death calculation that was irrelevant to the question of mitigation and aggravation and yet was highly prejudicial and inflammatory.

357.    The Supreme Court of Ohio found the trial court's instruction to be erroneous.  This erroneous trial court instruction violated McKnight's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  As such a writ of habeas corpus must issue.

358.    The Ohio court's decision on McKnight's claims relative to this erroneous trial court instruction was contrary to, or an unreasonable application of, clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts.

28 U.S.C. § 2254(d).

**Twenty-Fourth Ground for Relief**

**GREGORY MCKNIGHT WAS DENIED TO DUE PROCESS AND FAIR AND  RELIABLE SENTENCING DETERMINATION WHEN THE TRIAL COURT PROVIDED THE JURY WITH   VERDICT FORMS THAT SERVED TO MISLEAD THE JURY AS TO ITS ESSENTIAL ROLE DURING PENALTY PHASE DELIBERATIONS IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS**

359.     McKnight was denied his rights to due process and a fair and reliable sentencing hearing when

the trial court provided and read verdict forms to the jury that were materially inaccurate.

360.     Following the penalty phase instructions, the trial court read the verdict forms to the jury.

(Tr. 2060). As to the three life sentencing options, the verdict forms stated as follows:

> A: We, the jury, being duly impaneled and sworn, do hereby find that
> the aggravating circumstance that Gregory B. McKnight was found guilty of
> committing **does not outweigh** the mitigating factors presented in this case by
> **proof beyond a reasonable doubt**.

> We therefore unanimously find that the sentence of life imprisonment
> without parole eligibility for 25 full years should be imposed upon Gregory B.
> McKnight.

> B: We, the jury, being duly impaneled and sworn, do hereby find that
> the aggravated circumstance that Gregory B. McKnight was found guilty of
> committing **does not outweigh** the mitigating factors presented in this case by
> **proof beyond a reasonable doubt**.

> We therefore unanimously find that a sentence of life imprisonment
> without parole eligibility for 30 full years should be imposed upon Gregory B.
> McKnight.

> C: We, the jury, being duly impaneled and sworn, do hereby find that
> the aggravating circumstance that Gregory B. McKnight was found guilty of
> committing **does not outweigh** the mitigating factors presented in this case by
> **proof beyond a reasonable doubt**.

We therefore unanimously find that the sentence of life imprisonment without the possibility of parole should be imposed upon Gregory B. McKnight.

(Tr. 2060-61) (emphasis added)

361.    The verdict forms were materially inaccurate under Ohio Law. They could have only misled the jury as to its essential role under Ohio's capital sentencing scheme at the penalty phase.

Ohio Rev. Code § 2929.03(D)(2), in pertinent part, provides as follows:

If the jury unanimously finds, **by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors,** the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.(emphasis supplied)

362.    A plain reading of § 2929.03(D)(2) establishes that the General Assembly chose to impose only one burden of proof requiring the State to prove that the statutory aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt in order to impose a sentence of death. The statute does not place any burden of proof on the defendant ot prove that mitigating factors outweigh the statutory aggravating circumstances as the verdict forms here required.

363.    No burden of proof is assigned to the defendant under § 2929.03(D)(2) to persuade the jury to chose one of the life verdicts. Indeed, as Supreme Court of Ohio explained in *State v. Brooks*, Ohio Rev. Code. 2929.03(D)(2) contains no limiting language as to when a jury may contemplate a life sentence." 75 Ohio St. 3d 148, 160, 661 N.E.2d 1030, 1041 (1996). Therefore, no "limiting language" exists in the statute to require a jury to reach a life verdict only by finding that the aggravating circumstances do not outweigh the mitigating factors, by proof beyond a reasonable doubt. *See Id.*

364.    The jury here was instructed that it must find that the aggravating circumstances did not outweigh the mitigating factors beyond a reasonable doubt. (Tr. 2060-61). The trial court added improper "limiting language" to the jury's understanding of his or her weighing task. See *State v. Brooks,* 75 Ohio St. 3d 148 160, 661 N.E.2d at 1041(1996). It directed the jurors to reach a life verdict only if they unanimously found that the aggravating circumstances did not outweigh the mitigating factors "beyond a reasonable doubt." By those verdict forms the trial court put a burden of proof upon Gregory McKnight that does not exist in § 2929.03(D)(2) and is contrary to Ohio law that permits one juror to block a death sentence. *Brooks*, *supra*

365.    The verdict forms denied McKnight due process and a fair and reliable sentencing hearing. See *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976) (capital sentencing hearings require reliable proceedings). States must provide materially accurate information to jurors with regard to the jury's role at the penalty phase, as that role is defined by local law. See *Dugger v Adams* 489 U.S. 401, 407-08 (1989); *Caldwell v. Mississippi*, 472 U.S. 320, 341-43 (1985) (O'Connor J.,concurring); *California v. Ramos*, 463 U.S. 992, 1010 (1983). See also *Mills v. Maryland*, 486 U.S. 367, 377, n.10 (1988) (jurors must be properly instructed to understand capital sentencing issues). The jury received here received materially inaccurate information about its role under § 2929.03(D)(2).The jury was incorrectly told that it could reject the death penalty only if it was unanimously found that the aggravating circumstances did not outweigh the mitigating factors "beyond a reasonable doubt".

§ 2929.03(D)(2) puts no such burden of persuasion on capital defendants such as McKnight. (Tr. 2060-61) See *Davis v. Mitchell*, 318 F. 3d 682 (6th Cir. 2003).

366.    The Ohio court's decision on McKnight's claims relative to this erroneous trial court instruction was contrary to, or an unreasonable application of, clearly established federal law as stated

by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

**Twenty- Fifth Ground for Relief**

**THE TRIAL COURT CONSIDERED INVALID AGGRAVATING CIRCUMSTANCES ITS SENTENCING OPINION AND IMPOSED DEATH WITHOUT AN INDIVIDUALIZED CONSIDERATION OF MITIGATING FACTORS. GREGORY MCKNIGHT WAS DENIED A FAIR AND RELIABLE SENTENCING DETERMINATION UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

367.     Gregory McKnight was convicted of four statutory aggravating circumstances attached to count one, the aggravated murder of Emily Murray: Ohio Rev. Codes § 2929.04(A)(3);

- • § 2929.04(A)(3) - (to escape detection for commission of another crime);

- • § 2929.04(A)(5) - (course of conduct involving purposeful murder of two or more persons);

- • § 2929.04(A)(7) - (aggravated murder was committed during commission of committing aggravated robbery)

- • § 2929.04(A)(7) - (aggravated murder was committed during course of committing kidnaping)

368.     The trial court combined those four statutory aggravating circumstances into one super specification before weighing it. (Sent. Dec p. 2). Thus, the trial court weighed one aggravating circumstance that included some elements of these four statutory aggravating circumstances, but that did not constitute an aggravating circumstance authorized by the Ohio Legislature in Ohio Rev. Code § 2929.04(A) death specifications. (Id.).  The trial court, in essence, made up an aggravating circumstance that is not authorized to be considered under Ohio law.

146

369.     Ohio's death penalty statutes do not permit the creation or consideration of a super aggravating circumstance through merger or the consideration of any non-statutory aggravating circumstances. *See State v. Smith*, 80 Ohio St. 3d 89, 115-16 (1997).  The combination of the capital specifications resulted in an unconstitutional departure from Ohio's statutory scheme, because the trial court failed to follow the "guided discretion" mandated it by the General Assembly.  *See Gregg v Georgia*, 428 U.S. 153 (1976).

370.     In addition to the improper merger of aggravating circumstances, the trial court also considered non-statutory aggravating circumstances as justification for imposing a death sentence. Ohio Rev. Codes § 2929.04(A)(l)-(9) sets out the only statutory aggravating circumstances that may be weighed against a defendant's mitigating factors at the penalty phase of a capital trial. *See State v. Wogenstahl*, 75 Ohio St. 3d 344, 355 (1996).  These are the only selection factors that may be placed on "death's side of the scale." *See Stringer v. Black*, 503 U.S. 222, 232 (1992).

371.     McKnight was charged and convicted of committing multiple offenses with a firearm. See Ohio Rev. Code § 2923.11. Although this conduct exposed him to an additional three years of incarceration, this firearm specification could not properly have any bearing upon the trial court's independent weighing of the aggravating circumstances against the mitigating factors.  Ohio Rev. Code § 2929.04(A); 2929.03(D)(3). The trial court considered the use of a firearm when it assessed the aggravating circumstances McKnight was found guilty of.  (Sent. Dec. p. 3, 7).  Twice, the trial court considered McKnight's intentional use of a firearm as his chosen means to commit this murder. (Id.).

372.     The sentencing opinion demonstrates that the trial court found McKnight more deserving of

147

the death penalty as a result of his use of a firearm.   A defendant's use of a firearm is not part of any of the capital specifications found in Ohio Rev. Code § 2929.04(A).

373.    Similarly, the trial court considered the circumstances of these two murders as aggravating factors.   With regard to the (A)(7) kidnaping specification, the trial court considered McKnight's failure to release Emily in a "safe place, unharmed." (Trial court sentencing opinion, P. 3)  The trial court also considered the "intentional killing" of Emily during a kidnaping even though purpose or intent to kill is an element of the offense of aggravated felony murder. (Id.)  Further, it improperly considered the circumstance of the offense of McKnight's concealment of Emily's body "in a manner such that [she] remained missing for 36 days. (Id.). The trial court also considered as aggravating the dismemberment and disposal of Greg Julious's corpse on McKnight's property when it assessed the weight of the (A)(5) (course of conduct) specification. (Id.)

374.    All of these facts were cited as aggravating factors even though Ohio law requires that the nature and circumstances of the offenses can only be considered, if appropriate, on the mitigation side of the scale.  *See Wogenstahl*, 75 Ohio St. 3d at 355.  The weighing of invalid aggravators in  the capital sentencing calculus denied McKnight due process and a fair and reliable sentencing determination. *See Stringer*, 503 U.S. at 235-36; *Sochor v. Florida*, 504 U.S. 527, 539 (1992).

375.    The trial court also misconstrued Gregory McKnight's mitigating factors:  "[T]he mitigating factors . . . have very little effect in minimizing, lessening or excusing the degree of the defendant's murderous conduct**."**  (Trial court sentencing opinion, P. 7).  The trial court misconstrued mitigating factors as evidence offered to reduce McKnight's legal culpability or evidence offered to excuse his "murderous conduct."

376.    The trial court's view of mitigating evidence is contrary to Ohio law and Eighth amendment

148

jurisprudence. *State v. Holloway*, 38 Ohio St. 3d 239, 242; 527 N.E.2d 831, 835 (1988) (*Eddings v. Oklahoma*, 455 U.S. 104, 113 (1982) (error to define mitigation as an excuse for culpability). McKnight's sentence was imposed without "the type of individualized consideration of mitigating factors...required by the Eighth and Fourteenth Amendments." *Lockett v. Ohio*, 438 U.S. 586, 606 (1978).

377.    Based on each of the above errors and the cumulative effect of the trial court's failure to follow the carefully guided discretion mandated by the Ohio legislation and Eighth amendment jurisprudence, McKnight was denied due process and  a fair and reliable sentencing determination.

378.    In a death penalty case, there is a heightened need for reliability in capital sentencing proceedings. (*Woodson*, 428 U.S. 280, 304-05 (1976)  The trial court's fundamentally flawed independent sentence assessment denied Gregory McKnight due process and a fair and reliable sentencing determination by the trial court under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

378.    To the extent the Ohio courts ruled on the merits of the trial court's flawed weighing process, their rulings were an unreasonable application of clearly established federal law as stated by the Supreme Court of the United Sates, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254 (d).

**Twenty- Sixth Ground for Relief**

**MCKNIGHT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL DURING THE TRIAL PHASE OF HIS CAPITAL TRIAL IN VIOLATION OF HIS FOURTH, FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

**A.      Pre-trial - Motions to Suppress**

379.     Trial counsel's performance fell far below an objective standard of reasonableness when they failed to investigate and fully support with evidence the two motions filed to suppress illegally obtained evidence seized from McKnight's property and trailer in Ray, Ohio.  Counsel's deficient performance prejudiced McKnight because the evidence, seized pursuant to an invalid search warrant, was crucial to his conviction.

380.      Evidence used to convict McKnight was discovered after a search warrant was issued for his property and trailer in Ray, Ohio.  The search warrant was issued based on the affidavit of Corporal Charles Boyer.  The affidavit contained false information, which was made knowingly and intentionally and with reckless disregard for the truth, in violation of McKnight's Fourth, fifth, Sixth, Eighth, and Fourteenth Amendment rights.[37]

**1.      Motion to Suppress - Filed September 13, 2001**

381.    On September 13, 2001, trial counsel filed a Motion to Suppress Evidence on the following bases:  (a) the affidavit did not include a mention of any crime being committed, and (b) the affidavit failed to give supporting facts of a crime as listed in the provision of law violation section.  Based on these factors, trial counsel argued that the state had failed to demonstrate sufficient probable cause to justify the issuance of a search warrant to conduct a search of McKnight's residence and

---

[37] See First Ground for Relief where McKnight raised this issue as an independent Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment violation.,

surrounding property. Trial counsel also argued the warrant was "overbroad" and contrary to the provisions of Rule 41 of the Ohio Rules of Criminal Procedure.

382.   The fact that Boyer did not actually perform the tasks he had sworn to in his affidavit was never raised in the Motion to Suppress.

383.   The trial court scheduled a suppression hearing for November 19, 2001. At the hearing, Boyer testified that:

> (1) Deputy Kight was at the McKnight residence to serve an indictment, not Corporal Boyer.
>
> (2) It was Deputy Kight who initially saw the Subaru Outback and ran the license plate through LEADS, not Corporal Boyer.
> (3) All discussions with Knox County Sheriff's Office were through a dispatcher, not Corporal Boyer.

384.   After hearing Boyer's testimony, trial counsel moved for a hearing under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), because knowingly false information was placed in the affidavit. [38] The trial court denied McKnight's request for a *Franks* hearing. In denying trial counsel's request, the trial court ruled that the scope of the hearing was limited to the four corners of the affidavit, i.e., "the information that was presented through the affidavit as testified here by Corporal Boyer to Judge Grillo and upon which he would have either issued or not issued the search warrant." (Supp. Hrng 11-19-01 Tr. 33). On January 9, 2002, the trial court also denied McKnight's Motion to Suppress. (Order January 9, 2002).

---

[38]Once a "defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155-56.

### 2.     Supplemental Motion to Suppress - Filed on December 5, 2001

385.    After the suppression hearing, trial counsel filed a Supplement to Motion to Suppress on December 5, 2001.  In this motion, trial counsel again sought a *Franks* hearing based solely on Boyer's testimony about his discussions, or lack thereof, with representatives of the Knox County Sheriff's Office on December 9, 2001.

386.    On March 26, 2002, the trial court heard counsel's arguments for a *Franks* hearing.  (Hrng. March, 26, 2002, pp. 1-7).  Again, the scope of the hearing was limited. Defense counsel indicated that they wanted to present the testimony of Dispatcher Gerben and Detective Brenneman.  (Pre-trial, March 26, 2002, Tr. 3).  Defense counsel's argument was based only on discrepancies as to who received confirmation from Knox County about Emily Murray's status and the "Provision of law violation" section of the search warrant affidavit.

387.    The prosecutor argued that the defense would have to show that Corporal Boyer lied to get the search warrant: "So what we're really looking at is the one issue did Corporal Boyer lie when he said in the affidavit I obtained confirmation from Knox County."  (Id. At 5)

388.    The trial court, confining the issue to whether Corporal Boyer received information from Knox County, ruled that defense counsel had not shown Boyer had made false statements. (Pre-trial, March 26, 2002, Tr. 7).   The trial court filed an entry denying the Supplemental Motion to Suppress on August 23, 2002.  (Order August 23, 2002).

### 3.     Trial Counsel was  Ineffective for Failing to Support their Motions to Suppress

389.    The evidence used to convict McKnight on charges of aggravated murder with death specifications, aggravated robbery, kidnaping and murder was discovered after a search warrant was

issued for McKnight's property and trailer in Ray, Ohio.  The search warrant was based on an affidavit that contained false information which was made knowingly and intentionally and with reckless disregard for the truth.  Trial counsel failed to investigate and litigate this meritorious issue competently.

390.    Prior to filing the Motion to Suppress, trial counsel was aware of the fact that Deputy Matt Kight of the Vinton County, Ohio Sheriff's Department discovered Emily Murray's car parked at McKnight's trailer while attempting to serve an indictment. (PC ex. P, p.38) Yet, in the Motion to Suppress filed on September 13, 2001, trial counsel made no effort to attack the veracity of Corporal Boyer's sworn statements and incorrectly stated that he did in fact perform the acts sworn to in his affidavit.

391.    Despite having this knowledge, no effort was made by defense counsel to test the veracity of Boyer's sworn statements.  The motion was limited to the state's lack of probable cause to conduct a search of McKnight's residence and surrounding property.  In the Motion to Suppress, trial counsel ignored the principle that any finding of probable cause cannot be established through false statements.[39]

392.    The trial court set a hearing on the Motion to Suppress for November 19, 2001.  Trial counsel failed to attempt to interview Deputy Kight or Deputy Boyer prior to the hearing and never called Kight as a relevant witness.  This error is even more egregious when one considers the fact that trial counsel recognized the importance of Kight to the suppression issue, correctly noting that his

---

[39] "Because it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberate or reckless false statement, were to stand beyond impeachment." *Franks v. Delaware*, 438 U.S. 154, 165 (1978).

testimony "contradicts everything that Boyer put in the search warrant affidavit when he uses 'I' throughout it." (PC Ex. P, Pp. 37-38).

393. Corporal Boyer did testify at the hearing. Boyer's testimony indicated that it was Deputy Kight, not Boyer, who went to serve the indictment, and that it was Kight, not Boyer, who ran the license plate number through the LEADS computer. (Nov. 19, 2001 Supp. Hrg., Tr.. 9). Boyer's testimony contradicted his search warrant affidavit dated December 9, 2000.

394. Despite Boyer's testimony, the trial court barred counsel from presenting evidence, calling additional witnesses or challenging the veracity of the warrant affidavit in any way. The trial court's limitation on the scope of the hearing can be traced back to trial counsel's motion to suppress, which focused exclusively on probable cause and failed to attack the veracity of the warrant affidavit.

### 4.    Supplement to Motion to Suppress - Filed December 5, 2001

395. When trial counsel filed a supplemental motion to suppress on December 5, 2001, they again failed to highlight all the false statements contained in Corporal Boyer's search warrant affidavit, despite learning of that information at the November 19, 2001 hearing on the original motion to suppress. Instead the renewed motion focused exclusively on Boyer's testimony about his discussions, or lack thereof, with representatives of the Knox County Sheriff's Office on December 9, 2001. As with the previously filed Motion to Suppress, defense counsel failed to support their argument with the most relevant and critical facts.

