# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION AT COLUMBUS

GREGORY McKNIGHT

:

    Petitioner,                            Case No. 2:09-cv-059

:                 District Judge Susan J. Dlott
-vs-                                Magistrate Judge Michael R. Merz

DAVID BOBBY, Warden,

:

    Respondent.

---

## DECISION AND ORDER

---

This capital habeas corpus case is before the Court on Petitioner's Motion to Stay these Proceedings pending his filing a successor petition for post-conviction relief in the Ohio courts (ECF No. 202). The Motion is ripe on the Warden's opposition (ECF No. 204), McKnight's Reply (ECF No. 206), and supplementation by both parties (ECF No. 207, 209).

**Procedural History**

Several months apart in 2000, McKnight murdered Gregory Julious and Emily Murray. The Vinton County grand jury indicted McKnight for these two murders, charging aggravated murder with capital specifications as to Murray's death. McKnight was convicted and sentenced to death. The Ohio Supreme Court affirmed on direct appeal. *State v. McKnight*, 107 Ohio St. 3d 101 (2005), *cert. denied,* 548 U.S. 912 (2006). The Common Pleas Court denied McKnight's

1

post-conviction petition and that denial was affirmed on appeal *State v. McKnight*, 2008-Ohio-2435, 2008 Ohio App. LEXIS 2076, appellate jurisdiction declined, 119 Ohio St. 3d 1487 (2008). The Ohio Supreme Court denied McKnight's application for reopening to raise ineffective assistance of appellate counsel claims. *State v. McKnight*, 109 Ohio St. 3d 1492 (2006).

McKnight filed his Petition in this Court October 14, 2009. Under the initial Scheduling Order, pleadings were set to be complete approximately May 15, 2010 (ECF No. 11, PageID 287). Completion of discovery was stayed for two months during 2011 to permit consideration of the impact of *Cullen v. Pinholster,* 563 U.S. 170 (2011)(ECF No. 42, 47). Following completion of discovery, McKnight moved for an evidentiary hearing on August 29, 2011, to allow presentation of the fruits of habeas discovery (ECF No. 59). The Magistrate Judge denied the motion, in part based on the law of the case, but in part without prejudice to renewal on the ineffective assistance of counsel claims after the Court decided whether the Ohio courts' decisions on those claims were contrary to or an objectively unreasonable application of clearly established federal law (ECF No. 64, aff'd, ECF No. 93). The Magistrate Judge again denied an evidentiary hearing on Grounds Twenty-Seven and Thirty-Three (ECF No. 99), which Chief Judge Dlott affirmed on May 21, 2013 (ECF No. 115).

On December 19, 2013, Petitioner filed a renewed Motion to Stay pending state court litigation (ECF No. 134). Before that Motion was decided, the Court received McKnight's letter seeking to abandon his habeas corpus claims (ECF No. 138). These proceedings were essentially on hold for a year and a half until McKnight withdrew his request to abandon the case upon appointment of new counsel (ECF No. 192). Pursuant to a new Scheduling Order (ECF No. 200), the instant Motion was timely filed.

## Analysis

In *Rose v. Lundy,* 455 U.S. 509 (1982), the Supreme Court held that a "mixed" habeas petition containing both exhausted and unexhausted claims must be dismissed; *accord, Pilette v. Foltz,* 824 F.2d 494 (6th Cir. 1987). With the adoption of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"), *Rose* created a dilemma for the habeas petitioner: the new one-year statute of limitations and the new bar on second or successive petitions meant that a petitioner could not readily file a new petition after state court exhaustion.

To solve that dilemma, the Supreme Court decided *Rhines v. Weber*, 544 U.S. 269 (2005), which allows district courts to stay habeas corpus cases to permit exhaustion of state court remedies in consideration of the AEDPA's preference for state court initial resolution of claims. The Court cautioned, however,

> [S]tay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless. Cf. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). . . .
>
> On the other hand, it likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted

>claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics.

*Id.* at 277-278.  "Staying a federal habeas petition frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of federal proceedings.  *Id*.

McKnight seeks a stay under *Rhines* "pending the exhaustion of his **claims and evidence** developed in federal habeas in the state courts of Ohio." (Motion, ECF No. 202, PageID 16444, emphasis added.)

**What "Claims" Does McKnight Now Seek to Exhaust?**

McKnight's Motion is vague on the "claims" he now seeks to exhaust.  He never spells them out in the form of habeas grounds for relief or constitutional claims he might make in a successor post-conviction petition in the Ohio courts.  Instead he refers, repeatedly, to "new claims" collectively, often quoting language from the denial of evidentiary hearing on the new evidence (See, e.g., Motion, ECF No. 202, PageID 16446, 16447, 16455, 16458).  In contrast, he writes in the Motion of his "claim [singular] of denial of the effective assistance of penalty phase trial counsel." *Id.*  at PageID 16445, 16447.

