IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Gregory McKnight,                        :
                                         :      Case No. 2:09-cv-059
        Petitioner,                      :
                                         :      Judge Susan J. Dlott
            v.                           :
                                         :      Order Overruling Petitioner's Objections
David Bobby, Warden,                     :      and Affirming the Decision and Order
                                         :
        Respondent.                      :


        On August 2, 2016, Magistrate Judge Michael R. Merz issued a Decision and Order

(Doc. 210) denying Petitioner Gregory McKnight's Motion to Stay Proceedings and Hold Them

in Abeyance Pending Exhaustion in State Court ("Motion for Stay and Abeyance") (Doc. 202).

This matter is before the Court on McKnight's Objections (Doc. 211) to the Decision and Order.

For the reasons that follow, the Court will **OVERRULE** the Objections and **AFFIRM** the

Decision and Order.

I.      **BACKGROUND**

        Magistrate Judge Merz set forth the relevant procedural history that the Court will restate

here with a few additions.

A.      **State Court Proceedings**

        Several months apart in 2000, McKnight murdered Gregory Julious and Emily Murray.

The Vinton County, Ohio grand jury indicted McKnight for these two murders, charging

aggravated murder with capital specifications as to Murray's death.  McKnight was convicted

and sentenced to death.  The Ohio Supreme Court affirmed on direct appeal.  *Ohio v. McKnight*,

1

107 Ohio St. 3d 101 (2005).  The Vinton County, Ohio Court of Common Pleas denied

McKnight's post-conviction petition and that denial was affirmed on appeal.  No. 07CA665,

2008 WL 2124076, at *1 (Ohio App. May 19, 2008), *appellate jurisdiction declined*, 119 Ohio

St. 3d 1487 (2008).  The Ohio Supreme Court denied McKnight's application for reopening to

raise ineffective assistance of appellate counsel claims.  *Ohio v. McKnight*, 109 Ohio St. 3d 1492

(2006).

### B.     Federal Court Proceedings—Request for Evidentiary Hearing

McKnight filed his Petition in this Court on October 14, 2009.  (Doc. 9.)  He filed an

Amended Petition for Habeas Corpus ("Amended Habeas Petition") on January 25, 2013, and

then re-filed it at the Court's direction on August 26, 2013 with revised citations to the

electronically filed version of the state court record.  (Docs. 101, 127.)

Under the initial Scheduling Order, pleadings were set to be complete in May 2010.

(Doc. 11 at PageID 287.)  Completion of discovery was stayed for two months during 2011 to

permit consideration of the impact of *Cullen v. Pinholster*, 563 U.S. 170 (2011), in which the

Supreme Court held that a federal court's habeas review under 28 U.S.C. § 2254(d)(1) of state

court decisions on the merits was limited to the evidentiary record before the state court.  (Docs.

42, 47.)  Following completion of discovery, McKnight moved for an evidentiary hearing to

allow presentation of the fruits of habeas discovery.  (Docs. 49, 59.)  The Magistrate Judge

denied the motion, in part based on the law of the case, but in part without prejudice to renewal

on the ineffective assistance of counsel claims once the Court decided whether the Ohio courts'

decisions on those claims were contrary to or an objectively unreasonable application of clearly

established federal law.  (Doc. 64, *aff'd*, Doc. 93.)  The Magistrate Judge later  issued a Second

Supplemental Opinion denying McKnight an evidentiary hearing on Grounds Twenty-Seven and Thirty-Three, which this Court affirmed. (Doc. 99, *aff'd*, Doc. 115.)

The arguments concerning Ground Twenty-Seven of the Amended Habeas Petition are relevant to the current dispute. In Ground Twenty-Seven, McKnight accuses his trial counsel of ineffective assistance of counsel during sentencing for failure to introduce evidence about his abandonment by his father and failure to use a cultural expert to testify about his Caribbean cultural identity. (Doc. 127 at PageID 15820–27.) Ground Twenty-Seven is based on the ninth and fifteenth claims McKnight asserted in the state court post-conviction proceedings. McKnight sought an evidentiary hearing on Ground Twenty-Seven in these federal proceedings on the basis that the state court in the post-conviction proceedings had improperly denied the ninth and fifteenth claims on procedural grounds without an evidentiary hearing. McKnight also argued that he was entitled to an evidentiary hearing in federal court on the basis of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), to prove that his post-conviction counsel's negligence was "cause" to establish why his post-conviction counsel had not fully developed the evidentiary bases to support the claim for ineffective assistance of trial counsel at sentencing.

In denying the evidentiary hearing a second time, Magistrate Judge Merz concluded that the state court had denied the ninth and fifteenth post-conviction claims on the merits, not on procedural grounds. (Doc. 99 at PageID 2830–32.) Magistrate Judge Merz also concluded that McKnight was not entitled to an evidentiary hearing in these habeas proceedings pursuant to *Martinez* because *Martinez* only applies in cases of procedural default, not to decisions on the merits. (Doc. 99 at PageID 2837.) However, he suggested in dicta that some of the evidence that McKnight sought to introduce at an evidentiary hearing to support Ground Twenty-Seven

3

might support new claims not previously asserted in state court.  He instructed that the potential

new claims could not be heard in these habeas proceedings until they were exhausted in state

court.  (Doc. 99 at PageID 2840–41.).