396. Defense counsel failed to argue that Corporal Boyer's entire affidavit was based on falsehoods, not merely that he did not personally receive information from Knox County Officials. Boyer's testimony contradicted his search warrant affidavit dated December 9, 2000, in which he represented that while he (Boyer) attempted to serve the indictment, he saw the vehicle, and "[p]rior

to leaving, I ran the license plate number." But defense counsel did not use this information in their supplemental motion and again made no attempt to present Kight's testimony to the court.

397.    Responding to the supplemental motion, the prosecutor argued that the defense would have to show Corporal Boyer lied to get the search warrant: "So what we're really looking at is the one issue did Corporal Boyer lie when he said in the affidavit I obtained confirmation from Knox County."

398.    Again, the trial court admitted no evidence and limited the scope of the suppression hearing to the four corners of the affidavit.  The trial court's erroneous decision was a direct result of defense counsel's failure to detail specific allegations of falsehoods; i.e. highlight the fact that Boyer's warrant affidavit was based on false statements that served as the basis for judge Grillo's finding of probable cause.

399.    Trial counsel had a duty to fully investigate, and support with relevant facts, the two motions filed to suppress the illegally obtained evidence used to convict McKnight.   Despite being aware of critical facts, trial counsel failed to incorporate them into the motions and presentations at the suppression hearing.

400.    That failure led to the admission of illegally obtained evidence, obtained from a warrant affidavit based on false information which was made knowingly and intentionally or with reckless disregard for the truth in violation of McKnight's Fourth Amendment rights.  Trial counsel failed to litigate this meritorious issue competently.

401.    Trial counsel's performance fell below an objective standard of reasonableness.  As a result of counsel's failures, illegally obtained evidence was used to convict McKnight.  Counsel's

performance was deficient. Therefore, McKnight's trial counsel were ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984).

402. To the extent the Ohio courts ruled on the merits of McKnight's ineffective assistance of counsel claim, relative to the invalid search warrant, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

**B.      Failure to Present Compelling Evidence in Support of Motion for Change of Venue.**

403. The discovery of Emily Murray and Greg Julious's bodies was a shock to small, rural Vinton County, Ohio. Media coverage of the two murders and the chief suspect, Gregory McKnight, saturated the community through local media outlets as well as the larger Columbus, Ohio media market. The media publicity surrounding the discovery of two bodies on McKnight's property was overwhelming.

404. Emily Murray had been missing from her college for over a month when her body was discovered. No one had seen or heard anything from Murray since her last night of work at the Pirate's Cove restaurant in Gambier, Ohio. When her body was found in an isolated trailer in Vinton County, Ohio it was, understandably, big news.

405. The Columbus Dispatch, the major paper serving the Vinton County area, ran approximately twenty-eight (28) articles relating to the crimes. The Athens Messenger, also distributed in the Vinton County area, ran thirty-four (34) articles. (See Appendix to McKnight's Direct Appeal Merit Brief in the Supreme Court of Ohio) Papers throughout Ohio, as well as TV and radio media also ran

156

extensive stories regarding the two bodies being discovered. (See Juror questionnaires Questions 52, 95).

406.    The vast majority of these articles detailed the facts surrounding the discovery and recovery of the two bodies. The media repeatedly assaulted residents of Vinton County, including prospective jurors, with the horrific images of the facts and circumstances of these crimes. Newspapers frequently published photographs of Emily Murray with accompanying stories of her wonderful life cut short. This was in sharp contrast to the pictures of McKnight being shackled and forced to wear a bullet proof vest during his transportation to and from the courthouse.

407.    The media firestorm that transcended on this case also included stories of McKnight's past convictions, including that McKnight had a prior juvenile murder adjudication at the age of fifteen. On December 23, 2000, the Columbus Dispatch ran a detailed account of McKnight's juvenile murder, as told by an eyewitness.  (PC Ex. A) The witness expressed outrage that McKnight was able to beat the system and never served serious time for the murder.  (Id.).  The media also ran stories on a recent eight year sentence imposed on McKnight for an unrelated theft charge also committed in Vinton County. This evidence was not otherwise admissible at trial and would not have been made known to the jurors but for the pretrial publicity.

408.    Further, a ruling by the trial court drew extensive national media attention.  On August 8, 2002, the trial court granted Gregory McKnight's "Motion to Dismiss Capital Components." The trial court's entry stated:

> This Court is regularly called upon to authorize expenditures, and capital
> cases in particular require additional resources. While the Court has the authority
> to approve expenses, it would be disingenuous to suggest that a trial judge can
> consider such requests without an awareness of the financial impact on this
> County. The Court finds that the potential impact of financial considerations

could compromise the Defendant's due process rights in a capital murder
trial. The Court finds that this risk is unacceptable in this case.

It is therefore ORDERED that the capital components of this case are hereby DISMISSED.

409.    In addition to the local media who were already extensively covering the case, the trial court's

decision was covered by the New York Times, Los Angeles Times, Cleveland Plain Dealer, Time

Magazine, Channel 10 News from Columbus, Channel 4 News from Columbus, the NBC Today

Show and CNN, among others.

410.    Commentary denouncing the judge's actions was common.  On August 15, 2002, a Columbus

Dispatch editorial expressed outrage that the trial court dismissed the capital specifications in

McKnight's case.  The editorial noted that "justice" in the case took "a holiday." (PC Ex. A).  In an

August 22, 2002, Columbus Dispatch article, Vinton County residents expressed concern that justice

would not prevail.  (Id.)  Justice in this case meant nothing short of McKnight's execution.

411.    On August 14, 2002, the State sought reconsideration of the trial court's decision to dismiss

the capital specifications of the case.  The State's Motion for Reconsideration was sustained, and the

capital specifications were reimposed.

412.    The news media carried extensive covered that Emily Murray's parents welcomed the trial

court's decision to reimpose the capital specifications.  "You do not need to be a supporter of capital

punishment to regard the prospect that this man would be eligible for parole in his 40s as both a grave

injustice and a palpable danger to the community."  (PC Ex. A).

413.    Another repeated top of the media coverage was the costs to be endured by Vinton County.

After the trial court dismissed McKnight's capital specifications because the county could not afford

158

to provide him with a defense, the newspapers reported the costs associated with McKnight's defense. Attorneys' fees were noted as were the costs for experts, travel fees, and consultants.  Prospective jurors were told that much of the county's budget would be used up in defending McKnight.

414.    In light of the extensive publicity in this case, it was not possible for McKnight to have received a fair trial in front of an impartial jury in Vinton County, Ohio.  A change of venue was necessary.  The right to an impartial jury may be denied by a presumption of prejudice arising from extensive pretrial publicity.  *Irvin v. Dowd*, 366 U.S. 717, 725-28 (1961).  Because this was a capital case, heightened due process demanded that steps be taken by defense counsel to ensure McKnight received a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  See *Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280 (1976).

415.    Because of the pervasive publicity surrounding these murders defense counsel did move for a change of venue.  Defendant's Motion for a Change of Venue was filed on July 10, 2002.

416.    However, the motion filed on behalf of McKnight consisted of nothing more than four pages of boilerplate language.  Defense counsel failed to incorporate facts to demonstrate the aforementioned publicity blitz that surrounded McKnight's case.  The only specific aspect of McKnight's case discussed in the motion read, "a fair amount of newspaper clippings which, standing alone, is an adequate basis to presume prejudice and impartiality among this County's prospective jurors."  The motion read that McKnight's inability to get a fair trial in Vinton County, Ohio was a "self-evident conclusion."

417.    Defense counsel did cite to a "listing of the newspaper articles attached to the instant Motion." However no articles were attached to the motion. Lead counsel Herman Carson prepared McKnight's motion for change of venue. (PC Ex. P, p.24).  Carson testified that it was his normal practice to

159

attach newspaper articles to support a motion to change venue and failing to do so was "inconsistent" with what he normally did. (Id. at 24-25). If someone had brought it to Carson's attention that no articles were attached to the motion he would have supplemented it. (Id. at 26).

418. Attorney Robert Toy "didn't think there was any dispute that everybody knew" there was "a pretrial publicity problem." (PC Ex. R, p.25) Still, the evidence supporting the publicity problem was never incorporated into the motion or demonstrated to the court. To Toy, including relevant facts and articles into the motion was an inconsequential burden. "If they were, they were. If they weren't, they weren't. We had articles." (Id., p. 25) Counsel had many articles, especially after the trial court dismissed the capital specifications, but they failed to make them part of the record. The underlying theme of the second publicity blitz was that anything short of a death sentence for McKnight would fall far short of the justice demanded in this case. Defense counsel failed to supplement their venue motion with these articles.

419. Defense counsel were ineffective because they failed to present available, compelling evidence in support of their Motion for Change of Venue to the trial court. As a result, McKnight's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated. *Strickland v. Washington*, 466 U.S. 668 (1984).

420. The Vinton County, Ohio community had been saturated with news stories concerning McKnight's case so that community sentiment rendered it impossible for him to receive a fair trial before impartial jurors who learned of the case only through the evidence properly admitted during trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments and who are free from personal and community expressions of attachment and grief. By failing to document the extensive pre-trial publicity in McKnight's case and incorporate it into the Motion for a Change of Venue, defense

counsel failed to ensure that McKnight received a fair trial before a jury untainted by pre-trial publicity.

421. When assessing the performance prong in a capital case, the courts are informed by the ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003). See *Wiggins*, 539 U.S. at 524. When asserting a legal claim, such as a motion to change venue, the ABA *Guidelines* call for defense counsel to "present the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case." (See Guideline 10.8 - The Duty to Assert Legal Claims.) Defense counsel fell painfully short of this duty, instead relying on boilerplate language that came nowhere close to outlining the compelling and specific need for a change of venue in McKnight's case.

422. McKnight was prejudiced as a result. Perhaps the most fundamental of rights the criminal justice system recognizes is the defendant's right to a fair trial by an impartial jury. *Patterson v. Colorado*, 205 U.S. 454, 462 (1907). The massiveness and pervasiveness of the media coverage was such that a change of venue was constitutionally mandated. *Sheppard v. Maxwell*, 384 U.S. 333 (1966). In some cases such as McKnight's adverse publicity can be so pervasive and so prejudicial that jury prejudice is presumed. *Rideau v. Louisiana*, 373 U.S. 723 (1963).

423. Defense counsel's deficiency cannot be considered harmless error. Whether or not it was likely that McKnight may have be convicted in another venue is irrelevant. The right to a fair and impartial jury is fundamental. The denial of that right is a structural error that is never harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 290 (1991).

424. To the extent the Ohio courts ruled on the merits of McKnight's ineffective assistance of counsel claim, relative to defense counsel's failure to support their Motion to Change Venue, their

161

rulings were an unreasonable application of clearly established federal law as stated by the Supreme Court of the United Sates, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts. 28 § 2254 (d).

**C.     Failure to Request Change of Venue on Basis of Race**

425.    Gregory McKnight was denied due process, fair trial, a fair and reliable sentencing determination and the effective assistance of counsel when trial counsel failed to request a change of venue on basis of race under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

426.    The discovery of the bodies of Emily Murray and Greg Julious was a shock to small, rural Vinton County, Ohio. Media coverage of the two murders and the chief suspect, Gregory McKnight, saturated the community through local media outlets as well the larger Columbus, Ohio media market that served Vinton County.   The media publicity surrounding the discovery of two bodies on McKnight's property was overwhelming.[40]

427.    Because of the pervasive publicity surrounding these murders, defense counsel did move for a change of venue. McKnight's Motion for a Change of Venue was filed on July 10, 2002.[41] Defense counsel attempted to supplement evidence supporting their request with a scientific jury survey.   The trial court denied both requests.[42]  Although defense counsel did file a motion for a change of venue,

---

[40] McKnight raised the trial court's failure to change venue, due to extensive media coverage, in his <u>Second Ground for Relief.</u>

[41] Defense counsel failed to attach any supporting documentation of the media blitz to the motion to change venue.  This error is addressed in McKnight's <u>Second Ground for Relief</u>.

[42] The trial court's denial of funds for a scientific jury survey is raised in McKnight's <u>Fourth Ground for Relief</u>.

it was based exclusively on extensive pretrial publicity. Counsel failed to argue that venue should be changed also on account of race.

428.    Pre-trial publicity was not the only impediment a fair trial and impartial jury.  Racial bias was a critical issue.  Vinton County, Ohio is rural and overwhelmingly Caucasian.  The U.S. Census Bureau's 2000 population statistics for Vinton County, Ohio (PC Ex. B) shows the statistical disparity between the number of Caucasian and minority residents.   In a county of approximately 12,806 persons, Caucasians comprised 98.1% of the total population, while Blacks or African Americans made up 0.4%. (Id.)

429.    These figures indicate a social climate inherently hostile to a black capital defendant, particularly when the victim in the capital case was a white female. This is not simply an assumption based on numbers.  The United States Supreme Court has observed "more subtle, less consciously held racial attitudes" - unconscious racism - "could also influence a juror's decision in [the] case." *Turner v. Murray*, 476 U.S. 28, 35 (1976).  Inflammatory racial rhetoric about this case was expressed on the internet. (PC Ex. C.)  McKnight was referred to as an "animal." (Id.)  Others expressed hope that an "all white jury put the nigger to death and that this is done as quickly as possible."  (Id.)

430.    Racial bias in the venire was evident during voir dire. Prospective jurors—those willing to admit it aloud—expressed their racism:

- "My father's very racist. I've been brought up with that." (Voir Dire, Tr. 220).

- Not allowed to "watch a television show with any African Americans on it." (Voir Dire, Tr.221).

- Most [African Americans] that I've met personally I don't like." (Voir Dire, Tr. 224).

- "Just the way that [African Americans] act they think they're better." (Voir Dire, Tr. 224).

163

- "It'd be hard" to set aside that the defendant is black. (Voir Dire, Tr. 226).

- "Yes" it would be difficult to give the black defendant a fair trial. (Voir Dire, Tr. 227-28).

- "I don't believe in interracial marriages." (Voir Dire, Tr. 835).

- "Yes I do" have problems with blacks other than interracial marriages. (Voir Dire, Tr. 836).

- "I've never been raised around [blacks] and they bother me." (Voir Dire, Tr. 836).

- "Yes I do" have a problem with the fact that the defendant is black." (Voir Dire, Tr. 837).

- "I have prejudice." (Voir Dire, Tr. 853)

431.   The Fifth, Sixth, Eighth and Fourteenth Amendments guaranteed McKnight the right to a fair trial by a fair and impartial jury, due process, due process and the effective assistance of counsel. *See, Strickland v. Washington*, 466 U.S. 668 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003). In order for counsel to effectively represent McKnight, it was essential to conduct a thorough and complete investigation not only into the facts of the state's case, any potential defenses, and McKnight's history, character, and background, but also into the factual basis for any legal claims, such as change of venue on account of racial bias. See Guideline 10.4.d, 10.8, 10.10.2., ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, (2003).

432.   The Motion for a Change of Venue filed on behalf of McKnight consisted of nothing more than four pages of boilerplate language. Defense counsel failed to argue racial bias as a supporting factor that warranted a change of venue. The only specific aspect of McKnight's case discussed in the motion read, "a fair amount of newspaper clippings which, standing alone, is an adequate basis to presume prejudice and impartiality among this County's prospective jurors." The motion read that McKnight's inability to get a fair trial in Vinton County, Ohio was a "self-evident conclusion." Nothing written in the motion touched upon the racial atmosphere of the community that was about

164

to decide McKnight's fate.  Neither did defense counsel supplement the motion after racial bias was revealed throughout voir dire.

433.    The lack of effort put into the motion for a change of venue is even more disturbing given what defense counsel knew at the time it was filed.  Defense counsel were aware of the racial climate in Vinton County, Ohio before the trial began. Attorney Miller testified that he knew the county was "primarily white." (PC Ex. Q, p. 10)  He also had heard of Ku Klux Klan activity in the county. (Id. at 11) Attorney Carson similarly testified, "To my knowledge, there are no African American residents in Vinton County." (PC Ex. P, p. 13) He also had heard about a Ku Klux Klan rally or gathering in the county a few years prior. (Id. at 14) Co-counsel Toy also knew that Vinton County was "[p]rimarily white. I'd say about 98, 99 percent" and that the county "had some notoriety for not being an accepting community." (PC Ex. R, pp. 10-11) Carson, Miller, and Toy observed Confederate flags on property in the county. (PC Ex. P, pp. 15-16; Ex. Q, p. 18; Ex. R, p. 15) Miller also had found websites that reported on the case from a racist viewpoint. (PC Ex. Q, p. 20)

434.    When assessing the performance prong in a capital case, the courts are informed by the ABA *Guidelines for the Appointment of Counsel in Death Penalty Cases*.  See *Wiggins*, 539 U.S. at 524. When asserting a legal claim, such as a motion to change venue, the ABA Guidelines call for defense counsel to "present the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case."  (See Guideline 10.8 - The Duty to Assert Legal Claims.) Defense counsel fell painfully short of this duty, instead relying on boilerplate language that came no where close to outlining the compelling and specific need for a change venue in McKnight's case due to the racial bias simmering in Vinton County, Ohio.

435.    McKnight was prejudiced as a result.  In the culpability phase of the trial, an all white Vinton

County, Ohio jury heard testimony from white women who claimed McKnight made repeated sexual advances towards them.[43]  The prosecutor attempted to prove that McKnight preyed on white women, even referring to him as a "Venus fly trap."  (Tr. 2031-32). This was especially inflammatory given that this was a black on white crime.  Defense counsel simply ignored this legal land mine, while the prosecution exploited it during both phases of the trial.

436.    There is no more settled rule in the United States Constitution than the principle that due process requires that every defendant be given a fair trial.  This principal is further embodied in the Constitution's requirement that every juror must be impartial. "The right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors.  The failure to accord an accused a fair hearing violates even the minimal standards of due process.  'A fair trial in a fair tribunal is a basic requirement of due process." *Irvin v. Dowd*, 366 U.S. 717, 721-23 (1961).  Defense counsel's failure to argue, and support with documented evidence, the racial bias evident in Vinton County, Ohio precluded McKnight from receiving a fair trial by a panel of indifferent jurors.  A change of venue on account of racial bias was warranted and justified ,[44] yet ignored by defense counsel.   As a result, McKnight was denied due process and a fair trial by a fair and impartial jury as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments. *Strickland v. Washington*, 466 U.S. 668 (1984).

---

[43]The admission of this irrelevant and inflammatory evidence is raised in McKnight's <u>Eleventh Ground for Relief</u>.

[44] Should this Court determine insufficient evidence exists to establish racial bias in Vinton County, Ohio, that finding should be attributed to the trial court's denial of defense counsel's Motion for a Scientific Jury Survey. McKnight raised this in his <u>Fourth Ground For Relief</u>

437.     In no way can defense counsel's deficiency be considered harmless error. Whether or not it was likely that McKnight may have be convicted in another venue is irrelevant.  The right to a fair and impartial jury is fundamental.  The denial of that right is a structural error that is never harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 290 (1991).