The contrast is presented most baldly in Section III of the Motion which is captioned "McKnight's post-conviction counsel failed to thoroughly investigate and present his **claims** [plural] of the denial of effective assistance of penalty phase trial counsel." *Id.* at PageID 16450.  The very first sentence of this section reads "The investigation and presentation of McKnight's penalty phase ineffectiveness **claim** [singular] by initial-review state post-conviction counsel was as incomplete and deficient as trial counsel's investigation for the penalty phase had

4

been."

In opposing the Motion to Stay, the Warden hypothesizes that the "new claims" McKnight wants to present in a successor petition for post-conviction relief are those he included in his "Proposed Petition for Post Conviction Relief" which he filed in 2013 (ECF No. 133-1). See references in Warden's Opposition (ECF No. 204, at PageID 16471, 16472, 16473, 16475, 16477, 16480-81.)

Offered this plain opportunity to say either "yes, those are the new claims we are referring to" or "no, the new claims are thus and such," Petitioner's counsel do neither in the Reply. The Reply contains no reference to the 2013 proposed successor petition. Nor does it contain any statement of what the "new claims" are. Instead, counsel are content to again quote the language from the prior denial of an evidentiary hearing that "most" of the evidence summarized in Pamela Swanson's Affidavit "would support completely new claims. . . ." (ECF No. 99, PageID 2840).

Petitioner cannot plead new claims to be presented in a successor petition to satisfy *Rhines* merely by quoting the words "new claims" from the Magistrate Judge's prior opinion and Judge Dlott's adoption of it.

**McKnight's New Evidence**

McKnight argues his trial counsel were ineffective in that they failed to conduct a reasonable investigation into potentially mitigating evidence (ECF No. 202, PageID 16447). Had the investigation been properly done, McKnight argues it would have uncovered compelling mitigating evidence to explain both his juvenile adjudication for murder at age fifteen "as well as additional compelling and persuasive mitigation about the current crimes." *Id.* at PageID

5

16448.

This new "compelling mitigating evidence" is not discussed in the present Motion, but was previously presented to the Court in the Affidavit of Pamela Swanson (ECF No. 77-2, PageID 2578 et seq.). Ms. Swanson avers that she "has worked as a mitigation specialist for approximately twenty years." *Id.* at ¶ 1. At the time of the Affidavit, June 4, 2012, she was employed by the Capital Habeas Unit, but had previously been employed as a mitigation specialist with the Ohio Public Defender's Office. *Id.* She was assigned to McKnight's post-conviction case as an OPD employee in August 2003 under the supervision of attorney Ruth Tkacz, the sole attorney then handling that case.

Ms. Swanson reports that the investigators for the trial were also employees of the Ohio Public Defender; both claimed that McKnight "was uncooperative in providing information that would have aided their investigation." *Id.* at ¶¶ 4, 5, 6. Her understanding[1] is that the trial investigators did not travel to New York to interview potential mitigation witnesses because of budgetary and safety concerns. *Id.* at ¶ 7. When Swanson was assigned to the case in 2003, "there were the same concerns about money for out-of-state travel. *Id.* at ¶ 8. Ms. Tkacz therefore ordered Ms. Swanson to interview known witnesses by telephone to see if travel to New York and Texas would be worthwhile. *Id.*

McKnight was also uncooperative with post-conviction counsel. Swanson attributes this to his anger at being assigned "another black mitigation specialist."[2] *Id.* at ¶ 9. McKnight insisted he was "Carribean" and "resented being treated as any other young black man." Because McKnight did not "like" Ms. Tkacz and perceived Swanson as "being with Ruth," he "did not

---

[1] This understanding is based on uncorroborated hearsay: "I remember there was some discussion. . ." *Id.* at ¶ 7.
[2] Presumably a self- reference by Ms. Swanson, because she refers to Jessica Love, the trial level investigator, as black. *Id.* at ¶ 9.

provide Swanson with the information she needed to conduct a proper investigation." *Id.* at ¶ 10. McKnight "shared his feelings about Ruth with his mother" and she also refused to cooperate with Swanson. *Id.*

All that assertedly changed when McKnight filed his habeas petition. Of her mitigation investigation during this habeas case and the "compelling mitigating evidence." Swanson writes:

> The wealth of information obtained at the habeas stage of appeals, was due to Gregory forming a trusting relationship with habeas counsel at the Office of the Federal Public Defender.
>
> Working with habeas counsel, I was able to conduct the mitigation investigation that should have been done at the Office of the Ohio Public Defender either at trial or on postconviction. I interviewed Lewin McKnight and obtained her life history that had not been given to either the trial or post-conviction team. She talked about the abandonment of the family by Greg's father when Greg was seven months old and how it devastated Lewin and had a longterm negative impact on Greg. I was also able to obtain information about her extremely difficulty [sic] pregnancy with Gregory. Lewin also spoke about the problems Greg had in school, particularly, how he was teased because of his dark skin. She believed that the client eventually left school because he could no longer tolerate his treatment in school. He turned to the streets, where he was easily manipulated by older youths into selling drugs. Greg, she believes was used by the older youths because he sought in them, the father who abandoned him. It was a loss that Greg never recovered from. He wanted to have a relationship with his father was denied any relationship by the father. They never met, as Curbert McKnight, Gregory's father died in 1995.
>
> I was also able to confirm much of the information about the problems of abandonment by Curbert McKnight and the negative effect it had on Gregory from Stella Spence, Lewin's sister, her husband Wortley Spence and their daughters Melanie and Latoya Spence. None of them had been previously interviewed for purposes of trial or postconviction. The devastation Greg felt was also attested to by members of the Weekes family of Shepherd, Texas. The family kept the client from 1982 to 1984. I interviewed Beulah Weekes, her husband, Edmund, as well as, sons Earl, Andy, and spoke with sons, Lester and Derek. Derek Weekes explained how Lewin worked 16 hour days and went to bed after [sic] immediately

after cooking dinner; leaving Greg to his own devices, starved for attention, since he was ignored by his mother and brother. I also [interviewed] Steven Chandler, oldest son of Noel and Gloria Chandler, the client's godparents (with whom Gregory had also lived), as well as Ollie and Zachary Dykes. Zachary and Greg were in the same juvenile detention facility in Columbus. Zachary's mother, Ollie, took "adopted" [sic] Greg when he was released from detention. They both talked about the client's racial isolation in rural southern Ohio, where he lived with his wife and her family. With the exception of one interview of Gloria Chandler by telephone, none of these people had been contacted by either the trial or post-conviction teams.

The Chandlers explained that they had been the primary caregivers for Gregory from the day he came home from the hospital. Gregory was sent to live with them in Texas after they moved there and lived with them off and on for several years. The Chandlers were strict Seventh Day Adventists. Home life was extremely strict, especially in comparison to the complete lack of supervision Gregory had when in New York with his mother. The cultural differences were likewise shocking. The Chandlers lived in a mostly white rural area – where Gregory's extremely dark skin stood out and made him the subject of considerable harassment. Gregory was subjected to severe beatings by the Chandlers when he was in junior high school and before – and at the hands of his mother when he was with her. Greg was eventually sent back to NY when the Chandlers could no longer control his comings and goings. I also interviewed the Chandler children who had lived with Gregory. None of them had been previously interviewed by the trial or postconviction teams.

Gregory's isolation in Texas and feelings of abandonment and returns to New York where he had little to no supervision from his mother made him ripe for the brutal gang initiation and indoctrination that was to follow. Dino Johnson (now a youth outreach coordinator) and his gang recruited young boys like Greg, in New York's notorious LeFrak City.

I was able to visit the metropolitan housing complex with Dino Johnson. LeFrak was a huge complex of towers and tunnels. The building's courtyards were divided into fiercely defended gang territories. Socialization between buildings was strictly forbidden by gang members. Young boys were traumatized and brutalized by older gang members in order to desensitize them to the acts of violence they were expected to commit. The boys were, then, taken

8

> out of town to sell drugs for their handlers. The children were often abandoned or disposed of, when they were no longer of use or became a liability. Mr. Johnson believes that Greg was disposed of in such a manner. Harvey Halliburton, an Ohio gang expert, stated that Greg was dumped into the middle of a brutal gang war when he came to Columbus. He was faced with losing his own life, when he was robbed. This was verified by Mr. Johnson who stated that Greg would have been killed if he had been unable to replace the money that his handler had lost when the client was robbed of the drugs he was supposed to sell. Greg, not the money, was the disposable commodity in that situation.
>
> I also interviewed his maternal cousin, Gail King Fagan, who lived with Greg and his family when she and her mother first came from Trinidad. Greg pushed Gail out of harm's way when the two children were caught in the line of fire, just outside of LeFrak. I also interviewed Olda King, Gail's mother who provided information about the McKnight family in Trinidad. All of the witnesses interviewed talked about how the client strived to be a good person despite not having the skills or resources to do so. Records collected echoed statements made by the witnesses.

(ECF No. 77, PageID 2580-83.)

Swanson characterizes this information as evidence which should have been presented at the penalty phase of the trial.

> All of this information was available to the trial team and would have been available to me during the post-conviction investigation, had I been permitted to conduct such an investigation. It is my opinion, that Gregory McKnight's life history contains compelling mitigating evidence that not only humanizes him but is critical to explaining his behavior in the crimes he was charged with but also in the earlier juvenile murder adjudication.

*Id.* .