On May 21, 2013, this Court affirmed the Second Supplemental Opinion agreeing that

the state court had decided McKnight's ninth and fifteen post-conviction claims on the merits.

(Doc. 115 at PageID 12442–44.)  This Court also found that *Martinez* did not provide an avenue

to have an evidentiary hearing in the federal proceedings.  (*Id.* at PageID 12451–55.)  This Court

did not express an opinion, however, on Magistrate Judge Merz's suggestion that the evidence

developed in the habeas discovery might support new claims that had yet to be exhausted in state

court.  (*Id.* at PageID 12455–56 n.5.)

C.     **Federal Court Proceedings—Request to Stay Federal Proceedings In Order to
       Exhaust "New" Claim in State Court**

On December 19, 2013, McKnight filed a Request for Authorization Allowing Federal

Habeas Corpus Counsel to Conduct State Court Litigation and a Motion for Stay and Abeyance

pending state court litigation.  (Docs. 133, 134.)  McKnight sought in these two pleadings to

have these federal habeas proceedings stayed so that he could exhaust a "new" claim for

ineffective assistance of trial counsel at sentencing based on the evidence discovered in these

proceedings.  McKnight attached to the Request for Authorization a copy of the Petition for Post-

Conviction Relief ("Proposed Petition") that he would file in the Vinton County, Ohio Court of

Common Pleas.  (Doc. 133-1.)  He stated in the Proposed Petition the following claim

("Proposed Petition Claim"):

> Gregory McKnight Was Denied The Effective Assistance Of Counsel At The
> Penalty Phase Of His Trial Because Counsel Failed To Thoroughly Investigate

His Background And Mental Health History And Therefore Failed To Discover And Present Compelling Mitigating Evidence At The Penalty Phase.

> A. Counsel Performed Deficiently Because They Failed to Conduct a Reasonable Investigation into McKnight's Background and Mental Health History.

> B. Gregory McKnight Was Denied the Effective Assistance of Counsel During the Penalty Phase of His Trial When Counsel Failed to Investigate and Present Compelling Mitigating Evidence about His Cultural Background.

> C. Gregory McKnight Was Denied the Effective Assistance of Counsel During the Penalty Phase of His Trial When Counsel Failed to Investigate and Present Relevant and Available Mitigation Evidence with Respect to His Social History and the Circumstances of His Upbringing.

> D. Gregory McKnight Was Denied the Effective Assistance of Counsel During the Penalty Phase of His Trial When Counsel Failed to Investigate and Present Relevant and Available Mitigation Evidence with Respect to the Difficulties of his Survival in LeFrak City.

> E. Gregory McKnight Was Denied the Effective Assistance of Counsel During the Penalty Phase of His Trial When Counsel Failed to Investigate and Present Relevant and Available Mitigation Evidence About How His Gang Handlers Brought Him to Columbus Ohio at the age of Fifteen to Sell Drugs and Then Abandoned Him.

> F. Gregory McKnight Was Denied the Effective Assistance of Counsel During the Penalty Phase of His Trial When Counsel Failed to Investigate and Present Relevant and Available Mitigation Evidence About His Incarceration at the Department of Youth Services and his Behavior While Incarcerated as well as His Life afterwards.

(*Id.* at PageID 15950–66.)

Before the Request for Authorization and Motion for Stay and Abeyance were decided, the Court received McKnight's letter seeking to abandon his habeas corpus claims.  (Doc. 138.)

5

These proceedings were essentially on hold for more than one year until, in November 2015, McKnight withdrew his request to abandon the case upon appointment of new counsel.  (Doc. 192.)  Pursuant to a new Scheduling Order (Doc. 200), the current Motion for Stay and Abeyance was timely filed on April 1, 2016.[1]  McKnight again seeks leave to stay these habeas proceedings so he can return to state court to exhaust a purportedly new claim alleging ineffective assistance of trial counsel at sentencing based on the evidence developed in these proceedings.  (Doc. 202.)

Magistrate Judge Merz issued a Decision and Order denying the Motion for Stay and Abeyance.  (Doc. 210.)  He faulted McKnight for not clarifying whether the new claim he seeks to exhaust in state court is the Proposed Petition Claim asserted in Doc. 133-1.  (*Id.* at PageID 16589–90.)  He also stated that the District Court could not stay the federal proceedings to permit McKnight to return to state court to exhaust *new evidence* supporting claims that already had been exhausted in state court.  (Doc. 210 at PageID 165965–97 (citing *Carter v. Mitchell*, 829 F.3d 455 (6th Cir. 2016), *cert. denied*, No. 16-6467, 2017 WL 69368 (U.S. Jan. 9, 2017)).)  Finally, he faulted McKnight for interfering with his attorneys' efforts to gather mitigation evidence during his trial and post-conviction proceedings.  (*Id.* at Page ID 16597.)