438.     To the extent the Ohio courts ruled on the merits of McKnight's ineffective assistance of counsel claim, relative to defense counsel's failure to support their Motion to Change Venue, their rulings were an unreasonable application of clearly established federal law as stated by the Supreme Court of the United Sates, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts.  28 § 2254 (d).

**D.     Voir Dire**

438.     Gregory McKnight was denied the effective assistance of counsel, due process, equal protection and a fair and impartial jury when counsel unreasonably failed to voir dire, to challenge for cause, or strike by peremptory challenge  Juror I-30, who was ultimately empaneled but who was biased and unable to render a fair and impartial verdict in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

439.     Counsel failed to adequately voir dire and strike for cause or peremptory challenge a juror who disclosed during voir dire that she was biased and unable to render a fair and impartial verdict. Counsel's conduct fell far below prevailing professional norms and resulted in the biased Juror I-30 being seated on McKnight's jury.

440.     In her questionnaire, Juror I-30 was open and candid.  Several answers however, warranted detailed exploration from defense counsel about her ability to serve as a fair and impartial juror.  The following answers were provided by Juror I-30 in the questionnaire she completed prior to voir dire:

167

- Juror I-30 was the mother of two young daughters. (Question 4)

- Juror I-30's husband had previously worked as a law enforcement officer. ( Question 23)

- When asked to describe her views on the death penalty, Juror I-30 stated: "I think if there is no doubt that the person did the crime, the death penalty is suitable." (Question 48)

- When asked how long she held the opinion expressed in her answer to question 48, Juror I-30 responded that she has never held a different view on the death penalty. (Question 49)

- Juror I-30 responded that she was in favor of the death penalty. (Question 50)

- Juror I-30 expressed her opinion that McKnight was guilty of the charged offenses. In pertinent part, Juror 1-30 stated, "although this does not mean he did it, it doesn't look good for him." (Question 53).

- Juror I-30 responded that she led a very religious life. (Question 65)

- Juror I-30 was twice a victim of a serious crime in Vinton County, Ohio - burglary and bank robbery. (Question 75)

- The burglary of Juror I-30's home was unsolved at the time of McKnight's trial. (Question 79)

- Juror I-30 expressed a strong belief in punishment for those convicted of a crime. (Question 84)

- Juror I-30 held the belief that defendant's convicted of crimes are treated too leniently. (Question 87)

441. The questions defense counsel asked of Juror I-30 in voir dire were insufficient to uncover any biases that were suggested by her answers given in the questionnaire.  Counsel did not broach the issue of her opinion respecting McKnight's guilt. She was not asked about her strong opinions regarding the need for increased punishments in society.  Juror I-30 was not asked about her opinion,

held her entire life, that the death penalty is "suitable" for a convicted murderer when there is no question of guilt.

442.    At the time of the trial, Juror I-30 was the mother of two young daughters.  Defense counsel never asked her how the death of another young female, Emily Murray, would affect her ability to decide McKnight's fate if he was found guilty.  Juror I-30's husband had previously served as a law enforcement officer.  She was not questioned about whether this would cause her to give increased weight to the testimony of law enforcement agents.

443.    Juror I-30 stated in her questionnaire that she lived a very religious life.  Defense counsel never asked how she would respond to the state's evidence of Murray's religious aspirations.  At the time Juror I-30 filled out her questionnaire, Gregory McKnight had recently been convicted of property and theft crimes in Vinton County, Ohio.  Juror I-30's Vinton County home had been burglarized and the crime was never solved.  Defense counsel never asked if she was aware of McKnight's recent convictions, or if they would impact her ability to fairly decide both phases of this case.

444.    Juror 1-30 made comments similar to her questionnaire answers during voir dire:

> **Mr. Toy**: On both factors. Do you know what the defense has to prove at all?
>
> **Juror 1-30**: Just has to try to prove that he did not not do it in some way or shape or form or other the fact that he is not guilty.

(Voir Dire Tr. 359).

445.    Defense counsel proceeded to question Juror I-30 about her exposure to pre-trial publicity. After several questions, defense counsel concluded:

> **Mr. Toy**: So there's not much you have to set aside. You can really hear this case based on the facts and evidence as presented on the witness stand then you can

169

> take it back in the jury room is that correct.
> **Juror I-30**: I think so. Yes.

(Voir Dire Tr. 363).

446.    Later during voir dire, Juror 1-30 expressed her view that she could be a fair juror.

(Voir Dire Tr. 368). While Juror 1-30 may have believed that she could be fair she was not the proper person to judge. *Morgan v. Illinois*, 504 U.S. 719 (1992) ("As to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed." Id. at 736.)

447.    Defense counsel needed to explore Juror I-30's opinions in order to ensure that she could in fact be fair to McKnight.   Critically, counsel failed to further explore the answers Juror I-30 had provided in her questionnaire.   As a result, substantial doubts about Juror I-30's ability to be a fair, unbiased and impartial juror went unquestioned and unchallenged.   Defense counsel should have moved to dismiss Juror I-30 for cause, or failing that, excused her peremptorily.   Defense counsel failed to do so, and Juror I-30 ultimately sat on McKnight's jury, convicted him and sentenced him to death.  Juror I-30 admitted that the only factor that could have weighed in favor of a life sentence was if McKnight proved in any way he was not responsible for the crimes. (PC Ex. E)

448.    Defense counsel failure to effectively voir dire and remove Juror I-30 fell below the professional standards for capital representation and denied McKnight his right to a fair and impartial jury.   McKnight was prejudiced by his counsel's unreasonable failure to adequately voir dire, challenge for cause, or peremptorily strike a prospective juror who was biased and unable to render a fair and impartial verdict. Trying a defendant before a biased jury is akin to providing him no trial at all. It constitutes a fundamental defect in the trial mechanism itself.

449.    Had defense counsel adequately conducted voir dire and struck Juror I-30, there is a reasonable probability that McKnight would not have been sentenced to death. McKnight was sentenced to death by a jury that included a biased and partial juror. Under *Strickland v. Washington*, defense counsel failure to question, challenge for cause, or strike Juror I-30 fell far below prevailing professional norms to the prejudice of McKnight.

450.    To the extent the Ohio courts ruled on the merits of McKnight's ineffective assistance of counsel claim, relative to defense counsel's failure to support their Motion to Change Venue, their rulings were an unreasonable application of clearly established federal law as stated by the Supreme Court of the United Sates, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts. 28 § U.S.C. 2254 (d).

**E.    Failure to Object to Pre-testimony Instruction**

451.    Gregory McKnight was denied the effective assistance of counsel when counsel failed to object to the court's instructions telling the jury that inconsistencies among and between a witness's testimony did not impact on his or her credibility. As a result, the court's instructions denied McKnight his rights to confront the witnesses, due process and equal protection.

452.    Trial counsel failed to object to the trial court's preliminary instruction telling the jury to ignore inconsistencies among and between witness's testimony and prior statements of the witnesses for the purposes of determining credibility. By failing to object to this blatantly inaccurate instruction McKnight was denied his right to the effective assistance of counsel as dictated by *Strickland v. Washington*, 466 U.S. 668 (1989)

453.    At the trial phase, the court instructed the jury regarding to ignore inconsistencies in witness testimony:

> Also, discrepancies in a witness' testimony, or between his testimony and that of others, if there are any, does not necessarily mean that you should disbelieve the witness, as people commonly forget facts or recollect them erroneously after the passage of time.

(Tr. 18-19). Counsel failed to object. [45]

454.    Not only was the court's instruction fatally flawed, it was also illogical. The court's instruction minimized discrepancies in the witnesses' testimony. In essence, the court told the jury that inconsistencies were normal, thus eviscerating the impact of significant disparities in witnesses' testimony. However, the court's instructions failed to recognize that an untruthful witness can tell a very consistent lie. Moreover, a witness can make the same mistake repeatedly. Just as a witness's inconsistency might not demonstrate a lack of veracity, a witness's consistent story does not necessarily prove that he or she is being truthful. The trial court's instruction ignored the latter reality.

455.    It is a jury's duty to determine the significance of any inconsistences or contradictions without misleading instructions from the trial court. Here, the trial court's instructions stacked the deck against McKnight by protecting the State's witnesses from any weaknesses based on discrepancies in its case found in witness's testimony. Before any testimony was proffered, the jury was told that it is "normal" to have inaccuracies in one's memory. Conversely, the jury was not told that a witness can tell the same lie consistently, or be repeatedly mistaken.

456.    Gregory McKnight presented one witness to defend against the State's charges. The crux of

---

[45] See McKnight's <u>Eighth Ground for Relief</u> for a discussion of the merits of this claim.

172

his defense plainly was discrediting the State's case through the cross-examination of witnesses. The trial court's instruction was fatal to McKnight's defense.

457.    Trial counsel's failure to object to an obviously erroneous jury instruction fell far below prevailing professional norms. The trial court's instruction rendered McKnight's right to cross-examination a futile act. Trial counsel's failure to offer any objection to the instruction denied McKnight his right to te effective assistance of counsel. The evisceration of McKnight's right to confrontation and cross-examination "calls into question the ultimate integrity of the fact - finding process." *Chambers* v. *Mississippi*, 410 U.S. 284, 295 (1973)  The trial court's instruction infringed on McKnight's confrontation rights and his right to present a meaningful defense as well as his rights to due process, equal protection and the effective assistance of counsel. McKnight was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

458.    Counsel had an obligation to object at the time the instruction was given, failing to do so rendered their performance deficient. McKnight was prejudiced by counsel's failure to object to the erroneous and flawed instruction. This instruction significantly undermined any effectiveness of cross-examination of the witnesses regarding inconsistencies in their statements. But for this instruction, McKnight would have been able to discredit crucial state testimony, and changed the outcome of the trial.

459.    The merits decision of the Ohio courts on McKnight's claims was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

173

**F.** **Trial - Failure to Object to Irrelevant and Inflammatory Victim Impact Testimony**

460.    The performance of defense counsel at the trial phase fell below an objective standard of reasonableness by their failure when they failed to object to irrelevant and inflammatory victim impact evidence introduced by the State. Counsel's deficient performance prejudiced McKnight by permitting the State to inflame the passions and prejudices of the jury, thus denying him due process and a fundamentally fair trial.

461.    The State repeatedly introduced inflammatory victim impact evidence during the trial phase. the case was replete with victim impact evidence. Beginning with opening statement, the prosecutor focused on characteristics of the victim: "Two years ago, Emily S. Murray was attending Kenyon College in Gambier, Ohio. She was in her junior year, and she was 20 years young. (Tr. 24). At work, Emily was well-liked. She was outgoing, she was helpful, she was a good waitress. (Tr. 25).

462.    The State's emphasis on the victim's character and the impact of her disappearance on her family was the focus of the prosecution's direct examination of its first witness, the victim's father. The prosecutor elicited from the father the devastation his family felt when they learned Emily had disappeared, "it was like somebody hit us in the stomach with a sledgehammer." (Tr. 59.) The prosecutor continued to elicit irrelevant, inflammatory testimony from the father about their close family relationship. (Tr. 65, 67).

463.    The prosecutor continued in this vein, eliciting further testimony that the victim was responsible and honest and that she intended to be priest. (Tr. 68, 74). The prosecution, soon thereafter, put the victim's mother on the stand to add to the emotional tone of the prosecutor's case. The prosecutor had the mother echo her husband's testimony about the family's good relationship. (Tr. 356.) The prosecutor elicited from the mother testimony that Emily was "easy to love" and had her

174

repeat for the jury the victim's desire to become an Episcopal priest. (Tr. 355.)

464.    Neither of the victim's parents had any relevant testimony tending to demonstrate the existence or non-existence of any element of the crimes McKnight was charged with.

465.    The prosecutor continued to focus on the victim's character during direct examination of Emily's friends Megan DiCarlo and Kate Murray. The prosecution had DiCarlo describe the victim as being outgoing, social, independent, open, and trusting, and that she always looked for the best in people. (Tr. 86).  The prosecution elicited from how the victim was very intelligent and outgoing, as well as happy, cheerful, and trusting. (Tr. 130). The prosecution further had Kate Murray describe in detail the tattoo of a dove on Emily's back, and that the victim had strong religious beliefs, which the dove symbolized. (Tr. 136). The prosecution elicited testimony from the victim's co-workers at the Pirate's Cove who described the victim as "upbeat," "happy," "courteous," and "car[ing] for people." (Tr. 183, 185, 286).  None of this information was relevant to any element of the crimes with which McKnight stood charged.

466.    The prosecution then returned to these inflammatory and emotional themes in closing argument.[46] The prosecutor described the fall of 2000 as a "parent's worst nightmare" and repeated the father's testimony  that it "felt as if they had been hit in the stomach with a sledgehammer." (Tr. 1676). Moreover, the prosecutor argued that "the pain still stayed with the victim's family". (Tr. 1676). The prosecution again reminded the jury that Emily was a "great person," "kind-hearted," and that she "helped out." (Tr. 1693).

467.    The State's continued emphasis on the victim's good character and impact of her death on friends and family introduced an irrelevant and inflammatory element into the jury's decision making

---

[46] See McKnight's Thirty-First Ground for Relief detailing prosecutorial misconduct

in the trial phase.  Emily Murray's character was not in dispute.  The comments did not focus on the

murder or whether McKnight committed it and only served to increase the jury's compassion for the

victim and inflame the jury against the defendant charged with her murder.  Defense counsel failed

to object to any of this inflammatory and irrelevant testimony.

468.    Ohio law is clear, victim impact evidence is not permitted in the trial phase.  *See State Tyler*,

50Ohio St.3d 24, 35 (1990).  It is error for the prosecutor to argue that the jury consider the victim's

families.  *State v. Brooks*, 75 Ohio St.3d 148, 158 (1996).  The ABA Guidelines recognize defense

counsel's obligation in such a situation; "Because of the possibility that the client will be sentenced

to death, counsel must be significantly more vigilant about litigating all potential issues at all levels

in a capital case than in any other case."  (Guideline 10.8 A.)

469.    On March 25, 2002, defense counsel did file a motion in limine to prohibit victim-impact

evidence during the trial, and, if necessary, the mitigation phase.  That defense counsel's recognized

the importance of precluding this inflammatory evidence on paper, yet failed to object  at trial makes

their failure all the more unreasonable.

470.    Defense counsel had an obligation to ensure that McKnight received a fair trial.  *Strickland's*

duty to advocate and employ "skill and knowledge" included the necessity to object to inflammatory

and irrelevant victim impact evidence.  This testimony affected the integrity of both phases of

McKnight's capital trial. Defense counsel should have objected to the victim impact evidence. Under

*Strickland v. Wahington*, defense counsel was constitutionally ineffective for failing to do so.

471.    To the extent the Ohio courts ruled on the merits of McKnight's claim, relative to defense

counsel's failure to object to irrelevant and inflammatory victim impact evidence, their rulings were

an unreasonable applications of clearly established federal law as stated by the Supreme Court of the

United States, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**G.      Unreasonable Failure to Request *Remmer* Hearing**

472.    McKnight was denied the effective assistance of counsel and his right to an impartial and unbiased jury under the Fifth, Sixth, Eighth, and Fourteenth Amendments by trial counsel's unreasonable failure to question an available witness, or to request a *Remmer* hearing even though the prosecution alerted the trial court and defense counsel that a juror had been discussing facts of the case with persons in the community during the trial.

473.    On October 4, 2002, the prosecution alerted the trial court and defense counsel to allegations of juror misconduct. (Tr. 981).  Amy Warrix reported to the Vinton County Sheriff's Office and to the Vinton County Prosecutor's Office that Juror I-49 had been talking about the case.  (Tr.981-82).  Ms. Warrix remained at the courthouse in the event the trial court, prosecution or defense counsel wanted to speak with her.

474.    All parties retired to the judge's chambers.  The trial court then proceeded to question Juror I-49. He denied discussing the facts of the case with Ms. Warrix, but did admit to talking  about the food served to the jury for lunch.  When asked why anyone would make such serious allegations if they weren't true, Juror I-49 referred to Ms. Warrix as a "mean, hateful girl." (*Id*. at 983).

475.    The previous night, Juror I-49 and Ms. Warrix had been "riding around drinking" until about midnight.  (*Id*. at 984). According to Juror I-49, he had been involved in a relationship with Ms. Warrix that recently ended.  Juror I-49 believed Ms. Warrix was trying to do anything she could to send him to prison because she was "despiteful."  (*Id*. at 983).

476.    The trial court asked Juror I-49 if he had acquired any information about the case as a result of being around Ms. Warrix.  Although Juror I-49 denied this with certainty, he followed up by noting; "What she told me is nothing that's gone on in that courtroom.  I don't know where she got her stuff from that they was saying."  (Id at  987).

477.    The prosecution also inquired about the possibility of any pressure being exerted upon Juror I-49 as a result of his status as a juror in a high profile case. I-49 admitted the question was difficult to answer, given that "anybody that knows that I'm a juror all says something to do with it."  (Id. at 988-89). Based on Juror I-49's response, it is clear the Vinton County community was not shy about voicing their opinions to him about the trial to him.  "Everybody around has got their own opinion formed about it, you know.  It's not just them; it's everybody that does it, anybody that knows I'm a juror.  (Id. at 988).

478.    In light of Ms. Warrix's allegations coupled with Juror I-49's inconsistent responses and revelations about the community pressure exerted upon him, further exploration was essential to ensure McKnight was receiving a fair trial.  Confining the misconduct and community pressure questions to Juror Stewart was woefully insufficient in light of the following:

■    Juror I-49 referred to Ms. Warrix as mean, hateful and despiteful. But this was his former girlfriend who only one night before, was "riding around drinking" with him till around midnight ( Tr. 983-84).

■    Juror I-49 twice voiced fear that he would be sent to prison or arrested for violating the trial court's instructions.  (Tr. 983, 986).  Given this fear, Juror I-49 had a vested interest in denying any misconduct to the trial court.  His admission that he "registered to vote and everything so [he] could be a jury member and everything" and that he'd "been 29 years trying to be" a juror indicates he had an additional incentive to do whatever he could to try to remain on the jury in the case.  (Id. at 989).

■    Juror I-49 statement that he acquired no outside information about the case when talking with

178

Ms. Warrix was conflicted by the next two sentences to come out of his mouth. "What she told me is nothing that's gone on in that courtroom.  I don't know where she got her stuff from that they was saying." (*Id*. at 987).

- Juror I-49 claimed that he "never discussed the case with [Ms. Warrix] at all," but his statement appeared to be limited to a denial that *he* conveyed any information *to* Ms. Warrix. He never denied, however, that Ms. Warrix had shared information about the case *with him*, and in fact, indicated that she had done so. (*Id*. at 985).

- Juror I-49 confirmed that Ms. Warrix had "commented to [him] about what she thinks about the case," indicating that her comments consisted of "what she [had] seen on TV" about it. Indeed, Juror I-49's later statement that "[w]hat she told me is nothing that's gone on in that courtroom" is consistent with his earlier statement that Ms. Warrix shared details of television coverage of the case with him. (*Id*. at 987).