The Magistrate Judge reviewed the Swanson Affidavit in his last denial of an evidentiary hearing (Second Supplemental Opinion on Petitioner's renewed Motion for Evidentiary Hearing, ECF No. 99). Having done so, the Magistrate Judge concluded

9

> This copious information has never been presented to the state courts. To some extent, it might be regarded as further support for the ninth[3] claim for relief – failure to present available evidence on the impact of paternal abandonment. Some of the cultural information might be used to show prejudice from not presenting a cultural expert, the fifteenth claim for relief. But most of it would support completely new claims and none of it has been presented to the state courts.

*Id.* at PageID 2840. As noted above, McKnight relies on this conclusion to support his instant Motion, without pleading what those new claims would be (ECF No. 202, PageID 16446).

Passing for the moment whether this new evidence is compelling, the Court notes that a primary cause for failure to present it at trial and in post-conviction is McKnight's refusal to cooperate with counsel, which carried over to his mother. (See Swanson Affidavit, ECF No. 77-2, ¶¶ 6, 9, 10.) Ms. Swanson claimed in 2012 that this problem was cured when "Gregory form[ed] a trusting relationship with habeas counsel. . . ." *Id.* That "trusting relationship" apparently did not last, for it was complaints about habeas counsel which led McKnight to say he wanted to abandon his habeas case (See ECF No. 138, 171, 183). Eventually, habeas counsel were able to persuade McKnight not to abandon the case on appointment of new counsel from outside Ohio who would take a "fresh look" at the case.

**"Exhausting" the New Evidence**

In addition to exhausting unspecified new claims, McKnight says he wants to "exhaust" the new evidence gathered in habeas. However, the concept of "unexhausted evidence" is

---

[3] The ninth and fifteenth claims for relief referred to here are those made in McKnight's petition for post-conviction relief. His ninth and fifteenth grounds for relief in habeas raise different claims.

10

unknown to habeas corpus jurisprudence. *Carter v. Mitchell*, 2013 U.S. Dist. LEXIS 62231 * 4 (S.D. Ohio May 1, 2013). As this Court explained in *Carter*,

> To extend *Rhines* to encompass "unexhausted evidence" would provide virtually limitless opportunities to delay finality in habeas litigation. Particularly with respect to mitigation evidence, the ABA Guidelines suggest gathering as much biographical information as possible. *Bobby v. Van Hook*, 558 U.S. 4, 7-8, 130 S. Ct. 13, 175 L. Ed. 2d 255 (2009). Virtually anything thus gathered may be presented in mitigation if arguably relevant. *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998); *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 954, 57 L. Ed. 2d 973 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982). Of course the time within which to gather mitigating evidence before trial is limited, but the time within which to gather such evidence post-conviction is limited only by the natural life of the defendant. Assuming diligence in searching for such evidence, a doctrine of "unexhausted evidence" would permit delay of finality in habeas for extended periods and perhaps on a repeated basis.

*Waddy v. Robinson,* 2013 U.S. Dist. LEXIS 65092, *quoting Carter* at *5-6.

This Court's position on "unexhausted evidence" has now been adopted by the Sixth Circuit: In *Carter v. Mitchell*, ___ F.3d ___, 2016 U.S.App. LEXIS 12861 (6th Cir. July 13, 2016), that court held: "Carter seeks to use *Rhines* as an end-run around *Pinholster*, with the added benefit that a return to state court might delay his impending death sentence for a substantial period." *Id.* at *26. The circumstances of this case do not "allow us to extend *Rhines* stays to encompass "unexhausted evidence," and do[es] not entitle Carter to a trip back to state court. Moreover, we are aware of AEDPA's purpose of achieving finality, and must keep that interest in mind when deciding the propriety of a stay. See *[Ryan v.]Gonzales*, 133 S. Ct. at 709; *Rhines [v. Weber]*, 544 U.S. at 277-78. Allowing a petitioner periodically to discover (or rediscover) information about himself would frustrate that goal, and could incentivize capital defendants to

11

"deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of the sentence of death." *Rhines*, 544 U.S. at 277-78."

McKnight is not entitled to a remand to exhaust his newly-discovered evidence.

**Dilatory Tactics**

Petitioner's counsel claim he has not engaged in any intentionally dilatory litigation tactics (Motion, ECF No. 202, PageID 16461). The Court has no method to look inside Petitioner's mind to discern his motives. But every capital defendant has a motive to delay execution of sentence and when a capital defendant engages in behavior which has the likely effect of obstructing or delaying his case, he must accept the consequences. The record establishes McKnight has interfered with gathering of mitigation evidence because of his distrust or dislike for various persons assigned to provide him with legal services. Petitioner is free to trust or distrust whomever he pleases, but he cannot use his own failure to cooperate as an excuse to delay finality in these habeas proceedings.

The Motion to Stay is DENIED.

August 2, 2016.

s/ *Michael R. Merz*<br>United States Magistrate Judge