On August 15, 2016, McKnight filed the pending Objections to the Decision and Order.  (Doc. 211.)  McKnight clarifies in the Objections that the "new" claim he seeks to exhaust is the Proposed Petition Claim.  He disputes that he is attempting to exhaust only new evidence, not a

---

[1]  Petitioner had sought leave to file a Renewed Motion for Authorization to Litigate in State Court and a Renewed Motion for Stay and Abeyance.  (Doc. 197.)  Magistrate Judge Merz explicitly granted leave only as to the Renewed Motion for Stay and Abeyance without addressing the separate Renewed Motion for Authorization to Litigate in State Court.  (Doc. 200.)

new claim. He points out that Magistrate Judge Merz had suggested in his Second Supplemental Opinion issued on January 2, 2013 that the evidence developed in the federal proceedings would support new claims. (Doc. 99 at PageID 2840–41.) Substantively, McKnight asserts that his trial counsel had an independent duty to conduct a reasonable mitigation investigation regardless of whether or not he cooperated with the investigation.

## II.  STANDARD OF REVIEW

Rule 72(a) of the Federal Rules of Civil Procedure authorizes magistrate judges to decide nondispositive matters that have been referred to them. If a party timely files objections to a magistrate judge's decision on a nondispositive matter, the district judge must "modify or set aside any portion of the order that is clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a). The clearly-erroneous standard applies to a magistrate judge's findings of fact and the contrary-to-law standard to his conclusions of law. *See Gandee v. Glaser*, 785 F. Supp. 684, 686 (S.D. Ohio 1992), *aff'd*, No. 92-3304, 1994 WL 83265 (6th Cir. Mar. 14, 1994). "A finding is clearly erroneous where it is against the clear weight of the evidence or where the court is of the definite and firm conviction that a mistake has been made." *Galbraith v. N. Telecom, Inc.*, 944 F.2d 275, 281 (6th Cir. 1991), *overruled on other grounds*, *Kline v. Tenn. Valley Auth.*, 128 F.3d 337 (6th Cir. 1997); *see also Hood v. Midwest Sav. Bank*, No. C2-97-218, 2001 WL 327723, at *2 (S.D. Ohio Mar. 22, 2001). A decision is contrary to law if the magistrate has ignored or misapplied the applicable law found in the Constitution, statutes, or case precedent. *See Hood*, 2001 WL 327723, at *2; *Gandee*, 785 F. Supp. at 685–86.

### III.   ANALYSIS

Petitioner McKnight initiated these habeas proceedings after April 24, 1996 so they are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S. § 2254.  *See Hamilton v. Morgan*, 474 F.3d 854, 858 (6th Cir. 2007).

McKnight requests, pursuant to the doctrine announced in *Rhines v. Weber*, 544 U.S. 269 (2005), that the Court stay and hold in abeyance these habeas proceedings so that he can exhaust in state court the Proposed Petition Claim for ineffective assistance of counsel based on the evidence developed in the habeas proceedings.  The Supreme Court determined in *Rhines* that in narrow circumstances "a federal district court has discretion to stay [a] mixed petition [with both exhausted and unexhausted claims] to allow the petitioner to present his unexhausted claims to the state court in the first instance, and then to return to federal court for review of his perfected petition."  *Id.* at 271–72.  The Supreme Court held that stay and abeyance of the federal proceedings was appropriate if the petitioner had "good cause" for his failure to exhaust his claims in state court and did not engage in "intentionally dilatory litigation tactics[,]" and if the unexhausted claims are "potentially meritorious" and not "plainly meritless."  *Id.* at 277–78.  A stay should not be granted in cases involving "abusive litigation tactics or intentional delay" by the petitioner.  *Id.* at 278.

Three additional principles relevant to the analysis of whether to grant a stay and abeyance of bear repeating.  First, the Court cannot hear claims that a habeas petitioner failed to exhaust in state court.  28 U.S.C. § 2254(b)(1)(A).  Second, for claims that have been exhausted in state courts and were decided on the merits, the Court's review pursuant to 28 U.S.C. § 2254(d)(1) is limited to the evidence relied upon by the state court.  *Cullen*, 563 U.S. at 181–

8

85.  The Court cannot expand the record to consider new evidence in that circumstance by evidentiary hearing or by a joint motion.  *Moore v. Mitchell*, 708 F.3d 760, 779–84 (6th Cir. 2013).  Finally, the stay and abeyance procedure approved in *Rhines* cannot be extended to allow a petitioner to return to state court to exhaust *new evidence* supporting an already exhausted claim.  *Carter*, 829 F.3d at 466–67.