- Moreover, he admitted that this information went beyond the evidence that was presented during the trial proceedings when he explained that Ms. Warrix revealed information different from the evidence he had heard during what went "on in that courtroom" during the trial, noting that he "d[id]n't know where she got her stuff from," a comment that suggests Mr. Warrix shared information with Juror I-49 that was available to television viewers in the community, but excluded from the jurors hearing the evidence at trial. (*Id*.)

- Juror I-49 admitted that the Vinton County community continued to exert pressure on him during the trial.  Juror I-49's failure to deny that "anybody [had] told [him] how [he] should decide this case, on way or the other" proves the point.  Instead of denying receiving information and opinions about the case from Mr. Warrix and others in the community, Juror I-49 answered that the question was a "hard" one, "because *anybody that knows I'm a juror all says something to do with it*." (*Id*. at 988).

- After alerting the Vinton County Sheriff and Prosecutor about the misconduct, Amy Warrix remained at the courthouse and was available for questioning.  Absent inquiry of Warrix, the trial court had no means to judge the credibility of Stewart's answers.

479.  Under *Strickland* and the ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003), defense counsel in a criminal case are duty bound to "advocate the defendant's cause" as well as "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland* at 688.  Despite inconsistent and alarming

179

answers from Juror Stewart, red flags that screamed for further exploration, defense counsel failed to take any action, to question Amy Warrix, or to request a full *Remmer* hearing.  Juror I-49 was never asked what exactly Ms. Warrix or other members of the community shared with him about the case. He was never specifically asked who the members of the community were that felt free to voice their opinions to members of the jury.  No questions were asked of Juror I-49 about whether he shared this information with other members of the jury.  Ms. Warrix was never questioned, even though the prosecutor pointed out she present at the courthouse and available to be heard from.  (Tr. 990).

480.   Defense counsel's only response was to ask Juror I-49 two leading questions about having followed the trial court's instructions. (Tr. 985).  McKnight was entitled to a hearing pursuant to *Remmer v. United States*, 347 U.S. 227 (1954), to establish what information had been discussed, impressions had been brought, the impact these facts and impressions had on the juror, whether these matters had been shared with other jurors, and whether the misconduct prejudiced McKnight. *Id* at 229-30. Counsel should have requested that hearing, particularly after observing the inadequacy of the trial court's inquiry into the issue.

481.   However, not only did counsel fail to request a *Remmer* hearing, counsel also declined  the opportunity to question Juror I-49 's accuser, Ms. Warrix who was in the courthouse.  Inquiry of Juror I-49 alone was insufficient to determine the veracity of the accusations. Counsels' failure to question the accuser and failure to request a hearing deprived McKnight of his rights to an impartial jury and due process.

482.   Defense counsel's neglect of this issue cannot be deemed a strategic decision.  "There is no situation under which the impaneling of a biased juror can be excused."  *Franklin v. Anderson*, 434 F.3d 412, 428 (2006).  "To permit this would be to allow trial counsel to waive the defendant's right

180

to an impartial jury." (*Id*.).  The failure to remove biased jurors taints the entire trial, and therefore the resulting conviction must be overturned. (Id.)  As a result of defense counsel's failures, McKnight was convicted and sentenced to death by a jury that included at least one juror who ignored the court's admonitions and discussed the case outside the jury room.  The performance of McKnight's defense counsel fell far below prevailing professional norms to McKnight's prejudice thereby denying McKnight the effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 669 (1984).

483.    The failure of defense counsel to adequately address the allegations of juror misconduct violated McKnight's rights to a fair trial and to a trial by an impartial jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.   Therefore, McKnight's conviction and sentence are not deserving of confidence and must be vacated and his case remanded for a new trial. Alternatively, this Court should conduct a full evidentiary hearing.

484.    To the extent the Ohio Courts ruled on the merits of this issue, those rulings were unreasonable applications of clearly established federal law as stated by the Supreme Court of the United States, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**H**.    **Failure to Request Curative Action after a Spectator in the Courtroom Disrupted Trial Phase Closing Arguments**

485.    Defense counsel's performance fell below an objective standard of reasonableness when they failed to request any corrective action after a spectator in the courtroom disrupted closing arguments.  That failure prejudiced McKnight because he was denied due process, a fair trial, and his right to be tried by a fair and impartial jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

486.     An emotionally charged outburst during defense counsel's closing argument disrupted

Gregory McKnight's capital trial.  Given the tenor of the community, both prior to and during the trial,

this outburst likely further prejudiced McKnight's jury against him. Confronted with this situation,

defense counsel failed to request any curative action. The public disruption, coupled with defense

counsel's failure to act, deprived McKnight of a fair trial and an impartial jury.

487.     In closing argument, defense counsel argued McKnight had no reason or motive to kidnap and

murder Murray.  McKnight and Murray were co-workers and by all accounts friendly with one

another.  The following transpired during defense counsel's closing argument:

> DEFENSE COUNSEL: Why would he want to kill Emily? No. 3, Emily liked Greg,
> according to Abigail Williams. Emily and Greg were considering a relationship, according to
> Nate Justice.
>
> AUDIENCE MEMBER: No.

(Tr. 1722).  Following this outburst, defense counsel requested no curative action.

488.     The spectator's outburst was an attack on the sincerity and integrity of the argument put forth

by McKnight's defense counsel, as well as an affront to the credibility of McKnight himself.  A public

disruption, of sufficient magnitude for the court reporter to report of it in

the official transcript, occurred during a critical phase of McKnight's trial. Yet, defense counsel failed

to address this emotional disruption or to request any curative action.

489.     The law is clear on the appropriate action to take after a jury is exposed to unauthorized

communications.  Once inappropriate contact with a juror occurs, the trial court must conduct an

hearing to determine if the actions violated the defendant's rights to a fair trial by an impartial jury,

a reliable sentencing determination, and due process.  *Remmer v. United States,* 347 U.S. 227, 229-30

(1954). *Remmer* addressed the question of whether third party contact with a deliberating juror violated the Sixth Amendment right to a fair trial by an impartial jury. However, the central holding of Remmer has been extended to any "communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury..." *White v. Smith*, 984 F.2d 163, 166 ( 6th Cir. 1993).

490.　McKnight was entitled to a hearing pursuant to *Remmer v. United States*, 347 U.S. 227 (1954), to assess the impact of the emotional outburst on the jury and determine whether the misconduct prejudiced McKnight. *Id* at 229-30. Counsel should have requested that hearing, particularly after observing the inadequacy of the trial court's inquiry into the issue.[47]

491.　Under *Strickland*, defense counsel in a criminal case are duty bound to "advocate the defendant's cause" as well as "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." Id. at 688. The ABA *Guidelines* recognize defense counsel's obligation in a such a situation; "Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case." (*Guideline* 10.8 A).

492.　Because of defense counsel's failure to act, McKnight was prejudiced. The trial court never admonished the jury or individually questioned them to ensure that the disruption did not impact their ability to be fair and impartial. The jury was never instructed to disregard the outburst. Nor was the jury instructed that spectators in the courtroom know nothing about the facts relevant to the issue of guilt or innocence.

---

　　　　[47]The trial court's failure to conduct a *Remmer* hearing is raised in McKnight's <u>Fifteenth Ground for Relief</u>

493.    Defense counsel's lack of diligence meant that the trial court never asked the jurors if the outburst would influence their opinion or influence their conduct in the penalty phase of the trial. The jury should have been instructed to decide McKnight's based on properly admitted evidence applied to the correct law, not the conscience of angry courtroom spectators who thirsted for vengeance. "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907).

494.    Defense counsel should have requested curative action from the trial court. A spectator belittled defense counsel's closing arguments in front of the jury, yet counsel did nothing. Many remedies existed on how to address this disruption, yet defense counsel failed to request anything.

495.    The jury assembled to decide McKnight's guilt/innocence and punishment was exposed to an inflammatory and extraneous outburst from a courtroom spectator. The outburst was a direct attack on the defense put forth by McKnight. Defense counsel were duty bound to request further investigation by the trial court. *See Remmer*, 347 U.S. at 229-30. All parties involved in McKnight's case needed to know whether the jurors' exposure to this extraneous contact would impact on the enormous decisions they were about to make. Far short of requesting a *Remmer* hearing, defense counsel did not even ask the trial court to admonish the jury.

496.    The extensive and inflammatory pre-trial publicity surrounding McKnight's case compounded defense counsel's failure to act. In the months preceding McKnight's trial, the media saturated Vinton County with stories of the deaths of Murray and Julious.[48] The articles were emotionally charged and

---

[48] For full analysis of this issue, see McKnight's Second Ground for Relief where he argues a change of venue was necessary due to the extensive and inflammatory pre-trial publicity.

prejudicial. The State echoed this presentation by eliciting victim impact and victim character evidence, which further inflamed McKnight's jury. The State also introduced extensive bad character evidence, portraying McKnight as a black male who preyed on white women.

497. Moreover, jurors continued to be assaulted with publicity, or at least the opinions of what should happen in McKnight's case from the Vinton County community. Juror I-49 engaged in prejudicial discussions and upon questions from the trial court, admitted that "anybody that knows I'm a juror all says something to do with it." (Tr. 988-89). "Everybody around has got their own opinion formed about it, you know. It's not just them; it's everybody that does it, anybody that knows I'm a juror." (Id.)

498. The highly charged and emotional atmosphere surrounding McKnight's trial is demonstrated further by the second public disruption of McKnight's trial, which occurred post-sentence. Following the imposition of death upon McKnight, a courtroom spectator shouted and expressed approval of the sentence. (Tr. 2118). Again, defense counsel failed to address this disruption.

499. Defense counsel were constitutionally ineffective for failing to adequately address the emotional outburst and request curative action from the trial court. That failure ultimately deprived McKnight of the effective assistance of counsel, a fair trial and a verdict rendered by a fair and impartial jury under the Fifth, Sixth, Eighth and Fourteenth Amendments.

500. To the extent the Ohio courts ruled on the merits of defense counsel's ineffective assistance of counsel, their rulings were an unreasonable application of clearly established federal law as stated by the Supreme Court of the United Sates, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts. 28 U.S.C. § 2254 (d).

185

I.      **Failure to Object to the Introduction of Gruesome Photographs During the Trial Phase**

500.    Defense counsel's performance fell below an objective standard of reasonableness when they failed to object during the trial phase to the introduction and admission of numerous gruesome photographs that had no probative value and were highly prejudicial and inflammatory. That failure prejudiced McKnight because he was denied due process, a fair trial, and his right to be tried by a fair and impartial jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

501.    During the trial phase, the State introduced numerous photographs of the crime scene and body of Murray taken inside the trailer, where her body was found, as well photographs taken at the morgue during the autopsy. The photographs were extremely graphic in their display of various views of the gun shot wound and a decomposition of the body. These photographs clearly had a strong, emotional impact on the jury. Because this prejudice far outweighed their minimal probative value, the trial court should have excluded them and counsel should have objected. McKnight was denied due process**.**[49]

502.    Defense counsel had an obligation to ensure that McKnight received a fair trial. *Strickland's* duty to advocate and employ "skill and knowledge" included the necessity to object to inflammatory and irrelevant evidence.  These photographs infected the integrity of both phases of McKnight's capital trial. Defense counsel should have objected to the introduction of the photographs that were gruesome by their very nature.. Under *Strickland v. Wahington*, defense counsel was constitutionally ineffective for failing to do so.

---

[49] See McKnight's <u>Ninth Ground for Relief</u> for a discussion of the merits of this claim.

503.    To the extent the Ohio courts ruled on the merits of McKnight's claim, relative to defense counsel's failure to object to irrelevant and inflammatory victim impact evidence, their rulings were an unreasonable applications of clearly established federal law as stated by the Supreme Court of the United States, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**J.    Trial Counsel Waived Gregory Mcknight's Presence During a Critical Phase of His Trial.**

504.    On the fifth day of trial, the State informed the trial court and defense counsel that Amy Warrix reported that Juror I-49 had been talking to her about Gregory McKnight's trial. (TR. 981). Warrix was available and willing to be questioned about the issue. (Id.). The trial court brought Juror I-49 into chambers to voir dire him on the issue. (TR. 982). Defense counsel waived McKnight's presence at this voir dire, without consulting him. (Id.)  The trial court, State, and defense counsel proceeded to voir dire Juror I-49 in McKnight's absence.  Juror I-49 stated that Warrix was "despiteful" because he broke up with her the previous night. He denied talking to her about McKnight's trial. (TR. 983). All parties declined to voir dire Warrix. (TR. 989-90).

505.    Later in the trial, McKnight was once again excluded from a hearing to review the proposed jury instructions. (TR. 1640). The record simply indicates that McKnight was not present without any mention of a waiver by him or counsel. (Id.).

506.    One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial.  *Lewis v.United States*, 146 U.S. 370 (1892).  A defendant is required to be present at every stage of the trial except when he voluntarily declines to attend the proceedings. *Hopt v. Utah*, 110 U.S. 574 (1884).

187

507.    At trial, McKnight's counsel unilaterally waived his presence during the questioning of Juror I-49, to determine whether there had been juror misconduct. (TR. 982).  Although McKnight was available and in the courtroom, he was not present for the voir dire of Juror I-49, nor did he waive his presence.

508.    A waiver of such constitutional rights must be made part of the record in order to demonstrate that the waiver was done knowingly, intelligently and voluntary.  Furthermore, McKnight's absence from the proposed hearing on juror instructions was apparent from the record which does not contain any waiver of McKnight's presence.  Without a written or oral waiver in the record, it can not be presumed that a knowing, intelligent and voluntary waiver of appearance was secured.

509.    Proceedings resolving questions of juror misconduct based on credibility and decisions on what persons should be examined are necessarily critical proceedings that require the presence and input of the accused.  The hearing on proposed jury instructions likewise was critical as those instructions defined the parameters within which the jury decided whether he should live or die

510.    As a result, McKnight was denied Due Process, his right to Confrontation and right to be present as guaranteed by the Fifth, Sixth. Eighth and Fourteenth Amendments.

511.    Counsel have an obligation to ensure that their client is present during critical stages of the trial and is fully informed of all decisions made by counsel.  (See ABA Guidelines 10.5 C)

As a result of this failure, McKnight was denied his right to the effective assistance of counsel as guaranteed by the Fifth, Sixth. Eighth and Fourteenth Amendments to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668 (1984).

512.    The merits decision of the Ohio courts on McKnight's right to be present at all proceedings was contrary to or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(D).

**K.      Failure to Object to Repeated Instances of Prosecutorial Misconduct**

513.___Defense counsel's performance fell below an objective standard of reasonableness when they failed to object to numerous and deliberate acts of prosecutorial misconduct throughout the trial. That failure prejudiced McKnight because he was denied due process, a fair trial, and his right to be tried by a fair and impartial jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

Specifically counsel failed to object to the following:[50]

1.    The prosecutor saturated the trial with emotionally charged victim impact and character evidence.
2.    Presentation of irrelevant and prejudicial other acts evidence
      a.    Marital Infidelities
      b.    Improper reaction to police
3.    Other acts evidence.
4.    Improper speculation about what was in the victim's mind
5.    Improper rebuttal to defense arguments regarding blood and the .357 handgun
6.    Improper burden shifting regarding defense's failure to present witnesses
7.    Cumulative effect of misconduct

514.    Defense counsel was constitutionally ineffective for failing to object to the repeated and blatant instances of prosecutorial misconduct. That failure ultimately deprived McKnight of the effective assistance of counsel, a fair trial and a verdict rendered by a fair and impartial jury under the Fifth, Sixth, Eighth and Fourteenth Amendments.

515.    To the extent the Ohio courts ruled on the merits of defense counsel's ineffective assistance of counsel, their rulings were an unreasonable application of clearly established federal law as stated by the Supreme Court of the United Sates, and resulted in a decision that was based on an

---

[50] For a complete discussion of the merits see Thirty-First Ground for Relief

unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C.

§ 2254 (d).

**Twenty-Seventh Ground for Relief**

**MCKNIGHT'S DUE PROCESS, FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL WAS DENIED BY COUNSEL'S DEFICIENT PERFORMANCE DURING THE PENALTY PHASE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

516.    Gregory McKnight was denied the effective assistance of counsel during the penalty phase

trial. Counsel failed to conduct a reasonable mitigation investigation, and therefore presented a

woefully incomplete mitigation case. The acts and omissions of counsel prejudiced McKnight and

denied him due process, a fair trial and the effective assistance of counsel under the Fifth, Sixth,

Eighth, and Fourteenth Amendments. *Strickland v. Washington*, 466 U.S. 668 (1984).

517.    The failure to conduct a reasonable investigation into the background and mental health

history of the client and the resulting failure to introduce readily available and compelling mitigating

evidence constitutes deficient performance and resulting prejudice under *Strickland*. *Williams v.

Taylor*, 529 U.S. 362, 396-98 (2000), *Wiggins v. Smith* 539 U.S.510 (2003). Counsel must conduct

a reasonable investigation and develop evidence that humanizes the client and explains his behavior.

In order to have a reliable sentencing determination the client, the sentencer must be able to focus on

the individual characteristics of the defendant and circumstances of the crime. *Lockett v. Ohio*, 438

U.S. 586, 604 (1978).

190

**A.     Counsel Failed to Conduct a Reasonable Investigation into His Background and Mental Health History.**

518.    Counsel in capital cases have the duty to investigate the defendant's background for mitigating factors. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); ABA, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.* (2003). Counsel's failure to thoroughly investigate available and relevant mitigating evidence and their failure to introduce this compelling mitigating evidence prejudiced McKnight, because there is a reasonable probability of a different outcome had this compelling evidence been presented.

519.    Trial counsel only called two witnesses in its penalty phase presentation, his wife and his mother-in-law. This evidence was presented to demonstrate that he had a good relationship with his children. His wife had testified during the trial phase for the prosecution.

520.    "[I]nvestigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting ABA *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* 11.4.1( C ) (1989)); *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003)(finding *Wiggins* to "stand[] for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases").

521.    Counsel did not conduct reasonable or competent investigation into all reasonably available mitigating evidence.

522.    Because counsel failed to conduct a reasonable investigation, counsel failed to present readily available mitigating evidence regarding his character history and background, that would have

humanized Gregory McKnight and provided the jurors with reasons to spare is life.

523.    Only after a reasonable investigation can counsel make an informed, tactical decision about which information would be helpful in a client's case. *Wiggins,* 539 U.S. at 522-23*, Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995).Counsel's decisions are considered "strategic" and generally immune from attack only if preceded by a reasonable investigation. *Id*. Since no reasonable investigation was conducted in the present case prior to either the trial or sentencing phase, counsel's decisions during those stages cannot be considered "strategic."