To begin, the Court notes that McKnight has not moved to amend his Amended Habeas Petition to include the Proposed Petition Claim, so this is technically not a "mixed petition" case. The Sixth Circuit has stated that a district court is not required to dismiss "a petition containing only exhausted claims because the petitioner attempts to raise additional but unexhausted claims during the course of the habeas corpus proceedings."  *Jones v. Parke*, 734 F.2d 1142, 1145 (6th Cir. 1984).  Subsequently, the *Jones* case has been cited for the principle that a district court is not required to stay a pending habeas petition with only exhausted claims when the petitioner seeks to raise a new unexhausted claim.  S*ee e.g.*, *Taylor v. Haviland*, No. 3:16CV0847, 2016 WL 4720050, at *2 (N.D. Ohio Sept. 9, 2016) (quoting *Jones*); *Martin v. Warden*, No. 1:12-cv-458, 2013 WL 6087007, at *3 (S.D. Ohio Nov. 19, 2013) (quoting *Jones*), *report and recommendation adopted by*, 2014 WL 1271020 (S.D. Ohio Mar. 27, 2014).  This Court has denied the use of the *Rhines* stay and abeyance procedure when the habeas petitioner raised an unexhausted claim not pleaded in the habeas petition.  *See Gyekye v. Warden*, No. 1:09cv753, 2010 WL 3730978, at *6 (S.D. Ohio July 28, 2010) (same), *report and recommendation adopted by*, 2010 WL 3730977 (S.D. Ohio Sept. 8, 2010); *Bullock v. Jackson*, No. 1:07cv392, 2008 WL 906096, at *2–3 (S.D. Ohio Mar. 31, 2008) (order adopting report and recommendation).

9

These cases, however, are distinguishable because the unexhausted claims addressed therein did not arise from new facts developed during the habeas proceedings.  Courts in the Sixth Circuit have stayed habeas cases to permit petitioners to return to state court to assert new claims based on new evidence first discovered in habeas proceedings.  *See Conway v. Houk*, No. 2:07-cv-947, Opinion and Order, Doc. 161 at PageID 10660–67 (S.D. Ohio Mar. 1, 2016) ("[F]ederal courts have repeatedly granted abeyance motions so that petitioners who obtain new evidence during habeas corpus proceedings can return to state court to exhaust any claims that new evidence render unexhausted."); *Abraitis v. Woods*, No. 14-CV-14434, 2015 WL 1541871, at *1–3 (E.D. Mich. Apr. 7, 2015) (staying a petition with exhausted claims so that petitioner could return to state court to assert a new claim based on newly-discovered evidence); *Were v. Bobby*, No. 1:10-cv-698, Opinion and Order, Doc. 108 at PageID 5870–76 (S.D. Ohio Sept. 23, 2015) (granting stay and abeyance after finding that the new evidence "so fundamentally alters the claims at issue that they are properly characterized as new claims"); *Johnson v. Bobby*, 2:08-cv-55, 2012 WL 628507, at *2–3 (S.D. Ohio Feb. 27, 2012) ("The Court is of the view that the best course of action is to stay this case and hold the proceedings in abeyance to allow Petitioner to exhaust his new claims in the state courts.").  The Court agrees that the *Rhines* stay and abeyance procedure can be extended to allow a petitioner to assert in state court a new claim based on new evidence developed in the habeas proceedings.

## A.    Stay and Abeyance Appropriate Only for New Claims

The Warden disputes that the Proposed Petition Claim set forth in Doc. 133-1 is new and unexhausted.  Instead, the Warden argues that the Proposed Petition Claim is duplicative of the Ground Twenty-Seven of the Amended Habeas Petition.  As explained above, a stay and

abeyance is appropriate for unexhausted claims, but not for unexhausted evidence supporting claims already fairly presented in state court.  *Carter*, 829 F.3d at 466–67.  The Court, therefore, must compare the existing ineffective assistance of counsel claim and the evidence supporting it with the purported new claim and the evidence developed in these habeas proceedings.  Only if the new evidence "fundamentally alters" the existing ineffective assistance of counsel claim will the Court conclude that state court exhaustion of a new claim is required.  *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *Johnson*, 2012 WL 628507, at *2.

###### 1.     McKnight's Existing Ineffective Assistance of Counsel Claims

McKnight alleges as follows in the Twenty-Seventh Ground for Relief:  "McKnight's due process, fair trial and the effective assistance of counsel were denied by counsel's deficient performance during the penalty phase in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments."  (Doc. 127 at PageID 15820.)  Ground Twenty-Seven was based on the ninth and fifteenth claims presented to the state court in the post-conviction review proceedings.  McKnight's ninth claim in the post-conviction proceeding was for "ineffective assistance of counsel during the penalty phase because defense counsel failed to present mitigating evidence that McKnight's father abandoned him."  *McKnight*, 2008 WL 2124076, at *1.  His fifteenth claim was for "ineffective assistance of counsel due to trial counsel's failure to reasonably investigate and present relevant mitigating evidence" concerning his cultural background.  *Id.* at *1, *20.

###### 2.     Evidence Introduced in State Court Post-Conviction Relief Proceedings

The state court summarized the evidence admitted in post-conviction to support the ninth claim as follows:

> [McKnight] claims that trial counsel failed to investigate, prepare, and present mitigating evidence regarding his character, history, and background, and in particular, his father's abandonment.  McKnight alleges that the evidence would have humanized him and provided the jurors with reasons to spare his life.  To support this claim, McKnight relies upon affidavits from his mother, his maternal aunt, and a family friend in which they asserted that McKnight's feelings of paternal abandonment and the lack of a father-figure in his life were dominant themes in his life.  He also refers to lead defense counsel's deposition in which he stated that he did not consider parental abandonment as a mitigating factor.