524.    Family members and friends were readily available and would have provided compelling mitigating evidence of the type that jurors rely on in imposing a life sentence, (See *Wiggins* at 535) (PC Ex. I, J, K) These witnesses all discuss a common theme in McKnight's life, with respect to the abandonment of Mcknight by his father in infancy. McKnight's mother, aunt and family friend and caretaker were all readily available to testify on McKnight's behalf and would have been willing to assist with further investigation.(PC Ex. I, J, K)

525.    Counsel ceased their mitigation investigation allegedly because the trial court indicated that he would permit the State to present, in rebuttal, evidence that McKnight was adjudicated a delinquent on a charge of murder when he was 15 years old. Counsel, however, failed to conduct any investigation into the circumstances surrounding the prior murder conviction at fifteen. Especially in light of McKnight's youth, an investigation into the circumstances surrounding this earlier incident, as well as his time spent incarcerated, would have revealed compelling mitigation evidence, as well as an explanation of the circumstances surrounding these crimes.

526.    Lead trial counsel, Herman Carson, stated during his deposition that he was primarily responsible for the development of mitigation, See (PC Exh P, p. 40).and conceded "Well, we were

192

really limited by the judge's indicating that if we brought up anything prior to him being sent to DYS for the murder or adjudication of murder as a juvenile, that was going to come in. So we had to focus on what transpired since he got out of DYS." (PC Exh P, pp. 40-41) Carson further testified that he did not know if the judge had actually made a ruling, or the mitigation decision was based on in chambers conversations. (PC Ex. P, p. 41) Based on this determination by the trial court, counsel concluded that no mitigation investigation into McKnight's background from birth until the time he went to DYS at the age of 15 would be conducted. Had this investigation been done, particularly with respect to McKnight's incarceration in DYS, valuable *Skipper* evidence could have been presented to the jury which likely would have changed the outcome of the penalty phase hearing. *Skipper v. South Carolina,* 476 U.S. 1 (1986)

527.    Despite the fact that a mitigation specialist was available to conduct this investigation, no investigation was ever performed. Carson revealed that the mitigation specialist only made cursory attempts at contacting family members and critical witnesses, and did not travel to New York or Texas.(PC Ex. P, p.48-49) Little to nothing was done to investigate a reasonable mitigation strategy.

528.    Counsel did not file any type of pleading or motion in limine with the court to determine to what extent the juvenile murder could be used to rebut mitigation. (PC Ex. P, p. 60) Counsel did not do any investigation into the juvenile murder or McKnight's incarceration in DYS to determine if these events could yield information which could be mitigating or that could provide an explanation for McKnight's later behavior.

529.    Counsel's decision to curtail further investigation into a defendant's background will be deemed reasonable only to the extent that the investigation that the decision is premised on is reasonable. *Wiggins,* 539 U.S. at 522-23  Without a reasonable investigation, no strategic decisions

to curtail further investigation can be considered "reasonable". (*Id.*) Trial counsel had an obligation to exhaustively investigate all possible mitigation evidence. Counsel could not have considered all of the options, because they never investigated thoroughly so as to know what those options would be. This is particularly egregious because when Carson was asked if he believed there was a realistic chance of McKnight being found not guilty, he responded "no", and that this was a mitigation case from the beginning. (PC Ex. P, p.38) This belief was also held by co-counsel Bob Toy. (PC Ex. R, p. 26)

530. Reasonable strategic decisions cannot be made in a vacuum. Counsel has a duty to investigate the facts, "to preserve options" before embarking on a course of mitigation. *Powell v. Collins*, 332 F.3d 376, 399-400 (6th Cir. 2003). Defense counsel cannot make an informed choice among possible mitigating factors without first conducting a thorough investigation. *Wiggins v. Smith*, 539 U.S. 510, 525 (2003). Counsel here failed to conduct a thorough investigation upon which they might have been able to reasonably make informed trial strategy choices.

**B.  Gregory Mcknight Was Denied the Effective Assistance of Counsel During the Penalty Phase of His Trial When Counsel Failed to Present Relevant and Available Mitigation Evidence with Respect to His Cultural Background**

531. Trial counsel approached McKnight, who is black, as if he were African-American. Gregory McKnight however is Caribbean American. His parents are from Trinidad and Guyana respectively. There are significant and critical distinctions between African American and Carribean American culture. (See PC Exh T, Report by Dr. Kathleen Phillips Lewis, detailing the Carribean culture, and how a person from this background would assimilate into American culture, particularly

noting the differences between an African American background and someone whose parents were both Carribean))

532.   Counsel failed to employ the services of a cultural expert who would have been able to explain the client's background as it related to his family, and his history. Trial counsel failed to recognize the need to investigate McKnight's family roots as a Carribean American. As a result, counsel did not understand McKnight's background and therefore could not effectively present McKnight's compelling mitigation. McKnight was deprived of an individualized sentencing hearing because the jury was not provided with relevant and compelling mitigating evidence of his background.

533.   Lead counsel Carson conceded that one of the reasons he chose Dr. Monique Coleman as the defense psychologist was because she "was African American, which might get Greg to communicate better than he might otherwise". (PC Ex. P, p. 42) Additionally, the trial team was operating under the false assumption that Gregory McKnight's father was from Ghana, in Africa, and not Guyana, in South America. Carson also incorrectly believed that McKnight had no idea who his father was. (PC Exh P, p.54)

534.   Co-counsel K. Robert Toy, likewise referred to McKnight as "African American" during voir dire. (Voir Dire Tr. 613, 713) Counsel were wholly unaware of basic facts about their client's background. Clearly, even a superficial investigation would have revealed to counsel that their client's background was Carribean American and not African -American. Absent even this rudimentary investigation into McKnight's background counsel could not have been aware of the cultural differences that McKnight would have experienced and could not have made any reasonable decisions

about whether to curtail the investigation or whether or how to present this compelling mitigating evidence.

535. As Dr. Lewis's report indicates, McKnight was tormented with his identity. He was raised in the United States by an immigrant mother Trinidad. His father, who was absent from his life, was from Carribean nation of Guyana . (PC. Ex. I, T) The history of the Caribbean is complex.

536. Additionally, McKnight was raised within the strict Seventh Day Adventist religion. As a child and young teenager he was deprived of activities that youth in the United States traditionally experience. He was an outsider who struggled to fit in. When McKnight resided in Texas with his godparents(who were also from Trinidad), he endured strict discipline- humiliating beatings at the hands of his godfather, sometimes while he was in the shower. (PC Ex. T)

536. The picture of McKnight that emerges from this basic investigation is one of a young man who desperately searched for an identity. He longed for a connection to his father, but his mother isolated him from his father's side of the family. McKnight sought an outlet for his emotional and cultural confusion in the streets. The jury learned nothing about his background or cultural identity.

537. These were important factors to consider in mitigation, but counsel never considered bringing in a cultural expert, because they were unaware of cultural issues. ( PC Ex. P at 43) McKnight's background, cultural or otherwise was never investigated and therefore it could not have been presented to the jury. Had a reasonable investigation been done, and the compelling mitigating evidence been presented, there is a reasonable likelihood that at least one juror would have voted for a life sentence.

538. Defense counsel in a capital case must investigate the client's "cultural" influences for mitigation. ABA *Guidelines for the Appointment and Performance of Counsel in Death Penalty*

196

*Cases*, 10.7 (rev. ed. 2003),reprinted in Hofstra L. Rev. 913, 1022 (2003). See also ABA *Guidelines*

11.4.1(D)(2)( C)  and 11.8.6(B)(5) (1989). The guidelines set the standard for determining what is

reasonable when evaluating counsel's performance in a capital case. *Rompilla v. Beard*, U.S. , 125

S. Ct. 2456, 2466 (2005).

539.    When a capital defendant is deprived of an individualized sentencing assessment

because of his attorneys' failure to investigate, the integrity and reliability of the sentencing

determination are undermined establishing prejudice. *Williams v. Taylor*, 529 U.S. 362, 393 fn.17

(2000). Counsel did not conduct a reasonable investigation. Counsel's penalty phase performance fell

far below prevailing professional norms as articulated in the ABA Guidelines and *Wiggins v. Smith*,

539 U.S. 510 (2003), and *Powell v. Collins*, 332 F. 3d 376 (6th Circuit.2003)

540.    McKnight was prejudiced by his counsel's deficient performance which undermines

confidence which undermines confidence in the outcome of his capital sentencing hearing under the

Fifth, Sixth, Eighth, and Fourteenth Amendments were violated .

541.    The Ohio court's decision on McKnight's claims relative to this erroneous trial court

instruction was contrary to, or an unreasonable application of, clearly established federal law as stated

by the Supreme Court of the United States and resulted in a decision that was based on an

unreasonable determination of facts in light of the evidence presented in state courts.

28 U.S.C. § 2254(d).


**Twenty-Eighth Ground for Relief**

**MCKNIGHT'S WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN**

**COUNSEL FAILED TO OBJECT TO THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY WHICH TRIAL PHASE EVIDENCE WAS RELEVANT TO THE JURY'S WEIGHING PROCESS AT THE PENALTY PHASE.**

542.   McKnight was denied the effective assistance of counsel at the penalty phase as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984).

543.   At the penalty phase the trial court instructed Gregory McKnight's jury as follows, in pertinent part:

> The procedure that you must follow in arriving at your verdict in this phase of the trial is prescribed by law, and in this regard, you shall consider all of the testimony and **evidence relevant to the aggravating circumstance** Gregory B. McKnight was found guilty of committing and mitigating factors raised at both phases of the trial and final arguments of counsel.

(Tr. 2054-55) (emphasis added).

545.   Trial counsel failed to object to this instruction, even though it was in direct violation of Ohio case law. *See State v. Getsy*, 84 Ohio St. 3d 180 (1998). The trial court is required to determine what evidence is relevant and admissible and not leave it to the jury. *Id*. Counsel's failure to correct this incorrect instruction so infected McKnight's sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process.

546.   The "Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (citing *Darden v. Wainwright*, 477 U.S. 168, 179-83 (1986)).

547.    The death penalty can only be constitutional where the jury's discretion is carefully guided. *Gregg v. Georgia*, 428 U.S. 153 (1976).  The jury instruction in question here failed to guide the jury's discretion according to Ohio law, because the trial court has the responsibility to determine the admissibility of evidence.  *See* OHIO REV. CODE § 2929.03(D)(1)-(2); OHIO R. EVID. 104(A); *State v. Cornwell*, 86 Ohio St. 3d 560, 567 (1999) (citing *State v. Getsy*, 84 Ohio St. 3d 180, 201 (1998)); *Getsy*, 84 Ohio St. 3d at 201 (explaining that Ohio's Rules of Evidence, and Revised Code section 2929.03(D)(1) and (2), along with the holding in *State v. Gumm*, 73 Ohio St. 3d 413 (1995), require the trial court to determine what evidence is relevant).

548.    Juries "must first be properly instructed," so that they may be capable of understanding the issues posed in capital sentencing proceedings.  *Mills v. Maryland*, 486 U.S. 367, 377, n.10 (1988).

549.    The trial court's jury instruction violated McKnight's constitutional rights in that the instruction improperly permitted the jury to determine what evidence it deemed "relevant" to proving aggravating circumstances. Once the trial court breached its duty to determine what evidence was relevant, and to limit the re-introduction of non-relevant evidence, the jury was free to consider irrelevant and prejudicial evidence from the trial phase which tipped the scales on the side of death. Without further clarification or direction, the jury was free to deem any testimony or exhibit probative of the aggravating circumstances or its weighing of statutory aggravating circumstances against mitigating factors..

550.    As instructed, the jury could have considered all of the autopsy and crime scene photos as well as other inflammatory matters as relevant to the aggravating circumstances. The trial court's instruction likewise prevented the jury from giving full l effect to McKnight's mitigating evidence by improperly stacking the "death" side of the weighing scale with improperly admitted, irrelevant

199

evidence. At such a critical stage of the proceedings, the Fifth, Sixth, Eighth, and Fourteenth Amendments require that the jury be provided greater guidance than the trial court did in the present case.

551. The Supreme Court of Ohio concluded that the trial court's instruction was error. *State v. McKnight*, 107 Ohio St. 3d 101, 139; 837 N.E.2d 315, 356 (2005); ("To the extent that the jury might have interpreted the trial court's instructions as allowing them to determine relevancy, the trial court erred.")

552. Because of the trial court's erroneous instruction, the jury had full, unfettered discretion, not the carefully guided discretion mandated under the Fifth, Sixth, Eighth, and Fourteenth Amendments to consider and weigh evidence in its death calculation that was irrelevant to the question of mitigation or aggravation and yet was highly prejudicial and inflammatory.

553. Counsel's performance was objectively unreasonable and fell below accepted professional standards for representation of a capital defendant when they acquiesced and failed to properly narrow and control what evidence went to the jury. ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003); *State v. Getsy*, 84 Ohio St. 3d 180, 201; 702 N.E. 2d 866 (1998)

554. Counsel's failure to object to readmission of the trial evidence at the sentencing phase prejudiced McKnight by allowing the jury to consider irrelevant, erroneously admitted and inflammatory evidence during their death calculation. Simply put, *all* of the evidence did not go to *all* of the aggravators. Yet counsel failed to object to the readmission of such evidence during the penalty phase, to McKnight's prejudice when the evidence was part of the jury's death calculation.

555. In sum, McKnight's counsel's performance was objectively unreasonable and fell below

200

accepted professional standards for representation of a capital defendant when they failed to object to readmission of all the trial phase evidence during the penalty phase. As a result McKnight was prejudiced.  When counsel failed to object they ensured that even irrelevant, highly prejudicial, and inadmissible evidence would be put before the jury at the penalty phase.

556.    The admission of the evidence, including the photos, prejudiced McKnight because the evidence heavily infected the sentencing proceeding with unfairness, and resulted in a death sentence that was or appears to be based on caprice or emotion.

557.    The Supreme Court of Ohio found the trial court's instruction to be erroneous.  This erroneous trial court instruction and trial counsel's failure to object denied McKnight the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments. As such a writ of habeas corpus must issue.

558.    The Ohio court's decision on McKnight's claims relative to this erroneous trial court instruction was contrary to, or an unreasonable application of, clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts.

28 U.S.C. § 2254(d).

**Twenty- Ninth Ground for Relief**

**GREGORY MCKNIGHT'S WAS DENIED DUE PROCESS, A FAIR TRIAL AND**

**RELIABLE SENTENCING DETERMINATION AND THE EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO OBJECT TO THE TRIAL COURT'S VERDICT FORMS TO THE JURY THAT WERE MATERIALLY INACCURATE.**

559.    Gregory McKnight  was denied due process, a fair and reliable sentencing determination and the effective assistance of counsel at the penalty phase as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.  *Strickland v. Washington*, 466 U.S. 668 (1984).

560.    Trial counsel failed to object to verdict forms that were materially inaccurate. These verdict forms placed the burden of proof on the defendant to show that the mitigating factors outweighed the aggravating circumstance beyond a reasonable doubt. This type of burden shifting is impermissible, and denied McKnight a fair and reliable sentencing determination. [51]Counsel's failure to object to flawed verdict forms fell far below prevailing professional norms and denied McKnight the effective assistance of counsel.

561.    Trial counsel's deficient performance undermines confidence in the reliability of the sentencing determination.  As a result of trial counsel's ineffectiveness, McKnight was denied due process and a fair and reliable sentencing determination under the Fifth,  Sixth, Eighth, and Fourteenth Amendments.

562.    The Ohio court's decision on McKnight's claims relative to this erroneous trial court instruction and the ineffective assistance of counsel with respect thereto, was contrary to, or an unreasonable application of, clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in

---

[51] See McKnight's <u>Twenty- Fourth Ground for Relief</u>  for a discussion of the merits.

light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**Thirtieth Ground for Relief**

**GREGORY MCKNIGHT'S WAS DENIED DUE PROCESS, A FAIR TRIAL AND RELIABLE SENTENCING DETERMINATION AND THE EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO OBJECT TO THE TRIAL COURT'S FLAWED INSTRUCTIONS GIVEN DURING THE TRIAL AND PENALTY PHASE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS**

563.    Gregory McKnight  was denied due process, a fair trial and fair and reliable sentencing determination and the effective assistance of counsel at the penalty phase as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.  *Strickland v. Washington*, 466 U.S. 668 (1984).

564.    Trial counsel failed to object to flawed instructions given during the trial and penalty phase of his trial. Particularly, a flawed instructions as to reasonable doubt, [52] releasing the victim in a safe place unharmed, [53] and allowing the jury to select alternative felonies as elements.[54]

565.    Trial counsel's deficient performance undermines confidence in the reliability of the trial and sentencing determination.  As a result of trial counsel's ineffectiveness, McKnight was denied due process, fair trial and a fair and reliable sentencing determination under the Fifth,  Sixth, Eighth, and Fourteenth Amendments.

566.    The Ohio court's decision on McKnight's claims relative to these erroneous trial court instructions and ineffective assistance of counsel with respect thereto, was contrary to, or an unreasonable application of, clearly established federal law as stated by the Supreme Court of the

---

[52] See McKnight's Twentieth Ground for Relief

[53] See McKnight's  Eighteenth Ground for Relief

[54] See McKnight"s Seventeenth Ground for Relief

United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**Thirty-First Ground for Relief**

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS, A FAIR TRIAL AND RELIABLE SENTENCING DETERMINATION BY THE MISCONDUCT OF THE PROSECUTORS DURING TRIAL AND PENALTY PHASES UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS**

**I.      Trial Phase - Prosecutorial Misconduct**

**A**.      **The Prosecutor Saturated the Trial with Emotionally Charged Victim Impact and Character Evidence.**

567.    Beginning with opening statement, the prosecutor began placing emphasis on Emily Murray's character:

> Two years ago, Emily S. Murray was attending Kenyon College in Gambier, Ohio. She was in her junior year, and she was 20 years young.

(Tr. 24).

> At work, Emily was well-liked. She was outgoing, she was helpful, she was a good waitress.

(Tr.25)

568.    This emphasis on Murray's character and the impact of her disappearance on her family continued during the prosecution's direct examination of witnesses. Thomas Murray,  Emily's father, testified as the State's first witness. The prosecutor elicited from Mr. Murray the devastation his family felt when they learned Emily had disappeared, "it was like somebody hit

204

us in the stomach with a sledgehammer." (Tr. 59). Mr. Murray testified about their close

family relationship. (Tr. 65-67). The prosecutor also elicited character evidence about Emily from Mr.

Murray, including that Emily was responsible and honest and that she intended to be a priest in the

Episcopal Church. (Tr. 68, 74). Cynthia Murray, Emily's mother, added to the emotional tone of the

prosecution's case echoing her husband's testimony about the family's good relationship.(Tr. 356). She

indicated Emily was "easy to love." (Tr. 355). Additionally, Mrs. Murray told the jury of her

daughter's desire to become an Episcopal priest. (Tr. 355).

569.    The prosecutor continued to focus on Emily Murray's character during direct examination of

her friends Megan DiCarlo and Kate Murray. DiCarlo described Murray as being outgoing, social,

independent, open, and trusting. (Tr. 86). DiCarlo indicated that Murray always looked for the best

in people. (Tr. 86). Kate Murray described Ms. Murray as very intelligent and outgoing. (Tr. 130).