2008 WL 2124076, at *13.  The trial court record had indicated that trial counsel had conducted interviews with family members by phone and were aware that McKnight's cousin attended the trial and was available to testify in mitigation.  *Id.* at *16–17.  It further indicated that trial counsel had made a "strategic decision" not to present evidence regarding childhood issues of parental abandonment and lack of a father figure "to avoid possibly opening the door to [McKnight's] juvenile murder conviction."  *Id.* at *16.  Trial counsel testified in the post-conviction proceedings that the trial judge had warned them that "if they brought up anything that predated McKnight's detention as a juvenile, then they would open the door to his prior juvenile conviction for murder."  *Id.* at *21.  The state appeals court agreed that the decision was "strategic" and made after "full and fair consideration and investigation" so McKnight could not establish ineffective assistance of counsel.  *Id.* at *17.

As to the fifteenth claim in the state post-conviction proceedings, the state court relied on a Cultural Background Report prepared by Kathleen E. Phillips Lewis, Ph.D., a professor and Caribbean cultural expert retained by McKnight's post-conviction attorneys.  (Doc. 108-5.)  The court summarized the opinion of Dr. Lewis as follows:

> As Dr. Lewis's report indicates, McKnight was tormented with his identity.  He was raised in the United States by an immigrant mother.  McKnight's mother Lewin was raised in Trinidad.  His father, who was absent from his life, was from

12

Guyana.[2]  The history of the Caribbean is complex.  Additionally, McKnight was raised within the strict Seventh Day Adventist religion.  As a child and young teenager, he was deprived of activities that youth in the United States traditionally experience.  He was an outsider who struggled to fit in.  When McKnight resided in Texas with his godparents (who were from Trinidad), he suffered strict discipline—including humiliating beatings at the hands of his godfather, sometimes while McKnight was naked in the shower.

Dr. Lewis also found that McKnight was haunted by feelings of abandonment.  Not only had his father left him when he was just an infant, McKnight's mother had sent him to Texas to live with the Chandlers (his godparents) when he was only three years old.  Lewin promised McKnight that she would bring him back to New York to live with her when he turned five, but when she visited on his fifth birthday, the Chandlers convinced Lewin to leave McKnight with them.  McKnight told his mother that she had lied to him; he expressed his feeling that neither she nor anyone else liked him, and that he believed she loved his brother more.

McKnight also often expressed feelings that he was the reason his father had left.  He believed he was not lovable and that his father was ashamed of him.  These feelings—according to his wife, his mother, his cousin, and his aunt—made him a person who searched for his sense of self in others.  This, in turn, made McKnight vulnerable to others who were able to easily manipulate him because he wanted to fit in and gain the affection and approval of others.

2008 WL 2124076, at *20.

In addition to the findings quoted above, Dr. Lewis also stated that the decision of McKnight's mother to allow McKnight to live with his godparents in Texas was consistent with the fact that in her cultural tradition "[c]hild rearing and socialization were communal, cooperative collaborative and collective undertakings."  (Doc. 108-5 at PageID 11176.)

---

[2]  McKnight criticizes his trial counsel in these proceedings for treating him as an African-American based on the mistaken belief that his father was from Ghana, Africa instead of Guyana, South America.  The basis for his trial counsel's confusion is revealed in the post-conviction record.  The trial mitigation specialist stated in her written report to trial counsel that McKnight had told her that his father was from Ghana, Africa.  (Doc. 108-5 at PageID 110356.)

Dr. Lewis presented other details of McKnight's upbringing that painted the picture of a difficult childhood.  She stated that McKnight encountered racism and discrimination at school. (*Id.* at PageID 11191–92.)  He was called "tar baby" and told he had been "left in the oven too long."  (*Id.* at PageID 1191.)  He had difficulty finding his identity because he was "a young black man in a white world," he was "so dark-skinned that even the other black kids teased him," and he was "not allowed to be either fully American or fully Caribbean."  (*Id.* at PageID 11195.) Dr. Lewis also stated that McKnight felt isolated in Texas by the Chandlers' strict rules, including that he could not participate in football because the practice and games times conflicted with the Chandlers' religious practices.  (*Id.* at PageID 11194.)  Dr. Lewis concluded that McKnight was a "outgoing, trusting, [and] somewhat naïve" youth who was "very vulnerable, easily led astray and manipulated, easy prey to the predators out on the streets who were looking for young boys . . . to introduce to the underground drug and gang culture . . . who could be easily influenced to do their dirty work for them."  (*Id.* at PageID 11190.)  She explained that these circumstances led McKnight to participate in gang activity and "petty drug-trafficking" in New York.  Later, McKnight went to Columbus, Ohio to sell drugs "where there was less competition" and he was arrested for breaking the law.  (*Id.* at PageID 11195, 11200–01.)  This was McKnight's arrest for killing a person, but Dr. Lewis did not discuss the nature of the crime in her report.  Instead, she stated that he spent five years in a youth correctional facility for the crime.  Afterwards, he lived with his wife in a small, predominately white town where he was harassed on the basis of his race.  (*Id.* at PageID 11201.)  She stated that members of the KKK tried to run McKnight off the road on more than one occasion.  (*Id.*)