She indicated Murray was happy, cheerful, and trusting. (Tr. 130). Kate also discussed the tattoo of

a dove on Murray's back. Kate told the jury that Emily had strong religious beliefs, which the dove

symbolized. (Tr.136). Emily's co-workers at the Pirate's Cove repeated this same description of

Murray as "upbeat," "happy," "courteous." and "caring for people." (TR 183, 185, 286).

570.     The prosecution returned to these inflammatory and emotional themes in closing argument.

The prosecutor described the fall of 2000 as a "parent's worst nightmare" and echoed Mr. Murray's

testimony that it "felt as if they had been hit in stomach with a sledgehammer."(Tr. 1676). Moreover,

the prosecutor noted that the pain was still with Murray's family at that time. (Tr. 1676). The

prosecution again reminded the jury that Murray was a "great person," kind-hearted," and that she

"helped out." (TR 1693).

571.    This information, or argument from the prosecutor did not pertain to any issue at trial. The

205

comments did not focus on the murder or its attendant circumstances. This type of commentary could only have served to inflame the jurors' passions and create sympathy for the victim and her surviving family.

572.    The prosecutor's arguments and presentation of impermissible victim impact evidence during the trial phase was extensive and demonstrates the deliberate nature of the State's inflammatory presentation.

573.    The prosecutions presentation of this evidence and arguments denied McKnight a fair trial and due process. [55]

**B.    Presentation of Irrelevant and Prejudicial Other Acts Evidence.**

**1.    Marital Infidelities**

574.    The prosecution introduced irrelevant and inflammatory evidence that McKnight engaged in infidelities during his marriage. In particular, the prosecution called Amber Hammers, Gloria Ressler, Paul Amstutz, Dana Bostic, and Lisa Perkins to testify about advances made by McKnight or affairs McKnight had. [56]

575.    The prosecutor returned to these themes in closing argument. The prosecution reminded the jury that McKnight gave Lisa Perkins a ride to her grandparents and pulled over to have sex with her. (Tr. 1710). The prosecutor reminded the jury that McKnight invited Hammers dancing and told her she did not have to tell her fiancé. (Tr. 1710). The prosecutor reminded the jury that McKnight asked Ressler for a "quickie." (Tr. 1710) Finally, the prosecutor told the jury there was evidence that McKnight was "putting the moves on Dana." (Tr. 1784).

---

[55] See McKnight's <u>Eleventh Ground for Relief</u>

[56] See McKnight's <u>Eleventh Ground for Relief</u>

576.     The prosecution *never* linked any of this testimony about McKnight to the facts and circumstances of these crimes. The prosecution even admitted that they had no evidence that anything was going on between Murray and McKnight outside of work. (Tr. 1764)

577.     This testimony and prosecution's argument was emotionally charged and inflammatory. The extensive nature of this presentation likely confused the jury into believing it was relevant, which was both misleading and prejudicial to McKnight. The prosecution acted in a deliberate manner in presenting this extensive and inflammatory argument.

### 2. Improper Reaction to Police

578.     The prosecution also presented the testimony of Dana Bostic regarding McKnight's reaction to the presence of police at a club, prior to Greg Julious' and Murray's disappearance. This testimony was irrelevant to any fact at issue.[57] Its sole purpose was to prejudice McKnight, suggesting that he had reason to fear the police well before these crimes. [58]

### 3. Other Acts Evidence

579.     Additionally, Deputy Boyer testified that he was at McKnight's home to serve an indictment on McKnight for burglary. (Tr. 724). It was only after Boyer provided the jury with this prejudicial and damaging testimony that the prosecution requested an opportunity to tell the witness not to discuss the burglary indictment. (Id.). The prosecution should have assured that its witness would not divulge prejudicial and irrelevant evidence before he took the stand. Rather, the prosecutor allowed his witness to present this highly inflammatory evidence to the jury. Knowing that McKnight was

---

[57] See McKnight's Eleventh Ground for Relief

[58] The Supreme Court of Ohio found this error to be harmless. *State v. McKnight*, 107 Ohio St. 3d 101, 116; 837 N.E.2d 315, 337 (2005

charged in another crime, coupled with Bostic's story that McKnight left the club after seeing the police prejudicially painted McKnight as a career criminal. Moreover, if this act was not deliberate, it certainly was inexcusable neglect for the prosecutor not to anticipate that such information could come out during testimony and to advise this witness in advance not to address it.

**C.** **Improper Speculation about What Was in the Victim's Mind**

580. During his rebuttal closing argument, the prosecutor speculated as to what was in Murray's mind. The prosecutor stated that "I think that's for the proof that she is giving Greg a ride home to Met O Wood Lane in Gambier, not to Vinton County. That's what was in Emily's mind." (Tr. 1766). There was no evidence presented to support the prosecutor's speculation.

581. The prosecutor based his personal speculation on pure conjecture that was unsupported by any evidence. The prosecutor's comments invaded the jury's province and improperly influenced the jury's deliberations. The prosecutor's comments did not direct the jury's attention to relevant evidence or arguments, and certainly did not help produce a fair trial and a reliable verdict. No verdict achieved by such means can be deemed reliable, rational or fair.

**D.** **Improper Rebuttal to Defense Arguments**

582. During rebuttal closing argument, the prosecutor responded in a misleading manner to defense counsels' argument respecting law enforcement's failure to type the blood found inside the barrel of the .357. The prosecutor noted that "[t]his gun was not the murder weapon that was held up to Emily Murray's head and shot through her skull...How does what blood is in here have anything to do with Emily Murray? How does this blow the whole case out of the water?" (Tr. 1774-75). The prosecution's argument improperly misled the jury.

583. Defense counsel argued the failure to test the blood found in the .357 as it related to Greg

208

Julious' murder. (Tr. 1740). The prosecutor's argument misstated defense counsel's argument, which, with respect to the .357, plainly addressed the adequacy of the investigation surrounding Greg Julious's murder. The prosecutor improperly misstated the facts as they related to defense counsel's argument and essentially "put[ ] words into the mouths" of defense counsel. *Berger v. United States*, 295 U.S. 78, 84 (1935) Such argument was misleading and improper.

**E.      Burden to Present Witnesses**

584.    In rebuttal closing argument, the prosecution asked the jury "[w]hy didn't they [the defense] present any witnesses?" (Tr.1777). The prosecutor then went on to emphasize they had presented forty-one witnesses to prove their case. (*See id,*). The defendant has no burden at trial. It is the prosecution's job to prove every element of the crimes charged beyond a reasonable doubt. *In re Winship*. 397 U.S. 358, 361 (1970). It is improper for the prosecution to comment on the defendant's failure to testify or present witness. However, by noting McKnight's failure to present these unidentified witnesses, the prosecutor attempted to shift that burden to the defendant.

585.    The prejudicial inference from the prosecutor's comments, however, was that McKnight was expected to present witnesses and to prove a defense to the jury. This, of course, contravenes our system of justice and the right to a fair trial. The ultimate issue of fact for the jury to decide is whether the State has proved each essential element of the charge beyond a  reasonable doubt, not whether the defendant has proved his innocence. *Id*. at 364. The prosecutor invaded the province of the jury.

**II.     Penalty Phase-Prosecutorial Misconduct**

**A.       Prosecution Made Improper Arguments on the Aggravating Circumstances.**

586.    Prior to the commencement of the penalty phase, the trial court improperly combined four statutory aggravating circumstances into one non-statutory super-aggravating circumstance . (Tr.

209

1923). [59] The trial court noted that it would read all of the aggravating circumstances together, excluding the escaping detection circumstance. ( Tr. 1923) Shortly thereafter, the prosecutor listed the aggravating circumstances to the jury. The prosecutor included all four of the aggravating circumstances, listing the escaping detection circumstance despite the trial court's merger. (Tr. 1932).

587.    Defense counsel objected to both the use of the escaping detection circumstance and to the prosecutor's statement that the jury was to weigh each aggravating circumstance separately against the mitigating factors. (Tr. 1935). The trial court ruled that it previously eliminated the escaping detection aggravating circumstance  because it was duplicative. (Tr.1941, 1945). Subsequently, the trial court instructed the jury that the four circumstances were merged into three and that the escape circumstance overlapped the felony murder circumstance. (Tr. 1954).

588.    The prosecution blatantly ignored the trial court's ruling that the escaping detection aggravating circumstance merged into the felony murder aggravating circumstance. The prosecutor's conduct was improper and deliberate disregarding the specific ruling of the trial court made only minutes before.

**B.    Improper Remarks Regarding Mcknight's Marital Infidelities**

589.    McKnight  presented two witnesses during the penalty phase, his wife and mother-in-law. Both witnesses' testimony was restricted to discussing McKnight's relationship with his children. However, in closing argument, the state again dredged up its earlier themes from the trial phase-that Gregory McKnight was a lying cheating husband. (Tr. 2028, 2031-32). This argument did not rebut the very limited mitigation presented by the defense. Rather this was merely an attack on McKnight's

---

[59] See McKnight's Twenty-Second Ground for Relief

character. This evidence was irrelevant, improper and inflammatory.

## C.  Cumulative Effect of Misconduct

590.    The misconduct in this case was not slight or confined, but rather "pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Berger*, 295 US at 89. Especially when taken as a whole, the actions of the prosecution were extremely harmful and prejudicial to McKnight and denied him due process, a fair trial and a fair and reliable sentencing determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments..

591.    The Ohio court's decision on McKnight's claims relative to this erroneous trial court instruction was contrary to, or an unreasonable application of, clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

**Thirty-Second Ground for Relief**

**GREGORY MCKNIGHT'S RIGHTS TO A FAIR TRIAL, DUE PROCESS AND A RELIABLE SENTENCING DETERMINATION WERE DENIED UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WHEN MEMBERS OF HIS JURY ENGAGED IN MISCONDUCT BY FAILING TO FOLLOW THE TRIAL COURT'S INSTRUCTIONS OF LAW**

592.    Under Ohio's statutory death penalty scheme, the jury must be instructed to weigh aggravating circumstances against mitigating factors .Ohio Rev. Code §2929.04(B). Here, the trial judge informed the jurors that they must decide"whether the State of Ohio proved beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating factors present in this case." (Tr. 2055)

593.    The trial court instructed the jury that there was one combined aggravating circumstance, i.e. an aggravated murder committed while the defendant "was committing or attempting to commit or fleeing immediately after committing or attempting to commit kidnaping and aggravated robbery . . . and the aggravated murder was part of a course of conduct . . . involving killing two or more persons." (Tr. 2053) The court specifically instructed the jurors that they "may not consider the nature and circumstances of the crime as an aggravating circumstance." (Tr. 2059) However, the jury failed to follow these instructions thereby denying McKnight due process and a fair trial as the jury's verdict to sentence him to death was arbitrary and unguided.

594.    During state-post conviction proceedings, juror interviews were conducted. One juror stated that the aggravating circumstance that compelled her to vote for death was the "brutality" of the crimes. (PC. Exh E)

595.    Brutality is not an aggravating circumstance may be considered by the jury under the Ohio Rev. Code § 2929.09. The juror also cited the blood evidence as a  reason to vote for death. Blood goes to proof of the crime and does not constitute a statutory aggravating circumstance that may be weighed by the jury. The juror maintained that "the only factor that could have weighed in favor of a life sentence was if the defense had proven in any way that McKnight was not responsible for the crimes." (PC Ex. E) Residual doubt may no longer be considered as a mitigating factor. *State v. McGuire*, 80 Ohio St. 3d 390, 403 (1997).

596.    A second juror echoed those same sentiments by insisting that the evidence of McKnight's guilt was "too strong to vote for life." (PC Ex. E) Even though the defense did not offer remorse as a mitigating factor, the second juror nonetheless was looking for remorse from McKnight. The lack of it supported her decision to vote for death. (PC Ex.  E)

597.   Individualized sentencing under such cases as *Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976), and *Lockett v. Ohio*, 438 U.S. 538 (1978). The Fifth, Sixth, Eighth, and Fourteenth Amendments require that a sentencing authority actually consider and give effect to all relevant mitigation evidence before imposing a death sentence. *Penry v. Lynaugh*, 492 U.S. 302 (1989); *Hitchcock v. Dugger,* 481 U.S. 393 (1987); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982). When determining whether a defendant should live or die, jurors who consider factors that are prohibited from being considered to support a death sentence upset the statutorily and constitutionally mandated balancing process. Jurors here failed to consider the mitigation evidence offered during the sentencing phase by impermissibly placing the burden on McKnight to prove his innocence.

598.   McKnight's jury clearly did not follow the instructions of law, thereby depriving McKnight of due process, and a  fair trial and a reliable sentencing determination. As a result, McKnight's death sentence cannot stand.

599.   The Ohio court's decision on McKnight's claims relative to this erroneous trial court instruction was contrary to, or an unreasonable application of, clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

213

**Thirty-Third Ground for Relief**

**GREGORY MCKNIGHT WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL ON HIS SOLE APPEAL OF RIGHT TO THE SUPREME COURT OF OHIO UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

600.    Gregory McKnight's constitutional right to effective assistance of appellate counsel on his sole appeal of right to the Supreme Court of Ohio was violated when appellate counsel's performance unreasonably fell below prevailing professional norms, to his prejudice.

601.    Criminal defendants are entitled to the effective assistance of appellate counsel in their first appeal as a matter of right.  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  Appellate counsel's effectiveness is analyzed under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

602.    Ohio affords one appeal of right to the Supreme Court of Ohio for a defendant sentenced to death.  Ohio Rev. Code § 2929.05.

603.    Counsel were appointed to represent McKnight on appeal from the Office of the Ohio Public Defender.  This same office had provided assistance to counsel at trial.

604.    Appellate counsel's performance fell far below the prevailing professional norms for appellate counsel in a capital case because counsel failed to raise or properly litigate critical federal constitutional issues that were apparent from the record, that should have been evident to a competent appellate attorney, and for which there existed no reasonable strategic reason to not raise these issues. See *Mapes v. Coyle*, 171 F.3d 408 (1999)

605.    McKnight was prejudiced because the claims appellate counsel failed to raise were strong claims, including ineffective assistance of counsel claims relating to defense counsel's failure to

214

challenge all of the false statements in the probable cause affidavit, as well as counsel's failure to seek a change of venue due to the racial bias of the jury venire that was exposed during voir dire. *See Franklin v. Anderson*, 434 F.3d 412, 430-31 (6th Cir. 2006) (failure to raise strong claim on appeal was prejudicial under Strickland).

606.    In the absence of appellate counsel's failures, these claims would have been considered and there is a reasonable probability that the trial court's and trial counsel's failures (one of which is structural error requiring automatic reversal) would have compelled a different result on appeal and would have required a new trial and/or penalty phase.

607.    The claims that appellate counsel failed to raise are contained in the Twenty-Fifth Ground for Relief, *supra*, and incorporated here by reference. But for appellate counsel's failures, these claims would have been considered and there is a reasonable probability that the trial court's and trial counsels' failures would have compelled a different result on appeal and mandated a new trial and/or penalty phase. As such, Gregory McKnight was denied the effective assistance of counsel on appeal under the Fifth, Sixth, Eighth and Fourteenth Amendments. *Strickland v. Washington*, 466 US 668 (1984).

608.    The merits decisions of the Ohio courts on McKnight's claims were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in decisions that were based on unreasonable determination of the facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

215

**Thirty-Fourth Ground for Relief**

**MCKNIGHT'S DUE PROCESS, EQUAL PROTECTION, FAIR TRIAL AND FAIR AND RELIABLE SENTENCING DETERMINATION WERE DENIED WHEN HE WAS CONVICTED OF KIDNAPING AND AGGRAVATED MURDER WITHOUT LEGALLY SUFFICIENT EVIDENCE, AND CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS**

## I.     Sufficiency of the Evidence

609.     Federal constitutional law prohibits the criminal conviction of any person, except upon proof beyond a reasonable doubt of every element of the charged crime. *In re Winship,* 397 U.S. 358, 364 (1970). Where the evidence adduced to support a conviction is insufficient to convince a rational fact finder of the existence of each element of the offense for which the accused is on trial, his conviction offends the due process clause and must be reversed. *Winship; Jackson v. Virginia,* 443 U.S. 307 (1979).

610.     The critical inquiry in a sufficiency-of-the-evidence analysis is whether the record supports a finding of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 318. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, **any** rational  trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).

611.     Only record evidence may be considered when evaluating a sufficiency claim. *Herrera v. Collins*, 506 U.S. 390, 402 (1993); *Jackson*, 443 U.S. at 318. But that evidence must be "substantial and competent" for the conviction to be constitutionally sound. *See McKenzie v. Smith*, 326 F.3d 721, 727–28 (6th Cir. 2003) (conviction must be supported by "substantial and competent" evidence upon the record as a whole).

216

612.    In the present case, the State failed to produce evidence demonstrating that Gregory McKnight kidnaped Emily Murray. The State's case was insufficient as to those charges. Resultantly, McKnight's conviction for the substantive offense of kidnaping, as well as those offenses where kidnaping served as the predicate felony, violate his rights to substantive and procedural due process.

613.    Gregory McKnight was charged with kidnaping Emily Murray pursuant to Ohio Rev. Code § 2905.01. (Count 2). The charge of aggravated felony murder, (Count 1), repeated Emily Murray's kidnaping as a predicate felony, as did two aggravating circumstances - Ohio Rev. Code §§2929.04(A)(7) (felony murder) and Ohio Rev. Code § 2929.04(A)(3) (escaping detection) (Count 1, specifications 1, 3).

614.    In its case in chief, the prosecution presented evidence of when and where Murray was last seen alive. (Tr. 216). The prosecution also presented evidence of when and where Murray's body was found. (See e.g. Tr. 745). However, no evidence was presented as to what transpired between the time Murray left he Pirate's Cove and the time that law enforcement found her body in Vinton County, Ohio, some 36 days later.

615.    At the close of the State's case, trial counsel made a Rule 29 motion regarding the substantive offense of kidnaping as a predicate to the aggravated murder offense and aggravating circumstances. (Tr. 1586). Trial counsel renewed its Rule 29 motion at the conclusion of its case. (Tr. 1638). The trial court overruled both motions.

616.    The trial court gave the instruction to the jury:

> Before you can find Gregory McKnight committed kidnaping,
> Gregory McKnight, by force, threat or deception, did remove Emil
> the place where she was found or restrain the liberty of Emily
> purpose of terrorizing or inflicting serious physical harm on Emily

(Tr. 1809- 10, 1821)

217

617.    To prove McKnight guilty of kidnaping the State needed to prove that McKnight removed or restrained Murray. Moreover, to be considered kidnaping, the removal or restraint had to have occurred prior to Murray's death. The State failed to prove this critical element of kidnaping.