The state appeals court concluded that trial counsel did not render ineffective assistance of counsel for failing to present the evidence of a cultural expert at trial. *McKnight*, 2008 WL 2124076, at *22. The court believed the decision to be "tactical" and based on trial counsel's "reasonabl[e]" belief that if they introduced mitigation evidence that predated McKnight's juvenile detention, then the trial court would have permitted the prosecutor to introduce evidence regarding his juvenile murder adjudication. *Id.* at *21. The court also stated that McKnight only offered speculation that cultural background evidence "would have humanized him to a jury and led to a life sentence." *Id.* at *22. The court also relied on other decisions holding that trial counsel's failure to use cultural mitigation evidence did not constitute ineffective assistance. *Id.* For example, it specifically cited with approval a case holding that "[e]ncouraging jurors to decide a defendant's sentence based on conclusions about groups of people, delineated by race or ethnicity, is [an] anathema to individualized sentencing." *Id.* (quoting *State v. Murphy* (Dec. 26, 2000), Franklin App. No. 00AP–233).

### 3.  Evidence Developed in the Habeas Proceedings

McKnight purports to assert a new ineffective assistance of counsel claim, separate from Ground Twenty-Seven, based on the evidence developed in these habeas proceedings. The Court now will examine this evidence to determine if it is fundamentally different than the evidence introduced in the state court post-conviction proceedings. The following facts were stated in an affidavit by Pamela Swanson, a mitigation specialist:[3]

---

[3] Swanson first had been retained by McKnight during the state court post-conviction proceedings, but she explained that she was hampered in her investigation by McKnight's post-conviction attorneys. (Doc. 77-2 at PageID 2578–81.) The facts in the main text were discovered by Swanson during her habeas proceedings investigation.

- McKnight "insisted that he was Caribbean rather than African-American and resented being treated as any other young black man."

- McKnight was diagnosed with Attention Deficit-Hyperactivity Disorder as a child and was placed in special education classes at the various schools he attended.

- McKnight's mother "talked about the abandonment of the family by [McKnight's] father when [McKnight] was seven months old and how it . . . had a long-term negative impact on Greg."

- McKnight's feelings of abandonment "intensified when his mother repeatedly sent him off to live with friends and relatives in Texas."

- The Weekes family of Sheperd, Texas "kept" McKnight from 1982–1984.  They said that McKnight's mother had "worked 16 hour days and went to bed immediately after cooking dinner; [sic] leaving McKnight to his own devices, starved for attention, since he was ignored by his mother and brother."

- McKnight had problems in school, "particularly how he was teased because of his dark skin."  Children called McKnight a "tar baby and told him he stayed in the oven too long."

- McKnight lived with the Chandler family in Texas "in a mostly white rural area—where [his] extremely dark skin stood out and made him the subject of considerable harassment."

- McKnight's home life with the Chandlers, who were Seventh-day Adventists, was "extremely strict" and he was subjected to "severe beatings" by the Chandlers prior to and during junior high school.

- McKnight attempted to play football on the school football team in Texas, but the Chandlers would not allow him to practice or play in games that interfered with church meetings or the Sabbath.  He was beaten for disobedience when he snuck away for games.

- McKnight was subject to beatings by his mother when he lived with her.

- McKnight's "isolation in Texas and feeling of abandonment" coupled with the lack of supervision by his mother when he returned to New York "made him ripe for the brutal gang initiation and indoctrination that was to follow."

- McKnight left school because of his treatment there and "turned to the streets, where he was easily manipulated by older youths into selling drugs" because he sought a father figure in the older youths.

16

- In New York, McKnight and his mother lived in the LeFrak City "notorious" housing complex in New York.  A former gang leader and now youth counselor in New York explained the gang culture of LeFrak City to Swanson, and she summarized it as follows:

  > LeFrak was a huge complex of towers and tunnels.  The building's courtyards were divided into fiercely defended gang territories.  Each of the many buildings had their own gangs.  Associating with someone from another building was not tolerated.  Because of their sheer size and numbers, gangs from LeFrak City ruled the surrounding neighborhoods as well.  There was no escaping them.  The gangs looked for and targeted vulnerable boys, like McKnight, who did not have fathers in their lives.  They made sure that the gang became family and provided the boys with the protection and resources they needed to survive. . . .  [Y]oung boys recruited by the gangs were traumatized and brutalized by older gang members in order to desensitize them to the acts of violence they were expected to commit.  The young boys were conditioned to the violence in the same manner that soldiers and pit bulls were trained to kill.  They were forced to watch brutal violence being perpetrated without the ability to intervene. . . .  After proving themselves by "committing a felony" the boys were either taken out of town by their handlers to sell drugs or put on a bus to another city to sell drugs and return with the money.[4]

- McKnight was sent to Columbus, Ohio as part of his gang association.  He was robbed of his drugs and money in Columbus.  He committed murder in Columbus in an attempt to "come up with the money" at the age of fifteen and was placed in juvenile detention.

- McKnight began a relationship with a female guard while in detention.  He married her and they had children after he was released.  They lived together in a small, rural, predominately white town in southern Ohio.  He was the only black man in the community.  He faced racial hostility, including being run off the road and subjected to racial slurs.

- McKnight "strived to be a good person despite not having the skills or resources to do so."

---

[4] It appears that the youth counselor shared facts relating to the gang culture in LeFrak City generally and lacks knowledge regarding McKnight's specific gang history or affiliation.  At this time, the Court cannot determine if the youth counselor's testimony would be admissible.