618.    Clearly, the State believed that McKnight duped Murray into giving him a ride home after working their shifts at the Pirate's Cove, and that McKnight killed her after successfully completing this ruse. (Tr. 1766). However, not a single witness testified to these facts. The State's case for kidnaping was nothing more than speculation.

619.    In fact, there is no direct evidence establishing McKnight as the killer. The State presented no evidence that places McKnight at the scene of the crime, no eyewitness testimony, or a confession that identified McKnight as the murderer. The State failed to prove that McKnight was even the principal offender in this crime. Nor did they prove that the Julious killing was in any way related to Murray, or that McKnight was involved.

620.    The State has only offered to the court a mere suspicion of guilt. There is no physical evidence linking McKnight to the crime, nor any testimony linking him to the commission of this crime or any elements of these crimes.

621.    The State cannot, and did not, submit the degree of proof that is necessary to uphold McKnight's aggravated murder conviction and death sentence. The Constitution does not allow the execution of a man whose culpability is so unclear and whose trial was so unreliable. McKnight's convictions and sentence should be vacated.

**II.    Manifest weight of the evidence**

622.    Should this Court disagree with McKnight's sufficiency arguments, this Court should still vacate his conviction for kidnaping as well as the aggravated murder and capital specifications

that utilize kidnaping as the underlying offense because they are against the manifest weight of the evidence. In assessing the manifest weight of the evidence, this Court must examine the entire record and determine whether the evidence produced attains the high degree of probative force and certainty required for a criminal conviction.

623.    This inquiry is separate from the examination for sufficiency of the evidence. This review must be directed toward a determination of whether there is substantial evidence upon which a jury could reasonably conclude that all of the elements have been proved beyond a reasonable doubt. *State v. Elcy*, 56 Ohio St. 2d 169, 172, 383 N.E.2d 132, 134 (1978); *Glasser v. United States*, 315 U.S. 60, 80 (1942). Substantial evidence is more than a mere scintilla. See *United States v. Orrico*, 599 F.2d 113, 117 (6th Cir. 1979) (internal citation omitted). It is evidence affording a substantial basis of fact from which the fact at issue can be reasonably inferred. *Id.*

624.    There was no such evidence presented at McKnight's trial. No one knows what happened to Murray. Absent an understanding of the events that transpired between Murray's departure from the Pirate's Cove and the discovery of her body in Ray, Ohio, there is no substantial evidence upon which a conviction for kidnaping, or any of the other aggravating circumstances and charges can rest.

625.    The State presented no evidence upon which the jury could have found McKnight guilty of kidnaping, either as a substantive offense, a predicate felony to aggravated murder, or as a predicate to either aggravating circumstance. McKnight's convictions violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson*, 443 U.S. at 316. Therefore, the writ must issue.

626.    The decision of the Ohio courts on McKnight's claims relative to this claim was contrary to, or an unreasonable application of, clearly established federal law as stated by the Supreme Court of

219

the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts. Therefore, the writ should issue. 28 U.S.C. § 2254(d).

**Thirty-Fifth Ground for Relief**

**GREGORY MCKNIGHT'S RIGHTS WERE VIOLATED WHEN HE WAS CONVICTED AND SENTENCED TO DEATH UNDER OHIO'S DEATH PENALTY SYSTEM WHICH FAILS TO PROVIDE AN ADEQUATE SYSTEM OF APPELLATE AND PROPORTIONALITY REVIEW IN DEATH PENALTY CASES IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

627. Gregory McKnight's's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, including his right to due process, are denied by the lack of any adequate system of appellate and proportionality review under Ohio's death penalty scheme.

628. The Supreme Court of Ohio's arbitrary refusal to review life sentences imposed in similar cases as part of its statutorily mandated duty to conduct proportionality review denied McKnight due process, and a fair review of his sentence under the Fifth, Sixth, Eighth and Fourteenth Amendment.

629. Appellate review plays an essential role in eliminating the systemic arbitrariness and capriciousness which infected death penalty schemes invalidated by *Furman v. Georgia*, 408 U.S. 238 (1972). *Gregg v. Georgia*, 428 U.S. 153 (1976). A state may not leave the decision of whether a defendant lives or dies to the unfettered discretion of the jury because such a scheme inevitably results in death sentences that are "wantonly and . . . freakishly imposed" and "are cruel and unusual in the same way that being struck by lightening is cruel and unusual." *Furman*, at 309-10 (Stewart, J., concurring).

220

630.   This is true regardless of what other limitations and safeguards are enacted.  Appellate review is necessary to correct the arbitrary imposition of a sentence of death – despite the safeguards.  The Eighth Amendment requires some form of meaningful appellate review to assess the sentencer's imposition of the death penalty.

631.   When the Ohio General Assembly redrafted and reinstated the current capital punishment scheme, it enacted a system of proportionality review that mandated the filing and consideration of capital cases in which life sentences were imposed for similar offenses.  A proportionality procedure that provides otherwise does not ensure a constitutionally sound review.  The Supreme Court of Ohio, however, has ignored the scheme for proportionality review contained in Ohio's statutes.

632.   In McKnight's case, as in all other cases in which the court reviews a death sentence, the Supreme Court of Ohio did not follow the statutory directives for proportionality review.  The court limited its proportionality review of McKnight's death sentence to death sentences imposed for course of conduct murders, kidnapping murders and aggravated robbery murders.  *State v. McKnight*, 107 Ohio St. 3d 101 (2005).  The Court did not – and does not – make any comparison to those cases with similar charges or aggravating circumstances where death was not imposed.

633.   As employed, this procedure disregards an important procedural safeguard against imposing an arbitrary death sentence, denying McKnight due process of law. As enacted in 1981, the capital sentencing and review statute, Ohio Rev. Code § 2929.05(A), provides:

> In determining whether the sentence of death is appropriate, the . . . supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases . . . .

221

634.    The Ohio legislature intended to ensure that this proportionality review would include

life-sentence cases.  It enacted several comprehensive procedures:

> A. If an indictment or a count in an indictment charges the defendant with aggravate murder
> and contains one or more specifications of aggravating circumstances, the clerk of court in
> which the indictment is filed shall file a notice with the supreme court indicating the
> indictment was filed.

> B. The trial court is *required* to prepare a written opinion identifying the aggravating and
> mitigating factors and the resulting balance when it imposes a life or death sentence.

> The court or panel, when it imposes life imprisonment under division (D) of this section,
> shall state in a separate opinion its specific findings of which of the mitigating factors set
> forth in division (B) of Section 2929.04 of the Revised Code it found to exist, what
> aggravating circumstances the offender was found guilty of committing, and why it could
> not find that these aggravating circumstances were sufficient to outweigh the mitigating
> factors.  The court or panel shall file the opinion required to be prepared by this division  with
> the Clerk of the appropriate Court of appeals and with the Clerk of the Supreme  Court within
> fifteen days after the court or panel imposes sentence.

Ohio Rev. Code § 2929.03(F) (emphasis added); Ohio Rev. Code §§ 2929.03(G) and 2929.05(A).

635.    In the first death-penalty case decided under Ohio's 1981 law, *State v. Jenkins*, 473 N.E.2d

264, 303–04 (Ohio 1984), the supreme court acknowledged that the statutory scheme was mandatory

and that its purpose was "to provide the reviewing courts with some basis for reviewing the

proportionality of the imposition of the death sentence in comparison with sentences entered in

similar cases."

635.    There is nothing discretionary about Ohio's statutes, either with regard to the creation of the

capital-case sentence database or the proportionality review to be conducted in the context of that

database.  By directing trial judges to write opinions in life-sentence cases and file the opinions with

the state appellate and supreme courts, the statutes intended that proportionality review encompass

222

capital cases where life sentences were imposed for offenses similar to those committed by the defendant under review.

636.    The Supreme Court of Ohio rejected all of this in *State v. Steffen*, 31 Ohio St. 3d 111, 123-24; 509 N.E.2d 383, 395 (Ohio 1987), where it announced its own proportionality review rule:

> [T]he proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed . . . . No reviewing court need consider any case where the death penalty was sought but not obtained . . . .

(Emphasis added.)

637.    The court's holding in *Steffen* is contrary to the statutory provisions, which directed that life sentence cases be made part of the pool of cases to be compared in a proportionality review.  Thus, the *Steffen* court arbitrarily excluded from proportionality review information that the Ohio legislature mandated to be considered for the purpose of conducting that review.

638.    A state-created liberty interest must comport with due process and must place limits on judicial discretion.  This liberty interest is important and must be protected because, "[t]he question of who is spared . . . is of necessity critical when attempting to analyze whether who is spared is arbitrary."  Krivosha, *A Historical and Philosophical Look at the Death Penalty – Does It Serve Society's Needs*, 16 Creighton L. Rev. 1, 36 (1982).  Yet, when conducting its perfunctory "proportionality review" of McKnight's case, the Supreme Court of Ohio compared his sentence only to cases where a death sentence was imposed.  *McKnight*, 107 Ohio St. 3d at 149.

639.    Had the Supreme Court of Ohio engaged in meaningful review, it would have considered Edward McMillen.  Like McKnight, McMillen was a resident of Vinton County, Ohio.  On March 27, 2001, McMillen terrorized his wife, Traci, and her family for over two hours. (See Family

223

Recounts Two Hours of Terror, Columbus Dispatch, March 29, 2001, Appendix to Direct Appeal

Merit Brief,  Cl-C2).

640.    McMillen assaulted his wife because she would not have sex with him. (Id.).  McMillen then

assaulted the wife's brother with a claw hammer while he was sleeping. (Id.).  McMillen then grabbed

a shotgun and took his wife's father by the throat.  McMillen dragged him outside, where he shot and

killed him. (Id.). McMillen proceeded to assault his wife's nineteen-year-old cousin because McMillen

thought that he had a crush on his wife. (Id.).

641.    McMillen also forced his wife to view her murdered father.(Id). McMillen took her back

inside, stripped her, and tried to rape her at gun point while the rest of her family watched. (Id.).

McMillen then held a knife to his wife's four-year-old son while the family took the brother to the

hospital. McMillen was indicted for murder, five counts of kidnapping, felonious assault, and rape.

642.    Ironically, McMillen's indictment was secured only days after the indictment against

McKnight was filed. Although McMillen was not indicted for aggravated murder with death

specifications, the facts in his case certainly could have constituted a capital crime. See Ohio Revised

Code §§ 2903.01(B); " 2929.04(A)(7) (kidnapping); 2929.04(A)(7) (rape).  While McKnight was

indicted for a capital offense McMillen was not, even though he was clearly eligible for the death

penalty by his actions. The disparate treatment of these two similarly situated persons in Vinton

County underscores the arbitrary application of the death penalty. *See Furman v. Georgia*, 408 U.S.

238, 249 (1972)

643.    One substantial difference between McKnight and McMillen is the race of the offender.

McMillen is a white male convicted of killing a white male. McKnight, a black male, was indicted

with death specifications for killing a white woman in a high profile case. The Vinton County

224

prosecutor chose not to capitally indict McKnight for the murder of Greg Julious, an African American. When comparing these cases, the uncontrolled discretion of the Vinton County prosecutor strongly suggests the arbitrary and discriminatory nature of the death penalty based on race. *Furman*, 408 U.S. at 249 (arbitrary and discriminatory imposition of death penalty forbidden).

644.    Another difference between McKnight and McMillen was the amount of publicity.  Local and national media saturated the Vinton County community with inflammatory facts about McKnight's past convictions as well articles that brought up inadmissable victim impact evidence relating to Emily Murray.  While McMillen's crime certainly generated press, it was nothing compared to the media blitz that focused in on the crimes McKnight was alleged to have committed.[60]

645.    Because of the Supreme Court of Ohio's failure to conduct any meaningful appellate and proportionality review, McMillen's case, nor any other case where death was not sought or imposed, was never compared to the death sentence imposed on McKnight.  This limited scope of review also precluded the Supreme Court of Ohio from considering how race and pre-trial publicity factored into the decision to capitally indict or how it affected the imposition of a sentence of death on McKnight.

646.    McKnight's protected liberty interest in the fair proportionality review prescribed by Ohio's statutes was reduced to a meaningless procedure denying him due process.  In each case, in accordance with the *Steffen* ruling, the Supreme Court of Ohio has performed its "proportionality" review, the court has limited the pool of "similar" cases only to those capital cases in which a death sentence was actually imposed.  Not surprisingly, the Supreme Court of Ohio has *never* found a death sentence to be disproportionate, and there is no reason to think that it ever will.  No meaningful

---

[60] McKnight argues that a change of venue was warranted due to the extensive pre-trial publicity in his <u>Second Ground for Relief</u>

manner exists in which to distinguish those capital defendants who are deserving of the death penalty from those who are not.  This deficient review process violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution because the defendant's liberty interest in a meaningful statutory review is undermined.

647.    The proportionality review scheme enacted by the legislature is not followed in the Ohio courts:

> When we compare a case in which the death penalty was imposed only to other cases in which the death penalty was imposed, we continually lower the bar of proportionality.  The lowest common denominator becomes the standard. This result is ethically indefensible.

*State v. Murphy*, 747 N.E.2d 765, 813 (Ohio 2001) (Pfeifer, J., dissenting).

648.    One Justice of the Supreme Court of the United States has observed that when reviewing a death sentence in any particular case, a court must consider "whether there were 'similarly situated defendants' who had *not* been put to death because that inquiry is an essential part of any meaningful proportionality review."  *Walker v. Georgia*, 555 U.S. 481, 129 S.Ct. 453, at 454 (Oct. 20 2008) (Stevens, J., Statement Respecting Denial of Certiorari).

649.    The Supreme Court of Ohio's disregard for meaningful proportionality review in McKnight's case denied him due process and relief from his arbitrarily imposed death sentence.  As such, a writ of habeas corpus should issue.

650.    The decision of the Ohio court denying relief as to this claim was contrary to, or an unreasonable application of, clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**Thirty-Sixth Ground for Relief**

**WHEN THE AGGRAVATING CIRCUMSTANCES DO NOT OUTWEIGH THE MITIGATING FACTORS, A SENTENCE OF DEATH IS INAPPROPRIATE. ADDITIONALLY, THE DEATH SENTENCE MUST BE VACATED WHERE IT IS NOT PROPORTIONATE TO OTHER CRIMES.**

651.    Ohio Law requires the Supreme Court of Ohio to independently review McKnight's death sentence for appropriateness and proportionality.  See Ohio Rev. Code §. 2929.05(A).  By failing to follow the dictates of Ohio law, the trial court denied McKnight due process and a fair appellate review and left in place an arbitrary sentence of death in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  Ohio's system of review fails to provide an adequate check on the imposition of disproportionate and arbitrary sentences of death. The Supreme Court of Ohio's arbitrary refusal to consider compelling mitigation proffered by McKnight or life sentences imposed in similar cases as part of its statutorily mandated duty to conduct proportionality review denied McKnight due process, and a fair review of his sentence under the Fifth, Sixth, Eighth and Fourteenth Amendment.

652.    Appellate review plays an essential role in eliminating the arbitrariness and capriciousness which infected death penalty schemes invalidated by *Furman v. Georgia*, 408 U.S. 238 (1972). *Gregg v. Georgia*, 428 U.S. 153 (1976) and insuring that individual sentences are not arbitrary and are individualized.  *Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976) and *Lockett v. Ohio*, 438 U.S. 538 (1978).

653.    Here the Supreme Court of Ohio arbitrarily refused to consider relevant and powerful mitigating evidence when conducting its independent weighing of statutory aggravating circumstances and mitigating factors under Ohio Rev. Code § 2929.05.  A sentencing authority, in this case the

227

Supreme Court of Ohio on review, must  actually consider and give effect to all relevant mitigating evidence before imposing a sentence of death.  *Penry v. Lynaugh*, 492 U.S. 302 (1989)

654.    The death penalty is not an appropriate penalty for Gregory McKnight. The statutory aggravating circumstance the jury and the courts were authorized to weigh do not outweigh, beyond a reasonable doubt, the mitigating factors presented. Furthermore, the death penalty is disproportionate under the facts of this case.

655.    McKnight presented evidence in mitigation that is entitled to significant weight. In particular, McKnight's support for and devotion to his family, the love and support of his family members, his age, and his employment history are significant and should be given considerable weight. McKnight loved and cared deeply for his family. McKnight's wife Kathryn, testified that he was always a good husband and a good father who cared and provided for his family, especially his two children. (Tr. 1976, 1981). McKnight's mother-in-law, Emma Copley, also testified that McKnight was a good father. (Tr. 1988). Copley further testified that McKnight  was a loving son-in-law that cared for her and assisted her through her health problems. ( Tr. 1989). Those around McKnight knew how much he loved and cared for his family.

656.    McKnight's care and support for his family is entitled to weight in mitigation under Ohio law. *State v. O'Neal*, 87 Ohio St. 3d 402, 420 (2000); *State v. Chinn*, 85 Ohio St. 3d 548, 578(1999). In return, McKnight had the love and support from his own family members. This was also entitled lo weight in mitigation. *State v. Smith*, 80 Ohio St. 3d 89, 121 (1997). Furthermore, McKnight was not selfish in assisting others outside of his family. Dana Bostic testified that McKnight assisted her with the care of her children. (Tr. 995-96).  The failure of the Supreme Court of Ohio to give weight to the recognized compelling mitigating evidence denied McKinght due process.

228

657. McKnight's mitigation evidence of being a father and his worth as a human being was seen by other individuals. Kathleen Murray, sister of Emily Murray, submitted an affidavit requesting that McKnight's life be spared based on Emily Murray's opposition to the death penalty. Kathleen Murray's affidavit asked the trial court to spare McKnight's life because her sister was staunchly opposed to capital punishment. (Appendix to McKnight's Direct Appeal Merit Brief to the Supreme Court of Ohio A-32). However, Ms. Murray also expressed her belief that "more court proceedings may tear our family apart, within ourselves, and perhaps even from each other." *Id*. This is a valid mitigating circumstance that should have been considered and weighed by the Supreme Court of Ohio. However, Ms. Murray also noted that McKnight is the father of young children who would suffer from the loss of their father if he were executed. Reverend Robert A. Winter and Elizabeth Scriven submitted letters further expressing this view that McKnight has worth as a human being. (Tr. 1919) This evidence of McKnight's character and background is required to be given mitigating weight under Ohio law.

658. Evidence about the impact or effect of a capital crime on surviving victims may be considered without federal constitutional constraint. *Payne v. Tennessee*, 501 U.S. 808 827(1991) Such evidence is permissible when presented to the sentencer in capital cases in Ohio. See *State v. Fautenberry* , 72 Ohio St. 3d 435, 439-40, 650 N.E.2d 878, 882-83 (1995). Nevertheless, the trial court refused to admit or consider this evidence. Likewise the Supreme Court of Ohio refused to admit or consider this evidence in its independent weighing, thus denying McKnight due process and a fair and reliable review of his sentence of death to eliminate arbitrariness.