- During his childhood in New York, McKnight pushed his female cousin "out of harm's way when the two children were caught in the line of fire."

(Doc. 133-1 at PageID 15972–82; Doc. 77-2 at PageID 2578–83.)

McKnight also developed evidence in these habeas proceedings regarding the extent of the mitigation investigation performed by McKnight's trial counsel and post-conviction counsel. (Doc. 133-1; Doc. 77-2 at PageID 2578–2581.)  This evidence is recounted below where appropriate.

### 4.    Comparison of the Evidence and Claims

Most of the mitigation facts in the Swanson affidavit—facts promoted by McKnight's habeas counsel as "new evidence"—are duplicative of or overlap with the evidence developed in the state court post-conviction proceedings.  The following mitigation evidence was discussed both by Dr. Lewis during the state court post-conviction proceedings and by Swanson in the habeas proceedings:  McKnight's difficulties in school, the fact that his mother left him in the care of non-family members in Texas for years, his sense of abandonment by his father and to a lesser extent by his mother, his strict Seventh-day Adventist upbringing, his feelings of racial separateness based on his dark skin color and Caribbean heritage, his susceptibility to gang influence, his juvenile history of drug trafficking, and his time spent in a youth correctional facility.

The Court finds only a few minor differences between the evidence developed in state court and in these habeas proceedings.  Dr. Lewis did not state that McKnight had been diagnosed with ADHD.  She appeared to believe that McKnight lived with only one family in Texas, while Swanson identified two families which whom McKnight lived during his

childhood. Dr. Lewis stated that McKnight was subjected to beating from the Chandlers, but Swanson also stated that McKnight's mother also hit him. Finally, Swanson discussed in greater detail the gang initiation process in LeFrak City, how McKnight was sent by a gang to Columbus, Ohio to sell drugs, and the gang-related circumstances that led him to kill a person in Columbus while he was a teenager. In sum, McKnight has added a few new supporting facts in these habeas proceedings, but the evidentiary themes remain the same as what was presented to the state court in the post-conviction proceedings.

Moreover, the habeas evidence, whether new or not, does not support a new claim separate from Ground Twenty-Seven. The Court already has determined that Ground Twenty-Seven was denied on the merits in state court when it was asserted as the ninth and fifteenth claims for relief in the post-conviction proceedings. (Doc. 115 at PageID 12444.) McKnight's ineffective assistance of counsel claim can be characterized as a new claim only if new evidence added during federal habeas proceedings "so fundamentally alters the claims at issue that the principles of comity and federalism underlying the exhaustion doctrine dictate that the Petitioner give the state courts an opportunity to address the claims first." *Johnson*, 2012 WL 628507, at *2; *see also Vasquez*, 474 U.S. at 260 (stating in a pre-AEDPA case that new evidence did not support a new claim subject to the exhaustion requirement when it did not fundamentally alter the legal claim already considered by the state courts). The habeas evidence does not fundamentally alter Ground Twenty-Seven.

McKnight focuses extensively on the investigative steps that his trial counsel and post-conviction counsel did not take. Counsel (and the mitigation investigators) did not travel to New York, did not interview McKnight's family members in person, did not interview members of the

19

Weekes or Chandler families, and did not tour the LeFrak housing complex.  (Doc. 133-1 at PageID 15972–75.)  Nonetheless, after those steps were taken by Swanson during the habeas proceedings, she presented few mitigation facts that had not already been introduced by Dr. Lewis during the state court post-conviction proceedings.

A closer look at the Proposed Petition Claim reinforces the Court's conclusion. McKnight asserts in Ground Twenty-Seven that his trial counsel failed to complete a reasonable investigation into his background and mental health history.  (Doc. 127 at PageID 15820–27.) Specifically, he asserts that trial counsel failed to present evidence concerning parental abandonment and the significance of his Caribbean-American cultural heritage.  He states that such evidence would have "humanized" him to the jury and provided compelling evidence regarding the circumstances of his juvenile conviction.  Subclaim A of the Proposed Petition Claim is almost word-for-word identical to subclaim A of Ground Twenty-Seven.  (*Compare* Doc. 127 at PageID 15820–24 *with* Doc. 133-1 at PageID 15950–55.)  Subclaim B of the new claim in the Proposed Petition also is almost identical to the first five paragraphs in subclaim B of Ground Twenty-Seven.  (*Compare* Doc. 127 at PageID 15824–25 *with* Doc. 133-1 at PageID 15957.)

Subclaims C and D of the Proposed Petition Claim concern McKnight's social history and upbringing.  The subclaims are based on his mother's struggles as a single parent, the years he spent living in Texas with other families, the sense of isolation he felt based on his dark skin color and the strictness of the Seventh-day Adventist religion in which he was raised, and his susceptibility to gang influence in the LeFrak City housing project.  (Doc. 133-1 at PageID15957–62.)  These subjects were addressed in the state court post-conviction proceedings

by Dr. Lewis.  Admittedly, McKnight offers more specific testimony in the habeas proceedings concerning LeFrak City and the gang pressures to which McKnight was subjected.  However, the narrative that McKnight was susceptible to gang influence because of his upbringing and feelings of abandonment already were presented in this Court and in the post-conviction proceedings.