659. At the age of twenty-four, McKnight learned how to love, care, and support a family. He took responsibility and obtained employment. McKnight took employment at the Pirate's Cove as a

229

member of the kitchen staff. (Tr. 161, 178, 214, 407) . Lucia Neibarger (a.k.a. Chi-Chi), the kitchen leader for the Pirate's Cove, testified that McKnight was a good employee and he was in line for a promotion after he had been there for three months. (Tr. 170, 228). McKnight's employment record was entitled to weight in mitigation, *State v. Mitts*, 81 Ohio St. 3d 223, 236, (1998); *State v. Fox*, 69 Ohio St. 3d 183, 194, 631 (1994), which the Supreme Court of Ohio failed to give weight to.

660.   The affidavit of Kathleen Murray did not merely offer an unvarnished opinion against the death penalty. Instead, her opinion that McKnight deserved a life sentence was linked to evidence of his "history" and "background". See Ohio Rev. Code. § 2929.04(B) and 2929.05. Thus, Kathleen Murray's opinions bore upon McKnight's personal history and record. See *Skipper v. South Carolina*. 476 U.S. 1, 7-8 (1986); *Lockett v. Ohio*. 438 U.S.586, 604-05 (1978).The failure of the Supreme Court of Ohio to consider this evidence denied McKnight due process and a reliable review of the arbitrariness of his sentence of death under the Fifth, Sixth, Eighth and Fourteenth Amendments.

661.   McKnight's death sentence is likewise clearly disproportionate when compared to a similar case in Vinton County.  McKnight was indicted for a capital offense; Edward Michael McMillen was not indicted for a capital offense, even though he was clearly eligible for the death penalty by his actions.  (See Thirty Fifth Ground for Relief) The disparate treatment of these two similarly situated persons in Vinton County underscores the arbitrary application of the death penalty based on impermissible factors such as race. See *Furman v. Georgia,* 408 U.S. 238, 249 (1972):

662.   McMillen terrorized his wife and her family for over two hours. McMillen assaulted his wife, because she would not have sex with him, then assaulted her brother with a claw hammer while he was sleeping, then grabbed a shotgun and killed his father-in-law.  McMillen assaulted his wife's nineteen-year-old cousin, and forced his wife  to view her murdered father. He then took his wife

230

back inside, stripped her, and tried to rape her at gun point, while the rest of her family watched, and then held a knife to her four-year-old son. McMillen was indicted for murder, five counts of kidnapping, felonious assault, and rape.  He was not however indicted with death penalty specifications.  (See Thirty-Fifth Ground for Relief )

663.    One substantial difference between McKnight and McMillen is the race of the offender McMillen is a white male convicted of killing a white male. McKnight, a black male, was indicted for killing; a young white woman in a high profile case. When comparing these cases the uncontrolled discretion of the Vinton County prosecutor strongly suggests the arbitrary and discriminatory nature of the death penalty based on race. Furman, 408 U.S. at 249. The death penalty in this case is not proportionate when compared to a similar crime in Vinton County and the disproportionality is racially based in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

664.    Thus "it is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 358 (1977).

665.    McKnight was not indicted with the capital murder of Gregory Julious who was African - American. The State argued that McKnight "kidnapped'" Murray because they left the Pirate's Cove within ten minutes of each other and she was subsequently found dead on his property. Likewise. McKnight was the last person seen with Julious. who was also discovered on McKnight's property. McKnight was not charged with the kidnapping of Julious. even though the circumstances surrounding Julious's disappearance is similar to evidence of Murray being kidnapped. One

231

significant difference between Murray and Julious is their races. Murray was a while victim and Julious was a black man.

666.    McMillen committed a brutal murder during the course of two felonies that would have supported a capital indictment. But he was not even exposed to death penalty eligibility, due to the discretionary acts of the prosecutor. McKnight, a black defendant accused of killing a white woman, received no such discretionary leniency. Instead, he received society's ultimate penalty. There is an unacceptable risk that considerations of race, however subtle, infected the decision to seek and the imposition of the death penalty on McKnight for this inter-racial crime. The Supreme Court of Ohio refused to consider this disproportionality of McKnight's treatment based on race in its proportionality and appropriateness analysis thus rendering that analysis by the Supreme Court of Ohio a nullity for avoiding arbitrariness under the Fifth, Sixth, Eighth and Fourteenth Amendments. Gregory McKnight's sentence of death is arbitrary, disproportionate, and inappropriate under the circumstances.  The Supreme Court of Ohio's failure to correct this arbitrary sentence is an unreasonable application of clearly established federal law as enunciated by the Supreme Court of the United States in a long line of cases since *Furman* and *Gregg v. Georgia, supra.*

**Thirty-Seventh Ground for Relief**

**GREGORY MCKNIGHT'S CONSTITUTIONAL RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN HE WAS CONVICTED AND SENTENCED TO DEATH UNDER OHIO'S UNCONSTITUTIONAL DEATH PENALTY SCHEME.**

667.    McKnight was convicted and sentenced to death pursuant to Ohio's death penalty scheme. This scheme is unconstitutional, and as such McKnight's constitutional rights were violated by his convictions and sentences.

232

668.     Ohio has systemic constitutional problems in the administration of capital punishment.  The American Bar Association has recently called for a moratorium on capital punishment unless and until each jurisdiction attempting to impose such punishment "implements policies and procedures that are consistent with . . . longstanding American Bar Association policies intended to (1) ensure that death penalty cases are administered fairly and impartially, in accordance with due process, and (2) minimize the risk that innocent persons may be executed . . . ."

669.     As the ABA has observed in a report accompanying its resolution, "administration of the death penalty, far from being fair and consistent, is instead a haphazard maze of unfair practices with no internal consistency."  The ABA concludes that this morass has resulted from the lack of competent counsel in capital cases, the lack of a fair and adequate review process, and the pervasive effects of race and racial prejudice.

670.     The United Nations High Commission for Human Rights has studied the American capital punishment process, and has concluded that "guarantees and safeguards, as well as specific restrictions on Capital Punishment, are not being respected.  Lack of adequate counsel and legal representation for many capital defendants is disturbing."

671.     The High Commissioner further concluded that "race, ethnic origin and economic status appear to be key determinates of who will, and who will not, receive a sentence of death."  The report also described in detail the special problems created by the politicization of the death penalty, the lack of an independent and impartial state judiciary, and the racially-biased system of selecting juries:

> The high level of support for the death penalty cannot justify the lack of respect for the restrictions and safeguards surrounding its use. In many countries, mob killings and lynchings enjoy public support as a way to deal with violent crime and are often portrayed as "popular justice." Yet they are not acceptable in civilized society.

233

672.    The Ohio capital punishment system suffers from all of the problems identified in the ABA and United Nations reports: the under-funding of counsel, the lack of fair and adequate appellate review processes and the pervasive effects of race in determining who is sentenced to death.

673.    The Ohio capital sentencing statues also require submission of statutory presentence and mental health evaluations to the jury or judge once requested by a capital defendant, regardless of the content of those reports and without any further input or comment from counsel or the defendant. OHIO REV. CODE § 2929.03(D)(1).  This mandatory submission prevents a capital defendant from controlling the presentation of mitigating evidence in his case to the jury at the penalty phase because all information in these reports, no matter how irrelevant or how prejudicial, must go to the jury.  This statutory requirement blatantly violates a capital defendant's protections guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.

674.    Also, Ohio's capital statutory scheme unconstitutionally fails to genuinely narrow the class of individuals eligible for the death penalty.  *Compare* OHIO REV. CODE § 2929.04 (A)(7) *with* OHIO REV. CODE § 2903.01(B).  Additionally, Ohio Revised Code §§ 2929.03(D)(l) and 2929.04 are unconstitutionally vague.

675.    Ohio's capital statutory scheme permits the arbitrary and discriminatory imposition of the death penalty.  Ohio's death penalty sentencing scheme violates the rights of McKnight under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

676.    The Eighth Amendment prohibits the infliction of cruel and unusual punishment.  The Eighth Amendment's protections are applicable to the states through the Fourteenth Amendment. Punishment that is "excessive" constitutes cruel and unusual punishment.  The underlying principle of governmental respect for human dignity is the guideline to determine whether this statute is

constitutional.  The Ohio death sentencing scheme violates this bedrock principle.

677.    McKnight was convicted and sentenced to death in violation of the Fifth, Sixth, Eighth and Fourteenth Amendment as well as principles of international law contained in the various charters and treaties endorsed by the government of the United States and applied to the states under Article VI of the United States Constitution.  As such his conviction and sentence must be vacated and the writ of habeas corpus should issue.

678.    The merits decision of the Ohio courts on McKnight's claim was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the state courts.  28 U.S.C. § 2254(d).

**Thirty-Eighth Ground for Relief**

**THE PRACTICE OF EXECUTION BY LETHAL INJECTION VIOLATES GREGORY MCKNIGHT'S RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

679.    The trial court imposed a sentence of death for the aggravated murder of Emily Murray.  Ohio Revised Code section 2949.22(A) provides that McKnight's death sentence "shall be executed by causing the application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or combination of drugs of sufficient dosage to *quickly and painlessly cause death*." (emphasis supplied)

680.    The claim that lethal injection constitutes cruel and unusual punishment is properly brought as a habeas claim under 28 U.S.C. § 2254.  *See, Odraye Jones v. Bradshaw, Warden,* 6th Cir. Case No. 07-3766, Order  Jan. 30, 2009, unpublished; *Stanley Adams v. Bradshaw, Warden,* Case No. 07-

3688, Order, Feb. 13, 2009. (Both cases remanded to the District Court for discovery and factual development of lethal injection claims in these Ohio cases)

681.    The matter before this Court is truly unprecedented.  A trial on the merits of Ohio's lethal injection protocol is currently set to commence on November 2, 2009.  On Tuesday, September 15, 2009, the State of Ohio attempted to execute Romell Broom.  The State was unsuccessful.  After a series of abortive attempts over two hours and a multitude of needle jabs to Broom's body, efforts were suspended to execute Broom when Governor Ted Strickland issued a reprieve.  Media witness reports indicate Broom was suffering serious pain caused by Defendants' repeated attempts to execute him. An affidavit from Broom himself reveals that Defendants, in their repeated, abortive attempts to execute him, stuck Broom at least 18 times in efforts to gain venous access.  Alan Johnson, *Effort to kill inmate halted*, COLUMBUS DISPATCH, Sept. 16, 2009 at A1.

682.    On October 5, 2009, the United States Court of Appeals for the Sixth Circuit issued a stay of execution for Lawrence Reynolds execution, which was scheduled for October 8, 2009.  The Sixth Circuit held that scrutiny of Ohio's administration of its lethal injection is warranted.  On the same day, Governor Strickland issued a temporary reprieve in light of the Sixth Circuit's decision.

683.    The recent actions taken by the Sixth Circuit and Governor of Ohio indicate the  practice in Ohio of putting to death a person through lethal injection may cause massive pain and violates all contemporary standards of decency.  Thus, Ohio's practice of execution by lethal injection is cruel and unusual punishment as that term is defined by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  *Trop v. Dulles*, 336 U.S. 86, 101 (1958).

684.    The lethal injection protocol and procedure as presently instituted in Ohio likewise will deny McKnight his substantive due process right to a quick and painless execution mandated by Ohio Rev.

236

Code § 2949.22(A) as enforced under the Fourteenth Amendment.

685.    The practice in Ohio of putting to death a person through lethal injection also violates the United States's obligations under the International Convention on Civil and Political Rights ("ICCPR") and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment ("CAT").

686.    McKnight's constitutional rights were and are violated because he is subject to a death sentence by lethal injection, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  As such, the writ of habeas corpus should issue.

687.    To the extent the Ohio courts have ruled on this claim, the decision of the Ohio courts denying relief as to this claim was contrary to, or an unreasonable application of, clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

## Thirty-Ninth Ground for Relief

**GREGORY MCKNIGHT WAS DENIED DUE PROCESS, EQUAL PROTECTION, AND A FAIR AND RELIABLE TRIAL AND SENTENCING REVIEW BY OHIO'S INADEQUATE STATE POST-CONVICTION PROCESS THAT FAILS TO PROVIDE AN ADEQUATE REMEDY FOR MCKNIGHT TO FULLY AND FAIRLY VINDICATE HIS FEDERAL CONSTITUTIONAL CLAIMS IN THE STATE COURTS UNDER PRINCIPLES OF COMITY AND FEDERALISM, UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

688.    Gregory McKnight was required to fairly present and exhaust his federal constitutional challenges to his conviction and sentence in the state courts prior to being able to litigate those claims in federal court.  McKnight was required to diligently present the factual basis of his claims to the

237

state courts.  Ohio's post-conviction system does not provide an adequate vehicle to fully and fairly review the factual basis for his claims.

689.    Under principles of comity and federalism, McKnight was required to provide the Ohio courts the first opportunity to consider the federal constitutional claims. The state courts must be provided the first opportunity to "address and resolve" a state prisoner's federal constitutional claims, and the prisoner must first fully litigate these claims in the state courts.

690.    Denying McKnight an opportunity to prove his federal constitutional claims in state courts has reduced the Ohio post-conviction procedure to an arid ritual that renders a pursuit of post-conviction procedures in Ohio courts futile.

691.    Ohio's post conviction system under Ohio Revised Code §§ 2953.21 *et seq.* did not provide McKnight an adequate and independent means by which to vindicate his federal constitutional rights or to develop the factual basis for those federal constitutional claims in the state court system.

692.    While McKnight was represented by counsel in his post conviction litigation, the statutory scheme did not insure that he was provided with the reasonable and necessary investigative and expert assistance to develop and present all of his federal constitutional claims to the state courts.

693.    McKnight requested a full and fair opportunity to be heard in state court but was repeatedly denied such opportunity.  In his petition, McKnight requested discovery for every claim he raised. He also filed a separate motion for discovery. On June 21, 2005, the trial court granted limited discovery. McKnight was permitted to depose his trial counsel, but the trial court denied any further discovery or factual development.  The court denied McKnight access to critical witnesses, such as Donald Doles, Dana Bostic, and Lisa Perkins.  The court also prevented McKnight from deposing the jurors. The court denied McKnight an evidentiary hearing.

694.    McKnight was denied due process, and equal protection, as well as a full and fair opportunity to present and litigate his federal constitutional claims in state post-conviction proceedings in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

695.    Absent a full and fair opportunity to present his claims to the state courts, the federal courts are authorized to review those claims that McKnight presented to the state court, *de novo,* without any deference to state court fact findings or legal conclusion

696.    Gregory McKnight therefore requests a full and fair opportunity to present all of his claims to this court in habeas corpus and to have the opportunity to conduct discovery, the opportunity to amend the petition, the opportunity (and the ability) to fully investigate the claims and to present evidence in support of his claims to this court without any deference being given to the factual findings of the state courts.

697.    To the extent that the decisions of the Ohio courts on McKnight's claims were "full and fair" adjudication and determination of the merits of those claims, the Ohio courts' decisions are contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the state courts. Therefore, the writ should issue.  28 U.S.C. § 2254(d).

**Fortieth Ground for Relief**

**THE CUMULATIVE EFFECTS OF THE ERRORS AND OMISSIONS SET FORTH IN THE PRECEDING CLAIMS FOR RELIEF PREJUDICED MCKNIGHT AND DEPRIVED HIM OF HIS RIGHT DUE PROCESS,  A FAIR TRIAL AND A FAIR AND RELIABLE SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS**

698.    Each constitutional claim raised in McKnight's Petition for Writ of Habeas Corpus individually warrants the issuance of a writ of habeas corpus.  However, where an error by itself does not rise to the level of prejudice necessitating relief, the combined effect of constitutional errors may warrant relief. *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)

699.    The cumulative effects of the errors and omissions as presented in the preceding grounds for relief prejudiced McKnight and deprived him of his rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  The result is a constitutionally unreliable conviction and sentence.

700.    The totality of the multiple constitutional violations in McKnight's case had a substantial and injurious effect on the process that produced his convictions and death sentence.  This violated McKnight's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  As such, a writ of habeas corpus should issue.

701.    The merits decision of the Ohio courts on McKnight's cumulative error claim was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

## **PRAYER FOR RELIEF**

WHEREFORE, Gregory McKnight, requests that this court consider his Petition for Writ of Habeas Corpus and grant the following remedies and such other relief as the court deems appropriate:

1.      That this Court declare Gregory McKnight's convictions to have been obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and other provisions of the United States Constitution as well as the various treaties and charter obligations of the United States;

2.      That this Court declare that Gregory McKnight's sentence of death was obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and other provisions of the United States Constitution as well as the various treaties and charter obligations of the United States;

3.      That this Court grant McKnight leave to amend this petition;

4.      That this Court grant McKnight leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his convictions and sentences;

5.      That this Court grant McKnight the authority to obtain subpoenas *in forma pauperis* for witnesses and documents necessary to prove the facts asserted in this petition;

6.      That this Court order that the Warden provide and file a complete copy of the state court record pursuant to Rule 5 of the Rules Governing 28 U.S.C. § 2254 Cases;

7.      That this Court permit expansion of the Record with any documents necessary to resolution of the Petition for Habeas Corpus;

8.      That this Court order that the Warden file an answer pursuant to Rule 5 of the Rules Governing 28 U.S.C. § 2254 Cases;

9.      That this Court grant McKnight an evidentiary hearing pursuant to Rule 8 of the Rules

Governing 28 U.S.C. § 2254 Cases;

10.     That this Court grant such other relief as law and justice require.


                                        Respectfully submitted,


                                        */s/ David Stebbins*
                                        **David Stebbins(0005839)**
                                        Assistant Federal Public Defender
                                        Lead/ Trial Counsel
                                        david_stebbins@fd.org

                                        */s/ Sharon A. Hicks*
                                        **Sharon A. Hicks (0076178)**
                                        Assistant Federal Public Defender
                                        Co-Counsel
                                        sharon_hicks@fd.org

                                        */s/ Justin C. Thompson*
                                        **Justin C. Thompson (0078817)**
                                        Assistant Federal Public Defender
                                        Co-counsel
                                        justin_thompson@fd.org

                                        Office of the Federal Public Defender
                                        For the Southern District of Ohio
                                        Capital Habeas Unit
                                        10 West Broad Street, Suite 1020
                                        Columbus, Ohio 43215
                                        Phone: (614)469-2999
                                        Fax: (614)469-5999

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 14, 2009, I electronically filed the foregoing Habeas Petition with the Clerk of Court using the CM/ECF system, which will send notification of such filing to, Justin Lovett, Assistant Attorney General, Criminal Justice Section, 150 E. Gay Street, 16th Floor, Columbus, Ohio 43215.

*/s/ Sharon A.Hicks*
**Sharon A. Hicks (0076178)**
**Counsel for Gregory McKnight**

# EXHIBIT A

**Verification**

Pursuant to 28 U.S.C. § 2242, I, Gregory B. McKnight, petitioner herein, hereby verify that the allegations contained herein are true and accurate to the best of my knowledge.

_Gregory B. McKnight #412-247_ _10-01-09_
Gregory B. McKnight #412-247     Date