Subclaim E concerns the circumstances of McKnight being brought by his gang to Ohio to sell drugs, being robbed of his money and drugs, and committing murder to replace the money which he lost, all while he was a juvenile.  (Doc. 133-1 at PageID 15962–64.)  Swanson gave new facts leading to McKnight's juvenile arrest.  However, Dr. Lewis had explained in the state court post-conviction proceedings that McKnight sold drugs in New York and later in Ohio as a result of hanging out with a "baser sort" and "unsavory characters" on the streets.  She also reported that he was placed in a youth correctional facility for five years after breaking the law.  (Doc. 108-5 at PageID 11195, 11200.)  The reasonable inference that he was incarcerated for a crime arising from his drug-trafficking activities easily could be drawn from the facts in Dr. Lewis's report.

Finally, Subclaim F concerns McKnight's time in a youth detention center, his release, and his subsequent life with his wife in a rural and predominately white community in southern Ohio.  (Doc. 133-1 at PageID 15964–66.)  No evidence appears to have been introduced in the state court post-conviction proceedings about McKnight's good behavior in prison or the fact that he feared gang retribution upon his release.  However, Dr. Lewis did address McKnight's discomfort living in a small, predominately white community in Ohio after his arrest and the fact that he was subjected to harassment on the basis of his race.

The Court concludes that the ineffective assistance of counsel claim asserted in the Proposed Petition does not qualify as a new, unexhausted claim for purposes of the *Rhines* analysis.  McKnight presents a few new mitigation facts, but they do not fundamentally alter the substance of the ineffective assistance of counsel claims he first presented to the state court in the ninth and fifteenth claims in the post-conviction proceedings.  *Johnson*, 2012 WL 628507, at *2 (fundamentally alter standard); *see also Vasquez*, 474 U.S. at 260 (same).  *Rhines* does not provide an avenue by which McKnight can stay this habeas case so that he can exhaust new evidence in state court supporting an already exhausted claim.  *See Carter*, 829 F.3d at 466–67 (denying a stay to enable a petitioner to exhaust new evidence in support of an existing claim).  Further, because the Court already has determined that the underlying post-conviction proceeding claims were decided on the merits by the state court, McKnight can rely only on the evidence presented in the state court record to support his ineffective assistance of counsel claim in these habeas proceedings.  *See Cullen*, 563 U.S. at 181–85.

**B.    Dilatory Tactics**

Alternatively, McKnight fails to meet the *Rhines* test to obtain a stay and abeyance even if the Court were to conclude that he was offering new evidence to support a new, unexhausted claim.  Magistrate Judge Merz faulted McKnight for "interfer[ing] with the gathering of mitigation evidence" during the state court proceedings "because of his distrust or dislike for various persons assigned to provide him with legal services."  (Doc. 210 at PageID 16597.)  He concluded that McKnight had engaged in dilatory tactics and that he cannot now "use his own failure to cooperate as an excuse to delay finality in these habeas proceedings."  (*Id.*)  Because

that conclusion is not clearly erroneous or contrary to law, the Court will affirm the Magistrate Judge.

Mitigation specialist Swanson detailed the ways in which McKnight and his mother were uncooperative during the state court proceedings. Swanson reported that the trial mitigation specialist and the trial criminal investigator found McKnight to be difficult. (Doc. 133-1 at PageID 15973.) She stated that McKnight's mother was "guarded" when they spoke by telephone during the post-conviction proceedings and shared little beyond what she had told the investigators and attorneys prior to trial. (*Id.*) McKnight did not like his post-conviction attorney and had a strained relationship with her. (*Id.* at PageID 15973–74.) He was "angry" to be assigned a black litigation specialist because he insisted he was Caribbean and not African-American or "any other young black man." (*Id.*) Swanson stated that McKnight and his mother did not share information critical to mitigation with the trial or post-conviction counsel teams about "cultural child-rearing practices; [McKnight's] problems in school; issues of abandonment by primary caregivers; physical abuse; traumatization and brutalization by older youths who viewed him as a disposable commodity; and childhood diagnosis of Attention Deficit-Hyperactivity Disorder." (*Id.*)[5] It would undermine the AEDPA's purpose to encourage finality if a petitioner could be permitted to delay federal habeas proceedings to pursue an ineffective assistance of counsel claim based on evidence that was fully within control of the petitioner and his close family members during the earlier state court proceedings. *See Rhines*, 544 U.S. at 277 (recognizing that granting a stay frustrates the AEDPA goals to encourage finality and to

---

[5] Swanson's statement appears to be factually inaccurate because, as discussed earlier, information about all of those topics except the ADHD diagnosis was in the post-conviction record through Dr. Lewis's report.

increase incentives to exhaust all claims prior to filing in federal court).  Accordingly, the Court

will affirm the Decision and Order denying a stay and abeyance.

## IV.    CONCLUSION

For the foregoing reasons, Petitioner McKnight's Objections (Doc. 211) are

**OVERRULED** and the Decision and Order (Doc. 210) is **AFFIRMED**.

**IT IS SO ORDERED.**


S/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court

24