# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION AT COLUMBUS

GREGORY McKNIGHT

                         Petitioner,

                             -vs-

DAVID BOBBY, Warden,

                         Respondent.

                            :          Case No. 2:09-cv-059

                            :          District Judge Susan J. Dlott
                                        Magistrate Judge Michael R. Merz

# REPORT AND RECOMMENDATIONS

This capital habeas corpus case is before the Court on a Petition for a Writ of Habeas Corpus (ECF. No. 127[1]) in which Petitioner Gregory McKnight pleads forty-two grounds for relief challenging his convictions and sentences for aggravated murder, kidnapping, aggravated robbery, and murder.[2]  Respondent has filed his Return of Writ (ECF No. 13) and an amendment (ECF No. 112), and McKnight has filed his Traverse (Doc No. 17) and an amendment (ECF No. 128).  The

---

[1] McKnight's first petition was filed on October 14, 2009 (ECF. No. 9), and amended on February 23, 2011 (EFC No. 38), amended again on January 25, 2013 (Doc. No. 101), and again on August 26, 2013 (ECF No. 127).  Later, McKnight filed a supplement to his petition (ECF No. 241), and an amendment to the supplement (ECF No. 251), both limited to raising four lethal-injection claims which were ultimately dismissed without prejudice to their inclusion in an action under 42 U.S.C. § 1983 pursuant to *In re Campbell*, 874 F.3d 454 (6th Cir. 2017).  Those grounds for relief will not be considered further.  Finally, in this Report and Recommendations, "the petition" will refer to the most recent amended petition (ECF No. 127) for the sake of simplicity.

[2] McKnight was initially indicted on four additional counts involving tampering with evidence and gross abuse of a corpse, but those charges were subsequently withdrawn by the prosecutor.  (ECF No. 106-10, PageID 8991.)

matter is now ripe for decision.

## FACTS

The Supreme Court of Ohio summarized the State's and defense's cases as follows:

### State's Case

During early 2000, [Gregory] Julious lived with his girlfriend, Dana Bostic, at her home in Chillicothe. At the time, appellant was dating Lisa Perkins, who was a friend of Bostic's. Appellant became acquainted with Julious by visiting Perkins at Bostic's home.

On Friday, May 12, 2000, at around 4:00p.m., Bostic returned home from work and found appellant, Julious, and her daughter in the kitchen. Julious was wearing only boxer shorts. Bostic then left the house with her daughter to pick up her son.

When Bostic returned after approximately one hour, appellant and Julious were no longer at the house. Bostic testified, "The door was unlocked. There was [sic] candles still burning, * * * and it was like he just ran out for a minute and he was coming right back." Moreover, Julious's belongings, including his clothes, personal hygiene products, and his identification card, were still in the house.

When Julious did not return home, Bostic called appellant on his pager. Later that night, appellant returned Bostic's call and put Julious on the phone. Julious told Bostic that "he was in Columbus at McKnight's friend's house and they were getting ready to go to a [sic] OSU block party and he would be home." Bostic described the conversation as "very unusual" because Julious "didn't let [her] ask him anything else" and abruptly ended the conversation. Bostic never saw or talked to Julious again.

In June 2000, appellant and his wife, Kathy McKnight, acquired a trailer in a rural area near Ray, Ohio. Appellant and Kathy moved their belongings into the trailer, but they did not move in. Instead, they moved to the home of Kathy's mother, in Gambier.

In late September of early October 2000, appellant was hired as a kitchen worker at the Pirate's Cove restaurant in Gambier.

2

Appellant was friendly with his co-workers, and they would sometimes give him rides to his Gambier home after work.

Emily Murray, a Kenyon College student, was a part-time waitress at the Pirate's Cove.  Murray lived in a Kenyon College dormitory approximately 100 yards from the Pirate's Cove, and she drove her mother's Subaru Outback at Kenyon.

On November 2, 2000, Murray quit her job and spent her last evening working at the Pirate's Cove.  Several college friends visited Murray at the Pirate's Cove to help celebrate her last night at work, but her friends left before Murray finished work.

Appellant also worked at the Pirate's Cove on the evening of November 2.  Time cards showed that Murray finished work at 3:07a.m. and appellant finished work at 2:59a.m. on November 3.  Nathan Justice, the bartender at the Pirate's Cove, saw Murray looking for her keys before 3:30a.m.  No one at the Pirate's Cove recalls seeing Murray and appellant leave together.

Murray never returned to sleep in her dormitory room, and she failed to appear at a party on the evening of November 3.  This absence concerned Murray's friends because Murray had not left a message regarding her whereabouts and they could not find Murray's Subaru Outback on campus or in Gambier.

After an unsuccessful search for Murray, her friends notified Murray's family and Kenyon College Security.  A search of Murray's dormitory room by Murray's friend, Abigail Williams, produced Murray's wallet, which contained her Ohio and New York driver's licenses, credit cards, and bank card.

On Sunday evening, November 5, Williams talked to appellant about Murray's disappearance.  Appellant said that he had worked that night but 'left well before she did * * * [and] that he was not there so he could see her leave."  According to Williams, appellant was "very curt" and "[they] didn't get any information.  He just kind of smirked" at them.  A short time after Murray disappeared, appellant told Nate Justice that "[h]e felt that [Murray] was probably dead."

On December 9, 2000, Vinton County Sheriff's Chief Deputy

3

Charles Boyer and Deputy Matt Kight went to appellant's trailer to serve an unrelated indictment on him, but appellant was not there. Deputy Kight ran a license check on a vehicle on the property and learned that the Subaru Outback parked behind the trailer was associated with the disappearance of Emily Murray.

After obtaining a search warrant, law enforcement entered appellant's trailer and found bloodstains on the carpet near the front door. Police followed a trail of blood down the hallway and discovered Murray's clothed body wrapped inside a carpet in the spare bedroom.

During the search, Special Agent Gary Wilgus, a crime-scene investigator with the Ohio Bureau of Criminal Identification and Investigation, found a copper bullet jacket near the bloodstained carpet in the living room. A bullet hole was found in the area of the bloodstained carpet, but investigators did not find the bullet that went through the floor. Additionally, police found five spent .357 shell casings inside a drawer in the living room, seven nine-millimeter bullets inside a drawer in the master bedroom, and a roll of bloodstained duct tape in the living room.

Investigators searching the property found human bones and clothing in the cistern, the root cellar, and in a plastic bag. Police discovered that a fire had been started in the root cellar, and they recovered burned bones and pieces of clothing. The skeletal remains included most of the bones from a single human, but only six skull fragments were found. Dr. Nancy Tatarek, a forensic anthropologist, concluded that the remains were from an African-American male who was 20 to 25 years of age and six feet to six feet, six inches tall.

The police identified the remains as those of Gregory Julious. Dr. Franklin Wright, a forensic dentist, positively matched the teeth and jaw bone found on appellant's property with Julious's dental records. Bostic also identified the remains of boxer shorts found in the cistern as those Julious was wearing the day he disappeared. Kim Zimmerman, appellant's brother-in-law, had given police a bloodstained backpack that he had taken from the trailer's living-room closet.

Police searched the vehicle that appellant was driving when Julious

4

disappeared, and they discovered bloodstains on the carpet underneath the rear seat. Subsequent DNA analysis showed that the "DNA from the * * * carpet [was] consistent with the DNA profile from Gregory L. Julious." According to Diane Larson, a DNA serology analyst, the "chance of finding the same DNA profile in the population is * * * approximately 1 in 50 trillion people for the Caucasian population, one in 177 trillion in the African-American population, and 1 in 51 trillion in the Hispanic population.

Inside appellant's Gambier home, police found an empty box of Winchester .357 magnum cartridges underneath the bed in the master bedroom, two .30 caliber bullets in the master-bedroom closet, and four nine-millimeter bullets in the basement. Police also learned that appellant had purchased three handguns from two gun shops before the murders: a Jennings nine-millimeter semiautomatic pistol purchased on February 17, 1999, and Intratec nine-millimeter pistol purchased on April 24, 1999, and a Jennings .380 caliber semiautomatic pistol bought on May 24, 2000.

Dr. Dorothy Dean, Deputy Coroner for Franklin County, found that Murray had died from a single "gunshot wound to the head." Murray was shot with a high-powered weapon, and the gun was "very, very close or touching her skin" when fired.

Dr. Tatarek found that the condition of the skull fragments of Julious were "consistent with an injury by gunshot." She also found evidence of trauma to the vertebra "caused by some sort of sharp object penetrating the person's neck and cutting into the bone." Moreover, trauma to two hand bones was "consistent [with] defense wounds." Dr. Tatarek also found trauma around joints "consistent with dismemberment of a person." The condition of the skeletal remains placed the date of death within a three- to six-month time frame that included May 12, 2000.

Diane Larson concluded that the DNA profile from the bullet jacket found in appellant's trailer was consistent with Murray's DNA profile. The odds that the DNA from the bullet jacket was from someone other than Murray were one in 646 Billion for the Caucasian population. Larson also found that the bloodstains on the backpack and duct tape matched Julious's DNA profile. The odds that the DNA from bloodstains on the backpack was from

someone other than Julious were one in 64 quadrillion for the African-American population.

Heather Zollman, a firearms expert, compared a bullet taken from a tree behind the trailer and the bullet jacket from inside the house and concluded that they were "fired [from] the same firearm." Zollman described each as a "Remington brand 180 gram .357 magnum semi-jacketed hollow-point bullet." She could not determine the caliber of the bullet removed from Murray's body. Nevertheless, Zollman concluded that the lead was "consistent with having come from the bullet." Gunpowder on the surface of the bullet fragment was also "the same type of style of flattened ball powder that is loaded by Remington in these .357 magnum cartridges.

### Defense's Case

The defense called one witness. Donald Doles, a Vinton County neighbor of appellant, testified that twice during the fall of 2000, he had observed a woman who looked like Emily Murray drive past his house in a Subaru Outback with New York license plates. When she drove past on one occasion, Doles was only ten or [twelve] feet away from the car when "she turned around and looked at [him] and smiled and waved." During cross-examination, Doles did not recognize Murray's picture, and he said that he was not 100 percent certain that the woman driving past his house was Murray.

*State v. McKnight*, 107 Ohio St. 3d 101, 2005-Ohio-6046 at ¶¶ 2-25.


### PROCEDURAL HISTORY


At trial, the jury convicted McKnight of the aggravated murder of Emily Murray while committing a kidnapping, kidnapping, aggravated robbery, and the murder of Gregory Julious. (Trial Tr., ECF No. 105-26 at PageID 7332-40; Judgment Entry Upon Jury Verdicts, ECF No. 106-13 at PAGEID 9287-91.) The aggravated murder count contained four death penalty

6

specifications:  (1) murder to escape detection, apprehension, trial, or punishment for another offense; (2) murder as a "course of conduct" involving the killing of two or more people; (3) murder while committing or attempting to commit kidnapping; and (4) murder while committing or attempting to commit aggravated robbery.  McKnight was also charged with a firearm specification.  The jury found him guilty on all of those charges, and recommended a death sentence.  *Id*.  The trial court conducted an independent sentencing evaluation and adopted the recommendation of the jury.  *Id*. at PageID 9294-9312.  McKnight was sentenced to death on November 1, 2002.  *Id*.

McKnight took an appeal to the Supreme Court of Ohio, raising thirty propositions of law for the court's consideration (Appellant's Merit Brief, ECF No. 106-14 at PageID 9426 to ECF No. 106-15 at PageID 9662). each of which was overruled; the court affirmed McKnight's convictions and sentences in November 2005. *State v. McKnight*, 107 Ohio St. 3d 101, 2005-Ohio-6046 (2005).  The United States Supreme Court denied certiorari.  (ECF No. 107-5 at PageID 10426-27.)  McKnight's subsequent Motion for Reconsideration (ECF No. 107-5 at PageID 10350-68) was summarily denied (ECF No. 107-5 at PageID 10369), as was his application to reopen his direct appeal (ECF Nos. 107-5 at PageID 10395-409 and 10410).

McKnight simultaneously litigated his petition for post-conviction relief in the state trial court raising ten claims for relief.  (Post-Conviction Petition, ECF Nos. 107-6 to 107-8 at PageID 10470-10500.)  McKnight amended his post-conviction petition twice (ECF Nos. 108-1 at PageID 10666-82; 108-5 at PageID 10939-57), adding five more claims for relief for a total of fifteen.  The trial court denied McKnight's post-conviction petition, finding some claims barred

by the doctrine of *res judicata* and all of them unsupported by "sufficient credible evidence to establish substantive grounds for relief," but making no findings of fact or conclusions of law. (ECF No. 108-8 at PageID 11530-31.) An appeal from that denial was dismissed by the Fourth District Court of Appeals because of the trial court's failure to adhere to Ohio Rev. Code § 2953.21(C) which provides that "[i]f the court dismisses the petition, it shall make and file findings of fact and conclusions of law with respect to such dismissal." *State v. McKnight*, No. 06CA645, 2006-Ohio-7104 (Ohio App. 4th Dist. Dec. 27, 2006). Absent the required findings of fact and conclusions of law from the trial court, there is no final appealable order from which to appeal. After the trial court corrected its error (ECF No. 108-12 at PageID 11868-84), McKnight re-filed his appellate brief alleging four assignments of error (ECF No. 108-13 at PageID 11918-75). The court of appeals denied each, affirming the post-conviction trial court (ECF No. 108-14 at PageID 12171-216), and the Supreme Court of Ohio declined jurisdiction over McKnight's further appeal (ECF No. 108-15 at PageID 12219-84).

On October 14, 2009, McKnight filed his petition for a writ of habeas corpus in this Court. (ECF No. 9.) Amended petitions were filed as noted above, with the final amendment being filed on in August 2013 at ECF No. 127. McKnight pleads the following Grounds for Relief:

### First Ground for Relief

A search warrant based on an affidavit containing false information made knowingly and intentionally or with reckless disregard for the truth violated Gregory McKnight's right against an unreasonable search and seizure in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Second Ground for Relief**

Gregory McKnight was denied a fair trial, an impartial jury, and due process as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments when the trial court failed to change venue despite pervasive pretrial publicity.

**Third Ground for Relief**

Gregory McKnight was deprived of due process, a fair trial, and a fair sentencing hearing in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights due to the trial court's failure to change venue in light of the pervasive racial bias in the Vinton County, Ohio community.

**Fourth Ground for Relief**

Failure to provide Gregory McKnight with the expert resources to conduct a scientific jury survey denied him information crucial to establishing the necessity for a change of venue, thereby depriving him of the effective assistance of counsel, a fair trial, a fair and impartial jury, and due process in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Fifth Ground for Relief**

The trial court's dismissal and subsequent reinstatement of the capital specifications of statutory aggravating circumstances in Gregory McKnight's trial violated McKnight's right to due process, a fair trial, and a fair and impartial jury in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Sixth Ground for Relief**

Gregory McKnight was denied due process, a fair trial, and a fair and reliable sentencing determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments when the trial court tried the two unrelated murders jointly.

**Seventh Ground for Relief**

Gregory McKnight was denied due process and a fair trial because

9

the "course of conduct" specification was not supported by sufficient evidence and failed to narrow the class of murders [sic] eligible for the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Eighth Ground for Relief**

McKnight was denied the right to defend against the State's charges and to confront the State's witnesses, as well as his rights to due process and equal protection when the trial court instructed the jury in a manner calculated to defeat the effectiveness of cross-examination in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Ninth Ground for Relief**

McKnight's rights to a fair trial, due process, and a reliable determination of guilt as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the introduction and admission of numerous gruesome photographs with no probative value but which were highly prejudicial.

**Tenth Ground for Relief**

Gregory McKnight's right to a fair trial and due process were violated when [the] State introduced and the trial court admitted evidence to prove the victim acted in conformity with habitual behavior in violation of the Fifth, Sixth, Eighth[,] and Fourteenth Amendments.

**Eleventh Ground for Relief**

The admission of irrelevant and inflammatory evidence deprived Gregory McKnight of a fundamentally fair trial and due process in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Twelfth Ground for Relief**

Gregory McKnight's right to defend and to rebut the State's evidence was denied when the trial court precluded the admission of relevant evidence denying him his constitutional right to due

10

process and a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Thirteenth Ground for Relief**

McKnight was denied his right to a fair trial and impartial jury under the Fifth, Sixth, and Fourteenth Amendments when a member of his jury ignored the trial court's admonitions and engaged in discussions about the case with members of the community.

**Fourteenth Ground for Relief**

Gregory McKnight's right to due process and a fair trial by a fair and impartial jury was denied when the trial court permitted a juror to remain on the jury after the juror was sleeping during the presentation of evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Fifteenth Ground for Relief**

Gregory McKnight was denied his due process right and a fair trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, when the trial court failed to take curative action after his trial was disrupted during closing arguments of the trial phase.

**Sixteenth Ground for Relief**

Gregory McKnight was denied due process, a fair trial, and an impartial jury when he was shackled in the courtroom in front of the jury in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Seventeenth Ground for Relief**

Gregory McKnight was denied due process and a fair trial by the trial court's instructions that did not require unanimous jury verdicts in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments when the verdict was predicated on alternative theories of guilt.

**Eighteenth Ground for Relief**

Gregory McKnight's right to due process, a fair trial, and an

11

impartial jury were denied under the Fifth, Sixth, Eighth, and Fourteenth Amendments when the court instructed the jury on Ohio Rev. Code § 2905.1(C) mitigating factor when McKnight did not raise this affirmative defense.

**Nineteenth Ground for Relief**

Gregory McKnight was denied a fair trial, due process[,] and the right to confront witnesses against him in violation of the Fifth, Sixth, Eighth[,] and Fourteenth Amendments when he was excluded from critical portions of his capital trial.

**Twentieth Ground for Relief**

Gregory McKnight was denied due process and a fair trial when the State was permitted to convict upon a standard of proof below proof beyond a reasonable doubt, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Twenty-First Ground for Relief**

Gregory McKnight was denied due process, equal protection, and a fair and reliable capital sentencing determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments because the trial court excluded victim impact evidence about the effect of a homicide on the victim's family, and relevant mitigating evidence.

**Twenty-Second Ground for Relief**

Gregory McKnight was denied due process and a fair trial by the trial court's instruction on an invalid aggravating circumstance that is not authorized by Ohio's capital sentencing statute, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Twenty-Third Ground for Relief**

McKnight's due process rights to a fair, reliable trial and sentencing were violated when the trial court's erroneous instructions to the jury allowed the jury to determine what evidence was relevant for consideration and weighing during the penalty phase, in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution.

**Twenty-Fourth Ground for Relief**

Gregory McKnight was denied due process and [a] fair and reliable sentencing determination when the trial court provided the jury with verdict forms that served to mislead the jury as to its essential role during penalty phase deliberations in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Twenty-Fifth Ground for Relief**

The trial court considered invalid aggravating circumstances in its sentencing opinion and imposed death without an individualized consideration of mitigating factors.   Gregory McKnight was denied a fair and reliable sentencing determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Twenty-Sixth Ground for Relief**

McKnight was denied the effective assistance of counsel during the trial phase of his capital trial in violation of his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Twenty-Seventh Ground for Relief**

McKnight's due process, fair trial, and effective assistance of counsel [rights] were denied by Counsel's deficient performance during the penalty phase in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Twenty-Eighth Ground for Relief**

McKnight was denied the effective assistance of counsel when counsel failed to object to the trial court's failure to instruct the jury which trial phase evidence was relevant to the jury's weighing process at the penalty phase.

**Twenty-Ninth Ground for Relief**

Gregory McKnight was denied due process, a fair trial, a reliable sentencing determination, and the effective assistance of counsel by counsel's failure to object to the trial court's verdict forms to the

13

jury that were materially inaccurate.

**Thirtieth Ground for Relief**

Gregory McKnight was denied due process, a fair trial, a reliable sentencing determination, and the effective assistance of counsel by counsel's failure to object to the trial court's flawed instructions given during the trial and penalty phase[s] in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Thirty-First Ground for Relief**

Gregory McKnight was denied due process, a fair trial[,] and a reliable sentencing determination by the misconduct of the prosecutors during the trial and penalty phases under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Thirty-Second Ground for Relief**

Gregory McKnight's rights to a fair trial, due process, and a reliable sentencing determination were denied under the Fifth, Sixth, Eighth, and Fourteenth Amendments when members of his jury engaged in misconduct by failing to follow the trial court's instructions of law.

**Thirty-Third Ground for Relief**

Gregory McKnight was denied the effective assistance of appellate counsel on his sole appeal of right to the Supreme Court of Ohio under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Thirty-Fourth Ground for Relief**

McKnight's due process, equal protection, fair trial, and fair and reliable sentencing determination rights were denied when he was convicted of kidnaping and aggravated murder without legally sufficient evidence, and contrary to the manifest weight of the evidence under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Thirty-Fifth Ground for Relief**

Gregory McKnight's rights were violated when he was convicted and sentenced to death under Ohio's death penalty system which fails to provide an adequate system of appellate and proportionality review in death penalty cases in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Thirty-Sixth Ground for Relief**

When the aggravating circumstances do not outweigh the mitigating factors, a sentence of death is inappropriate. Additionally, the death sentence must be vacated where it is not proportionate to other crimes.

**Thirty-Seventh Ground for Relief**

Gregory McKnight's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when he was convicted and sentenced to death under Ohio's unconstitutional death penalty scheme.

**Thirty-Eighth Ground for Relief**

The practice of execution by lethal injection violates Gregory McKnight's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

**Thirty-Ninth Ground for Relief**

Gregory McKnight was denied due process, Equal Protection, and a fair and reliable trial and sentencing review by Ohio's inadequate state post-conviction process that fails to provide an adequate remedy for McKnight to fully and fairly vindicate his federal constitutional claims in the state courts under principles of comity and federalism, under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Fortieth Ground for Relief**

The cumulative effects of the errors and omissions set forth in the

preceding claims for relief prejudiced McKnight and deprived him of his right [to] due process, a fair trial[,] and [a] reliable sentencing determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Forty-First Ground for Relief**

Gregory McKnight's execution will violate the Eighth Amendment because Ohio's lethal injection protocol will result in cruel and unusual punishment.

**Forty-Second Ground for Relief**

Gregory McKnight's execution will violate the Fourteenth Amendment because Ohio's lethal injection protocol will deprive him of equal protection of the law.

(ECF No. 127.)

# Analysis

Since McKnight filed his petition well after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("the AEDPA"), the amendments to 28 U.S.C. § 2254 embodied in that Act are applicable to this case. The Supreme Court has elaborated on the standard of review of state court decisions on constitutional claims later raised in federal habeas corpus as follows:

> Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, a federal court may grant habeas relief only when a state court's decision on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" decisions from this Court, or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). . . .

16

> [The] AEDPA's standard is intentionally "difficult to meet."
> *White v. Woodall*, 572 U.S. [415], [419], 134 (2014) (quoting
> *Metrish v. Lancaster* 569 U.S. [351], [358] (2013)). We have
> explained that "clearly established Federal law" for purposes of §
> 2254(d)(1) includes only the holdings, as opposed to the dicta, of
> this Court's decisions. *White*, 572 U.S., at [419] (some internal
> quotation marks omitted). "And an 'unreasonable application of'
> those holdings must be objectively unreasonable, not merely wrong;
> even clear error will not suffice." *Id.*, at [419] (same). To satisfy
> this high bar, a habeas petitioner is required to "show that the state
> court's ruling on the claim being presented in federal court was so
> lacking in justification that there was an error well understood and
> comprehended in existing law beyond any possibility for fairminded
> [sic] disagreement." *Harrington v. Richter*, 562 U.S. 86, 103
> (2011).
>
> Adherence to these principles serves important interests of
> federalism and comity. [The] AEDPA's requirements reflect a
> "presumption that state courts know and follow the law."
> *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*). When
> reviewing state criminal convictions on collateral review, federal
> judges are required to afford state courts due respect by overturning
> their decisions only when there could be no reasonable dispute that
> they were wrong. Federal habeas review thus exists as "a guard
> against extreme malfunctions in the state criminal justice systems,
> not a substitute for ordinary error correction through appeal."
> *Harrington*, *supra*, at 102-103 (internal quotation marks omitted).

*Woods v. Donald*, 575 U.S. 312, 316-17 (2015)(*per curiam*)(some internal quotation marks and

parallel citations omitted). "The question under [the] AEDPA is not whether a federal court

believes the state court's determination was incorrect[,] but whether that determination was

unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473

(2007), *citing Williams v. Taylor*, 529 U.S. 362, 410 (2000). The presumption of correctness due

a state court's factual findings can be rebutted only by clear and convincing evidence, 28 U.S.C. §

2254(e)(1), and that evidence must be found within the state court record. *Schriro*, *supra*, at

473-74; *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011); *Bray v. Andrews*, 640 F.3d 731, 737 (6th Cir. 2011); 28 U.S.C. § 2254(d)(2).

In addition, the United States Court of Appeals for the Sixth Circuit has stated, "federal courts need not review every point of error raised by a *habeas* petitioner."  *Hoffner v. Bradshaw*, 622 F.3d 487, 495 (6th Cir. 2010).   The appellate court went on to explain:

> When a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).   In this circuit, to determine whether a federal claim has been procedurally defaulted, we apply the three-prong test initially laid out in *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986):
>
>> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule . . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction . . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim . . . .
>
> *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001) (quoting *Maupin*, 785 F.2d at 138).   If the state procedural rule was not complied with and that rule was an "adequate and independent" ground for default, we may still excuse the default if the petitioner can demonstrate "that there was 'cause' for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Maupin*, 785 F.2d at 138.

*Hoffner*, 622 F.3d at 495 (parallel citations omitted).   It is with these principles in mind that this Court considers McKnight's forty-four grounds for relief.

18

**First Ground for Relief**

In his first ground for relief, McKnight contends that the warrant issued authorizing law enforcement to search his trailer in Ray, Ohio, was based upon information known to the averring officer Boyer to be false. (Petition, ECF No. 127, PageID 15668-75.) Respondent counters that the claim is not cognizable in habeas corpus, is procedurally defaulted, and is meritless. (ROW, ECF No. 13, PageID 335-45.) McKnight insists that each of Respondent's arguments is incorrect. (Traverse, ECF No. 17, PageID 625-36.)

The record shows that McKnight initially moved for suppression of the evidence seized at his trailer in Ray on the ground that the accompanying affidavit did not contain facts establishing probable cause to search the trailer and grounds. (Appendix, ECF No. 106-1, PageID 7863-67.) The trial court held a hearing on the motion in 2001 at which Boyer testified (Trial Tr., ECF No. 105-1, PageID 3154-3220), and subsequently denied McKnight's motion (Entry, ECF No. 106-3, PageID 8047). McKnight's attorneys noticed a discrepancy between Boyer's testimony at the hearing and his affidavit supporting the request for a warrant to search McKnight's trailer and premises. They supplemented the motion to suppress with that information, contending that in his affidavit, Boyer stated he had spoken to Knox County Sheriff's Office regarding the Subaru Outback found parked behind McKnight's trailer, but that it was Vinton County Sheriff's Deputy Matthew Kight who actually spoke with the Sheriff's dispatcher. (Appendix, ECF No. 106-3, PageID 8041-44.) McKnight sought a hearing on his supplement to his motion to suppress, invoking *Franks v. Delaware*, 438 U.S. 154 (1978). In that case, the Supreme Court held as

19

follows:

> Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks*, 438 U.S. at 155-56. The trial court denied McKnight's request for a hearing, but allowed his attorneys and the prosecutor to present their arguments with regard to the supplemented motion to suppress; then the court orally denied the motion, finding that McKnight failed to show that Boyer's statement in the affidavit was either false or made with reckless disregard for the truth. (Trial Tr., ECF No. 105-1, PageID 3250-55; *see also* Entry, ECF No. 106-8, PageID 8511.) The court explicitly found that not to be the case, in fact. *Id*. at 3255.

McKnight appealed the trial court's decision on Fourth Amendment grounds in his fifth proposition of law on direct appeal to the Supreme Court of Ohio. (Appellate Brief, ECF No. 106-14, PageID 9489-96.) The court found that: (1) after Emily Murray's car was found behind McKnight's trailer, there was a fair probability that evidence of a crime would be found on McKnight's property, thus providing probable cause to search the trailer and grounds for evidence of Emily's possible kidnapping and abduction; (2) Boyer did not state that he himself spoke with the Knox County Sheriff's Office, but instead that he "obtained confirmation" from that office that Emily's car was missing and had been since she had last been seen, which did not necessarily imply he himself spoke with Knox County officials; and (3) McKnight's claim that Boyer untruthfully stated he had seen the Subaru behind the trailer and verified its ownership was not borne out by the record, thereby disentitling McKnight to the process provided for by *Franks*.

20

*State v. McKnight*, 107 Ohio St. 3d 101, 2005-Ohio-6046, ¶¶ 30-42. McKnight's proposition of law was consequently denied (*id*.), as was his request for reconsideration. *State v. McKnight*, 108 Ohio St. 3d 1418, 2006-Ohio-179. The United States Supreme Court declined McKnight's request for a writ of certiorari. *McKnight v. Ohio*, 548 U.S. 912 (2006).

McKnight also pursued his Fourth Amendment claim regarding Boyer's affidavit in his post-conviction proceedings, presenting it as his eighth claim for relief in his petition. (Appendix, ECF No. 107-8, PageID 10494-96.) The post-conviction court found the claim barred by the doctrine of *res judicata* since it was considered and rejected by the Supreme Court of Ohio on direct appeal. (Appendix, ECF No. 108-12, PageID 11875-76.) The court of appeals affirmed that decision, but also noted that even if the claim were not procedurally barred, it lacked merit because assuming the allegedly false information were eliminated from Boyer's affidavit, the affidavit still established probable cause to search McKnight's trailer and surrounding property. *State v. McKnight*, No. 07CA665, 2008-Ohio-2435, ¶¶ 61-65 (Ohio App. 4th Dist. May 19, 2008). McKnight's appeal to the Supreme Court of Ohio was not accepted for review. *State v. McKnight*, 119 Ohio St. 3d 1487, 2008-Ohio-5273.

Despite McKnight's having presented his claim in both direct appeal and post-conviction, he maintains that in neither proceeding was his claim given "full and fair consideration" for lack of a *Franks* hearing at trial which would have provided the trial and appellate courts with evidence essential to resolution of the claim. If his claim is not cognizable in habeas corpus or is procedurally defaulted as Respondent argues, there will be no reason for this Court to address its merits. Thus, the Court will consider Respondent's procedural defenses first.

21

**Cognizability Argument**

Regarding Fourth Amendment claims pleaded in habeas corpus, the Sixth Circuit has held:

> *Stone v. Powell* in the main prohibits federal habeas corpus review of a state prisoner's Fourth Amendment claim.  428 U.S. 465, 486 (1976).  Two explanations supported the decision.  One, the key purpose of federal habeas corpus is to free innocent prisoners.  But whether an investigation violated the Fourth Amendment has no bearing on whether the defendant is guilty.  *Id*. at 490.  Two, exclusion is a prudential deterrent prescribed by the courts, not a personal right guaranteed by the Constitution.  Any deterrence produced by an additional layer of habeas review is small, but the cost of undoing the final convictions is great.  *Id*. at 493.

*Good v. Berghuis*, 729 F.3d 636, 637 (6th Cir. 2013)(parallel citations omitted).  *See United States v. Calandra*, 414 U.S. 338, 348 (1974); *Mapp v. Ohio*, 367 U.S. 643, 654-55 (1961).  *Powell* provides an exception for petitioners who were denied the "opportunity for full and fair consideration" of their claims in state court, however.  428 U.S. at 486.  McKnight argues he was denied that opportunity.

Respondent contends that under *Powell*, McKnight's Fourth Amendment claim is not cognizable in habeas corpus.  (ROW, ECF No. 13, PageID 335-37.)  McKnight argues that the Sixth Circuit Court of Appeals has indicated that federal habeas relief is warranted where the state court commits "'an egregious error in the application of the [F]ourth [A]mendment claim,'" and asserts that the trial court's failure to provide him with a *Franks* hearing was just such an error. (Traverse, ECF No. 17, PageID 626, *quoting Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982).)  In *Riley*, however, the Sixth Circuit observed that at least some level of review of the merits of a Fourth Amendment claim would be required to determine if there was egregious error in the state

22

court's decision, and acknowledged that approach as one used in the Tenth Circuit in *Gamble v. Oklahoma*, 583 F.2d 1161 (10th Cir. 1978). *Riley*, 674 F.2d at 525. In rejecting that court's approach, the Sixth Circuit stated:

> We believe that a limited inquiry into the correctness of state court decisions, occurring as a matter of course in the district courts, would be inconsistent with *Stone* [*v. Powell*]. *Id*. at 493 n.35. The language of *Gamble*, however, entails an examination of each state decision which precipitates a habeas petition. This case by case review is inconsistent with *Stone*'s assumption that state courts are as capable of deciding [F]ourth [A]mendment issues as federal courts. When a petitioner alleges egregious error in the application of [F]ourth [A]mendment principles, of a magnitude and nature similar to the state court error present in *Gamble*, however, a federal habeas court might be justified in concluding that an opportunity for a full and fair hearing had not been afforded the petitioner.

*Riley*, 674 F.2d at 526. Thus, McKnight attributes a position to the Sixth Circuit it did not unequivocally take. Subsequently, the appellate court has clarified that "[t]his court in *Riley* declined to adopt that portion of *Gamble* permitting federal review of egregious substantive errors committed by state courts on Fourth Amendment claims." *Gilbert v. Parke*, 763 F.2d 821, 824 (6th Cir. 1985), citing *Riley*, 674 F.2d at 525-26.

McKnight acknowledges that the Sixth Circuit has directed district courts in habeas cases raising Fourth Amendment claims to (1) "determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a [F]ourth [A]mendment claim," and (2) "whether presentation of the claim was in fact frustrated because of a failure of that mechanism." *Riley*, 674 F.2d at 526. That court has found the mechanism provided by the State of Ohio to be "clearly adequate," allowing pretrial motions to suppress illegally seized evidence, and direct appeal of right should the motion to suppress be unsuccessful, *Riley*, 674 F.2d at 526. McKnight does not

23

take issue with the process itself. Instead, he contends the presentation of his claim in the state trial court was frustrated because he was denied the opportunity to present evidence of the alleged falsehoods in Boyer's affidavit. (Traverse, ECF No. 17, PageID 635.)

McKnight's argument, however, appears to rest upon a misapprehension of the Supreme Court's *Franks* decision. He argues that he should have been permitted to present witness testimony in order to demonstrate that Boyer intentionally made false statements in his affidavit, or that his statements were made with a reckless disregard for the truth. But *Franks* holds that only where (1) "the defendant makes a *substantial preliminary showing* that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and (2) that the "allegedly false statement is *necessary to the finding of probable cause*," does the Fourth Amendment require a hearing on the matter at the defendant's request. *Franks*, 438 U.S. at 155-56 (emphasis added). In McKnight's case, both the trial court and the state court of appeals found that McKnight had not made the showing necessary to entitle him to a *Franks* hearing. The court of appeals went further, in fact, and found that McKnight's basic premise, that Boyer's affidavit contained false statements, was incorrect. (Trial Tr., ECF No. 105-1, PageID 3250-55; *see also* Entry, ECF No. 106-8, PageID 8511.) *See United States v. Doyle*, 650 F.3d 460, 469 (4th Cir. 2011) (finding that "the information provided [in the search warrant affidavit], though perhaps misleading by virtue of sentence construction, was not technically false"). In post-conviction, the court of appeals indicated probable cause to search McKnight's trailer and premises was present even without Boyer's allegedly false statements in his affidavit. *McKnight*, 2008-Ohio-2435, ¶ 63. Thus, the state courts determined that

24

McKnight failed to meet either of *Franks*' two requirements and that he was consequently not entitled to a second suppression hearing. *See Rugendorf v. United States*, 376 U.S. 528, 532 (1964) (stating, "The factual inaccuracies depended upon by petitioner to destroy probable cause . . . were of only peripheral relevancy to the showing of probable cause.").

Given the "clearly adequate" process afforded defendants who wish to challenge the propriety of a search warrant or the veracity of an accompanying affidavit, and McKnight's failure to make a "substantial preliminary showing" that Boyer intentionally or with reckless disregard for the truth included false information in his affidavit, McKnight's first ground for relief is not cognizable in habeas corpus under *Stone v. Powell*, 428 U.S. 465, 486 (1976).

**Procedural Default Argument**

Even if McKnight's claim were cognizable in these proceedings, however, he has procedurally defaulted part of his claim. Respondent asserts that in his state court proceedings, McKnight presented his claim as a Fourth Amendment violation, and that the portion of his claim in habeas that expands to include violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments is procedurally defaulted. (ROW, ECF No. 13, PageID 337-38.) McKnight counters that his claims in the state courts and his claim here are substantially equivalent and that the state court had notice and an opportunity to rule on the expanded federal constitutional claim, citing *Arrowood v. Clusen*, 732 F.2d 1364, 1367-68 (7th Cir. 1984). *Arrowood*, however, is distinguishable from McKnight's situation. There, the state court was presented with two claims

it eventually determined it could not reach due to an insufficient record. *Id*. The federal court reviewed the record and found that the record provided a sufficient basis upon which the court could review both claims. *Id*. at 1368. Here, McKnight did not present his claim in the state court as one implicating the Fifth, Sixth, Eighth, or Fourteenth Amendment. Even though some of the facts he recited in his Fourth Amendment claim in the state court could conceivably be the same ones that would be included in arguments relating to the Fifth, Sixth, Eighth, and Fourteenth Amendments, that alone does not suffice to put the state court on notice that his claim involved more amendments than the one explicitly stated in McKnight's argument.

There are occasions when a state court defendant will have made claims in the state courts which, while not explicitly invoking the United States Constitution, in fact fairly place before the state courts the factual and legal substance of a claim or claims later made in habeas corpus. In *Franklin v. Rose*, 811 F.2d 322 (6th Cir. 1987), the Sixth Circuit cited with approval the Second Circuit's analysis in *Daye v. Attorney General,* 696 F.2d 186 (2nd Cir. 1982), *after remand*, 712 F.2d 1566 (2nd Cir. 1983):

> [T]he ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like factual situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts well within the mainstream of constitutional litigation.

*Franklin*, 811 F.2d at 326, quoting *Daye v. Attorney General of State of New York*, 696 F.2d at 192-94; *accord*, *Whiting v. Birt*, 395 F.3d 602 (6th Cir. 2005); *McMeans v. Brigano,* 228 F.3d 674,

26

681 (6th Cir. 2000). In reviewing McKnight's argument on direct appeal in the Supreme Court of Ohio, this Court reaches a conclusion opposite to the one McKnight urges: nothing in his argument to the state court indicated McKnight intended his proposition of law to include violations of the Fifth, Sixth, Eighth, or Fourteenth Amendment in his challenge to the search warrant and the veracity of Boyer's affidavit. The federal cases mentioned in his argument concerned Fourth Amendment challenges to search warrants as did the state cases McKnight sited in his brief. (Appellate Brief, ECF No. 106-14, PageID 9489-96.) Nothing in his argument called to mind any specific right protected by the Fifth, Sixth, or Eighth Amendment, and the facts alleged did not fall well within the mainstream of litigation relating to those amendments. Accordingly, to the extent McKnight contends in his first ground for relief that his Fifth, Sixth, and Eighth Amendment rights were violated, his claim is procedurally defaulted. McKnight does not allege that his default is excused by his trial and appellate counsel's ineffectiveness.

Implicit in his argument to the state court, however, was an assumption that a Fourth Amendment claim concerning state action implicates the Fourteenth Amendment. Perhaps McKnight believed this fact was so obvious that it need not be explicitly stated in his argument. In any case, the Fourth Amendment is applicable to the states via the Fourteenth Amendment's doctrine of incorporation. *Mapp v. Ohio*, 367 U.S. 643 (1961). McKnight's argument that the state authorities and trial court were required to respect his Fourth Amendment rights is well within the mainstream of constitutional litigation of Fourth and Fourteenth Amendment matters. Thus, this Court agrees with McKnight that to the extent his claim in the state court inferentially relied upon the Fourteenth Amendment's incorporation of the Fourth Amendment's protections,

the Fourteenth Amendment claim was presented to the state court. It is therefore preserved for habeas corpus review. That does not overcome the problem of cognizability of Fourth Amendment claims in habeas corpus discussed above, however.

In his Traverse, McKnight also argues that the search warrant authorized a search of 36070 Clark Road rather than his property located at 36037 Clark Road. (Traverse, ECF No. 17, PageID 634.) McKnight did not bring the issue to the trial court's attention at the suppression hearing or during the subsequent oral arguments in which McKnight sought a *Franks* hearing, (Trial Tr., ECF No. 105-1, PageID 3154-220; 3249-55), nor was it argued before the state supreme court where he took his challenge to the search warrant on direct appeal (Appellate Brief, ECF No. 106-14, PageID 9489-96). The discrepancy was not argued in his habeas petition in these proceedings either. (ECF No. 127, PageID 15668-75). A district court may decline to review a claim a petitioner raises for the first time in his Traverse or reply. *Jalowiec v. Bradshaw*, 657 F.3d 293 (6th Cir. 2011), *citing Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005). In addition, McKnight procedurally defaulted this portion of his claim by failing to present it to the state trial and appellate courts.

**Merits**

Even if McKnight's claim were cognizable in habeas corpus and fully preserved, however, it would fail. The state supreme court found that Boyer checked the vehicle identification number and license plate number of the Subaru found behind McKnight's trailer and verified that it was

28

registered to Emily Murray's mother, which does not contradict Boyer's statement in his affidavit that he saw the Subaru and verified its ownership. *McKnight*, 2005-Ohio-6046, ¶ 36. The court also found that in his affidavit, Boyer did not state that he had personally contacted Knox County officials, as McKnight claims, and that in any event, police officers are permitted to rely on information relayed to them from other officers. *Id*. at ¶ 37. The court further rejected McKnight's contention that probable cause to search McKnight's trailer and property was absent when the police officers found the car Emily was known to have been using hidden behind McKnight's trailer more than a month after she had last been seen alive. The court explained that "[p]robable cause to search does not require proof that a crime was actually committed, merely the fair probability that evidence of a crime will be found at the location described." *Id*. at ¶ 41, *citing State v. George*, 45 Ohio St. 3d 325 (1989) (paragraph one of the syllabus), *citing Illinois v. Gates*, 462 U.S. 213, 238-239 (1983). Based on the facts that Emily had been missing for some time, that her car had not been seen since she went missing, and that the car was found in a remote area of Vinton County far from where Emily lived and worked, the state court concluded that there was a fair probability that evidence of a kidnapping or abduction would be found in or around McKnight's trailer. *McKnight*, 2005-Ohio-6046, ¶ 41.

In his petition, McKnight argues that Boyer did not personally perform the acts he claimed to have performed in his affidavit, that Boyer admitted he was the one who determined which crimes to include in the "provisions of law" section of the warrant request, and that Boyer knowingly and intentionally and with reckless disregard for the truth misled the issuing judge to obtain a search warrant for McKnight's property. (Petition, ECF No. 127, PageID 15674.) But

29

he does not explain how the state court's rejection of those same arguments is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor does he explain how the factual determinations of the state court were unreasonable in light of the evidence before the court at the time. Instead, he simply states that the court's decision does both. That simply does not meet the burden imposed on him by the AEDPA.

**Conclusion**

McKnight's first ground for relief claiming a violation of his Fourth Amendment rights is not cognizable in habeas corpus. Furthermore, his claim that he was convicted with evidence that was illegally seized in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights was procedurally defaulted by his failure to present that claim to the state court. Were this Court able to reach the merits of his first ground for relief, it would find it to be unavailing. Accordingly, McKnight's first ground for relief should be denied.

**Second Ground for Relief**

In his second ground for relief, McKnight alleges he was deprived of a fair trial in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights because his request for a change of venue due to extensive pretrial media coverage of the discovery of two bodies on his property was denied. (Petition, ECF No. 127, PageID 15675-84.) He also argues that he was deprived of an

30

opportunity to demonstrate the pervasive prejudice in the community that was in part a result of the pretrial media coverage of the murders. *Id.* Respondent contends McKnight's claim is partially procedurally defaulted and wholly meritless. (ROW, ECF No. 13, PageID 346-57.) McKnight counters that he presented a "substantially equivalent" claim to the state court, and that the state court relied on the same United States Supreme Court cases as he did in his presentation of the claim to that court [3] (Traverse, ECF No. 17, PageID 637-51), presumably to establish fair presentation of his entire claim to the state court and that court's decision on the merits.

**Pretrial Publicity**

McKnight did indeed present a claim on direct appeal challenging the trial court's failure to grant him a change of venue and funds for expert assistance in conducting a scientific jury survey (ECF No. 106-14, PageID 9506-11; ECF No. 106-15, PageID 9512-15), but he alleged violations only of his Sixth and Fourteenth Amendment rights (ECF No. 106-14, PageID 9506; ECF No. 106-15, Page ID 9515). Thus, McKnight did not claim a Fifth Amendment violation when he presented his claim to the state supreme court. His omission makes no difference, however, because an analysis of a due process claim under that Amendment would have the same result as one under the Fourteenth Amendment. *See Malloy v. Hogan*, 378 U.S. 1, 26 (1964) (stating "'[d]ue process of law is secured against invasion by the federal Government by the Fifth

---

[3] With the exception of *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554-555 (1976), the Supreme Court of Ohio cited no federal law in its discussion of McKnight's eighth proposition of law on direct appeal. *McKnight*, 2005-Ohio- 6046 ¶¶ 58-67.

Amendment and is safeguarded against state action in identical words by the Fourteenth,'" *quoting*

*Betts v. Brady*, 316 U.S. 455, 462 (1942), *overruled on other grounds by Gideon v. Wainwright*,

372 U.S. 335 (1963); *Malinski v. New York*, 324 U.S. 401, 415 (1945) (Frankfurter, J., concurring)

(observing that "[t]o suppose that 'due process of law' meant one thing in the Fifth Amendment

and another in the Fourteenth is too frivolous to require elaborate rejection."); *United States v.*

*Johnson*, 703 F.3d 464, 469 n.4 (8th Cir. 2013) (quoting *Malinski*, 324 U.S. at 415); *United States*

*v. Neto*, 659 F.3d 194, 201 n.7 (1st Cir. 2011) (same).

During the pretrial proceedings of McKnight's case, trial counsel filed a motion for a

change of venue on July 2, 2002.[4]  (ECF No. 106-1, PageID 7662.)  On direct appeal, the

Supreme Court of Ohio found the claim, in which McKnight did not mention the racial bias of the

community, or the racial makeup of his jury, meritless:

> {¶ 59}  **1.  Change of venue.**  Extensive pretrial publicity
> surrounded appellant's case on television and in the newspapers.
> National media focused on the case after the judge dismissed the
> capital specifications because of financial considerations and later
> reinstated them.
>
> {¶ 60}  A motion for change of venue is governed by Crim.R.
> 18(B), which provides that "the court may transfer an action * * *
> when it appears that a fair and impartial trial cannot be held in the
> court in which the action is pending."  Crim.R. 18(B) does not
> require a change of venue merely because of extensive pretrial
> publicity.   The decision whether to change venue rests in the sound

---

[4] Despite the Court's having no duty to search the record for support for or against party's arguments, significant time
has been spent doing just that, especially with respect to the motion for a change of venue.   The law clerk assisting on
this case, having found no documents in the appendix that were filed at any time in July 2002, skimmed through all the
pretrial motions, to no avail.   In fact, the appendix contains no documents filed in McKnight's case from May 31,
2002, to August 15, 2002.   See ECF No. 106-5, PageID 8462; ECF 106-6, PageID 8463.)   The Court also notes that
McKnight has not provided a citation to the ECF number and PageID number at which the motion for a change of
venue might be found, as is required by S. D. Ohio Civ. R. 7.2(B)(5).

discretion of the trial court. *State v. Landrum* (1990), 53 Ohio St.3d 107, 116.

{¶ 61} We have stated that "'a careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.'" *Id*. at 117, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98. A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464. "Only in rare cases may prejudice be presumed." *Id*.; see, also, *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479; *Press Assn. v. Stuart* (1976), 427 U.S. 539, 554-555.

{¶ 62} Our review of the voir dire examination does not support appellant's claim of prejudicial pretrial publicity. During voir dire, each seated juror was individually questioned about pretrial publicity. Although all of the jurors had some knowledge about the case, seven of the jurors had formed no opinion about it. Four other jurors were not asked whether they had formed an opinion about the case, but they agreed to disregard anything that they had heard outside the court. The remaining juror stated that he had "[n]ot really formed an opinion, but it leans toward that." Further questioning showed that this juror knew few details about the case. Finally, all 12 of the jurors agreed to set aside anything they had heard and decide the case solely upon the evidence presented in court.

. . .

{¶ 64} Appellant has not shown that any juror was biased. Under these circumstances, we find that the trial court did not abuse its discretion by refusing to change venue.

{¶ 65} **2. Scientific jury survey.** The state must provide an indigent criminal defendant with funds to obtain expert assistance "only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." *State v. Mason* (1998), 82 Ohio St.3d 144, syllabus.

33

{¶ 66}  In his motion for an expert to conduct a scientific jury survey, appellant asserted that a "scientific survey [was] necessary to prove the obvious that because of the publicity a fair trial cannot be had within Vinton County."  Such a generalized assertion does not qualify as the "particularized showing required by *Mason*, 82 Ohio St.3d 144, syllabus.  Furthermore, comprehensive voir dire examination of the seated jurors about pretrial publicity negated any need for a scientific jury survey of public opinion within Vinton County.  Thus, we find that appellant has failed to demonstrate that denial of the requested expert denied him a fair trial.  See *Mason*, 82 Ohio St.3d at 152 (services of a mass-media expert unnecessary); *Landrum*, 53 Ohio St.3d at 117 (psychologist for jury selection unnecessary; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 193 (sociologist to assist voir dire unnecessary).

{¶ 67}  Based on the foregoing, we find that proposition VIII has no merit.

*McKnight*, 2005-Ohio-6046.

McKnight fails to demonstrate that the state supreme court's rejection of his eighth proposition of law on direct appeal was in any way contrary to or an unreasonable application of federal law as determined by the Supreme Court or based on an unreasonable determination of the facts that were before the trial court.   See 28 U.S.C. § 2254(d).   Instead, he repeats or restates the arguments he presented to the state supreme court as if his case in this Court were merely a redo of his direct appeal.   Such is not the case.

In his presentation of his claim to the post-conviction court, McKnight alleged his claim in two pages and in very general terms, relying on general statements of law as to accepted reasons for a change of venue and the protections such a change is intended to provide for a fair trial.   He appended a substantial number of newspaper articles about the murders, his life, the lives of his victims, the trial judge's initial dismissal of the aggravating circumstances making McKnight

34

eligible for the death penalty, and his subsequent reinstatement of the same. (ECF No. 107-8, PageID 10502-03; ECF No. 107-9, PageID 10504-14; ECF No. 107-10, PageID 10515-26; ECF No. 107-11, PageID 10527-36; ECF No. 107-12, PageID 10537-46; ECF No. 107-13, PageID 10547-56; ECF No. 107-14, PageID 10557-67; ECF No. 107-15, PageID 10568-10579; ECF No. 107-16, PageID 10580-85.) The newspaper articles, however, cannot stand in for actual and specific argument in any court. The fact that the murders were covered by local, state, and in the case of the trial court's dismissal and reinstatement of the capital specifications, national news media does not mean that McKnight's trial was *ipso facto* unfair.

The Supreme Court has stated:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Spies v. People of State of Illinois*, 123 U.S. 131; *Holt v. United States*, 218 U.S. 245.

*Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961). The Supreme Court has also stated that widespread and inflammatory publicity that has highly biased the community can make a change of venue constitutionally required. *Irvin*, 366 U.S. at 720. As the state court pointed out, McKnight's jurors were questioned about any pretrial publicity they had been exposed to during voir dire, and all twelve of the jurors had "agreed to set aside anything that they had heard and decide the case

35

solely upon the evidence presented in court." *McKnight*, 2005-Ohio-6046 at ¶ 62. McKnight

has not demonstrated that any of his jurors failed to do just that. Furthermore, the media coverage

in McKnight's case bears little resemblance to the "carnival atmosphere" present in *Sheppard v.*

*Maxwell*, 384 U.S. 333, 358 (1966), which is described at length in the Court's opinion, *id.* at

338-349. The Supreme Court has recognized that "most cases of consequence garner at least

some pretrial publicity," and that "[a] presumption of prejudice . . . attends only the extreme case."

*Skilling v. United States*, 561 U.S. 358, 379, 381 (2010). There have been such extreme cases

occasionally. See *Sheppard*, supra; *Estes v. Texas*, 381 U.S. 532, 538 (1965)(reversing

conviction where "extensive publicity before trial swelled into excessive exposure during

preliminary court proceedings as reporters and television crews overran the courtroom and

'bombard[ed] . . . the community with the sights and sounds of' the pretrial hearing. The media's

overzealous reporting efforts . . . 'led to considerable disruption' and denied the 'judicial serenity

and calm to which [Estes] was entitled.' *Id.,* at 536; *Rideau v. Louisiana*, 373 U.S. 723

(1963)(reversing conviction based on repeated pretrial television broadcast of defendant's

confession). The pretrial publicity in McKnight's case bears little resemblance to the extreme

publicity of those cases.


**Racial Composition of Vinton County Population**


In his post-conviction proceedings, McKnight raised a claim of ineffective assistance of

trial counsel based on their failure to include in the motion for a change of venue arguments

alleging racial bias in the county, the jury venire, and the jury. (ECF No. 108-5, PageID 10952-54.) He supported the claim with documents from the 2000 United States Census and depositions from his trial counsel evidencing their knowledge that Vinton County was almost exclusively Caucasian. *Id.* In denying that proposition of law, the Ohio Court of Appeals for the Fourth District reasoned as follows:

> {¶ 89} In his fourteenth claim for relief, McKnight contends that the trial counsel rendered ineffective assistance by failing to argue for a change of venue based upon race. He asserts that he could not receive a fair trial in an overwhelmingly white community.
>
> {¶ 90} We again find that *res judicata* bars McKnight's fourteenth claim for relief. McKnight does not offer any evidence that was unavailable for him to use on direct appeal. He cites statistical evidence and testimony from the voir dire transcript to support this claim. Both items were available for him to use on direct appeal.
>
> {¶ 91} Additionally, McKnight's claim lacks substantive merit. In *State v. Elmore*, Licking App. No. 2005-CA-32, 2005-Ohio-5940, the court considered and rejected a similar argument. In that case, the defendant, like McKnight, argued that trial counsel rendered ineffective assistance of counsel by failing to request a change of venue due to the lack of African-Americans in the available jury pool. In rejecting this argument, the court explained:
>
> > "As previously noted[,] appellant failed to present evidence outside of the record to * * * indicate deliberate exclusion of 'distinctive groups' of the jury venire or jury panel involved. The statistical data and juror questionnaires do nothing to demonstrate intentional, systematic exclusion of minorities in the jury-selection process.
> >
> > Moreover, each impaneled juror confirmed that he or she had not formed an opinion about the guilt or innocence of the accused, or could put aside any opinion, and that he or she could render a fair and impartial verdict based on the law

37

and evidence.  *State v. Treeesh* (2001), 90 Ohio St.3d 460, 464.”

*Id.* at ¶¶ 69-70; see, also, *State v. Braswell*, Miami App. No. 2001 CA22, 2002-Ohio044368, at ¶ 8 (rejecting argument that trial court should have changed venue based upon racial composition when defendant failed to present evidence that the venire did not represent a fair cross section of the community or that any of the jurors who did serve was unable to render an impartial verdict); *State v. Jones* (2001), 91 Ohio St.3d 335, 341, (concluding that trial court did not err by denying defendant’s motion to change venue based upon racial composition of county when defendant failed to show that jury venire failed to represent fair cross-section of the community).

{¶ 92}  Similarly, here, McKnight failed to show that the jury venire failed to contain a representative cross-section of the community or that any of the seated jurors were unable to render an impartial verdict.

{¶ 93}  Accordingly, we find that the trial court did not abuse its discretion by dismissing [McKnight’s] fourteenth claim for relief.

*McKnight*, 2008-Ohio-24335.

Taking the state court’s *res judicata* basis for denying McKnight’s claim first, it is apparent that the doctrine was misapplied.  The state court suggested that all of the demographic information was available to McKnight on direct appeal, but since trial counsel had submitted none of it during trial, the appellate court could not consider it on direct appeal.  Ohio Appellate Rule 16(A)(3) states, “A statement of the assignments of error presented for review, *with reference to the place in the record where each error is reflected*.”  (Emphasis added.)  Appellate counsel could hardly have referenced the place in the record where the demographic evidence was reflected since trial counsel never broached the subject of a change of venue based on the racial makeup of Vinton County.  Whether that omission constitutes ineffective assistance of trial

counsel is discussed *infra*, but for now it is clear that the state appellate court misapplied its doctrine of *res judicata* in response to McKnight's fourteenth proposition of law in his post-conviction proceedings.

The state court also found the claim meritless, however. McKnight has also alleged in his twenty-sixth ground for relief, *infra*, that his trial counsel were ineffective for failing to move for a change of venue on the basis of the racial composition of Vinton County. There, this Court concludes that the claim underlying that ground for relief is without merit and that his trial counsel were not ineffective for failing to request a change of venue based on the racial makeup of the county. For the same reasons stated therein, the trial court violated no federal constitutional right McKnight had to a fair trial or due process.

Accordingly, McKnight's second ground for relief should be denied.

**Third Ground for Relief**

McKnight's third ground for relief is essentially a continuation of that part of his second ground in which he asserts that the trial court should have *sua sponte* ordered a change of venue based on the racial makeup of Vinton County and the racial animus expressed by some prospective jurors and on the internet about his case. (ECF No. 127, PageID 15684-88.) But voir dire was conducted individually, so none of McKnight's actual jurors heard the potentially prejudicial statements by any prospective jurors. In addition, although McKnight was tried before an all-white jury, the racial makeup of the venire and the jury accurately reflected that of the

39

community in Vinton County where McKnight committed the murders. Finally, there is no evidence whatsoever that any juror saw the despicable racist posts McKnight refers to in his argument. For the reasons stated in this Court's discussion of McKnight's second ground for relief, and here, his third ground for relief should be denied.

**Fourth Ground for Relief**

McKnight repeats much of his second and third grounds for relief arguments in his fourth, claiming the trial court deprived him of a fair trial and due process when it failed to provide him with an expert to conduct a scientific jury survey that would have provided him with the evidence needed for his motion for a change of venue to succeed. (ECF No. 127, PageID 15688-98.) He again states that the pretrial publicity was significant, *id*. at PageID 15688-91, and that the racial makeup of Vinton County was almost exclusively white, *id*. at PageID 15691.

McKnight's trial counsel filed his motion for a scientific jury survey on August 26, 2002. (ECF No. 106-8, PageID 8521-23.) It comprised three pages; one page for the motion itself, one for the memorandum in support, and one for the certification of service. His counsel attached no supporting evidence such as newspaper reports, etc. His attorneys' entire argument, if it can be called that, was as follows:

> A "Fire Storm," [sic] of publicity has centered on this case since August 8, 2002, at the time of filing of the court's decision to dismiss the capital components of this case.
>
> National attention has been focused on this case in the news media. The New York Times, Los Angles [sic] Times, Cleveland Plain

40

> Dealer, Time Magazine, Channel 10 News from Columbus, Channel 4 news from Columbus, the NBC Today show, CNN, along with the Columbus Dispatch, Athens Messenger, and the Vinton County Courier. [Sic.]This intense media interest has so tainted the potential jury pool that Mr. McKnight cannot be afforded a fair trial within Vinton County.
>
> A scientific survey is necessary to prove the obvious that because of the publicity a fair trial cannot be had within Vinton County. In order to effectively defend Gregory McKnight it is necessary that $4,250.00 be provided in order to conduct a scientific survey of public opinion within Vinton County.

(ECF No. 106-8, PageID 8522.) The instant ground for relief does not contend that McKnight's trial counsel were ineffective in presenting their naked motion for a change of venue, only that the trial court unconstitutionally denied McKnight a fair trial and deprived him of due process by denying the motion. Given the skeletal motion, which was filed with no supporting evidence, barely any reasoning, and no specifics as to why *voir dire* would not serve just as well to root out any undue influence news reports might have had on prospective jurors, it is unlikely in the extreme that any judge would have granted McKnight's motion for a scientific jury survey. Accordingly, and in conjunction with this Court's reasons for recommending denial of McKnight's second and third grounds for relief, his fourth ground for relief should also be denied.

**Fifth Ground for Relief**

In his fifth ground for relief, McKnight contends that the "media blitz" following the trial judge's dismissal and reinstatement of the capital specifications in his case violated his rights to a fair trial, an impartial jury, and due process. (ECF No. 127, PageID 15699-703.) This issue was

41

included in McKnight's second ground for relief, *supra*, and has already been addressed in the Court's discussion there.   In addition, McKnight concedes in his Traverse that the "trial court may have acted within its discretion in dismissing and then reinstating the capital specifications," (ECF No. 17 PageID 671).   Finally, McKnight has not demonstrated that any of the jurors in his case were biased against him due to their exposure to media coverage of the two murders, the dismissal and reinstatement of the capital specifications, or his race.   Lacking that, he is not entitled to habeas corpus relief.   Accordingly, his fifth ground for relief should be denied.


**Sixth Ground for Relief**


In his sixth ground for relief, McKnight contends the murder charge pertaining to Gregory Julious should have been severed from the aggravated murder and other charges concerning Emily Murray.   (Petition, ECF No. 127, PageID 15703-6.)   Respondent argues the claim was procedurally defaulted in the state court by McKnight's failure to raise his federal claim there, focusing instead on state-law issues relating to joinder in his direct appeal.   (ROW, ECF No. 13, PageID 376.)   McKnight states that the claim raised here is "substantially equivalent" to the claim put forth in his appellate brief to the Supreme Court of Ohio on direct appeal, and that he has thereby satisfied the "fair presentment" requirement for habeas corpus review.   (Traverse, ECF No. PageID 676-77.)

To preserve a federal constitutional claim for habeas corpus, the claim must be "fairly presented" to the state court in a way that provides the state court with an opportunity to remedy

the asserted constitutional violation, including presenting both the legal and factual basis of the claim. *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006); *Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir.), *cert. denied,* 509 U.S. 907 (1993), *overruled in part on other grounds by Thompson v. Keohane,* 516 U.S. 99 (1995); *Riggins v. McMackin,* 935 F.2d 790, 792 (6th Cir. 1991). The claim must be fairly presented at every stage of the state appellate process. *Wagner v. Smith,* 581 F.3d 410, 418 (6th Cir. 2009).

Merely using talismanic constitutional phrases like "fair trial" or "due process of law" does not constitute raising a federal constitutional issue. *Slaughter v. Parker,* 450 F.3d 224, 236 (6th Cir. 2006); *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000), *citing Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2nd Cir. 1984); *Franklin v. Rose,* 811 F.2d 322, 326 (6th Cir. 1987). "A lawyer need not develop a constitutional argument at length, but he must make one; the words 'due process' are not an argument." *Riggins v. McGinnis*, 50 F.3d 492, 494 (7th Cir. 1995). Furthermore, a state prisoner ordinarily does not "fairly present" a federal claim to a state court if that court must read beyond a petition, a brief, or similar papers to find material that will alert it to the presence of such a claim. *Baldwin v. Reese*, 541 U.S. 27 (2004).

There are occasions, however, when a state court defendant will have made claims in the state courts which, while not explicitly invoking the United States Constitution, in fact fairly place before the state courts the substance, both facts and legal theory, of a claim or claims later made in habeas corpus. In *Franklin v. Rose*, 811 F.2d 322 (6th Cir. 1987), the Sixth Circuit cited with approval the Second Circuit's analysis in *Daye v. Attorney General,* 696 F.2d 186 (2nd Cir. 1982),

43

*after remand*, 712 F.2d 1566 (2nd Cir. 1983). The four ways in which a state defendant may fairly present to the state courts the constitutional nature of his or her claim are:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing [federal] constitutional analysis in like factual situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts well within the mainstream of constitutional litigation.

811 F.2d at 326, *quoting* 696 F.2d at 193-94; *accord*, *Whiting v. Birt*, 395 F.3d 602 (6th Cir. 2005); *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000).

McKnight's claim here is "substantially equivalent" to that presented to the state court as his sixth proposition of law on direct appeal. (*See* ECF No. 106-14, PageID 9497-9500.) It is so "substantially equivalent," in fact, that it appears to have been simply cut and pasted from McKnight's direct appeal brief. If the question here were the same question that was put before the Supreme Court of Ohio -- in other words, if "federal habeas corpus" were synonymous with "appeal" -- such a tactic might have some chance of success. As this Court explained in *Ahmed v. Houk*, No. 2:07-cv-658, 2014 WL 2709765 at *24 (S.D. Ohio, June 16, 2014), however:

> Ahmed's task under the AEDPA is to demonstrate that the Supreme Court of Ohio's decision . . . was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, or based on an unreasonable determination of the facts in light of the evidence before the court. 28 U.S.C. § 2254(d)(1) and (2). Instead of attempting that in any serious manner, however, Ahmed has simply repeated nearly verbatim the arguments he presented in the state court. That practice, disturbingly common in capital habeas corpus cases that come before this Court, reveals a fundamental misunderstanding of the statutory limitations on federal habeas corpus. The issue before the habeas court is not the same as the issue presented to the state court. The question before the state court [in Ahmed's case] was whether

44

there was a conflict of interest or a total breakdown of communication between Ahmed and his trial counsel requiring reversal of his convictions. Here, the question is whether the state court's decision that there was not a conflict is either contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, or whether the state court's decision was based upon an unreasonable determination of the facts, given the evidence before that court at the time of Ahmed's trial, starkly different inquiries than the one before the state court in the first instance. Basically cutting and pasting the claim as it was presented to the state court into a habeas petition is consequently ill advised as it does not address the question this Court must consider in habeas review. *Harrington v. Richter*, [562] U.S. [86, 101], 131 S.Ct. 770, 785 (2011). That is true even in cases where the argument in the state court fairly presents the federal constitutional claim. *See Lamar v. Ishee*, No. 1:04-cv-542, 2010 WL 5574467 at *23 (S.D. Ohio, July 30, 2010) (Report and Recommendations, adopted in its entirety in *Lamar v. Ishee*, No. 1:04-cv-541, 2011 WL 110561 (S.D. Ohio, Jan. 13, 2011)).

In the state court, McKnight did not rely on "pertinent federal cases employing constitutional analysis," nor did he rely on "state cases *employing* [*federal*] *constitutional analysis in like factual situations*." *Franklin v. Rose*, 811 F.2d at 326 (emphasis in original). In his sixth proposition of law presented to the Supreme Court of Ohio on direct appeal, McKnight identified the law applicable to his claim as Ohio R. Crim. P. 8(A), Ohio R. Evid. 404(B), and the state court's discussion of joinder in *State v. Franklin*, 62 Ohio St. 3d 118, 122 (1991). (ECF No. 106-14, PageID 9498.) In that case, the state court noted that joinder was challenged as improper under those same state rules as well as Ohio R. Evid. 403. *State v. Franklin*, *supra*.

Here, McKnight cites the same authority as he did in his proposition of law in the state supreme court. (Petition, ECF No. 127, PageID 15703-6.) The only discernible differences are found in his heading, which reads "Gregory McKnight was denied due process, a fair trial, and a

45

fair and reliable sentencing determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments when the trial court tried the two unrelated murders jointly," and his closing paragraph, "The Ohio court's decision . . . [5] was contrary to, or an unreasonable application of, clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts." *Id.* at 15706. McKnight cited only the Fourteenth Amendment in the heading of his proposition of law in the state court, just as Respondent contends. (ECF No. 13, PageID 376.)

In his Traverse, McKnight states without citation that the state supreme court relied on federal constitutional principles in denying his joinder claim on direct appeal. The court's discussion of McKnight's claim, however, is limited to whether the trial court's refusal to sever the Julious count from the Murray counts violated the state's evidentiary and criminal rules, and only state court cases were cited beyond that. *McKnight*, 2005-Ohio-6046, ¶¶ 167-72. *See also*, *State v. Lott*, 51 Ohio St. 3d 160, 163 (1990) (quoting Ohio R. Crim. P. 8(A) and *Bradley v. United States*, 433 F.2d 1113, 1116-17 (1969), which relies upon the corresponding federal criminal rule).[6] Thus, McKnight's statement that the state supreme court relied on federal constitutional principles is incorrect.

McKnight expanded his claim in habeas corpus beyond what he alleged when he raised it

---

[5] McKnight makes reference to his "claims relative to this erroneous trial court instruction" in his closing paragraph, which the Court presumes is a mistake, as the current claim concerns joinder, not an improper jury instruction.

[6] It is not the job of this Court to link from case to case to case through history in a search for some shred of support for McKnight's statement that the state court applied federal constitutional law to his joinder claim, and the Court will not do so in this instance. Out of curiosity, however, the Court did so with regard to the first case cited by the Supreme Court of Ohio in its discussion of McKnight's joinder claim and found no basis for McKnight's statement that the state court had relied upon federal constitutional principles.

in the state supreme court.   Specifically, he alleges here that the trial court's failure to sever the Julious count from the Murphy counts violated his rights under several federal constitutional amendments, but in the state court he only alluded to the Fourteenth Amendment, and then only in the heading of his proposition of law, which itself fails to fulfill the requirement that he "fairly present" his constitutional claim to the state court.   Consequently, McKnight's sixth ground for relief is procedurally defaulted.

Even if that were not so, McKnight's claim would fail.   As the Ninth Circuit Court of Appeals has observed,

> The Supreme Court has not held that a state or federal trial court's denial of a motion to sever can, in itself, violate the Constitution. *See Zafiro v. United States*, 506 U.S. 534, 539 (1993) (discussing joinder and severance in the context of Rules 8 and 14 of the Federal Rules of Criminal Procedure); *United States v. Lane*, 474 U.S. 438, 446 & n.8 (1986) (discussing misjoinder under Rule 8 of the Federal Rules of Criminal Procedure); *see also Collins v. Runnels*, 603 F.3d 1127, 1132 (9th Cir. 2010) (holding that neither *Zafiro* nor *Lane* established a constitutional standard binding on the states); *Runningeagle v. Ryan*, 686 F.3d 758, 776-77 (9th Cir. 2012) (reiterating the holding in *Collins* and holding that "[n]either decision is 'clearly established Federal law' sufficient to support a habeas challenge under § 2254").

*Grajeda v. Scribner*, 541 F. App'x 776, 778 (9th Cir. 2013).   Furthermore, in *Mayfield v. Morrow*, 528 Fed. App'x 538, 541-42 (6th Cir. 2013), the Sixth Circuit rejected a petitioner's joinder claim in habeas corpus, explaining that

> Mayfield does not allege that the Tennessee Criminal Court of Appeals' decision [on his joinder claim] was contrary to or an unreasonable application of, any Supreme Court case.   The one Supreme Court case he does cite – *United States v. Lane*, 474 U.S. 438 (1986) – addresses the failure to sever criminal charges in dicta only.   *Id.* at 446 n.8.   And "clearly established Federal law" for

47

> purposes of § 2254(d)(1) refers to "the holdings, as opposed to the
> dicta, of [the Supreme] Court's decisions." *Williams v. Taylor*, 529
> U.S. 362, 412 (2000). Thus, as to Mayfield's severance claim,
> *Lane* does not clearly establish anything. *See Carey v. Musladin*,
> 549 U.S. 70, 74 (2006). We therefore reject this claim . . . . *See*
> *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005).

Thus, there is no clearly established federal law as determined by the United States Supreme Court

that the state court's decision denying McKnight's claim of improper joinder could be in conflict

with or contradict. As such, his claim is without merit and would be denied on that basis even if it

were properly preserved.

Because McKnight's sixth ground for relief is procedurally defaulted, it should be denied.


**Seventh Ground for Relief**


In his seventh ground for relief, McKnight alleges that the "course of conduct"

specification was unsupported by sufficient evidence and against the manifest weight of the

evidence, is unconstitutionally vague, and fails to narrow the class of persons eligible for the death

penalty. (Petition, ECF No. 127, PageID 15707-10.) Respondent argues that manifest-weight-

of-the-evidence claims are not cognizable in habeas corpus, that McKnight's claim is procedurally

defaulted, and that the claim is meritless. (ROW, ECF No. 13, PageID 381-88.) McKnight

counters that the claim raised here is substantially equivalent to a claim presented to the state court

and is therefore preserved for habeas review, and, taking much of his argument directly from his

appellate brief submitted to the Supreme Court of Ohio, that the claim does indeed have merit.

(Traverse, ECF No. 17, PageID 681-87.)

On direct appeal to the Supreme Court of Ohio, McKnight raised the following issues regarding the "course of conduct" specification in his second proposition of law:

1. Insufficient evidence;

2. Against the manifest weight of the evidence;

3. Void for vagueness;

4. It does not sufficiently narrow the category of persons eligible for the death penalty;

5. Weighed as a "selection factor" in the penalty phase, impermissibly tipping the scales toward the death sentence, and;

6. The circumstances of the two murders do not fall into any of the three narrowing constructions of the specification set forth by the Supreme Court of Ohio.

(ECF No. 106-14, PageID 9470-76.) In the heading of his second proposition of law on appeal, McKnight claimed violations of the Eighth and Fourteenth Amendments, citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), for the general proposition that a conviction resting on insufficient evidence violates the defendant's right to due process. (ECF No. 106-14, PageID 9470.) He further cited *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990), *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980), *Gregg v. Georgia*, 428 U.S. 153 (1976), and *McCleskey v. Kemp*, 481 U.S. 279, 305 (1987), to support his argument that the "course of conduct" specification fails to protect against the arbitrary and capricious imposition of the death penalty. (ECF No. 106-14, PageID 9470-72). McKnight argued that inclusion of the "course of conduct" specification in the penalty phase's weighing process "placed an impermissible thumb on 'death's side of the scale,'" citing *Stringer v. Black*, 503 U.S. 222, 232

49

(1992), and a state court case that relied on *Barclay v. Florida*, 463 U.S. 939 (1983). (ECF No. 106-14, PageID 9471.) He described the Supreme Court of Ohio's findings regarding the three narrowing constructions of the "course of conduct" specification, citing several state supreme court cases, and contended that the circumstances of Gregory Julious' and Emily Murray's murders fit into none of them. *Id*. at PageID 9472-74.

It is true, as Respondent alleges, that McKnight did not raise his claim in the state court under either the Fifth or Sixth Amendments to the United States Constitution. Thus, any part of his claim relating to those amendments presented here is procedurally defaulted, and he has not offered any cause for the default nor has he demonstrated prejudice therefrom, so the default is unexcused.[7] In addition, "claim[s] pertaining to the weight of the evidence [are] not a federal constitutional claim." *Johnson v. Havener*, 534 F.2d 1232, 1234 (1976); *see also Hill v. Sheldon*, No. 1:11-cv-2603, 2014 WL 700024 at *15 (N.D. Ohio, Feb. 21, 2014) (stating the proposition that weight-of-the-evidence claims are not cognizable in federal habeas corpus is "well-settled," citing *Johnson*, *supra*); *Turner v. Warden*, No. 3:10-cv-117, 2011 WL 1004553 at *1 (S.D. Ohio, Mar. 17, 2011) (concluding manifest weight of the evidence claims present a matter of state law); and *Morris v. Hudson*, No. 5:06-cv-2446, 2007 WL 4276665 at *3 (N.D. Ohio, Nov. 30, 2007) (adopting the conclusion of the magistrate judge that manifest weight challenges are not cognizable in a habeas petition). McKnight's manifest weight argument is not one amenable to review in these proceedings.

---

[7] McKnight does not link the individual amendments to any of his specific arguments, but his arguments have not changed in any noticeable way from what he presented to the state court, so this Court will proceed under the assumption that all his arguments relate to his contention that his Eighth and Fourteenth Amendment rights were violated.

50

As for the remainder of McKnight's claim, the state court observed that it had repeatedly found the "course of conduct" specification constitutional under both the federal and state constitutions, and explained at some length the facts in McKnight's case that satisfied the narrowing requirement imposed by the federal constitution and state law. *McKnight*, 2005-Ohio-6046 at ¶ 159-65. Specifically, the Supreme Court of Ohio articulated the relevant test respecting the course-of-conduct specification, and determined that

> In order to find that two offenses constitute a single course of conduct under R.C. 2929.04(A)(5), the trier of fact 'must * * * discern some connection, common scheme, or some pattern or psychological thread that ties [the offenses] together." *State v. Cummings* (1992), 322 N.C. 487, 510, 422 S.E.2d 692 . . . . See, also, *State v. Price* (1990), 326 N.C. 56, 81, 388 S.E.2d 84. Thus, for instance, the factual link might be one of time, location, murder weapon, or cause of death. It might involve the killing of victims who are close in age or who are related. It might involve a similar motivation on the killer's part for his crimes, a common getaway car, or perhaps a similar pattern of secondary crimes (such as rape) involving each victim. Whatever the link or links between the multiple murders might be, the statutory words "course of conduct" compel the government to present evidence of those connections.
>
> . . .
>
> [W]hen two or more offenses are alleged to constitute a course of conduct under R.C. 2929.04(A)(5), the amount of time between the offenses is a relevant factor. . . .
>
> Nevertheless, we have said that murders taking place at different times "may satisfy the R.C. 2929.04(A)(5) specification so long as the offender's actions were part of a continuing course of criminal conduct." *State v. LaMar*, 95 Ohio St. 3d 181, 2002-Ohio-2128, 767 NE.2d 166, ¶ 71. Thus, the length of time between offenses does not necessarily determine whether the offenses form a course of conduct.

*State v. Sapp*, 105 Ohio St. 3d 104, 112, 2004-Ohio-7008 at ¶¶ 52-55 (Ohio 2004).[8]

The Supreme Court of Ohio cited *Sapp* and then applied it to the facts of McKnight's case as follows:

> Significant similarities exist between the two murders. Murray and Julious were both acquaintances of appellant. Appellant was driving alone with both victims before their disappearances. Appellant also shot both victims in the head and disposed of their bodies on his property.
>
> Moreover, the passage of five and one-half months between the two murders does not invalidate appellant's course-of-conduct specification conviction. Indeed, "murders taking place at different times 'may satisfy the R.C. 2929.04(A)(5) specification so long as the offender's actions were part of a continuing course of criminal conduct.'" *State v. Sapp*, [*supra* at] ¶55, quoting *State v. Lamar*, 95 Ohio St. 3d 181, 2002-Ohio-2128, ¶71.
>
> In *Sapp*, [supra], ¶ 57, ¶ 61, this court found that murders committed more than a year apart were part of the same course of conduct because of common motive and similarity in the offenses. See,

---

[8] McKnight cites *Sapp* for the proposition that

> There are three instances when it is appropriate to narrow construction of the "course of conduct" specification to distinguish capital murders from other murders: (1) When the multiple murder is part of one criminal transaction or directly associated with one criminal transaction; (2) When the multiple murder involves victims of a particular group, or victims who share a common association with each other and the defendant; and (3) When the multiple murders are all done in furtherance of a common criminal purpose, motive[,] or objective.

(Petition, ECF No. 127, PageID 15708.) The Court is unable to find any such language in *Sapp*, however, and an online search in all Ohio and federal cases revealed that that language, in an expanded form, appears in only one place: McKnight's appellate brief to the Supreme Court of Ohio, which predates *Sapp* by more than one year. Appellant's Merit Brief, 2003 WL 25665050 at * 22-24 (Nov. 3, 2003).

> Don't assume that the court won't bother to read the cases. It will. If a court believes you led it astray, whether intentionally or not, all your assertions will be suspect. Once the court thinks that you failed to read even just one case carefully, it will doubt the accuracy of your recitation of all the cited cases.

Hon. James G. Carr, *A Judge's Guide to Protecting your Reputation*, 36 LITIGATION 26, 28 (Spring 2010).

also, *State v. Fautenberry* (1995), 72 Ohio St. 3d 435, 444, 650 N.E.2d 878 (five murders over a five-month period represented a course f conduct); [*State v.*] *Benner* [(1988)], 40 Ohio St. 3d at 320, 533 N.E.2d 701 (two murders and an attempted murder over a five-month period evidenced a course of conduct). In this case, the similarities in the Murray and Julious murders establish a course of conduct despite the lapse of five and one-half months.

In conclusion, we reject appellant's claim that the evidence was insufficient to support his conviction for a course-of-conduct specification in the murders of Julious and Murray. The two murders involved similarities in the commission of the offences, the causes of death, and the disposal of the bodies. Based on the totality of the circumstances, we find that evidence was sufficient to support appellant's conviction of a course-of-conduct specification in the murders of Julious and Murray.

*McKnight*, 2005-Ohio-6046 at ¶¶162-65 (some citations omitted). In pointing out dissimilarities between the Murray and Julious murders, McKnight does not challenge the similarities between them as found by the Supreme Court of Ohio. (ECF No. 127, PageID 15707-09.) That is, he has not shown that the Supreme Court of Ohio's "adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(2).

McKnight also contends that permitting the jury to weigh the course-of-conduct specification against the mitigating factors in the penalty phase of his trial was "particularly egregious" since the murders were separated by time and had "no apparent connection to one another," despite the state supreme court's findings to the contrary. (ECF No. 127, PageID 15709.) Again, however, McKnight does not dispute the factual findings supporting the course-of-conduct specification as found by the Supreme Court of Ohio; he merely lists differences between the two murders, as he perceives them.

53

McKnight has not demonstrated that the Supreme Court of Ohio's decision is contrary to or an unreasonable application of federal law as determined by the Supreme Court, or that it is based on an unreasonable determination of the facts that were before the trial court. As such, his seventh ground for relief should be denied.

**Eighth Ground for Relief**

In his eighth ground for relief, McKnight contends that a preliminary jury instruction given prior to opening arguments advising jurors that "discrepancies in a witness' testimony, or between his testimony and that of others, if there are any, does not necessarily mean that you should disbelieve the witness, as people commonly forget facts or recollect them erroneously after the passage of time" (ECF No. 105-13, PageID 5347), deprived him of due process and equal protection of the law. (ECF No. 127, PageID 15710-13.) He argues that the instruction denied him his right to confront witnesses whose testimony contained inconsistencies.

Respondent accurately states that to the extent McKnight alleges an Eighth Amendment violation, the eighth ground for relief is procedurally defaulted. When McKnight presented the instant claim to the state court on direct appeal, he never mentioned the Eighth Amendment (ECF No. 106-15, PageID 9516-23.) Further, Respondent contends the entire eighth ground for relief is procedurally defaulted because the state court relied on an independent and adequate state procedural rule in dismissing the claim. Even if preserved, however, Respondent argues the claim is meritless.

54

McKnight raised the instant claim as his ninth proposition of law on direct appeal in the

Supreme Court of Ohio.   *Id*.   The court opined as follows:

> [A]ppellant argues that the trial court's preliminary instructions on credibility were improper.   Trial counsel, however, failed to object and waived all but plain error.   *State v Underwood* (1983), 3 Ohio St.3d 12, syllabus.
>
> During preliminary guilt-phase instructions, the court advised the jury:   "the testimony of one witness believed by you is sufficient to prove any fact.   *Also, discrepancies in a witness' testimony, or between his testimony and that of others, if there are any, does not necessarily mean that you should disbelieve the witness, as people commonly forget facts or recollect them erroneously after the passage of time.*   You are certainly all aware of the fact that two persons who are witnesses to an incident may often see or hear it differently.   In considering a discrepancy in witness testimony, you should consider whether such discrepancy concerns an important fact or a trivial one."   (Emphasis added.)   These preliminary instructions on credibility were not repeated during the closing instructions.
>
> Crim.R. 30(B) permits the trial court to give cautionary jury instructions relating to credibility and weight of the evidence.   The preliminary instructions clarified the jury's function in judging credibility and determining the weight to assign the testimony.   Moreover, this instruction is virtually identical to instructions approved in *State v. Cunningham*, 105 Ohio St.3d 197 . . . ¶ 51-56.   Thus, we find no plain error in these instructions.

*State v. McKnight*, 2005-Ohio-6046, ¶¶ 221-23 (2005) (parallel citations omitted).

Ohio's contemporaneous objection rule provides that parties must preserve errors for

appeal by calling them to the attention of the trial court at a time when the error could have been

avoided or corrected.   *State v. Glaros*, 170 Ohio St. 471 (1960)(paragraph one of the syllabus).

The Supreme Court has found, and the Sixth Circuit has repeatedly found Ohio's

contemporaneous objection rule to be an independent and adequate state ground of decision in the

habeas corpus context. *Coleman v. Thompson*, 501 U.S. 722, 747 (1991) (stating "Ohio's contemporaneous objection rule barred respondents' claim on appeal . . . . We held that this independent and adequate state ground barred federal habeas as well, absent a showing of cause and prejudice."), *citing Engle v. Isaac*, 456 U.S. 107, 124 *et seq.* (1982); *Hand v. Houk*, 871 F.3d 390, 417 (6th Cir. 2017); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011; *Awkal v. Mitchell*, 613 F.3d 629, 648-49 (6th Cir. 2010); *Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir. 2007); *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003). The rule was applied to McKnight's claim by the Supreme Court of Ohio as noted above, which results in its procedurally default.

McKnight makes two arguments in an attempt to avoid the default. First, he assumes that the state supreme court's plain-error review constituted a decision on the merits of the claim. (ECF No. 127, PageID 15713.) Not so. It is well established that an Ohio state appellate court's review for plain error is enforcement, not waiver, of a procedural default, and the Supreme Court of Ohio's discussion of the claim clearly indicates it was conducting plain-error review. *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *Jells v. Mitchell*, 538 F.3d 478, 511 (6th Cir. 2008); *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006). Even so, the opinion of a state court on plain error review is still entitled to AEDPA deference if the federal court reaches the merits despite the procedural default. *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009).

Second, McKnight offers the ineffectiveness of his trial counsel as cause for his default. (ECF No. 17, PageID 689.) The parties agree that *Strickland v. Washington*, 466 U.S. 668 (1984), is the law governing ineffective assistance of counsel claims, whether the allegation of ineffectiveness is asserted as a free-standing claim itself, or as cause to excuse a procedural

default.   (ECF No. 13, PageID 512-13; ECF No. 127, PageID 15801-3.)   In the latter case, a petitioner must demonstrate both cause for the default and resulting prejudice

For counsel's ineffectiveness to excuse his default, McKnight must have preserved the ineffectiveness claim itself by presenting it to the state court.  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000)(holding that an ineffective assistance of counsel claim asserted as cause for the procedural default of another claim must itself have been preserved in the state court to excuse the default in habeas).   McKnight raised his ineffective assistance of counsel claim on direct appeal, satisfying *Edwards* (ECF No. 106-15, PageID 9607, 9615-16), and the state court discussed the merits of the claim in its review for plain error.   The court concluded that McKnight had "suffered no prejudice from his counsel's failure to object to various guilt-phase . . . instructions," and denied the claim, finding no plain error.  *McKnight*, 107 Ohio St. 3d at 145, ¶ 305.   That finding is entitled to the deference required under the AEDPA, as noted above.

McKnight alleges prejudice to him flowed from the preliminary jury instruction at issue in this ground for relief because of alleged inconsistencies between various witnesses' testimonies that followed the instruction.   It is, however, "the province of the factfinder . . . to weigh the probative value of the evidence and resolve any conflicts in testimony."   *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir 1992), *citing Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Recall that the jury instruction to which McKnight contends his counsel should have objected reads as follows:   "Also, discrepancies in a witness' testimony, or between his testimony and that of others, if there are any, does not necessarily mean that you should disbelieve the witness, as people commonly forget facts or recollect them erroneously after the passage of time."

(ECF No. 105-13, PageID 5346-47.)   At the time of McKnight's trial, that sentence was a standard part of Ohio jury instructions.   *Cunningham v. Hudson*, Case No. 3:06-cv-167, 2010 WL 5092705 at *65-66 (N.D. Ohio, Dec. 7, 2010), *vacated and remanded on other grounds at* 756 F.3d 477 (6th Cir. 2014); *see also* 4 Ohio Jury Instructions (2001), Section 405.20.[9]

"It is well established that [a jury] instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."   *Estelle v. McGuire*, 502 U.S. 62, 72 (1991), *quoting Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Therefore, the Court recites the instruction at issue here in the context in which it was presented to McKnight's jury at trial:

> As jurors, you have the sole and exclusive duty to decide the credibility of the witnesses who will testify in this case, which simply means that it is you who must decide whether to believe or disbelieve a particular witness and how much weight, if any, to give to the testimony of each witness.
>
> In determining these questions, you will apply the tests of truthfulness which you apply in your daily lives.   These tests include the appearance of each witness on the stand, his or her manner of testifying, the reasonableness of the testimony, the opportunity he or she had to see, hear and know the things concerning which he or she testified, his or her accuracy of memory, frankness or lack of it, intelligence, interest or bias, if any, together with all the facts and circumstances surrounding the testimony.
>
> Applying these tests, you will assign to the testimony of each witness such weight as you deem proper.   You are not required to believe the testimony of any witness simply because it was given under oath.   You may believe or disbelieve all or any part of the testimony of any witness.   You should not decide any issue of fact

---

[9] The instruction was not repeated in the court's later instructions on determining credibility (Trial Tr., ECF No. 105-25-26, PageID 7256-61), and is no longer a part of Ohio's standard instruction on the credibility of witnesses. *See* Ohio Jury Instructions, Section 409.05 (formerly 405.20).

> merely on the basis of the number of witnesses who testify on each side of such issue; rather, the final test in judging evidence should be the force and weight of the evidence, regardless of the number of witnesses on each side of an issue.
>
> The testimony of one witness believed by you is sufficient to prove any fact. Also, discrepancies in a witness' testimony, or between his testimony and that of others, if there are any, does not necessarily mean that you should disbelieve the witness, as people commonly forget facts or recollect them erroneously after the passage of time.
>
> You are certainly all aware of the fact that two persons who are witnesses to an incident may often see or hear it differently. In considering a discrepancy in a witness['s] testimony, you should consider whether such discrepancy concerns an important fact or a trivial one.
>
> If you conclude that a witness has willfully lied in his or her testimony as to a material fact, you may distrust all of his or her testimony, and you would then have the right to reject all of his or her testimony, unless, from all of the evidence, you believe that the probability of truth favors the testimony in other particulars.

(Trial Tr., ECF No. 105-13, PageID 5345-47.) Viewing the instruction McKnight believes his

counsel should have objected to even in the limited context just quoted, it is one sentence in a

six-paragraph explanation of the jury's role in determining the credibility of the witnesses.

Considered in the context of McKnight's entire trial, the evidence presented against him, and the

jury instructions as a whole, it is impossible for the Court to conclude that the preliminary

instruction on any discrepancies in a witness' testimony or between witnesses' testimonies could

have had any discernable impact on the outcome of McKnight's trial. That being the case,

McKnight's counsel could not have been ineffective for failing to object to a jury instruction that

had little or no likelihood of affecting the outcome of his trial and the procedural default of his jury

59

instruction claim remains unexcused.

McKnight procedurally defaulted his claim that the trial court's preliminary instruction to the jury on credibility and has not demonstrated cause for the default or prejudice therefrom. Accordingly, it is recommended that his eighth ground for relief be denied.

## Ninth Ground for Relief

In his ninth ground for relief, McKnight argues numerous unnecessary and gruesome photographs of Emily Murray in death were introduced into evidence to his detriment and over defense objections. (ECF No. 127, PageID 15714-17.) Respondent counters that the claim is not cognizable in habeas corpus, procedurally defaulted, and meritless. (ECF No. 13, PageID 395-400.) McKnight denies the claim is procedurally defaulted, stating he raised the claim both on direct appeal and in post-conviction in the state courts. (ECF No. 17, PageID 698.) Nevertheless, he appears to offer counsel's ineffectiveness as cause for the default and that he suffered prejudice as a result. *Id.* at 699. Finally, he disputes Respondent's argument that the claim is without merit. *Id.* at PageID 702-3.

McKnight raised a gruesome photographs claim on direct appeal in the Supreme Court of Ohio alleging violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and to certain provisions of the Ohio Constitution. (ECF No. 106-15, PageID 9539-42.) There he acknowledged that his counsel did not object to the admission of the

photographs,[10] although they had filed a motion in limine to exclude all photographs of Emily Murray on March 25, 2002, a full six months before McKnight's trial began.

The Supreme Court of Ohio held that defense counsel's failure to object to the photographs at trial and that consequently, all but plain error was waived. *McKnight*, 2005-Ohio-6046 at ¶ 139. In doing so, the state court enforced a state procedural rule requiring litigants to bring errors to the attention of the trial judge at a time when they can be corrected, thereby preserving any error for appeal. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *State v. Glaros*, 170 Ohio St. 471 (1960) (paragraph one of the syllabus). Ohio's rule requiring a contemporaneous objection is an adequate and independent state procedural rule, which when enforced against a defendant, renders his claim procedurally defaulted for habeas corpus purposes, as noted above in the Court's discussion of McKnight's eighth ground for relief.

McKnight argues his pre-trial motion in limine, which was denied, was sufficient to put the State and trial court on notice that he "strenuously objected" to the admission of the photographs. (ECF No. 127 at PageID 15715.) But it has long been the law in Ohio that "the denial of a motion *in limine* does not preserve a claimed error for review in the absence of a *contemporaneous* objection at trial." *State v. Hancock*, 108 Ohio St. 3d 57, 2006-Ohio-160 at ¶ 59 (emphasis added), *quoting State v. Hill*, 75 Ohio St.3d 195, 203 (1996). *See also State v. Brown*, 38 Ohio St. 3d 305 (1988) (paragraph three of the syllabus); *State v. Maurer*, 15 Ohio St. 3d 239, 259 (1984)

---

[10] In his appellate brief, McKnight cited to "Vol. VII, Tp. 1582" as the place in the state court record where the attorneys' failure to object appears. In the electronic state court record, filed in this Court in 2013, page 1582 of the trial transcript does not appear in the cited volume, nor does it contain any reference to photographs being admitted into evidence. Rather, it reflects part of the voir dire of a prospective juror. (ECF No. 105-11, PageID 5098.) The Court takes McKnight at his word respecting his attorneys' failure to object to the admission of the photographs.

(holding objecting party must challenge evidence during trial when issue is presented in full context notwithstanding previous motion *in limine*).

> A ruling on a motion *in limine* reflects the court's anticipated treatment of an evidentiary issue at trial and, as such, is a tentative, interlocutory, precautionary ruling. Thus, "the trial court is at liberty to change its ruling on the disputed evidence in its actual context at trial. Finality does not attach when the motion is granted." *Defiance v. Kretz* (1991), 60 Ohio St.3d 1, 4, citing *State v. Grubb* (1986), 28 Ohio St.3d 199, 201-202.

*State v. French*, 782 Ohio St.3d 446, 450 (1995)(parallel citations omitted). Also, a motion *in limine* made six months prior to trial can hardly be called "contemporaneous" to the introduction of evidence at trial. No federal law negates Ohio's requirement for a contemporaneous objection at trial to preserve an error for appellate or habeas review. Therefore, McKnight's argument that his pre-trial motion *in limine* preserved his gruesome photographs claim fails.

Nor does McKnight's presentation in state post-conviction of his gruesome photographs claim preserve it for habeas review. The post-conviction process in Ohio requires that claims raised there rely on evidence outside the trial record. When the claim involves evidence alleged to have been erroneously admitted at trial, the claim is plainly apparent in the state court record and must be brought on direct appeal rather than in post-conviction. *Henness v. Bagley*, Case No. 2:01-cv-43, 2007 WL 3284930 at *49 (S.D. Ohio Oct. 31, 2007), *aff'd* 766 F.3d 550 (6th Cir. 2014).

Finally, the state supreme court found no plain error in the admission of the photographs into evidence. Instead, it found each to be sufficiently probative to outweigh any prejudice that might flow therefrom. *McKnight*, 2005-Ohio-6046 at ¶¶ 138-47. An Ohio state appellate

court's review for plain error is enforcement, not waiver, of a procedural default.   *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) (plain error review does not constitute a waiver of procedural default.

McKnight's ninth ground for relief is procedurally defaulted without excuse and should be denied.


**Tenth Ground for Relief**


In his tenth ground for relief, McKnight contends the trial court's admission of Emily Murray's habit of notifying family and friends of her whereabouts was an unconstitutional infringement of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.  (ECF No. 127, PageID 15717-24.)  Respondent argues the claim is procedurally defaulted since, pertinent to habeas corpus review, McKnight alleged in the state court only a Fourteenth Amendment violation, and argued that the admission of the habit evidence violated a state evidentiary rule, with only cursory mention of the federal constitution.  (ECF No. 13, PageID 401.)  He asserts that the Supreme Court of Ohio addressed the merits of the "substantially equivalent" claim he presented there, contending that his claim is thereby saved from procedural default.  (ECF No. 17, PageID 704.)

The Supreme Court of Ohio overruled McKnight's tenth proposition of law on direct appeal, where he claimed the testimony elicited by the prosecutor about Emily Murray's penchant for notifying friends and/or family of her whereabouts was improper.

Over defense objection, the state presented evidence of Murray's habit of informing family and friends about her whereabouts before departing on a trip. Thomas Murray testified that her family and friends maintained close contact with Murray as to her whereabouts following Murray's suicide attempt in May 2000. Murray exchanged phone calls and e-mails with her parents on an almost daily basis. During the fall of 2000, Murray remained in contact with her parents when she traveled to Japan and made a trip to St. Louis.

. . .

Murray's daily phone calls and e-mails with her father as to her whereabouts, and her practice of leaving notes as to her whereabouts with her friends were "'numerous enough to base an inference of systematic conduct,'" permitting the admissibility of the testimony. *Wilson v. Volkswagen of Am., Inc.* (C.A.4, 1977), 561 F.2d 494, 511, quoting *Strauss v. Douglas Aircraft Co.* (C.A.2, 1968), 404 F.2d 1152, 1158.

We reject appellant's argument that Murray's behavior was a volitional act and therefore not admissible as habit evidence. Activities that are "semi-automatic or nearly nonvolitional, can be easily classified as habit." I Giannelli & Snider, Evidence (2d Ed.2001) 265, Section 406.4. For example, locking the door of a house or traveling home from work by the same route are examples of habitual acts that may become semiautomatic and thus tend to prove that one acted in a particular situation in the same manner. *Id.* . . .

Similarly, Murray's repeated practice of notifying friends and family of her whereabouts before departing on a trip became a semiautomatic form of behavior that was admissible to prove habit. See *State v. Allen* (1995) 73 Ohio St. 3d 626, 633 (testimony that victim was an immaculate housekeeper was admissible under Evid.R. 06 to show she would likely have wiped the defendant's fingerprints off her glasses) . . . .

We also reject appellant's argument that habit evidence should not have been admitted because the testimony did not identify a specific manner that Murray used to notify her friends and family of her whereabouts. Testimony established that e-mails, phone calls, and

64

> notes were Murray's specific methods for notifying family and
> friends as to her whereabouts.
>
> Finally, sufficient examples of Murray's conduct demonstrated
> Murray's habit. Murray exchanged e-mails and phone calls with
> her parents on almost a daily basis, remained in daily contact with
> her father as to her whereabouts in Japan, and notified her parents
> about her trip to St. Louis. Moreover, college friends testified that
> Murray left notes and information as to her whereabouts on a [dry]
> erase board before departing on trips. . . .
>
> The trial court did not abuse its discretion in admitting testimony
> about Murray's habit under Evid.R. 406. Thus, [P]roposition X is
> overruled.

*McKnight*, 2005-Ohio-6046 at ¶¶ 106, 132-37 (parallel citations omitted). In addition, the state

court cited Ohio R. Evid. 406, the Advisory Committee's Notes on the state rule, and the Rules of

Evidence for United States Courts and Magistrates in defining "habit." *Id*. at ¶¶ 130-31. It noted

that the Ohio rule is identical to the corresponding federal rule and cited several cases interpreting

the federal rule in its discussion of habit evidence. *Id*. at ¶ 131. The court never mentioned the

United States Constitution and did not discuss the Due Process Clause or McKnight's right to a fair

trial in its discussion of his habit evidence claim.

Most likely, that is a consequence of McKnight's nearly exclusive focus on the state

evidentiary rule in his brief on direct appeal. (ECF No. 106-15, PageID 9524-32.) In fact, in his

explication of the law applicable to his claim, he cited only the Ohio and federal evidentiary rules

and federal cases from outside the Sixth Circuit interpreting the federal rule, never discussing any

federal constitutional amendment, due process, or the right to a fair trial. He mentioned the

federal constitution in only two places in arguing his claim to the state court: (1) in the heading of

his claim, and (2) in the conclusion, and neither time included any argument. *Id*. at PageID 9524,

9532.

Merely using talismanic constitutional phrases like "fair trial" or "due process of law" does not constitute raising a federal constitutional issue. *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000), *citing Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2nd Cir. 1984); *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987). "A lawyer need not develop a constitutional argument at length, but he [or she] must make one; the words 'due process' are not an argument." *Riggins v. McGinnis*, 50 F.3d 492, 494 (7th Cir. 1995). If a petitioner's claim in federal habeas rest on different theories than those presented to the state courts, they are procedurally defaulted. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

Habeas corpus relief for a state prisoner is only available on the ground that he or she is in custody in violation of the federal constitution, or laws, or treaties of the United States, and does not lie for errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). "[T]he due process clause guarantees the fundamental elements of fairness in a criminal trial." *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967), *citing Tumey v. Ohio*, 273 U.S. 510 (1927). Federal habeas corpus relief is only warranted where a violation of a state's evidentiary rule results in the denial of fundamental fairness and, therefore, a violation of due process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (stating "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions); *Frank v. Mangum*, 237 U.S 309, 331 (1915) (observing that the Fourteenth Amendment's due process guarantee applies to "the substance of right, and not to matters of form or procedure"; *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (observing that a claim contending a state court violated a state evidentiary rule is not cognizable on habeas corpus

66

review).   Thus, whether the challenged evidence was admitted contrary to a state evidentiary rule is not itself a question for this Court, even if the state rule is identical to the corresponding federal rule.

To preserve a federal constitutional claim for presentation in habeas corpus, the claim must be "fairly presented" to the state courts in a way which provides them with an opportunity to remedy the asserted constitutional violation, including presenting both the legal and factual basis of the claim.   *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).   As noted above, there are occasions when a state court defendant will have made claims in the state courts which, while not explicitly invoking the United States Constitution, in fact fairly place before the state courts the substance, both facts and legal theory, of a claim or claims later made in habeas corpus.   *Franklin v Rose*, *supra*.   As noted above, McKnight has done none of these things.   Since he did not "fairly present" his claim to the state court, it is procedurally defaulted.

Even if it were properly preserved, the Court could not grant habeas relief on the instant claim because McKnight has not overcome the substantial deference with which this Court must treat the state court's decision.   That decision is neither an unreasonable application of federal law as determined by the Supreme Court, nor an unreasonable determination of the facts given the evidence before the state court, and McKnight's bare assertion that it is does not make it so.

McKnight's tenth ground for relief is procedurally defaulted and should consequently be denied.

**Eleventh Ground for Relief**

In his eleventh ground for relief, McKnight contends the introduction of inflammatory evidence relating to his infidelities in his marriage, his hasty departure from a club at which the police had arrived, and personal characteristics of Emily Murray, and the prosecutor's opening statement and closing argument deprived him of a fundamentally fair trial and his due process rights in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendments. (ECF No. 127, PageID 15725-33.)

The Warden correctly argues that McKnight's claim is partially procedurally defaulted since, as relevant here, he raised it only as a violation of his Fourteenth Amendment rights on direct appeal in the state court. (ECF No. 13, PageID 410-22.) To the extent McKnight's claim was addressed on the merits by the Supreme Court of Ohio, the Warden reminds this Court of its obligation to accord deference to that decision, and further asserts that the claim is meritless. *Id.*

In his Traverse, McKnight counters that his claim in the state court is "substantially similar" to the instant ground for relief and, without citation to authority, argues that presentation of a claim in habeas substantially similar one submitted to the state court satisfies the exhaustion requirement of the AEDPA. (ECF No. 17, PageID 714-26.) In both *Picard v. Connor*, 404 U.S. 270, 276 (1971), and *Anderson v. Harless*, 459 U.S. 4, 6 (1982), and later in *Duncan v. Henry*, 513 U.S. 364, 366 (1995)(*per curiam*), however, the Supreme Court emphasized that "mere similarity of claims is insufficient to exhaust." To paraphrase *Picard*, the Supreme Court of Ohio dealt with the arguments McKnight offered and cannot be faulted for failing to address *sua sponte* potential

68

claims under other constitutional amendments not mentioned by McKnight. *See Picard*, 404 U.S. at 277. McKnight contends the ineffectiveness of his trial counsel excuses any default and that he was prejudiced by the inflammatory and irrelevant evidence. *Id*. at PageID 716.

It has long been recognized that the "Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). The United States Constitution has never been thought to establish a federal court as a "rule-making organ for the promulgation of state rules of criminal [or evidentiary] procedure." *Spencer v. Texas*, 385 U.S. 554, 564 (1967). Thus, an inquiry into whether certain evidence was admitted at trial in violation of a state's evidentiary rules "is no part of a federal court's habeas review of a state conviction." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007); *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983). To the extent McKnight asserts evidence of his marital infidelity, avoiding the police at a reggae club, and the victim-impact evidence presented in the culpability phase of his trial was inadmissible under Ohio's Rules of Evidence, his claim is not cognizable in habeas corpus.

This Court must determine, therefore, whether McKnight "fairly presented" his federal claim to the state court. He raised admission of the complained-of evidence as his third proposition of law on direct appeal in the Supreme Court of Ohio, alleging the evidence was irrelevant and prejudicial. (ECF No. 106-14, PageID 9477-85.) He cited the Fourteenth Amendment in the heading of his proposition of law but identified only Ohio R.Evid. 401 and 402 and *Brown v. Cleveland*, 66 Ohio St.2d 93, 97 (1981), under the "Law" section of his brief. Elsewhere, however, he cited the Fourteenth Amendment and Justice Thomas' dissent in *Dawson*

*v. Delaware*, 503 U.S. 59, 179 (1992), where the Justice quoted *Payne v. Tennessee*, 501 U.S 808, 825 (1991) and cited *Darden v. Wainwright*, 477 U.S. 168, 179-83 (1986), for the general proposition that unduly prejudicial evidence that renders a trial fundamentally unfair violates the Due Process Clause of the Fourteenth Amendment.   (ECF No. 106-14, PageID 9477.)

The state court discussed the merits of McKnight's claim at length:

1.  {¶78}   **"Other acts" evidence.**   Amber Hammers and appellant worked together at Flappers Bar, a Mount Vernon bar and grill then owned by an owner of the Pirate's Cove. Hammers testified that appellant called and asked her to go dancing with him.  Hammers told appellant that she had not talked to her boyfriend about going dancing with another man, an no plans were made.

    {¶79}   Gloria Ressler and appellant worked together at the Pirate's Cove.   Ressler testified that following Murray's disappearance, appellant called her on three occasions during November 2000 and asked "if he could come over and hang out, have a party, come out and just have [her] and him * * * out there."   Appellant also approached her at work and said, "[W]e could have a quickie and [your fiancé] wouldn't have to know."

    {¶80}   Lisa Perkins testified that at one point, appellant gave her a ride in his car and along the way, appellant "stopped up on the top of the hill, and * * * he just started talking and touching [her] and [they] had sex up on the hill in the car."   Dana Bostic testified that appellant had spent the night with Perkins at Bostic's home.  Following Julious's disappearance, appellant told Bostic that "his plans were * * * to leave his wife [and] * * * come and stay with [Bostic] and Lisa at [Bostic's] house."

    {¶81}   Paul Amstutz, a former Pirate's Cove delivery driver, testified about a conversation with Kathy McKnight about appellant's whereabouts.   During a food delivery to the McKnight home, Kathy indicated to Amstutz that she thought that appellant was working that evening at the Pirate's Cove. Amstutz knew, however, that appellant was not working that evening and was instead drinking at the Pirate's Cove bar.

{¶82}  Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity.  "It may, however, be admissible * * * [to show] motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident."  However, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v Sage* (1987), 31 Ohio St.3d 173, paragraph two of the syllabus.

{¶83}  The trial court did not abuse its discretion in admitting Hammers's and Ressler's testimony.  That evidence related to appellant's modus operandi or plan.  Evidence showing a modus operandi is admissible because "'it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator.'"  *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, ¶104, quoting *State v Lowe* (1994), 69 Ohio St.3d 527, 531.

{¶84}  Hammers and Ressler helped to establish appellant's opportunity, preparation, and plan to acquaint himself and be alone with Murray.  Appellant's phone calls to Hammers and Ressler showed that appellant developed an interest in his co-workers and asked them out.  This pattern of behavior showed the likelihood that appellant also developed an interest in Murray.  Thus, the jury could reasonably infer from the testimony of Hammers and Ressler that appellant had asked Murray for a ride after work.

{¶85}  We also reject appellant's argument that his phone calls to Ressler were not admissible because they were made after Murray's disappearance.  "[P]ursuant to Evid.R. 404(B), * * * evidence of subsequent crimes or acts of misconduct is admissible if it is relevant to an issue at trial and its probative value is not outweighed by its prejudicial effect."  *Cleveland v Dillingham* (May 11, 1995), Cuyahoga App. No. 67693, 1995 WL 277105, *4.  Appellant's phone calls, though made two or three weeks after Murray's disappearance, were relevant in establishing appellant's modus operandi.

71

{¶86}   Moreover, the trial court provided the jury with cautionary instructions on "other acts" evidence.   The jury was advised:   "Evidence was introduced that the defendant may have committed other acts other than the offenses with which he was charged in this case.   If you find that the evidence of other acts is true * * *, you may consider that evidence only for the purpose of deciding whether it proves Gregory McKnight's motive, opportunity, intent or purpose or plan to commit kidnapping of Emily Murray.   The evidence may not be considered for any other purpose.   It was not received, and you may not consider it to prove the character of Gregory McKnight in order to show that he acted in conformity with that character."   In view of these instructions and the probative value of the testimony of the two women, the trial court did not abuse its discretion in admitting this "other acts" evidence.   See *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 48.

{¶87}   We also find that the testimony about appellant's visits to Perkins in Bostic's home was relevant to show how appellant and Julious knew each other.   Thus, the trial court did not abuse its discretion in admitting such evidence.

{¶88}   Testimony that appellant and Perkins had sex in appellant's car and spent the night together at Bostic's home was not relevant and not admissible under Evid.R. 404(B). Nevertheless, we find that the impact of such testimony was minimal and not prejudicial given other compelling evidence of appellant's guilt.   See *Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶49.

{¶89}   **2.   Reaction to the police.**   Two to three weeks before Julious was murdered, appellant, Kathy, Bostic, and Julious drove from Chillicothe to Columbus to go to a reggae club. Over defense objection, Bostic testified that when they "pulled into a parking lot [of the reggae club] * * * there was police sitting in the parking lot."   Bostic testified that appellant said, "'There's the police.'   And then we turned * * * out of the parking lot and we drove all the way back home."

{¶90}   We find that the trial court abused its discretion in admitting this testimony.   Appellant's reaction to the police

72

occurred *before* he murdered either Julious or Murray. This evidence did not prove consciousness of guilt, because there was no connection between appellant's reaction to the police and the charged offenses. Appellant's reaction to the police, however, was not tied to any other misconduct, and he was not prejudiced by such testimony. Thus, the introduction of this evidence constituted harmless error.

{¶91} **3. Victim-impact comment and testimony.** During his opening statement, the prosecutor stated, "Two years ago, Emily S. Murray was attending Kenyon College in Gambier, Ohio. She was in her junior year, and she was 20 years young." Further, the prosecutor stated, "At work, Emily was well-liked [sic]. She was outgoing, she was helpful, she was a good waitress."

{¶92} Thomas Murray, the victim's father, testified that he had a "very close" relationship with his daughter. He added, "Emily was in touch with her mother or me or both of us almost every day." According to Thomas, Emily "was very responsible; she was just a very honest kid." Moreover, Murray returned from a religious retreat about ten days before her disappearance and was "really excited about becoming a priest." Thomas also testified that when he learned of his daughter's disappearance, "it was like somebody hit [him] in the stomach with a sledgehammer."

{¶93} Cynthia Murray, the victim's mother, described a "very close relationship" with Murray, said Murray was "easy to love," and testified that Murray "wanted to become an Episcopal priest."

{¶94} Megan DiCarlo, a college friend, described Murray as "very outgoing, very social, independent, very open with people, trusting of people. Like she always looked for the best in people." Kate Murray, another college friend, described Murray as "[v]ery outgoing, had a lot of friends, very friendly." Kate also testified that Murray was very religious, and the tattoo of a dove on Murray's back symbolized this interest.

{¶95} Michael Corrigan, the general manager of the Pirate's Cove, stated that Murray was "courteous and cared for people,

73

and she was a very upbeat person, fun to work with."  On the night she disappeared, Murray was "very upbeat and happy." Nathan Justice also testified that Murray was a "very nice, happy person."

{¶96}  During the guilt-phase closing argument, the prosecutor described Murray's disappearance as "every parents' [sic] worst nightmare," repeated Thomas Murray's statement that "they felt as if they had been hit in the stomach with a sledgehammer," and mentioned that "that pain in their stomach stays with them today."  The prosecutor also argued that Murray was "nice" and "kind-hearted" and might have given appellant a ride on the night she disappeared.

{¶97}  The defense filed a motion in limine to exclude victim-impact evidence.  Nevertheless, except where noted, the defense did not renew its objection to the foregoing testimony at trial and thus waived all but plain error.  See *Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 34 ("a ruling on a motion in limine may not be appealed and * * * objections * * * must be made during the trial to preserve evidentiary rulings for appellate review").

{¶98}  Evidence relating to the facts attendant to the offense is "clearly admissible" during the guilt phase, even though it might be characterized as victim-impact evidence.  *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440, 650 N.E.2d 878. Thus, testimony that Murray was friendly, outgoing, and trusting was admissible in showing the likelihood that Murray provided appellant a ride in her car on the night she disappeared. Moreover, testimony that Murray was a responsible person was admissible in showing that she would not have left campus in her car without taking her wallet and driver's license.

{¶99}  The defense objected to Thomas's and Cynthia's testimony because of the lack of foundation to prove habit but did not object to the testimony as inappropriate victim-impact evidence.  Thomas's and Cynthia's close personal relationship and frequent contact with their daughter laid the foundation about Murray's habit of notifying family members as to her whereabouts before making a trip, and this testimony was also admissible.  Thomas's testimony that his daughter's

74

disappearance was "like somebody hit [him] in the stomach with a sledgehammer" was of questionable relevance; however, such testimony did not constitute outcome-determinative plain error. See *State v. Reynolds* (1998), 80 Ohio St.3d 670, 679, 687 N.E.2d 1358; cf. *State v. Hartman* (2001), 93 Ohio St.3d 274, 293, 754 N.E.2d 1150.

{¶100}  Testimony about Murray's upbeat mood before her disappearance, her strong religious beliefs, and her aspirations to become an Episcopal priest was admissible in rebutting arguments that Murray might have committed suicide.

{¶101}  Kate Murray's testimony about the tattoo of a dove on Murray's back was relevant in identifying Murray's body.  See *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 108 (photos of victim's tattoo admissible to help identify the victim).

{¶102}  As to the prosecutor's opening statement and closing argument, the trial counsel failed to object and thus waived all but plain error.  See *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. There was no plain error.  The prosecutor's brief description of Murray in his opening statement simply pointed out her age and that she had attended Kenyon College, which explained why she lived in Gambier.  Cf. *Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 56 (description of victims' lives established that the victims had been living persons, an element of the charge of aggravated murder).

{¶103}  The prosecutors' remarks during closing argument also did not result in plain error.  The prosecutor described Murray as a nice, kind-hearted, and helpful person to point out the likelihood that Murray provided a ride to appellant on the night she disappeared.  The prosecutor's comments about Thomas's and Cynthia's pain and anguish simply pointed out the obvious feelings that Murray's parents experienced following their daughter's death.  Moreover, the prosecutor's remarks in question were very brief and not overly emotional.

{¶104}  Based on the foregoing, we reject proposition [of law] III.

75

*McKnight*, 2005-Ohio-6046. The state court cited only state cases and evidentiary rules in its discussion of McKnight's claim, and did not expressly decide the claim that the admission of the complained-of evidence violated McKnight's Fourteenth Amendment right to due process.

As noted above, however, McKnight barely mentioned any federal law in his presentation of his claim to the state court, citing it only for a very general statement of law. It is possible that the state court simply overlooked McKnight's federal claim, to the extent that he actually raised it, that is. After all, he cited no federal case in which the Supreme Court has held the admission of evidence such as that admitted in his trial violated the Fourteenth Amendment's Due Process Clause. As such, it is questionable whether such skimpy reference to federal law fairly presented his claim to the state court and properly preserved it for habeas review. The Warden, however, does not advance the procedural default defense respecting McKnight's Fourteenth Amendment argument.

When a state court is presented with a claim on appeal that alleges violations of both state and federal law but does not expressly acknowledge that it is deciding the federal constitutional issue, however, an assumption that the unaddressed federal claim was simply overlooked is unwarranted. *Johnson v. Williams*, 568 U.S 289, 298 (2013). Rather, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted." *Id.* at 301. The Supreme Court further stated that "[w]hen the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case

76

before a federal judge." *Id*. at 303.

Johnson involved the state trial court's dismissal of a juror during deliberations. The state court of appeals, while not deciding the Sixth Amendment claim expressly, cited a California Supreme Court case in which that court acknowledged the federal constitutional right to a jury trial and the need to protect the sanctity of jury deliberations, discussing at length three federal appellate court cases that had considered those issues in depth. *Id*. at 304. No such reliance on federal law is present in the state supreme court's decision on McKnight's admissibility of evidence claim. Thus, the posture of McKnight's claim can be distinguished from Johnson's on the basis that the state court expounded upon federal law in deciding Johnson's claim, while the Supreme Court of Ohio did not do so in McKnight's case.

Assuming McKnight's claim was fairly presented to the Supreme Court of Ohio, and that the Supreme Court of Ohio did not address the merits of that claim, this Court will address his Fourteenth Amendment claim *de novo*. *See Thompson v. Warden, Bellmont Corr. Inst.*, 598 F.3d 281, 285 (6th Cir. 2010), *quoting Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005) ( "Where the state court has not addressed or resolved claims based on federal law, most courts, including this one, have held that the decision is not an 'adjudication on the merits.' Thus, a federal habeas court reviews such unaddressed claims *de novo*."); *Reed v. Jenkins*, Case No 3:15-cv-620, 2016 WL 6311235 at *5 (N.D. Ohio June 22, 2016) (same). "To the extent that the state court did not assess the merits of a claim properly raised in the habeas petition . . . AEDPA deference does not apply and we review questions of law and mixed questions of law and fact *de novo*." *McElrath v. Simpson*, 595 F.3d 624, 630 (6th Cir. 2010), *citing Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir.

2004), and *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003). Furthermore, "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State" 28 U.S.C. § 2254(b)(2), which strongly suggest the same is true for any individual ground for relief.

That is not to say that the Supreme Court of Ohio's factual findings are to be disregarded. On the contrary, the AEDPA requires this Court to presume the state court's factual findings to be correct unless a petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The state court found the evidence McKnight challenges probative of the sequence of events leading up to the murders; the identities of the victims; McKnight's modus operandi; and as to Emily Murray, the unlikelihood that her death was a suicide to counter the defense's suggestion that it was. Here, McKnight has offered no evidence at all, much less clear and convincing evidence, calling those findings into question.

The state court also found that the trial court's admission of evidence that McKnight left a reggae club due to the presence of police cars in the parking lot was an abuse of discretion, predominantly because that incident occurred prior to the murders of Julious and Murray. The court found the error harmless, however, and this Court agrees. A reasonable person could easily conclude that anyone would be quite reluctant to enter a club at which the police were already involved rather than view such behavior as evidence of guilt even before a crime had been committed.

As noted above, the state supreme court determined that McKnight had not objected to the prosecutor's opening statement and closing argument, and thus had waived all but plain error, of

which the state court found none.   Ohio's contemporaneous objection rule is an independent and adequate state procedural rule actually applied in McKnight's case rendering his claim procedurally defaulted for habeas corpus purposes.   McKnight offers his counsel's ineffectiveness as cause for the default, but the state court found the prosecutor's statements brief, and merely restatements of some witnesses' testimony.   Giving due deference to the state court's factual findings, this Court finds that no error, let alone plain error, resulted from the admission of the prosecutor's statements that could have rendered McKnight's trial unfair.

In *Burton v. Renico*, 391 F.3d 764, 774 (6th Cir. 2004), the Sixth Circuit Court of Appeals explained as follows:

> For the admission of evidence to violate constitutional due process, it must be shown that admitting the evidence violates "fundamental fairness."  i.e., that it "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." *Dowling v. United States*, 493 U.S. 342, 352-53 (1990) (internal quotation marks and citations omitted).

*Id*. (parallel citations omitted).   The circuit court has more recently observed that "[t]o the extent any Supreme Court precedent supports [Petitioner's] due process claim, it does so largely in *dicta* and at a daunting level of generality."   *Dowling*, the court said, "hold[s] out the possibility that 'the introduction' of 'evidence' in general could be 'so extremely unfair that its admission violates fundamental conceptions of justice.'"   *Desai*, 732 F.3d at 630-31, *quoting Dowling*, 493 U.S. at 352.

Thus, the erroneous admission of evidence does not necessarily implicate the Due Process Clause.   In *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), for instance, the Supreme Court

held that numerous comments by a prosecutor in a capital case, though improper, did not violate the Constitution because they had not "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The Sixth Circuit has explained that "beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Blackmon v. Booker*, 696 F.3d 536, 552 (6th Cir. 2012)(internal quotation marks omitted), *quoting Dowling*, 493 U.S. at 352; *see also Payne v. Tennessee*, 501 U.S. 808, 823 (1991)(observing that "[i]n many cases the evidence relating to the victim is already before the jury at least in part because of its relevance at the guilt phase of the trial"); *Stojetz v. Ishee*, 892 F.3d 175, 203 (6th Cir. 2018)(noting "there is no per se prohibition on the introduction of victim-impact evidence during the guilt phase of a trial, citing *Hicks v. Collins*, 384 F.3d 204, 222 (6th Cir. 2004) and *Payne*, *supra*); *Clark v. O'Dea*, 257 F.3d 498, 502-03 (6th Cir. 2001) (finding evidence that petitioner was involved in satanism did not deprive petitioner of due process despite absence of physical evidence death was a ritualistic murder).

To conclude, McKnight has procedurally defaulted his claim insofar as he alleges his Fifth, Sixth, and Eighth Amendment rights were violated by the introduction of the complained-of evidence. Giving McKnight the benefit of the doubt and assuming he "fairly presented" his Fourteenth Amendment claim to the state court, that court did not address the federal claim, leaving it for this Court to address *de novo*. In doing so, this Court is obligated to presume the correctness of the state court's factual findings, which it does, and concludes that McKnight's Fourteenth Amendment claim is meritless. In addition, his inclusion of comments made by the

prosecutor in the opening statement and closing argument were procedurally defaulted by counsel's failure to object at trial. The alleged ineffectiveness of his trial counsel does not excuse the default because this Court presumes the state court's factual finding that the comments were brief and caused no undue prejudice to McKnight negates the argument that trial counsel were ineffective. For all of these reasons, it is recommended that McKnight's eleventh ground for relief be denied.

**Twelfth Ground for Relief**

In his twelfth ground for relief, McKnight contends his attempt to introduce into evidence Emily Murray's journals or notebooks was denied at trial, thereby violating his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (ECF No. 127, PageID 15733.) He argues in language parroting his arguments in his appellate brief to the state court (ECF No. 106-15, PageID 9556-59), that Murray's journals would have revealed Murray to have been depressed and fixated on death rather than the happy, enthusiastic young woman the State portrayed her to have been at the time of her murder. *Id*. at 15734-36.

The Warden argues McKnight's claim is at least partially procedurally defaulted because McKnight failed to assert a violation of his Sixth or Eighth Amendment rights when he presented it to the state court. (ECF No. 13, PageID 423.) The Warden acknowledges that the remainder of McKnight's claim was decided on its merits by the state court and argues that AEDPA deference applies to the resulting decision, and that the claim is meritless. *Id*. at PageID 423-27.

In his Traverse, McKnight provides several examples of Supreme Court cases in which lower court decisions excluding evidence offered by the defense were reversed, and argues that in light of those cases, the exclusion of portions of Emily Murray's journals was contrary to or an unreasonable application of federal law or based on an unreasonable determination of the facts. (ECF No. 17, PageID 727-32.)

On direct appeal to the Supreme Court of Ohio, McKnight presented his claim in his fifteenth proposition of law, claiming violations of only his Fifth and Fourteenth Amendment rights.   (ECF No. 106-15, PageID 9556.)   Thus, insofar as he alleges violations of his Sixth and Eighth Amendment rights, his claim is procedurally defaulted.

The Supreme Court of Ohio concluded that (1) the excluded portions of Murray's writings predated her murder by more than a year, while the portions admitted were within a couple of months of the murder and did not indicate any intention to commit suicide; (2) the fact that Murray was found rolled up in a carpet and the coroner's testimony ruled out suicide as a possible cause of death; (3) McKnight suffered no prejudice from the exclusion because most of the writings that mentioned suicide were admitted; and (4) from a state-law perspective, the excluded notebooks were inadmissible under the state evidentiary rules governing hearsay evidence.  *McKnight*, 2005-Ohio-6046 at ¶¶ 148-157.

The only federal law cited by the state supreme court in its discussion of McKnight's claim was *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295-96 (1892).   In that case, two letters written by a Mr. Walters expressing his intent to travel with a Mr. Hillmon from Wichita, Kansas, to Colorado were excluded from evidence.   The same month the letters were received by their

addressees, a body was found at Crooked Creek. At first, the deceased was thought to be Mr.

Hillmon, but Hillmon's various life insurers refused to pay on the policies, claiming Hillmon and

another man conspired to defraud the insurance companies and that Mr. Walters was the deceased,

not Mr. Hillmon. The Supreme Court found exclusion of Mr. Walters' letters reversible error. It

reasoned that Walters' letters were proof of his intent to travel with Hillmon on a route that took

them to Crooked Creek where the body was found. The Court stated

> When the intention to be proved is important only as qualifying an
> act, its connection with that act must be shown, in order to warrant
> the admission of declarations of the intention. But whenever the
> intention is of itself a distinct and material fact in a chain of
> circumstances, it may be proved by contemporaneous oral or written
> declarations of the party.
>
> . . .
>
> Upon principle and authority, therefore, we are of opinion that the
> two letters were competent evidence of the intention of Walters at
> the time of writing them, which was a material fact bearing upon the
> question in controversy.

*Mutual Life Ins. Co. of New York v. Hillmon*, 145 U.S. 285, 295, 299-300 (1892). *Hillmon* never

mentions the Constitution or any amendment thereto and was decided as a matter solely about the

admissibility of evidence. In fact, the "*Hillmon* Doctrine" was later formalized as Fed. R. Evid.

803(3) and in the same rule in the Ohio Rules of Evidence. Both before and after the

promulgation of the Federal Rules of Evidence, the *Hillmon* decision has been treated as an

evidentiary matter, not as one implicating the federal constitution. *Shepard v. United States*, 290

U.S. 96, 104-06 (1933); *United States v. Diaz*, 597 F.3d 56, 66 (1st Cir. 2010); *Coy v. Renico*, 414

F.Supp.2d 744, 766-72 (E.D. Mich. 2006); *United States v. Smallwood*, 299 F.Supp.2d 578, 585

(E.D. Va. 2004); *United States v, Houlihan*, 871 F.Supp. 1495, 1500 (D. Mass. 1994). The Sixth

Circuit has done so as well. *United States v. Williams*, 704 F.2d 315, 322 (6th Cir. 1983); *United*

*States v. Hoffa*, 349 F.2d 20, 45 (6th Cir. 1965).

Thus, the state court cited no federal constitutional law to suggest that it had considered the

federal constitutional component of McKnight's claim, nor did it give any indication that the state

claim raised in McKnight's fifteenth proposition of law "fully incorporate[d] a related federal

constitutional right." *Johnson v. Williams*, 568 U.S. 289, 298 (2013). McKnight's reference to

the federal constitution was not fleeting, as he cited several Supreme Court cases in his state

appellate brief. *Id.* at 299. While there is a slim possibility that the state court could have

regarded McKnight's claim as "too insubstantial to merit discussion," *id.*, that seems unlikely

given the full discussion of the state claim asserted in the court's opinion in McKnight's fifteenth

proposition of law. As there is good reason to believe that the state supreme court simply

overlooked McKnight's federal constitutional claim included in his fifteenth proposition of law on

direct appeal, this Court may address that part of his claim *de novo*.

McKnight cites a few Supreme Court cases for the general propositions that (1) in an

adversary system, the development of all relevant facts is fundamental; (2) "the defendant's right

to be heard in his own defense is a basic component of due process and a fair trial; (3) a criminal

defendant must have a "meaningful opportunity to present a complete defense"; and (4) a

defendant must not be "stripped of his right to have sufficient time to advise with counsel and

prepare his defense." *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988), *citing United States v.*

*Nixon*, 418 U.S. 683, 709 (1974); *In re Oliver*, 333 U.S. 257, 273 (1948); *Crane v. Kentucky*, 476

U.S. 683, 690 (1986), *citing California v. Trombetta*, 467 U.S. 479, 485 (1984); and *Powell v. Alabama*, 287 U.S. 45, 59 (1932).    While those very general statements are surely true, the state court determined that the parts of Emily Murphy's notebooks that were excluded were not relevant to her state of mind at the time of her death, in part because they were either undated entries or were dated more than a year before her murder.    *McKnight*, 2005-Ohio-6046 at ¶ 151.   The state court also observed that "most of the documents from Murray's notebook and notepad that mentioned suicide were admitted."   *Id*. at 123.   In addition, McKnight has not argued that he did not have sufficient time to "advise with counsel and prepare his defense."   Nor does he challenge the state court factual findings as they relate to his habeas claim that his right to due process and a fair trial was violated.

In his Traverse, McKnight cites *Crane* along with *Washington v. Texas*, 388 U.S. 14 (1967), *Rock v. Arkansas*, 483 U.S. 44 (1987), and *Holmes v. South Carolina*, 547 U.S. 319 (2006), all of which were cases before the Supreme Court on direct appeal, not on petitions for habeas corpus relief.   In *Crane*, the Court was presented with the question whether, after a confession has been found to have been voluntary, the defense counsel may introduce evidence at trial that it was unworthy of belief because it contained inconsistencies and due to the length of the interrogation of the sixteen-year-old defendant and the manner in which it was conducted.   476 U.S. at 685-86.   *Washington* struck down a Texas law that prohibited codefendants in the same crime from testifying for one another and held that the Sixth Amendment right of an accused to have compulsory process for obtaining witnesses in his favor is incorporated in the Due Process Clause of the Fourteenth Amendment, and therefore applicable in state proceedings.   388 U.S. at

18-19. In the *Rock* case the question before the Court was "whether a criminal defendant's right to testify may be restricted by a state rule that excludes her posthypnosis [sic] testimony," 483 U.S. at 53, clearly not an issue in McKnight's case as he was never hypnotized nor was he prohibited from testifying in his own defense.

Finally, and most pertinent to McKnight's claim, in the *Holmes* case the Supreme Court recognized an accused's right under the Due Process Clause of the Fourteenth Amendment while noting that state rule makers "have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." 547 U.S. at 324. The Court stated

> While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. Plainly referring to rules of this type, we have stated that the Constitution permits judges "to exclude evidence that is repetitive . . . , only marginally relevant[,] or poses an undue risk of harassment, prejudice, [or] confusion of the issues." *Crane*, 476 U.S., at 689-690 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679.

*Holmes*, 547 U.S. at 326-27 (some citations, parallel citations, and internal quotation marks omitted). The Court vacated and remanded Holmes' case because the South Carolina Supreme Court applied a state rule that stated, "[W]here there is strong evidence of [a defendant's] guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt" may (or perhaps must) be excluded." *Id.* at 329, *citing State v. Holmes*, 361 S.C. 333, 342 (2004). The problem with that rule, the Supreme Court explained, is that the trial judge's focus is not on the probative value or potentially damaging effects from admitting a

defendant's third-party-guilt evidence, but is instead on the strength of the prosecution's evidence. *Holmes*, 547 U.S. at 329. In other words, "[i]f the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues." *Id.*, citing *Holmes*, 361 S.Ct. at 432

The evidence McKnight sought to have admitted at trial was not evidence of any third-party's guilt, but instead was intended to cast suspicion on Emily Murphy herself. The theory of the defense's case was that Emily Murphy had committed suicide, and Murray's reflections about her suicide attempt several months before her murder as well as other writings pertaining to her mental health were admitted into evidence. McKnight argues that Murphy's written "fictional stories, several drawings, and [her] reflections on life that did not mention suicide," *McKnight*, 2005-Ohio-6046 at ¶ 151, should also have been admitted but were not. Furthermore, the evidence McKnight wanted admitted that did not mention suicide predated the evidence that was admitted and did mention suicide and hospitalization. It is difficult to imagine how those circumstances could have deprived McKnight of "a meaningful opportunity to present a complete defense." *Holmes*, 547 U.S. at 331 (internal quotation marks omitted), *quoting Crane*, 476 U.S. at 690, in turn *quoting Trombetta*, 467 U.S. at 485. McKnight's twelfth ground for relief should be denied.

**Thirteenth Ground for Relief**

In his thirteenth Ground for Relief, McKnight alleges a member of his jury improperly discussed McKnight's case with a woman with whom he had recently had a relationship.   (ECF No. 127, PageID 15736-42.)   He argues that the trial court's in-chambers questioning of the juror fell short of a full hearing under *Remmer v. United States*, 347 U.S. 227 (1954), and that his Fifth, Sixth, and Fourteenth Amendment rights were violated as a result.   *Id*. at PageID 15736.

Respondent begins by asserting McKnight's ground for relief is procedurally defaulted to the extent he failed to raise error under the Eighth Amendment in his appeal to the Supreme Court of Ohio.   (ECF No. 13, PageID 428.)   But McKnight does not claim an Eighth Amendment violation in his amended habeas petition here, nor did he do so in his initial petition or any other amendments.   The Warden does not contend that the claim McKnight actually raises is procedurally defaulted, only that it is without merit.   *Id*. at 430-34.

McKnight unnecessarily repeats his claim in his Traverse, and argues that the communication between the juror and his ex-girlfriend must be presumed to have been prejudicial under *Remmer*.

When reviewing a state court judgment in habeas corpus proceedings, this Court is, as has been noted above, bound to defer to the state court's factual findings.   Thus, it is useful to recite the facts as found and relied upon by the Supreme Court of Ohio in its rejection of McKnight's parallel proposition of law.

88

{¶ 188}  In proposition of law XIII, appellant argues that he was denied a fair trial because one juror discussed the case with a nonjuror during the trial.

{¶ 189}  During the state's case, the prosecutor informed the trial court that Amy Warrix reported that her boyfriend, Terry Stewart, a juror, "has been talking to her about the case."  The trial court then called Juror Stewart into chambers for questioning.  Juror Stewart denied talking with Warrix about the trial.  He stated that he had "never discussed the case with her at all, nothing about the facts or that deals with the case at all."  Juror Stewart said that Warrix may have made these allegations against him because he had "left her last night, and she's a mean, hateful girl."  Juror Stewart said that when Warrix tried to talk to him about the case, he told her, "I'm under oath not to talk about it and not to hear about it."  He also told the court that he had followed those instructions.  Juror Stewart also assured the court that he did not acquire any outside information about the case as a result of being around Warrix.

{¶ 190}  Following the completion of Juror Stewart's questioning, defense counsel stated, "I'm satisfied with his explanation."  Defense counsel indicated that no further inquiry was necessary and declined the opportunity to question Warrix.  The trial court then stated, "The Court is satisfied as well at this point."

. . .

{¶ 192}  Appellant argues that the trial court was obligated to conduct a *Remmer* hearing to question Warrix, and possibly other jurors, before making a determination that no improper contact had occurred. . . .  The defense, however, was "satisfied" with the juror's explanation and indicated that no further inquiry into the allegations was necessary.  Thus, the trial court did not abuse its discretion. . . .

{¶ 193}  Appellant has failed to demonstrate that any juror misconduct occurred, and proposition XIII is overruled.

*McKnight*, 2005-Ohio-6046.  In addition, Juror Stewart stated in chambers that he only talked to

Warrix about the food the jurors were eating and nothing about the case itself.  (ECF No. 105-20,

PageID 6384.)   When Warrix tried to discuss with him what she had seen on television about the case, he told her he was under oath not to discuss it.   *Id.*   He told the court that he was following the instructions and that he had "told Carolyn about it when I come up here [this morning].   I come up and talked to them cops. . . .   I even come up and talked to [Deputy] Whitmore" about Warrix and her allegations.   *Id.* at PageID 6385-86.   Stewart expressed certainty that he had not acquired any information about the case from Warrix, and assured the court that he would make his decision as a juror based solely on the evidence produced in the trial.   *Id.* at PageID 6388-89. The prosecutor offered to make Warrix available to defense counsel for questioning, but both attorneys declined.   *Id.* at 6390.

In *Remmer v. United States*, 347 U.S. 227 (1954), the Supreme Court stated as follows:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.   The presumption is not conclusive, but the burden rests heavily upon the Government to established, after notice to and hearing of the defendant that such contact with the juror was harmless to the defendant.

*Id.* at 229.   Later, however, the Court restated the *Remmer* standard to place the burden of showing actual prejudice on petitioners when they allege juror partiality.   *Lang v. Bobby*, 889 F.3d 803, 911 (6th Cir. 2018), *citing Smith v. Phillips*, 455 U.S. 209, 217 (1982).

> The Sixth and Fourteenth Amendments guarantee a criminal defendant an impartial jury in state-court proceedings.   *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).   The state fails to vindicate that right for a defendant if "even a single biased juror" sits on the panel.   *Williams* [*v. Bagley*], 380 F.3d [932,] . . . 944 [(6th

90

Cir. 2004)] (citing *Morgan v. Illinois*, 504 U.S. 719, 729 (1992)). If a trial court is faced with evidence of a juror's bias, the court "must conduct 'a hearing with all interested parties permitted to participate.'" *United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005) (quoting *Remmer v. United States*, 347 U.S. 227, 230 (1954).

A defendant must "do more than simply raise the possibility of bias" in order to obtain a full *Remmer* hearing. *Id.* To the contrary, a trial court needs to conduct a *Remmer* hearing only when the defense raises a "colorable claim of extraneous influence." *Id.* (internal quotation and citation omitted). An "extraneous influence" is "one derived from specific knowledge about or a relationship with either the parties or their witnesses." *Id.* (internal quotation and citation omitted). . . . A court must seek assurance from the juror that she is capable of proceeding without bias, and if a trial court "views juror assurances of continued impartiality to be credible, the court may rely upon such assurances." *United States v. Pennell*, 737 F.2d 521, 533 (6th Cir. 1984).

*Jackson v. Bradshaw*, 681 F.3d 753, 766 (6th Cir. 2012)(parallel citations omitted).

Having recited the governing law established by the Supreme Court, this Court must consider whether the Supreme Court of Ohio's decision was contrary to or an unreasonable application of that law or an unreasonable determination of the facts given the evidence before the state trial court. 28 U.S.C. § 2254(d).

McKnight argues that Juror Stewart's answers to the attorneys' and trial court's questions in chambers reinforced rather than rebutted the presumption of prejudice. (ECF No. 17, PageID 741.) As noted above, however, the burden of raising a "colorable claim of extraneous influence" is on the defense. *Jackson*, 681 F.3d at 766. Only then is a *Remmer* hearing required. *Id.* *See also*, *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984) (noting that the *Smith* Court "held that *Remmer* does not govern the question of the burden of proof where potential jury partiality is alleged" and instead "controls the question of how the . . . court should proceed where such

91

allegations are made").  McKnight also declares that "[u]nder clearly established federal law, jurors being exposed to extrinsic evidence or other extraneous influence violates a defendant's Sixth Amendment rights, and a state court decision that conflicts with this rule may justify habeas relief . . . under the AEDPA."  (ECF No. 17, PageID 742-43.)  That statement completely ignores a defendant's burden of proof to raise a colorable claim of extraneous influence.

In McKnight's case, Juror Stewart himself reported Warrix's attempt to engage him in a conversation about the case before the jury was reconvened the next morning.  He explained that Warrix threatened to implicate him in inappropriate conversation about the case because he broke off their relationship, and that appears to be precisely what she did as evidenced by the prosecutor's bringing the issue to the court's attention the same morning.  There is no indication that Stewart shared any information about the incident with any other jurors.  The judge, prosecutor, and defense counsel were all satisfied with Juror Stewart's explanation of the events of the previous night and agreed that no further questioning of him was necessary.  Although McKnight alleges his defense counsel were ineffective for not pressing for a *Remmer* hearing, this Court recommends denial that claim, *infra*.  Consequently, it cannot be said that the state court's denial of McKnight's proposition of law was contrary to or an unreasonable application of federal law or an unreasonable determination of the facts.  Accordingly, McKnight's thirteenth ground for relief should be denied.

**Fourteenth Ground for Relief**

McKnight asserts that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when jurors who fell asleep during the presentation of evidence were permitted to remain on the jury. (ECF No. 127, PageID 15742.) He cites two examples of one or more jurors sleeping and states that no admonishment or other corrective action was taken by the court. *Id*. at 15744.

Respondent contends McKnight's ground for relief is procedurally defaulted to the extent he alleges violations of the Fifth, Eighth, and Fourteenth Amendments because he raised only a Sixth Amendment claim in the state supreme court. (ECF No. 13, PageID 435-36.) In addition, the Warden argues that even McKnight's Sixth Amendment claim is procedurally defaulted since there was no objection by his counsel respecting the sleeping jurors or the trial court's handling of the situation. *Id*. The Supreme Court of Ohio evaluated McKnight's claim only for plain error, and found none, Respondent states. *Id*. McKnight disputes the Warden's allegation that he presented only his Sixth Amendment claim in the state court, referring the Court to his state court appellate brief. (ECF No. 17, PageID 744.) Whether or not McKnight alleged the violation of his rights under one or many amendments to the Constitution is immaterial because under either set of circumstances, the ground for relief is procedurally defaulted.

In the first instance of a juror apparently dozing off, the prosecutor brought the matter to the court's attention and suggested a break so the jurors could move around to counteract the sleep-inducing effects of the "sweltering" heat in the courtroom. *McKnight*, 2005-Ohio-6046 at

93

¶¶ 173-76.   In the second instance, again brought to the attention of the court by the prosecutor, the court stated it would take note and be aware of the issue.   *Id*. at ¶¶ 177-83.   In neither instance did defense counsel object that the jurors were apparently sleeping or to the court's handling of the matter.   Thus, when McKnight raised it as a proposition of law on direct appeal, the state supreme court evaluated the claim as follows:

> {¶185}   Appellant argues that the trial court should have questioned [the second juror] to determine whether she was sleeping, or in the alternative, . . . [that she] should have been dismissed and replaced with an alternate juror.   The defense did not request either remedy at trial and expressed no dissatisfaction with the trial court's handling of the matter.   Thus, in the absence of plain error, this claim is waived.   See *State v. Childs* (1968), 14 Ohio St.2d 56, paragraph three of the syllabus.

> {¶186}   No plain error occurred.   There was only a vague allegation that jurors were sleeping when the issue was first raised with the trial court.   [One j]uror was alleged to have been asleep during a later portion of the trial, but the defense has provided no evidence that this juror was in fact sleeping.   Thus, whether [she] or any other juror was in fact sleeping is speculative.   The trial court observed that [that juror] did not "move around like other jurors * * * [and] just [maintained] a fixed position, as she [had] throughout."   The trial court noted counsel's concern about [the juror's] sleeping, but no further concern about sleeping jurors was raised during the trial.

> {¶187}   Moreover, appellant has provided no evidence of prejudice.   Nothing in the record shows what part of the testimony, if any, jurors actually missed.   See [*State v.*] *Sanders*, 92 Ohio St.3d [245,]253 [(2001)](affirming conviction where there was no evidence that the juror missed large or critical portions of the trial).   Based on the foregoing, we reject proposition XI.

*McKnight*, 2005-Ohio-6046.

The reasoning contained in the trial court's discussion of McKnight's claim is remarkably

similar to that of the Sixth Circuit Court of Appeals in *United States v Rafidi*, 829 F.3d 437 (6th Cir. 2016), except that there it was defense counsel who brought the sleeping juror to the court's attention, by asking the court, "Is there anything you might be able to say to him?" *Id*. at 448. The circuit court then explained that

> The district court asked both defense counsel and the prosecution whether they had witnessed a juror sleeping and remarked that it had told the jurors to "stand and stretch." Rafidi's counsel did not request that the district court take any further action following this exchange, such as requesting that the juror be removed or that the juror be questioned about sleeping. Rafidi's counsel did not object to the district court's proposed solution nor did counsel move for a mistrial. Because defense counsel did not request any further action and did not raise the issue again during trial, we cannot say that the district court plainly erred in addressing defense counsel's sleeping-juror allegation.

*Id*. The court of appeals also reasserted that "[A] juror who sleeps through much of the trial testimony cannot be expected to perform his duties." *Id*. at 448, *quoting United States v. Warner*, 690 F.2d 545, 555 (6th Cir. 1982).[11]

McKnight alleges the Supreme Court of Ohio "turned a blind eye to the reality of the record," that the ultimate responsibility of assuring a criminal trial is fair lies with the trial court so the sleeping jurors should have been dismissed even without defense counsel's request, and that "prejudice must be presumed." (ECF No. 17, PageID 749-50.) Yet the supreme court's opinion reflected a familiarity with the record and there is no evidence in the record before this Court to indicate how long the jurors may have been dozing or what testimony they may not have heard. Additionally, there is no authority cited for the proposition that prejudice should be presumed from

---

11 McKnight cites the same page of *Warner*, leaving out the part that specifies that the sleeping must be through "*much of the trial testimony*" to warrant dismissal of a juror. (ECF No. 17, PageID 748.)

a juror's dozing off. Consequently, even if McKnight had preserved the instant claim, it would be unavailing.

It bears mentioning, too, that *Rafidi*, *supra*, was heard on direct appeal and was not constrained by the stringent requirements of the AEDPA. Even so, the Sixth Circuit found no plain error in *Rafidi* in a factual scenario very similar to that in McKnight's trial. This Court would be hard-pressed to conclude that the Supreme Court of Ohio's same conclusion was contrary to or an unreasonable application of federal law. For the reasons stated, McKnight's fourteenth ground for relief should be denied.

**Fifteenth Ground Relief for Relief**

In his fifteenth ground for relief, McKnight argues that an outburst from a trial spectator during the closing arguments and the trial court's failure to take curative action afterward violated his rights to due process and to a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (ECF No. 127, PageID 15747.) The "outburst" consisted of a spectator's single-word statement, "No," after defense counsel suggested in closing argument that Emily Murray and McKnight were considering having a relationship. (ECF No. 105-25, PageID 7179.) Anticipating the Warden's response, McKnight acknowledges that his trial counsel failed to request any curative action, and preemptively offers his counsel's ineffectiveness as cause for the assumed procedural default. *Id*. McKnight also advances a sort of cumulative prejudice argument in claiming the pretrial publicity, victim impact evidence, other acts evidence, character

96

evidence, the same or another spectator's shout of approval when McKnight's sentence was read, and opinions expressed to the jurors from community members combined with the spectator's comment to deny him a fair trial before a fair and impartial jury.   *Id*. at PageID 15748-50.

The Warden counters that McKnight raised the instant claim only insofar as he claims his Sixth Amendment rights were violated, and that because his trial counsel did not lodge a contemporaneous objection to the spectator's comment, the entire ground for relief is procedurally defaulted.  (ECF No. 13, PageID 441.)   In the alternative, Respondent contends McKnight's claim is meritless.   *Id*. at PageID 443-44.

In his Traverse, McKnight argues against the procedural default of his ground for relief and summarizes his presentation of it to the state court, offers cause for any default, and prejudice therefrom.  (ECF No. 17, PageID 753.)   However, in *Harris v. Reed*, the Supreme Court held that a federal claimant's procedural default precludes federal habeas review . . . only if the last state court rendering a judgment in the case rests its judgment on the procedural default[.]"   489 U.S. 255, 262-63 (1989), *citing Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985); *Ulster County Court v. Allen*, 442 U.S. 140, 152–54 (1979); *see also Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) The fact is, however, that the state court ignored any procedural default and addressed the claim on its merits, although it noted that McKnight's counsel did not object or ask for a curative instruction after either outburst.  *McKnight*, 2005-Ohio-6046 at ¶¶ 194-204.

At trial, during defense counsel's culpability-phase closing argument, a spectator said, "No." when the attorney stated that one witness testified that Emily Murphy and McKnight were considering a relationship.  (ECF No. 105-25, PageID 7179.)   McKnight argues that the

97

disruption was of "sufficient magnitude for the court reporter to report it in the official transcript."

(ECF No. 127, PageID 15747.)   But that is precisely the court reporter's duty and she would be

remiss in that duty if a spectator uttered anything audible during the proceedings and she did not

include the word or words spoken in the transcript.   Thus, the fact that the court reporter

accurately recorded the words spoken in the courtroom is remarkable only as a testament to her

professionalism and proficiency.

The state supreme court stated as follows:

> {¶ 203}   "The impact of emotional outbursts at trial by witnesses or
> spectators cannot be judged by an appellate court on a cold record.
> 'Was the jury disturbed, alarmed, shocked or deeply moved? * * *
> These questions necessarily depend on facts which no record can
> reflect.'"   *State v. Hill* (1996), 75 Ohio St.3d 195, 204, quoting
> *State v. Bradley* (1965), 3 Ohio St.2d 38, 40.   Thus, a trial court
> must determine, as a question of fact, whether an emotional outburst
> deprived the defendant of a fair trial.   *State v. Scott*, 101 Ohio St.3d
> 31, 2004-Ohio-10, ¶ 44, [(Ohio 2004)].   "in the absence of clear,
> affirmative evidence to the contrary, the trial court's determination
> will not be disturbed."   [*State v.*] *Morales*, 32 Ohio St.3d [252,] 255
> [(Ohio 1987)].

> {¶ 204}   The record does not show whether the jurors heard the . . .
> outburst, and if so, whether it had any effect on them.   Further,
> neither counsel brought the outburst to the trial court's attention.
> Thus, it would be speculative to conclude that the one-word outburst
> was disruptive or prejudicial.   Under these circumstances, we find
> that no "clear, affirmative evidence" exists that the outburst
> deprived appellant of a fair trial.

*McKnight*, 2005-Ohio-6046.

McKnight argues that the trial court's failure to hold a *Remmer* hearing, question the jurors

as to whether the spectator's comment would influence their verdict, or give a curative instruction

compromised the fairness of his trial.   The Sixth Circuit has long recognized that

> [I]t is ordinarily advisable for a trial judge to conduct a hearing
> when there is third-party communication with the jury.   We cannot
> conclude, however, as [Petitioner] would have us, that the
> *Constitution requires a trial court to *sua sponte* conduct a
> full-blown evidentiary hearing every time a courtroom spectator
> makes a comment within the jury's hearing.   Where the
> communication is innocuous and initiated by a spectator in the form
> of an outburst, a hearing is not necessarily required.   This is
> particularly true when . . . the trial judge follows up with a statement
> to the jury, allaying any apprehensions.

*White v. Smith*, 984 F.2d 163, 166-67 (6th Cir. 1993).   In a more recent case, the Sixth Circuit

determined that the district court was within its discretion in finding the jurors would not be

prejudiced by a spectator's outburst that "They murdered my son" during a cooperating witness'

testimony.   *United States v. Nagi*, 541 Fed.App'x 556, 573 (6th Cir. 2013).   Granted, the district

court immediately instructed the jurors to disregard the statement, but it is also true that the nature

of the spectator's outburst in *Nagi* was qualitatively different than the single-word comment

uttered by the spectator in McKnight's case.   Similarly, the Sixth Circuit found a motion for

mistrial was properly denied without an evidentiary hearing where a "victim's wife, in reference to

the defendant, repeatedly uttered 'murderers and killers'" and where the trial court issued general

admonitions to the jury to be fair to both sides and presume the defendants were innocent until

proven guilty.   *Rogers v. Howe*, 64 Fed. App'x 450, 457 (6th Cir. 2003).   Furthermore, coming as

it did following the prosecutor's argument that McKnight and Emily Murray were considering a

relationship, the spectator's "No" could have had no impact on the jurors with regard to the

offenses with which McKnight had been charged with the possible exception of the kidnapping

count.   Even if McKnight and Murray had been in a relationship, that would not have insulated

him from the kidnapping conviction; it is possible to kidnap intimates.

99

"It is clear that a defendant who fails to request a hearing or other relief 'bears a heavy burden.'" *Mays v. Chandler*, Case No. Crim. A. 6;06-426-DCR 2007 WL 2903212 at *7 (E.D Ky. Sept. 28, 2007), *quoting United States v. Walker*, 1670 F.3d 1078, 1083 (6th Cir. 1998). Given the context and nature of the spectator's comment in this case and the absence of a request for a hearing, admonition, or mistrial, this Court cannot say that the Ohio court's decision respecting the instant ground for relief was contrary to or an unreasonable application of federal law as determined by the Supreme Court. Accordingly, McKnight's fifteenth ground for relief should be denied.

**Sixteenth Ground for Relief**

In his sixteenth ground for relief, McKnight contends his appearance before the jury while shackled violated his rights to due process, a fair trial, and an impartial jury as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (ECF No. 127, PageID 15750.) Respondent argues that the state court's decision denying the claim is entitled to deference under the AEDPA and that it is consequently meritless. (ECF No. 13, PageID 445-48.) McKnight counters that since he was shackled in the courtroom and in the jury's presence, prejudice should be presumed and his convictions and sentence vacated. (ECF No. 17, PageID 760-62.)

On direct appeal, the Supreme Court of Ohio resolved McKnight's claim as follows:

{¶ 216} ***Defendant's shackling.*** In proposition of law XVII, appellant contends that he was denied a fair trial when the jury saw him shackled.

{¶ 217} After the jury had started guilt-phase deliberations, the jury returned to the courtroom for instructions prior to retiring for the evening. Appellant was placed in handcuffs while the jurors were leaving the courtroom. Although trial counsel acknowledged that the handcuffing was "inadvertent," the defense requested a mistrial. In overruling the motion for mistrial, the trial court stated that "Mr. McKnight has appeared throughout all stages of the proceedings, * * * whenever the jury has been present, * * * he has appeared in street clothing, and he has appeared free of any restraints of any type, at least anything visible to the jury."

{¶ 218} Over defense objection, the trial court provided a curative instruction before the jury resumed its deliberations. The trial court advised the jury: "If you have seen Gregory B. McKnight in any type of restraints at any time during this proceeding, you are hereby instructed to disregard it, as it does not bear on his guilt or innocence in any manner."

{¶ 219} No one should be tried while shackled, absent unusual circumstances. *Illinois v. Allen* (1970), 397 U.S. 337, 344. Even though the jury saw appellant handcuffed on one occasion, appellant has failed to demonstrate prejudice. The jury's view of him was brief and inadvertent. Cf. *State v. Kidder* (1987), 32 Ohio St.3d 279, 285-286 (danger of prejudice is slight where a jury's view of defendant in custody is brief, inadvertent, and outside of the courtroom).

{¶ 220} Moreover, the trial court's curative instruction removed any prejudice. See *State v. Garner* (1995), 74 Ohio St.3d 49, 59 (jury presumed to follow the trial court's curative instructions). Thus, the fact that the jury observed appellant handcuffed on one occasion did not deprive him of a fair trial. Accordingly, we find that proposition [of law] XVII lacks merit.

*McKnight*, 2005-Ohio-6046 (parallel citations and footnote omitted).

It is true that "[t]he Constitution forbids the use of visible shackles during the penalty phase

[of a capital trial], as it forbids their use during the guilt phase," *Deck v. Missouri*, 544 U.S. 622, 624 (2005),[12] but that prohibition is not unqualified. If the use of such security measures is "justified by an essential state interest – such as the interest in courtroom security – specific to the defendant on trial," there is no constitutional prohibition against using such measures. *Id*. In other words, the Constitution does not prohibit shackling, it prohibits routine shackling. *Id*. at 626. Moreover,

> Where a defendant was seen shackled in the courtroom for a significant period of time, courts have found the shackling "inherently prejudicial." However, if the defendant was seen shackled outside the courtroom or was seen shackled in the courtroom only briefly, prejudice has not been presumed and the petitioner must prove he was actually prejudiced. ([C]itations omitted.)

*Keys v. Booker*, 798 F.3d 442, 455 (6th Cir. 2015) (some quotation marks omitted).

The first barrier to habeas relief on McKnight's claim is that the single incident of his being handcuffed before all jurors were out of the courtroom is a far cry from the "routine" shackling *Deck* prohibits. Defense counsel recognized that the handcuffing in the presence of some of the jurors "was truly inadvertent" and that "I have never had a client treated with the respect and the courtesy that Mr. McKnight has been shown by this Court and by the Sheriff's staff." *Id*. at PageID 7312-13. The handcuffing of McKnight in the view of the jury can only be described as brief.

Second, there is no clear evidence that any juror actually saw McKnight being handcuffed,

---

[12] The Sixth Circuit has observed that it has twice held that "the principles underlying *Deck* were, in fact, clearly established by the Supreme Court before its decision in *Deck*." *Mendoza v. Berghuis*, 544 F.3d 650, 653 (6th Cir. 2008), *citing Lakin v. Stine*, 431 F.3d 959, 963 (6th Cir. 2005).

and neither the prosecutor nor the judge saw him being cuffed. (Trial Tr., ECF 105-26, PageID 7309-10.) In fact, in objecting to the curative instruction later given, defense counsel acknowledged that "an instruction may focus all twelve jurors on something that some or none may have observed." *Id*. at PageID 7313.

Third, the complained-of incident occurred when court had been adjourned for the day and everyone was exiting the courtroom. *Id*. at PageID 7310-11. The trial judge remarked that the jurors knew everyone was leaving, including McKnight. *Id*. at PageID 7311. As a convicted murderer of two individuals facing death or a very long prison sentence, it would be nothing short of folly to prepare to transport McKnight without restraints. Surely no juror would rest her sentencing decision on the brief sight of McKnight being prepared to be transported to jail, even assuming she did see the handcuffing.

Finally, because McKnight argues that any and all shackling inside the courtroom in the presence of the jury is inherently prejudicial, he makes no attempt to demonstrate prejudice as required when the jury's exposure to the shackling is brief, and none is evident from the record before this Court. *See Keys*, 798 F.3d at 455.

McKnight also argues error in the trial judge's decision to give the jury a curative instruction on the chance that any of the jurors actually saw McKnight being handcuffed. Before giving the curative instruction, however, the trial judge gave defense counsel a chance to withdraw their previously made motion for mistrial based on the handcuffing issue. (ECF No. 105-26, PageID 7315.) McKnight's counsel declined and argued strenuously against the instruction saying it would amplify rather than cure the error and insisting that declaration of a mistrial was

the only remedy for the error.  *Id*. at PageID 7315-19.  Nevertheless, the court gave the jury instruction as noted in the excerpt from the Supreme Court of Ohio's decision, *supra*.

McKnight has offered no proof of prejudice attributable to the complained-of jury instruction.   In spite of his objection to the instruction, the Sixth Circuit has noted that when jurors inadvertently catch a glimpse of a defendant in shackles and the trial judge instructs them in a manner similar to the instruction given in McKnight's case, "[t]here is the presumption that juries will follow such curative instructions."  *United States v. Moreno*, 933 F.2d 362, 368 (6th Cir. 1991).   In *Moreno*, the Sixth Circuit quoted with approval from *United States v. Gomez-Pabon*, 911 F.2d 847, 858 (1st Cir. 1990), where that court stated that "presumption will be defeated only if there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect . . . would be devastating to the defendant."   Since even defense counsel acknowledged that they were unsure whether any of McKnight's jurors even saw him being handcuffed, rebutting the presumption in his case is insurmountable.

McKnight has failed to demonstrate that the brief opportunity jurors had to view him being handcuffed in preparation for transport prejudiced him in any way, and has also failed to show any prejudice from the trial court's having given a curative instruction in case one or more jurors actually saw his being handcuffed.   The Supreme Court of Ohio's rejection of McKnight's claim of error was neither contrary to nor an unreasonable application of Supreme Court law.   Accordingly, his sixteenth ground for relief should be denied.

**Seventeenth Ground for Relief**

In his seventeenth ground for relief, McKnight contends he was denied due process and a fair trial due to the trial court's instruction that the jury "must decide whether the State has proved beyond a reasonable doubt that Gregory McKnight committed the aggravated murder for the purpose of escaping detection, apprehension, trial or punishment for kidnapping and/or a theft offense." (ECF No. 127, PageID 15754-56; ECF No. 105-26, PageID 7269.) He argues that the "and/or" wording of the court's instruction deprived him of a unanimous verdict since some jurors may have found him guilty of the charge on the basis of the kidnapping, some on the basis of the theft, and others on the basis of both offenses. He makes the same argument with respect to the court's instruction on the aggravated robbery charge which allowed that jurors could find him guilty if he knowingly obtained or exerted control over the Subaru Outback without consent or by threat. McKnight states his claim by cutting and pasting from his appellate brief to the Supreme Court of Ohio with very little modification and adding a paragraph parroting 28 U.S.C. § 2254(d), and simply declaring that the state court's decision does not comport with that law.

Respondent counters that the claim is procedurally defaulted because McKnight did not raise it as an Eighth Amendment claim in the state court. (ECF No. 13, PageID 449.) That is true as far as it goes (ECF No 106-14, PageID 9571-79), so to the extent McKnight relied on the Eighth Amendment in his ground for relief, his claim is procedurally defaulted. But McKnight did raise the claim as Fifth, Sixth, and Fourteenth Amendment violations. (ECF No. 106-15, PageID 9571-79.) Respondent also argues that McKnight's claim is procedurally defaulted

because he lodged no contemporaneous objection at the time the challenged instruction was given, and because he invited any error by including the instruction he now challenges in his own proposed jury instructions.

In his Traverse, McKnight addresses the Warden's procedural default defense, offering his attorneys' ineffectiveness as cause and arguing that he was "required to prove that the mitigating factors outweighed the aggravating circumstances, an impermissible shift of the burden of proof which denied him due process and a fair and reliable sentencing determination." (ECF No. 17, PageID 765. He also repeats his argument from his petition.[13] *Id.* at PageID 763-70.

McKnight raised the instant claim alleging violations of his Fifth, Sixth, and Fourteenth Amendment rights in the Supreme Court of Ohio as his eighteenth proposition of law. (ECF No. 106-15, PageID 9571-79.) That court rejected the claim, reasoning, in relevant part, as follows:

> {¶ 224} **2. Duplicative instructions.** In proposition of law XVIII, appellant argues that the instructions on the R.C. 2929.04(A)(3) escaping-detection specification and the separate kidnapping and aggravated-robbery charges were duplicative and violated his right to a unanimous jury verdict.
>
> {¶ 225} Appellant's failure to object to the alleged duplicative nature of the instructions waived all but plain error. [*State v.*] *Underwood*, 3 Ohio St.3d 12 [(1983)], syllabus. Moreover, appellant's proposed instructions included language that he now contends was erroneous. Thus, appellant invited any error and may not "take advantage of an error which he himself invited or

---

[13] The Court notes that McKnight refers to his "conviction" on a kidnapping and/or theft offense in throughout his petition and his traverse in his presentation of his seventeenth ground for relief, which concerns instruction on the aggravating circumstance which the jury found beyond a reasonable doubt. But "[a]ggravating circumstances are not separate penalties or offenses," *Poland v. Arizona*, 476 U.S. 147, 156 (1986), so "[a] capital sentencer's finding, or failing to find, an aggravating circumstance does not 'convict' or 'acquit' a defendant." *United States v. Lawrence*, 735 F.3d 385, 427 (6th Cir. 2013), *quoting Poland v. Arizona*, 476 U.S. 147, 156 (1986). Moreover, "[t]he use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988); *Scott v. Mitchell*, 209 F.3d 854, 884 (6th Cir. 2000).

induced." *State v. Bey* (1999), 85 Ohio St.3d 487, 493, quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.* (1986), 28 Ohio St.3d 20, paragraph one of the syllabus; *State v. Seiber* (1990), 56 Ohio St.3d 4, 17.

{¶ 226} We reject appellant's claims on the basis of plain error and invited error. Instructions on the R.C. 2929.04(A)(3) specification referred to appellant's committing the murders for "the purpose of escaping detection, apprehension, trial or punishment for *kidnapping and/or a theft offense*." (Emphasis added.) Appellant argues that this instruction deprived him of his right to a unanimous jury verdict because some of the jurors may have convicted him of the (A)(3) specification on the basis of kidnapping and others on the basis of aggravated robbery. The jurors did not convict appellant of the (A)(3) specification on alternative theories, because the same jury separately convicted of *both* kidnapping and aggravated robbery. Cf. *State v. Noling*, 98 Ohio St.3d 44[, 57] ¶ 68 [(2002)]; *State v. Keene* (1998), 81 Ohio St.3d 646, 664. Thus, the outcome of appellant's case would not have been different had the instructions been worded differently.

*McKnight*, 107 Ohio St.3d at 132 (parallel citations and internal quotation marks omitted). Thus, the Supreme Court of Ohio rejected McKnight's proposition of law for lack of a contemporaneous objection at the time the challenged instruction was given, and because McKnight included the language he argued was improper in his proposed jury instructions.

The Supreme Court has stated that "in all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal *habeas corpus review of the claims is barred* unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 3501, U.S. 722, 749 (1991) (emphasis added). A federal habeas petitioner can procedurally default a claim by "failing to obtain consideration of a claim by a state court . . . due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim." *Seymour*

107

> *v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80 (1977)). When the state procedural rule prevents the state court from hearing the merits of the claim, procedural default occurs when 1) a petitioner failed to comply with the rule, 2) the state actually enforced the rule against the petitioner, and 3) the rule is an "adequate and independent" state ground foreclosing review of a federal constitutional claim. *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003). Failure to comply with well-established and normally enforced procedural rules usually constitutes "adequate and independent" state grounds for foreclosing review. *See id*. at 745.

*Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006)(parallel citations and footnote omitted). The Sixth Circuit Court of Appeals has repeatedly held that Ohio's contemporaneous objection rule constitutes an independent and adequate state procedural rule which, when relied upon by the state court, results in the default of the claim in federal habeas corpus proceedings. *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 424 (6th Cir. 2003)(listing cases). Thus, McKnight's ground for relief is procedurally defaulted.

Even if that were not so, however, his claim would fail on the merits. As the state court pointed out, the jury had already unanimously found McKnight guilty beyond a reasonable doubt in the culpability phase of his trial. Given that fact, it is unlikely in the extreme that any of the jurors would have held out for a life sentence for McKnight had the complained-of specification referred only to one of the underlying offenses. It is true that the better practice would have been to do just that, but this Court is authorized only to correct errors of a federal constitutional dimension and even if McKnight's ground for relief demonstrated such an error, it is difficult to detect corresponding prejudice sufficient to warrant the extraordinary relief that is habeas corpus.

For the reasons stated, McKnight's seventeenth ground for relief should be denied as

procedurally defaulted.

**Eighteenth Ground for Relief**

In his eighteenth ground for relief, McKnight contends that his rights to due process, a fair trial, and an impartial jury were violated by the trial court's instructions concerning the kidnapping charge, citing the Fifth, Sixth, Eighth, and Fourteenth Amendments. (ECF No. 127, PageID 15757.) Specifically, he states that the trial court's instruction to the jury that should it find McKnight guilty of the kidnapping charge, it must then determine whether she was released in a safe place, unharmed. *Id.* The Warden correctly argues McKnight's claim is procedurally defaulted to the extent that it was not raised as a violation of McKnight's Fifth or Eighth Amendment rights in the state court. (ECF No. 13, PageID 455; Appendix, ECF No. 106-15, PageID 9584.) McKnight counters that because his claim here is "substantially similar" to that raised in the state court, it is saved from procedural default, whole and in part. (ECF No. 17, PageID 771.)

> A petitioner "fairly presents" the "substance of his federal habeas corpus claim" when the state courts are afforded sufficient notice and a fair opportunity to apply controlling legal principles to the facts bearing upon the constitutional claim. [*Anderson v.*] *Harless*, 457 U.S. [4,] 6[ (1982)]. Although a certain degree of tinkering is permissible, a petitioner does not fairly present a claim if he presents an issue to the state courts under one legal theory, and then presents the issue to the federal courts under a different legal theory. Rather, he must present to the federal court essentially the same facts and legal theories that were considered and rejected by the state courts. *Lorraine v. Coyle*, 291 F.3d 416, 425 (6th Cir. 2002)(citing *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998); *Lott*

> *v. Coyle*, 261 F.3d 594, 607, 609 (6th Cir. 2001), *Lott v. Bagley*, 534
> U.S. 1147 (2002).

*Cowans v. Bagley*, 236 F.Supp.2d 841, 857 (S.D. Ohio 2002)(parallel citations omitted).

McKnight argues, and the state supreme court agreed, that his exclusion of the "released in a safe place, unharmed" instruction in his proposed jury instructions, preserved the instant claim for appeal in the state court. *McKnight*, 2005-Ohio-6046 at ¶ 232. The state court went on to address the merits of McKnight's proposition of law. *Id.* at ¶¶ 233-34. Accordingly, McKnight's eighteenth ground for relief is preserved for habeas review to the extent that he purports he raised it as a federal constitutional matter in the state court.

In relevant part, the state supreme court denied McKnight's claim, reasoning as follows:

> Appellant never argued that Murray was released unharmed in a safe place. Thus, the language was not properly at issue.
>
> Appellant argues that the instruction on release in a "safe place unharmed" was prejudicial, turning a mitigating circumstance into an aggravating element. That assertion, however, is speculative. Moreover, overwhelming evidence supported the jury's verdict on the kidnapping and murder charges. Consequently, appellant suffered no prejudice by the finding of the jury that Murray was not released "in a safe place unharmed." Thus, we overrule proposition XX.

*McKnight*, 2005-Ohio-6046 at ¶¶ 233-34. Noting that in McKnight's appellate brief to that court stated that "the jury could have used this element as proof for the underlying felony" (ECF No. 106-15, PageID 9587), and repeating that language verbatim in his habeas petition (ECF No. 127, PageID 15759) and his Traverse (ECF No. 17, PageID 773), this Court finds nothing unreasonable about the Supreme Court of Ohio's conclusion that any supposed prejudice McKnight may have suffered as a result of the "safe place unharmed" instruction is purely speculative.

110

For the reasons stated, McKnight's eighteenth ground for relief should be denied.

**Nineteenth Ground for Relief**

In his nineteenth ground for relief, McKnight argues that his absence during Juror Stewart's voir dire regarding Amy Warrix's alleged conversations with the juror about the trial violated his right to be present.  (ECF No. 127, PageID 15760.)  He contends his lawyer's waiver of his presence from that in-chambers discussion violated his rights to a fair trial, due process, and to confront the witnesses against him.  *Id*.  McKnight was also absent from a review of the parties' proposed jury instructions although he states he did not waive his presence in either situation.  *Id*.

The Warden does not advance a procedural default defense and instead counters that McKnight waived his presence at any in-chambers discussions with counsel which included the voir dire of Juror Stewart and the review of the proposed jury instructions.  (ECF No. 13, PageID 461-62.)  Furthermore, McKnight's presence would not have contributed to the fairness of his trial as the discussions involved matters about which McKnight would have had little to add beyond his attorneys' questions and comments.  *Id*.

McKnight denies he consented to his absence at discussions held in chambers and insists he was prejudiced by the court's failure to obtain his knowing and intelligent consent to be absent from the in-chambers discussions.  (ECF No. 17, PageID 778-81.)

A defendant's right to be present is not all encompassing or absolute.  *Polizzi v. United*

111

*States*, 550 F.2d 1133, 1137 (9th Cir. 1976). "Due process does not assure 'the privilege of presence when presence would be useless, or the benefit but a shadow.'" *Id.*, quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106-07 (1934). "Moreover, even improper exclusion of a defendant from a 'critical portion of the trial does not automatically require reversal, if in the particular case the defendant's absence was harmless beyond a reasonable doubt." *Id.*, citing *Rogers v. United States*, 422 U.S. 35, 40 (1975) (dictum).

### Exclusion from Juror Stewart's In-Chambers *Voir Dire*

In *United States v. Gagnon*, 470 U.S. 522 (1985) (*per curiam*), a juror expressed concern to the bailiff that the defendant, Gagnon, had been sketching portraits of the jury. The judge ordered that the activity cease immediately, and Gagnon's attorney suggested the concerned juror be questioned in chambers to determine whether he had been prejudiced against Gagnon because of the sketching. In chambers, and in Gagnon's absence, the court explained to the juror that Gagnon was an artist and meant no harm, that the drawings had been confiscated, and that he was instructed not to make any more sketches. The juror stated he was satisfied and was able to remain impartial as the trial continued. The Supreme Court stated:

> We think it clear that respondents' rights under the Fifth Amendment Due Process Clause were not violated by the *in camera* discussion with the juror. "[T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. **The defense has no constitutional right to be present at every interaction between a judge and a juror**. . . ." *Rushen v. Spain*, 464 U.S. 114, 125-126 (1983)(Stevens, J., concurring in judgment).

112

> The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, *e.g.*, *Illinois v. Allen*, 397 U.S. 337 (1970), but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him.  In *Snyder v. Massachusetts*, 291 U.S. 97 (1934), the Court explained that a defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. . . .  [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."  *Id.*, at 105-106; see also *Faretta v. California*, 422 U.S; 806, 819, n.15 (1975).  The Court also cautioned in *Snyder* that the exclusion of a defendant from a trial proceeding should be considered in light of the whole record.  291 U.S., at 115.

*Gagnon*, 470 U.S. at 526-27 (emphasis added; parallel citations omitted).  McKnight has not put forward any suggestion that his absence from the *in camera* discussion with Juror Stewart thwarted the fairness of the hearing.  Thus, to the extent McKnight argues his federal constitutional rights were violated by the trial court's *in camera* questioning of Juror Stewart, he has failed to demonstrate that the state court's decision was an unreasonable application of federal law as determined by the United States Supreme Court  28 U.S.C. § 2254(d)(1).

McKnight relies on *Hopt v. Utah*, 110 U.S. 574 (1884), for the proposition that "[a] defendant is required to be present at every stage of the trial except when he voluntarily declines to attend the proceedings."  (ECF No. 127, PageID 15761.)   But as was observed in *Illinois v. Allen*, "[t]he broad dicta in *Hopt v. Utah* . . . that a trial can never continue in the defendant's absence have been expressly rejected."  397 U.S. 337, 342 (1970),   *citing Diaz v. United States*, 223 U.S. 442 (1912).  *Hopt* can also be distinguished from McKnight's case because in *Hopt*, after having

been accused of bias, a "trier" was appointed to each juror and taken out of the courtroom to be questioned by their trier out of the presence of the trial judge, the defendant, and his counsel. *Hopt*, 110 U.S. at 577.

Furthermore, at McKnight's trial the following colloquy took place during a pretrial hearing on various motions:

> [Defense counsel] Mr. Carson:  [Prosecutor] Mr. Gleeson had inquired of if we had no objection and if Greg [McKnight] personally had no objection that in[-]chambers conferences be conducted what I'll refer to as the traditional manner which is the Court and Counsel sometimes Court staff, but not the defendant present and we are and Mr. McKnight is part of that we, we are in agreement with proceeding in that manner as we did before here on the record this morning.  In[-]chambers conferences would be conducted in the traditional Court, counsel and whatever Court staff the Court wished to have present.  Thank you.
>
> Judge Simmons:  All right.  Thank you, Mr. Carson.  Mr. Gleeson.
>
> Mr. Gleeson:  Your honor, I would like to go one step further and get Mr. McKnight and ask him to say yes I (inaudible).
>
> Judge Simmons:  Sure. . . .  All right.  Just just just I'm fully satisfied you're in agreement, Mr. McKnight, but you would you just heard what Mr. Carson said about when the Court would have any discussions in chambers with counsel that that would be either way those are typically conducted.
>
> Mr. McKnight:  Yes.
>
> Judge Simmons:  And he indicated that you and he were in agreement that that could be done in that way and is that your agreement?
>
> Mr. McKnight:  Yes, I agree with that.

(Trial Tr., ECF No. 105-1, PageID 3307-08.)  It is difficult to interpret that colloquy in any way

114

other than that McKnight personally waived his presence at any in-chambers discussions during his trial.

### Exclusion From Review of Proposed Jury Instructions

McKnight's argument on this point is sparse and devoid of any specificity. What instructions would he have offered or objected to that his attorneys did not? How would they have made a difference in the outcome of his trial? McKnight provides no answers to those questions. He merely states that his waiver of attendance at the review of the proposed jury instructions is not on the record or in writing (despite his waiver on the record at the June 5, 2002, hearing on various motions, *supra*), and that his exclusion at that "critical" hearing was therefore a violation of his right to be present. As noted above, however, that right is not absolute, and McKnight not persuaded this Court that the state supreme court's overruling of his proposition of law on the basis of his valid waiver of his right to be present at in-chambers conferences was contrary to or an unreasonable application of federal law as determined by the Supreme Court.

For the foregoing reasons, McKnight's nineteenth ground for relief should be denied.

## Twentieth Ground for Relief

In his twentieth ground for relief, McKnight contends that the trial court's instructions on reasonable doubt violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights to due

115

process and a fair trial. (ECF No. 127, PageID 15762.) Specifically, he argues that the instruction describing "beyond a reasonable doubt" as a level of certainty at which "an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs," given in both phases of his trial, allowed the jury to convict and sentence him on a lower standard of proof than is required by the Constitution. *Id.* at PageID 15762-64.

The Warden counters that McKnight's claim is procedurally defaulted because he never raised the claim in the state court as a violation of his Fifth, Sixth, or Eighth Amendment rights. (ECF No. 13, PageID 464.) The Warden further argues that the state supreme court's rejection of McKnight's claim based on its own precedent is due deference in this Court. *Id.* at PageID 465.

McKnight does not contradict the Warden's procedural default argument, but contends his claim here is "substantially similar" to that raised in the state court which he alleges saves it from default. (ECF No. 17, PageID 783.) He argues that Ohio's definition of clear and convincing evidence is distinctly similar to its definition of the reasonable doubt standard, and that as a consequence, he was convicted on proof that was less than beyond a reasonable doubt and thereby denied due process. *Id.* at 786. The definition he quotes, however, explicitly distinguishes the two standards of proof:

> Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.

*Id.*, *quoting Cross v. Ledford*, 161 Ohio St. 469, 477 (1954); *accord*: *Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, ¶ 14. But that instruction was never given at McKnight's

116

trial. The preliminary jury instruction on reasonable doubt was given as follows:

> To find the defendant guilty, you must find that the State has proved the defendant guilty by proof beyond a reasonable doubt. Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge.
>
> Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.
>
> Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

(ECF No. 105-13, PageID 5348.) Except for the first sentence in the quotation above, the same instruction was given at the close of the culpability phase of McKnight's trial (ECF No. 105-25, PageID 7254), and at the conclusion of the penalty phase of his trial, the second and third paragraphs of the instruction above were given, prefaced by, "Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced that the aggravating circumstance of which Gregory B. McKnight was found guilty outweighs the mitigating factors (ECF No. 105-27, PageID 7542).

Although McKnight's challenging of an instruction never given at his trial is enough to defeat his claim, the Court observes that McKnight also conspicuously neglects to mention the Supreme Court case of *Victor v. Nebraska*, 511 U.S. 1 (1994), where the Court stated as follows:

> The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. Cf. *Hopt v. Utah*, 120 U.S. 430, 440-441 (1887). Indeed, so long as the court instructs the jury on the necessity that the

117

> defendant's guilt be proved beyond a reasonable doubt, see *Jackson v. Virginia*, 443 US. 307, 320 (1979), the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Cf. *Taylor v. Kentucky*, 436 U.S. 478, 485-486 (1978). Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." *Holland v. United States*, 348 U.S. 121, 140 (1954).

*Id*. at 5 (parallel citations omitted). The Court went on to explain that it had only found a definition of reasonable doubt violative of the Due Process Clause one time, that being *Cage v. Louisiana*, 498 U.S. 39 (1990)(*per curiam*), a death penalty case. Soon after *Cage*, the Court, in an attempt to clarify the question courts must answer when a petitioner challenges a jury instruction, stated that it is not how reasonable jurors *could* have understood the charge as a whole, but "'whether there is a reasonable likelihood that the jury *has* applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 and n.4 (1991)(disapproving *Cage*), *quoting Boyde v. California*, 494 U.S 370, 380 (1990) (emphasis added).

In any event, The Sixth Circuit has repeatedly held that the language McKnight challenges does not violate due process. *Franklin v. Bradshaw*, 695 F.3d 439, 456 (6th Cir. 2012); *White v. Mitchell*, 431 F.3d 517, 534 (6th Cir. 2005); *Coleman v. Mitchell*, 268 F.3d 417, 437 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 366 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir. 2000); *Scott v. Mitchell*, 209 F.3d 854, 884 (6th Cir. 2000); *Thomas v. Arn*, 704 F.2d 865, 867-68 (6th Cir. 1983). McKnight does not explain why the "reasonable doubt" instructions given in his case should be treated differently from the same instructions in those cases. The Supreme Court of Ohio's rejection of McKnight's claim on direct appeal was neither contrary to nor an

118

unreasonable application of clearly established Supreme Court law. Consequently, his twentieth ground for relief should be denied.

**Twenty-first Ground for Relief**

In his twenty-first ground for relief, McKnight argues that the exclusion of victim impact evidence favoring a life sentence for him deprived him of his rights to due process and equal protection as well as a fair and reliable sentencing determination, violating the Fifth, Sixth, Eighth, and Fourteenth Amendments. (ECF No. 127, PageID 15764.) The Warden counters that McKnight's claim is procedurally defaulted to the extent he raised it as a violation of the Fifth and Sixth Amendments. (ECF No. 13, PageID 467.) Additionally, the Warden contends that the state court's decision respecting the instant claim was neither contrary to nor an unreasonable application of federal law as determined by the Supreme Court. *Id.* at PageID 470-72. McKnight replies that his habeas claim is substantially equivalent to the claim presented in the state court which constitutes a fair presentation of the claim sufficient to defeat the Warden's procedural default defense. (ECF No 17, PageID 788.) As for the merits of his claim, he argues that the affidavit and intended testimony of Emily Murray's sister Kathleen Murray to the effect that McKnight should not be sentenced to death because the proceedings following such a sentence "may tear our family apart.". (ECF No. 107, PageID 9975.) In addition, Kathleen Murray begged the court to sentence McKnight to a life term of imprisonment rather than death because Emily was opposed to the death penalty on religious and humanitarian grounds, the

119

suffering his young children would experience from having a father on death row and eventually executed, and Kathleen's own opposition to the death penalty.  *Id*. at PageID 9975-76.

The United States Supreme Court has recently summarized the law respecting victim impact evidence as follows:

> In *Booth v. Maryland*, 482 U.S 496 (1987), this Court held that "the Eighth Amendment prohibits a capital sentencing jury from considering victim impact evidence that does not "relate directly to the circumstances of the crime."  *Id*., at 501-502, 507, n.10.  Four years later, in *Payne v. Tennessee*, 501 U.S. 808 (1991), the Court granted certiorari to reconsider that ban on "'victim impact' evidence" relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family."  *Id*., at 817.  The Court held that *Booth* was wrong to conclude that the Eighth Amendment required such a ban.  *Payne*, 501 U.S. at 827.  That holding was expressly "limited to" this particular type of victim impact testimony.  *Id*., at 830, n.2.  "*Booth* also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment, . . . ."  *Ibid*.

*Bosse v. Oklahoma*, ___ U.S. ___, ___, 137 S.Ct. 1, 1-2 (2016) (*per curiam*) (parallel citations omitted).   The *Payne* Court succinctly stated its holding:   "We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on [the] subject [of the personal characteristics of the victim and the emotional impact of the crimes on the victim's family], the Eighth Amendment erects no *per se* bar."  *Payne*, 501 U.S. at 827.  But "*Booth*'s prohibition on characterizations and opinions from a victim's family members about the crime, the defendant, and the appropriate sentence" survives *Payne* unless and until the Supreme Court reconsiders that ban.  *Bosse*, 137 S.Ct. at 2.

The Supreme Court of Ohio addressed the merits of McKnight's Eighth and Fourteenth

Amendments claim as follows:

{¶ 245}  [A]ppellant's constitutional rights were not violated by the exclusion of testimony from [Emily] Murray's family members recommending that appellant receive a life sentence.  In *Lockett v. Ohio* (1978), 438 U.S 586, a plurality of the court held that a jury should "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  (Emphasis sic.)  *Id.* at 604.  It noted, however, that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense."  *Id.* at 605, fn. 12.  Here, possible testimony from Murray's family members recommending a life sentence had no relevance to appellant's character, prior record, or the circumstances of the offense.

{¶ 246}   Second, appellant contends that the life-sentence recommendations from Murray's family were admissible as victim-impact testimony.   This argument also lacks merit.

{¶ 247}  In *State v. Huertas* (1990), 51 Ohio St.3d 22, syllabus, this court held "Expressions of opinion by a witness as to the appropriateness of a particular sentence in a capital case violate the defendant's constitutional right to have the sentencing decision made by the jury and judge."   Subsequently, the United States Supreme Court held, "[I]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar."  *Payne v. Tennessee* (1991), 501 U.S. 808, 827, overruling *Booth v. Maryland* (1987), 482 U.S. 496, 507 (victim-impact evidence inadmissible at sentencing phase of capital trial unless directly related to circumstances of crime), and *South Carolina v. Gathers* (1989), 490 U.S. 805, 811 (extending *Booth* to prohibit prosecutor's statements regarding personal characteristics of victim).   *Payne* did not reexamine the propriety of victims' families' recommendations as to the appropriate sentence or sanction their admission.   See *Payne*, 501 U.S. at 830, fn. 2.

121

{¶ 248}  . . .  Thus, the recommendations of the Murray family concerning the appropriate sentence were not admissible as victim-impact testimony.

{¶ 249}  Finally, we find that the trial court did not err by failing to consider the recommendations from Murray's family and friends before imposing the death sentence.

*McKnight*, 2005-Ohio-6046 (parallel citations omitted).

Although McKnight casts the evidence he claims was unconstitutionally excluded from the penalty phase of his trial as victim impact evidence and as having bearing on McKnight's history and background, in reality it reflected Emily's sister Kathleen Murray's and her family's opinion on what sentence was appropriate for McKnight.  Kathleen's own and her deceased sister's opposition to the death penalty cannot be characterized as victim impact evidence.  Sadly, the effect of McKnight's death sentence on his children and the grueling and lengthy ordeal endured by Emily Murray's family through the legal process that has followed McKnight's conviction is not victim impact evidence, either.  Kathleen Murray uses those unquestionably painful realities to argue for a sentence less than death for McKnight, which is in contradiction to those parts of *Booth* that remain intact and *Payne*, *supra*.  Even if *Booth* had not been modified by *Payne*, the *Payne* Court's observation that "the Eighth Amendment erects no *per se* bar[,]" *Payne*, 501 U.S. 827, to victim impact evidence in the penalty phase of capital trials does not create a constitutional imperative that such evidence be admitted; that decision was left to the state courts' discretion, to which this Court must accord deference.  Consequently, McKnight's twenty-first ground for relief should be denied.

122

**Twenty-second Ground for Relief**

In his twenty-second ground for relief, McKnight contends the trial court's instructions on the aggravating circumstance in the penalty phase of his trial described one that is not authorized by Ohio's death penalty statute.  (ECF No. 127, Page ID 15767-69.)  The Warden responds that McKnight's claim is procedurally defaulted to the extent that he failed to raise it as a claim under the "Fifth or Sixth Eighth Amendments [sic]."  (ECF No. 13, PageID 473.)  The record shows, however, that McKnight did raise the instant claim as Eighth and Fourteenth Amendment violations (ECF No. 106-14, PageID 9588), so it is not completely procedurally defaulted.  The Warden acknowledges as much, noting that the state supreme court addressed its merits on direct appeal.  (ECF No. 13, PageID 474-75.)  McKnight repeats his "substantially similar" argument against the Warden's procedural default defense and goes on to state that the trial court's instruction as to the aggravating circumstances confused the jury and created a so-called super-aggravating circumstance.  (ECF No. 17, PageID 793-96.)

Although he does not say so in these terms, McKnight essentially argues that rather than merging the aggravating circumstances in his case, the trial court cumulated them, adding weight to the aggravating side of the weighing process and that by doing so the court deprived him of due process and a fair sentencing determination.

McKnight was indicted and found guilty of the aggravated murder of Emily Murray.  That charge in the indictment included four death penalty specifications, all of which McKnight was found guilty of beyond a reasonable doubt in the culpability phase of his trial.  Those

123

specifications were (1) murder to escape detection, apprehension, trial, or punishment for another offense pursuant to Ohio Rev. Code § 2929.04(A)(3); murder as a course of conduct in killing two or more people pursuant to Ohio Rev. Code § 2929.04(A)(5); murder while committing or attempting to commit kidnapping pursuant to Ohio Rev. Code § 2929.04(A)(7); and murder while committing or attempting to commit aggravated robbery, pursuant to Ohio Rev. Code. § 2929.04(A)(7).   It is true that the instructions given at different times during the penalty phase of the trial were confusing, advising at one point that the §2929.04(A)(5) and the two (A)(7) specifications should be counted as one, and later instructing that those same (A)(7) specifications and the (A)(5) course-of-conduct specification should be treated as three separate aggravating circumstances.  *McKnight*, 2005-Ohio-6046 at ¶252.  Just before deliberations, the trial court instructed that there was only one aggravating circumstance which it explained was as follows:

> The aggravated murder was committed while Gregory B. McKnight was committing or attempting to commit or fleeing immediately after committing or attempting to commit kidnapping and aggravated robbery of Emily S. Murray and Gregory B. McKnight was the principal offender, and the aggravated murder was part of a course of conduct by Gregory B. McKnight involving killing two or more persons.

*McKnight*, 2005-Ohio-6046 at ¶ 253.

The Supreme Court of Ohio found that the aggravating circumstances in Ohio Rev. Code § 2929.04(A)(5) and (A)(7) were not duplicative and should not have been merged by the trial court, but that the error was harmless.  *McKnight*, 2005-Ohio-6046 at ¶255, 256.  It reasoned that grouping the aggravating circumstances together did not alter their substance, *id*. at ¶256; or, as the Warden puts it, "grouping the contents of three specifications into one does not change the weight"

of them (ECF No. 13, PageID 478.)   The Supreme Court of Ohio has held that "[o]nly the aggravating circumstances related to a given count [of aggravated murder] may be considered in assessing the penalty for that count," *State v. Cooey*, 46 Ohio St. 3d 20, 38-39 (1989), which contemplates that multiple aggravating circumstances may attach to a single count of aggravated murder when determining the appropriate sentence.

Although both parties delve into the Ohio law respecting merger of aggravating circumstances, the fairness or unfairness of the trial court's merging of the aggravating circumstances, its instruction to the jury on that topic, and whether the claimed error was harmless or not, neither mentions *Clemons v. Mississippi*, 494 U.S. 738 (1990), where the Supreme Court held that "the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review."  *Id*. at 741.   Soon after *Clemons* was decided, the Court clarified that "we have not suggested that the Eighth Amendment permits the state appellate court in a weighing State to affirm a death sentence without a thorough analysis of the role an invalid aggravating factor played in the sentencing process."  *Stringer v. Black*, 503 U.S. 222, 230 (1992).   Furthermore, "[w]hen the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence."  *Id*. at 232.   To that end, in affirming McKnight's sentence of death, the Supreme Court of Ohio expressly stated that "we have independently reevaluated the sentence and thereby rectify any error in the merger of the aggravating circumstances."  *McKnight*, 2005-Ohio-6046 at

¶ 256. That rectification would involve dissecting the trial court's instruction back into the three separate aggravating circumstances, the first of the four having been merged with the (A)(7) aggravating circumstances as duplicative. How that would have apportioned less weight on the aggravating side of the scale is a mystery, but that is McKnight's argument. In any case, the Supreme Court of Ohio independently reweighed the three unmerged aggravating circumstances and mitigating factors and concluded that the death sentence was appropriate. That decision is in line with rather than in conflict with federal law as determined by the United States Supreme Court. As such, McKnight's twenty-second ground for relief should be denied.

**Twenty-third Ground for Relief**

In his twenty-third ground for relief, McKnight alleges his rights to due process and a fair trial and sentencing determination were violated when the trial court instructed the jury to consider all evidence relevant to the aggravating circumstance, leaving it to the jurors to sort the relevant evidence from the irrelevant. (ECF No. 127, PageID 15770.) He acknowledges that trial counsel did not object to the instruction, but also states that the Supreme Court of Ohio "concluded that the trial court's instruction was error." (ECF No. 127, PageID 15770, 15772.) Aside from a few Supreme Court cases standing for some very basic precepts of constitutional law, McKnight cites state law in support his argument. *Id*. at 15771.

The Warden argues the claim is procedurally defaulted for lack of a contemporaneous objection at trial, and notes the state supreme court's conclusion that McKnight had consequently

126

waived all but plain error and absence of plain error results in default. (ECF No. 13, PageID 480.)

In his Traverse, McKnight argues the substantial similarity of his claim to that raised in the state court, cites trial counsel's ineffective assistance as cause for his default, and contends that prejudice resulted because the jury's discretion was not suitably guided as a result of the challenged instruction.

Ohio requires contemporaneous objections to perceived errors at trial and McKnight's attorneys failed to comply with that rule. The state supreme court actually enforced the rule by finding McKnight had waived all but plain error. The Sixth Circuit has said that "[t]he [state] court's plain-error review is not considered a review on the merits." *Jells v. Mitchell*, 538 F.3d 478, 511 (6th Cir. 2008). Ohio's contemporaneous objection rule, that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, is an adequate and independent state ground of decision. *State v. Glaros*, 170 Ohio St. 471 (1960), paragraph one of the syllabus; *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir. 2012), *citing Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *State v. Mason*, 82 Ohio St. 3d 144, 162 (1998).

> For habeas corpus relief to be warranted on the basis of an incorrect jury instruction, a petitioner must show more than "the instruction is undesirable, erroneous, or even universally condemned." *Estelle v. McGuire,* 502 U.S. 62, 72 (1991)(*citing Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)). A petitioner must establish that, taken as a whole, the instructions were so infirm that they rendered the entire trial fundamentally unfair. *Id.; Henderson v. Kibbe,* 431 U.S. 145, 154 (1977); *Hardaway v. Withrow,* 305 F.3d 558, 565 (6th Cir.2002); *Buell v. Mitchell,* 274 F.3d 337, 355 (6th Cir.2001).
>
> Because jury instruction errors typically are matters of state law, the standard for demonstrating that a jury instruction caused

127

> constitutional error in a habeas proceeding "is even greater than the
> showing required to establish plain error on direct appeal."
> *Henderson* [*v. Kibbe*], 431 U.S. [145,] 154 [1977].

*Stallings v. Bagley*, 561 F.Supp.2d 821, 855 (N.D. Ohio 2008) (parallel citations omitted). A

habeas petitioner's burden when challenging jury instructions is to establish that "the ailing

instruction by itself so infected the entire trial that the resulting conviction violates due process."

*Cupp v. Naughten*, 414 U.S. 141, 147 (1973).

As noted above, McKnight offers his attorneys' ineffectiveness in failing to object as cause

for his procedural default. Even if his counsel had objected, however, the state court would have

overruled the objection. "An error instructing the jury to consider all relevant evidence – that is,

to make the relevance determination – is not reversible error unless it proves prejudicial to the

outcome." *Leonard v. Warden, Ohio State Penitentiary*, No. 1:09-cv-056, 2015 WL 2341094

(S.D. Ohio May 14, 2015) (Dlott, J.), *aff'd* 846 F.3d 832 (6th Cir. 2017), *citing State v. Getsy*, 84

Ohio St.3d 180, 201(1998); *State v. Hale*, 119 Ohio St.3d 118, 140 (2008). Although the state

courts in McKnight's case found the challenged instruction to be erroneous, it determined that

"much of the guilt-phase evidence was relevant to the aggravating circumstances, the nature and

circumstances of the offense and the mitigating factors . . . , [and] properly admitted evidence

supports the jury's finding that the aggravating circumstances outweigh the mitigating factors."

*McKnight*, 2005-Ohio-6046 at ¶ 261. Furthermore, McKnight mentions only the autopsy and

crime scene photos (without any more specificity), "as well as other inflammatory matter as

relevant to the aggravating circumstances" (again without a clue as to which specific items he

refers) and does not explain how those items "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).

McKnight has failed to demonstrate any deficiency in his counsel's representation, nor has he shown any prejudice counsel's failure to object to the challenged jury instruction. Consequently, his procedural default of his claim is unexcused. As such, his twenty-third ground for relief should be denied.

**Twenty-fourth Ground for Relief**

In his twenty-fourth ground for relief, McKnight contends that the penalty-phase life verdict forms misled the jurors into believing that they had to unanimously find that the aggravating circumstances did not outweigh the mitigating factors beyond a reasonable doubt. (ECF No. 127, PageID 15774-76.)

The Warden argues McKnight's claim is procedurally defaulted because he raised it asserting violations of the Eighth and Fourteenth Amendments in the state court, but here he raises it under those amendments as well as the Fifth and Sixth Amendments. (ECF No. 13, PageID 483.) Although the Warden proceeds as if McKnight's failure to include the alleged Fifth and Sixth Amendment violations when he presented his claim to the state court results in default of the entire claim, in fact only the unpreserved part of his claim is so defaulted. Apparently in the alternative, the Warden also reminds the Court that it must give deference to the state court's ruling that McKnight invited any error by proposing jury instructions nearly identical to those given and

that counsel's failure to object to the challenged instruction rendered the claim subject only to plain error review, of which the state court found none.   *Id*. at PageID 483-84.

McKnight raised the impropriety of the verdict forms in conjunction with the relevant jury instructions pertaining to the weighing of the aggravating circumstances and mitigating factors as part of his twenty-fourth proposition of law in the Supreme Court of Ohio.   That court decided the claim as follows:

> {¶ 262}   In proposition of law XXIV, appellant argues that the penalty-phase instructions and the language of the verdict forms improperly placed the burden of proof on the defense for the life-sentence options.

> {¶ 263}   The defense failed to object to these instructions and verdict forms and waived all but plain error.   [*State v.*] *Underwood*, 3 Ohio St.3d 12 [(1983)], syllabus. . . .

> {¶ 264}   [T]here was no plain error.   The trial court instructed the jury:   "If all twelve of you find that the State of Ohio proved beyond a reasonable doubt that * * * the aggravating circumstance * * * is sufficient to outweigh the mitigating factors in this case, then it will be your duty to decide that the sentence of death shall be imposed on Gregory B, McKnight.

> {¶ 265}   "If you find that the State of Ohio has failed to prove beyond a reasonable doubt that the aggravating circumstance Gregory B. McKnight was guilty of committing is sufficient to outweigh the mitigating facts present in this case, then it will be your duty to decide which of the * * * life sentence alternatives should be imposed[.] * * *

> {¶ 266}   "If the weight of the aggravating circumstance and mitigating factors are equal, then you must proceed to consider the life sentence alternatives.   You are not required to unanimously find that the State failed to prove that the aggravating circumstance outweighs the mitigating factors before considering one of the life sentence alternatives."

130

{¶ 277}[sic]  The language in the verdict forms tracked these instructions.  The three verdict forms presenting life sentence options stated:  "We, the jury, being duly impaneled and sworn, do hereby find that the aggravating circumstance that Gregory B. McKnight was found guilty of committing, does not outweigh the mitigating factors presented in this case by proof beyond a reasonable doubt."  The verdict forms then provided the jury with the options of life imprisonment with parole, life imprisonment without the possibility of parole for 30 years, or life imprisonment without the possibility of parole for 25 years.

{¶ 268}  The instructions and the language of the verdict forms for the life-sentence options did not place the burden of proof on the defense.  When read as a whole, the instructions of the trial court and the language of the verdict forms effectively informed the jury that a death-penalty recommendation could be returned only after a unanimous vote that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt.  See *State v Davis* (1996), 76 Ohio St.3d 107, 117.  As to the life-sentence options, the instructions and the language of the verdict forms simply instructed the jury that it *must* decide among the life-sentence options *if* it found that the state had failed to prove that the aggravating circumstances outweighed the mitigating factors.  See *State v. Taylor* (1997), 78 Ohio St.3d 15, 29.  We reject proposition XXIV.

*McKnight*, 2005-Ohio-6046.

Thus, the state court determined McKnight waived his verdict forms claim because his attorneys failed to lodge a contemporaneous objection.  Ohio's contemporaneous objection rule requires that parties preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected.  *State v Glaros*, 170 Ohio St. 471 (1960) (paragraph one of the syllabus).  That rule has repeatedly been found to be an independent and adequate state ground of decision upon which a procedural default finding may rest in federal habeas corpus.  See, e.g., *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir. 2012), *citing Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).

131

To excuse the procedural default of his claim, McKnight must demonstrate cause for the default and prejudice therefrom.  "Absent cause and prejudice, 'a federal habeas petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review.'" *Boyle v Million*, 201 F.3d 711, 716 (6th Cir. 2000), quoting *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996); *Murray v. Carrier*, 477 U.S. 478, 485 (1986).  McKnight offers the ineffectiveness of his trial counsel to excuse his procedural default.  (ECF No. 17, PageID 806.)

McKnight repeats much of his argument as it was presented to the state court, claiming that the trial court's instructions to the jury that their verdict, whether for one of the life alternatives or the death penalty, must be unanimous.  That is a true statement of the law in Ohio.  Anything less than a unanimous verdict in the penalty phase of a capital trial requires the trial judge to sentence the offender to one of the life-sentence options.  *State v. Springer*, 63 Ohio St.3d 167 (1992) (syllabus); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012), *quoting Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).  The life verdict forms that McKnight challenges do not contradict the state law.

McKnight argues that the life verdict forms placed a burden of proof upon him by requiring him to show that the aggravating circumstance did not outweigh the mitigating factors beyond a reasonable doubt.  (ECF No. 127, PageID 15775.)  He also argues that those verdict forms are contrary to Ohio law which allows for one juror to block a death sentence.  *Id*.  It is true in Ohio that in order to sentence a capitally convicted defendant to one of the life options, the jury must be unanimous.  McKnight's argument sounds vaguely like the "acquittal of the death penalty first" claim that is not unfamiliar to any attorneys or judges who have worked these cases, but he only

132

challenges the life sentence verdict forms.   Even where a sentencing verdict form misstates the standard by stating that "the 'mitigating factors are sufficient' to outweigh the aggravating circumstance," the court found it unnecessary to reverse the sentencing determination because the parties and judge generally referred to a correct standard during the proceedings.   *Hill v. Mitchell*, 400 F.3d 308, 326-27 (6th Cir. 2005).   Furthermore, McKnight's jury was specifically instructed that:

> You should proceed to consider and choose one of the life sentence alternatives if *any one or more* of you conclude that the State has failed to prove beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating factors.  *One juror may prevent a death penalty determination by finding the aggravating circumstance does not outweigh the mitigating factors*.

(ECF No 105-27, PageID 7545-47 (emphasis added).)

Because the life verdict forms in McKnight's case were correct statements of the law and because it was made perfectly clear to the jurors that one juror could prevent a death sentence, his claim would have had little chance of success had his attorneys objected to the verdict forms at the proper time.   They cannot have been ineffective for failing to raise a losing claim.   Consequently, their performance cannot provide cause for McKnight's default of his claim.   Accordingly, his twenty-fourth ground for relief should be denied as procedurally defaulted.

**Twenty-fifth Ground for Relief**

In his twenty-fifth ground for relief, McKnight contends that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by (1) merging the four aggravating

133

circumstances of which he was found guilty into one "non-statutory . . . super aggravating circumstance, (2) considered his use of a firearm in multiple offenses as an aggravating circumstance and his failure to release Emily Murray unharmed, (3) considered the nature and circumstances of Emily Murray's murder during a kidnapping as an aggravating circumstance. (ECF No. 127, PageID 15776-79.) He also argues that the trial court erred in considering the mitigating factors only insofar as they had an effect on "minimizing, lessening or excusing the degree of [McKnight's] murderous conduct." *Id*. at PageID 15778, quoting the trial court's sentencing opinion at ECF No. 106-13, PageID 9309.

Respondent counters that McKnight's claim is procedurally defaulted because he did not raise it in the state court as arising under all four of the amendments he includes in his ground here. (ECF No. 13, PageID 489.) The record shows, however, that McKnight did raise the instant claim as violative of his Eighth and Fourteenth Amendment rights in the state court (ECF No. 106-15, PageID 9602), so barring any other default, this Court will consider the claim to that extent. Respondent further argues that McKnight's claim is meritless.

In his reply, McKnight acknowledges that the Supreme Court of Ohio determined that its independent weighing of the mitigating factors and aggravating circumstances cured any error in the trial court's sentencing opinion, but he later characterized that court's independent weighing as an "*attempt*[] to independently cure the recognized errors . . . contrary to or an unreasonable application of clearly established federal law." (ECF No. 17, PageID 814, 815-16, emphasis added.)

The relevant parts of the trial court's sentencing opinion are as follows:

134

In this case the aggravating circumstance which is to be weighed against the mitigating factors is as follows:

> The aggravated murder was committed while Gregory B. McKnight was committing or attempting to commit or fleeing immediately after committing or attempting to commit kidnapping and aggravated robbery of Emily S. Murray, and Gregory B. McKnight was the principal offender, and the aggravated murder was part of a course of conduct by Gregory B. McKnight involving killing two or more persons.

Regarding the aggravating circumstance, the Defendant kidnapped Emily S. Murray and took her to his property in a remote area of Vinton County, some three hours from her residence at Kenyon College in Gambier, Ohio. Instead of releasing her in a safe place and unharmed, McKnight shot Emily in the head, intentionally killing her, and then concealed her body in his trailer such that Emily remained missing for 36 days. McKnight committed Aggravated Robbery by using a firearm and intentionally killing Emily Murray by shooting her in the head.

. . .

Mitigating factors are factors that lessen the moral culpability of Gregory B. McKnight or diminish the appropriateness of a death sentence.

. . .

The aggravating circumstance in this case deserves great weight. There is nothing mitigating about the offense itself. . . . [T]he aggravating circumstance that [Emily's murder] was done while committing aggravated robbery by the use of a firearm makes the murder even more vicious. In short, Mcknight [sic] viciously took Emily Murray's life in a cold-blooded manner.

Against this backdrop, the mitigating factors of the Defendant's age, his work record, and his family's testimony that he is a good father have very little effect in minimizing, lessening, or excusing the degree of the Defendant's murderous conduct.

(ECF No. 106-13, PageID 9305-09.)

135

The Supreme Court of Ohio found McKnight's claim of trial court error in the sentencing opinion meritless, reasoning as follows:

{¶ 311}   In proposition of law XXV, appellant asserts that there are numerous flaws in the sentencing opinion of the trial court.

{¶ 312}   First, appellant argues that the sentencing opinion of the trial court improperly considered the kidnapping and aggravated-robbery aggravating circumstances, R.C. 2929.04(A)(7), and the course-of-conduct aggravating circumstance, R.C. 2929.04(A)(5), as one "superaggravating" circumstance.   As discussed earlier in proposition XXI, the trial court erred by combining the two nonduplicative aggravating circumstances into a single aggravating circumstance.   We have independently reevaluated the sentence and rectified this error in our sentencing evaluation.   See *State v. Fox* (1994), 69 Ohio St.3d 183, 191; *State v. Lott* [(1990)], 51 Ohio St.3d [160,] 170.

{¶ 313}   Second, appellant contends that the trial court considered the following nonstatutory aggravating circumstances as aggravating factors:  his use of a firearm, his failure to release Murray in a "safe place and unharmed," and his concealment of Murray's body "such that Emily remained missing for 36 days." We reject this argument because "[u]nder R.C. 2929.03(F), a trial court * * * may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State v. Stumpf* (1987), 32 Ohio St.3d 95, paragraph one of the syllabus; see, also, *Dickerson* [(1989)], 45 Ohio St.3d [206,] 212.

{¶ 314}   Third, appellant asserts that the trial court improperly considered the "intentional killing" of Murray during a kidnapping. The trial court could properly refer to the "intentional killing" of Murray in discussing the R.C. 2929.04(A)(7) aggravating circumstance because intent is an element of the underlying felony murder.   See *State v. Campbell* (2000), 90 Ohio St.3d 320, 345.

{¶ 315}   Finally, appellant argues that the trial court misconstrued the mitigating factors as evidence offered to reduce his culpability for the crimes.   "[M]itigating factors under R.C. 2929.04(B) are not necessarily related to a defendant's culpability but, rather, are those

136

factors that are relevant to the issue of whether an offender convicted under R.C. 2903.01 should be sentenced to death." *State v. Holloway* (1988), 38 Ohio St.3d 239, paragraph one of the syllabus.[14]

{¶ 316}   The sentencing opinion thoroughly discussed the mitigating evidence in appellant's case.   The trial court also properly stated that the "aggravating circumstance must * * * be weighed against the mitigating factors about the individual which would weigh in favor of a decision that a life imprisonment sentence is the appropriate sentence."   Thus, the trial court used the proper standard in weighing the aggravating circumstance against the mitigating factors.     Nevertheless, the trial court improperly concluded that "the mitigating factors * * * have very little effect in minimizing, lessening or excusing the degree of the Defendant's murderous conduct."   Again, we have independently reevaluated the sentence and rectified this error in the sentencing opinion.  *Fox,* 69 Ohio St.3d at 191.

*McKnight*, 2005-Ohio-6046 (parallel citations omitted).[15]

The state court cited no federal law in its discussion of McKnight's claim, and the state cases it did cite do not rely on Supreme Court law, with one exception, *Lott*.   The federal case governing the ability of a state court's independent weighing of mitigating factors and aggravating circumstances is, of course, *Clemons v. Mississippi*, 494 U.S. 738 (1990), which *Lott* cited for the following proposition:

[I]t is within the province of this court to conduct its own careful appellate reweighing of aggravating circumstances against mitigating factors to produce a "measured consistent application" of

---

[14] There is no syllabus in *Holloway*, but the quoted sentence appears at page 242 of that case.

[15] In his reply, McKnight contends that the state supreme court relied on two Supreme Court cases he cited in his appellate brief to that state court, those being *Stringer v. Black*, 503 U.S. 222 (1992), and *Sochor v. Florida*, 504 U.S. 527 (1992), but as the reader can see, citation to those cases appear nowhere in the state court's discussion of McKnight's claim.   (See ECF No. 17, PageID 811.)   Indeed, neither of those cases is cited in the opinion of the Supreme Court of Ohio at all.

the death penalty which would be in no way unfair to the defendant. . . . "Nothing inherent in the process of appellate reweighing is inconsistent with the pursuit of the foregoing [twin] objectives."

*Lott*, 51 Ohio St. 3d at 170 (alteration in original), quoting *Clemons*, 494 U.S. at 748.[16]

The Court assumes without finding that the quoted sections from the trial court's sentencing opinion were error as McKnight alleges. *Clemons*, then, is the federal law as determined by the Supreme Court governing McKnight's claim. But McKnight does not acknowledge *Clemons* in his petition or his reply and makes no attempt to explain how the state supreme court's decision is contrary to or an unreasonable application of the holding of that case. Consequently, he has failed to demonstrate entitlement to habeas corpus relief.

Because McKnight has ignored the governing federal law as determined by the Supreme Court, and because he has not demonstrated that the Supreme Court of Ohio's sentencing decision and reweighing of the aggravating circumstances and mitigating factors is contrary to or an unreasonable application of that governing federal law, his twenty-fifth ground for relief should be denied.

---

[16] Interestingly, about six years prior to *Clemons*, the Supreme Court of Ohio held that the error resulting from a trial court's failure to comply with Ohio Rev. Code § 2929.03(F)(requiring the trial court to make specific findings as to the existence of any mitigating factors, the aggravating circumstances the defendant was found guilty of, and why the aggravating circumstances outweighed the mitigating factors) could be cured by independent review at the appellate stage of the proceedings. *State v. Maurer*, 15 Ohio St.3d 239, 247 (1984). Later, the state supreme court expanded the *Maurer* holding by stating, "We have previously held that our independent review of a sentence will cure any flaws in the trial court's opinion." *State v. Fox*, 69 Ohio St.3d 183, 191 (1994), citing *Maurer*, *supra*.

**Twenty-Sixth Ground for Relief**

In his next ground for relief, McKnight alleges his trial counsel were ineffective at all phases of his trial.

It is well settled that the law governing ineffective assistance of counsel claims is *Strickland v. Washington*, 466 U.S. 668 (1984), which states as follows:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
>
> . . .
>
> When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.
>
> . . .
>
> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

139

> assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See *Michel v. Louisiana*, . . . 350 U.S. [91,] 101 [(1955)].

*Strickland*, 466 U.S. at 687-89.

In assessing trial counsel's performance in capital cases, the Supreme Court has made it clear that the "ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases." *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2004), quoting *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); see also ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989).

The Supreme Court of Ohio addressed the merits of McKnight's claim on direct appeal as follows:

> {¶ 300}  In proposition of law XXVI, appellant raises numerous instances of alleged ineffective assistance of counsel during both phases of his trial.  Reversal of a conviction for ineffective assistance of counsel "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington* (1984), 466 U.S. 668, 687.  Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, paragraph two of the syllabus.
>
> {¶ 301}  First, appellant complains that his counsel conducted inadequate voir dire of a prospective juror.  "'The conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked.'"  *State v. Cornwell* (1999), 86 Ohio St.3d 560, 568, quoting *State v. Evans* (1992), 63 Ohio St.3d 231, 247.
>
> {¶ 302}  Appellant argues that counsel was [sic] deficient in failing to question Juror I-30 about her opinion regarding appellant's guilt

140

after Juror I-30 indicated her belief, in the juror questionnaire, that appellant was guilty of the charged offenses.  One question in the juror questionnaire asked, "Based on what you may have heard about this case, do you have an impression or opinion about what happened or who is responsible?"  Juror I-30 answered[,] "yes" and explained, "In the case of the death of the girl, I believe the body was found on his premises, although this does not mean he did it, it doesn't look good for him."

{¶ 303}  Juror I-30's response on the questionnaire did not indicate that she had formed a preconceived belief of appellant's guilt. Moreover, Juror I-30 indicated that she had not formed an opinion about who or what caused the death of Julious or Murray in other responses on the questionnaire.

{¶ 304}  Moreover, during the prosecutor's voir dire, Juror I-30 was asked whether she had formed any opinions about the case, and Juror I-30 answered, "Not necessarily.  No."  As noted in *State v. Watson* (1991), 61 Ohio St.3d 1, 13, defense counsel "need not repeat questions about topics already covered by * * * opposing counsel."  Furthermore, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent."  *State v. Murphy* (2001), 91 Ohio St.3d 516, 539. Thus, the defense counsel was [sic] neither remiss nor ineffective.

{¶ 305}  Appellant raises other instances of alleged ineffectiveness of counsel, but none prejudiced him.  As discussed in other propositions of law, Appellant was not prejudiced by his counsel's failure to request the removal of an alleged sleeping juror (proposition XI), or by counsel's failure to request a *Remmer* hearing to explore allegations that a juror had discussed the case with his girlfriend (XIII).  Furthermore, appellant was not prejudiced by his counsel's failure to request curative instructions following a courtroom outburst (XVI), or by his counsel's failure to request curative instructions following a courtroom outburst (XVI), or by his counsel's failure to object to prosecutorial misconduct (XXVII), gruesome photographs (XII), life-sentence options on the verdict forms (XXIV), or character and impact testimony about Murray (III).  Appellant also suffered no prejudice from his counsel's failure to object to various guilt-phase (IX, XVIII, XX, and XXIX) and penalty-phase (XXIII and XXIX) instructions. Moreover, appellant was not prejudiced by his counsel's failure to

141

request that evidence be stricken that related to appellant's marital infidelities or his reaction to the police prior to the date of the offenses (III).

{¶ 306}  We also reject appellant's argument that his counsel was [sic] ineffective by waiving appellant's presence at in-chambers proceedings without consulting him.  Appellant personally waived his presence at in-chambers proceedings, and this waiver was valid for the two in-chambers proceedings that he challenged (XIV).

{¶ 307}  Finally, appellant argues that the cumulative effect of his counsel's ineffectiveness necessitates reversal.  Appellant received a fair trial, and any error was nonprejudicial.  See *Braden*, 2003-Ohio-1325, ¶ 123.  None of appellant's claims establish ineffective assistance of counsel and proposition XXVI is overruled.

**Pretrial**

McKnight alleges his trial counsel were ineffective in litigating the motion to suppress and two supplements because they (1) failed to argue that the affidavit providing probable cause to search McKnight's trailer and property contained no allegation or supporting facts indicating that any crime was being committed; (2) failed to bring to the trial court's attention certain inaccuracies in the warrant affidavit, argued in their supplemental motion to suppress only about discrepancies as to who among the Vinton County officers received the information from the Knox County officers regarding Emily Murray's status as a missing person, and; (3) failed to attack the veracity of the warrant affidavit and focused instead on whether it established probable cause.  McKnight also alleges his trial counsels' failures led to the admission of illegally obtained evidence in violation of his Fourth Amendment rights.  (ECF No. 127, PageID 15779-85.)  Respondent

states that McKnight's claim is procedurally defaulted (ECF No. 13, PageID 508), but that is not so. He raised trial counsels' ineffectiveness pertaining to the affidavit supporting the warrant to search his trailer and property as his twelfth claim in his second amended post-conviction petition. (ECF No. 108-5, PageID 10946-48.)

The underlying warrant affidavit claim was discussed at length in this Court's consideration of McKnight's first ground for relief and was found meritless. For the reasons stated there, and because counsel were "not required to raise meritless arguments to avoid a charge of ineffective assistance of counsel," *Ludwig v. United States*, 162 F.3d 456, 459 (6th Cir. 1998); see also *Kelly v. Lazaroff*, 846 F.3d 819, 830-31 (6th Cir. 2017)(stating "appellate counsel cannot be considered ineffective for failing to raise a meritless claim"), McKnight's claim that his counsel were ineffective for their handling of the warrant affidavit in the motions to suppress and in the suppression hearing should be denied.

Next, McKnight contends his attorneys were ineffective for failing to support their motion for a change of venue and its supplement with evidence of the "media firestorm" following discovery of the bodies on McKnight's property which was amplified later when the trial court dismissed of the capital components of the indictment due to the financial impact it would have on small, rural Vinton County. *Id*. at PageID 15785-91. He also alleges that as his trial progressed, the news media kept the community apprised of how much his defense was costing taxpayers, compromising his ability to be tried by a fair and impartial jury even further.

Respondent acknowledges that McKnight raised an ineffective assistance of trial counsel claim in his twenty-sixth proposition of law on direct appeal to the Supreme Court of Ohio, and

143

proceeds to argue that the claim is both procedurally defaulted and meritless.  (ECF No. 13, PageID 508.)  There, however, McKnight did not raise any ineffectiveness on the part of his trial counsel having to do with pretrial publicity or media reports of the cost of his defense to taxpayers.[17]  (Appellate Brief, ECF No. 106-14, PageID 9607-16.)  In his second ground for relief in post-conviction, McKnight raised his pretrial publicity claim, but not his cost-of-defense claim.  (Petition, ECF No. 107-6, PageID 10479, ECF No. 107-7, PageID 10480.)

On direct appeal from the trial court's denial of McKnight's post-conviction petition, the Ohio Court of Appeals decided as follows:

> {¶ 28}  . . . McKnight contends that his defense attorneys rendered ineffective assistance of counsel by failing to present the available media reports in support of the motion to change venue.  He asserts that the evidence would have demonstrated pervasive publicity and prejudicial content.
>
> . . .
>
> {¶ 30} Here, we find that McKnight could have raised this ineffective assistance of counsel claim on direct appeal.  "A claim of ineffective assistance of counsel presented in a postconviction petition may be dismissed under the doctrine of res judicata when the petitioner, represented by new counsel on direct appeal, has failed to raise on appeal the issue of trial counsel's competence and the issue could fairly have been determined without evidence dehors the record."  *State v. Sowell*, [73 Ohio App.3d 672, 676 (1991)], citing *State v. Cole* (1982), 2 Ohio St.3d 112. . . .  In this case, McKnight had different counsel on appeal than he did at trial. Also, his ineffective assistance of counsel claim could fairly have

---

[17] McKnight did raise a pretrial publicity claim on direct appeal, but not one claiming his counsel were ineffective for not adequately supporting the motion for a change of venue.  Instead, he alleged trial court error due to the court's denial of his request for funds to hire an expert in demographics to demonstrate that McKnight could not get a fair trial in Vinton County.  There, he placed blame on the trial court stating that the "deficiency [in McKnight's evidence that a fair trial was impossible] is attributable *solely* to the trial court's denial of his requested expert assistance," (ECF No. 106-15, PageID 9513 (emphasis added)), essentially admitting the fault was not with his trial counsel.

been determined without evidence dehors the record. Therefore, res judicata bars this claim.

{¶ 31} Furthermore, McKnight's second claim fails on the merits. As one court has noted, counsel's failure to include every piece of publicity surrounding a case does not amount to ineffective assistance of counsel when the trial court is well aware of the level of publicity. *State v. Moreland* (Jan. 7, 2000), Montgomery App. No. 17557. Here, the trial court was well aware of the extent of pretrial publicity. Thus, counsel's failure to document the pretrial publicity through the use of newspaper articles could not have prejudiced McKnight.

{32} Accordingly, we find that the trial court did not abuse its discretion by dismissing McKnight's second claim for relief.

*McKnight*, 2008-Ohio-2435.

In his Traverse, McKnight briefly contradicts the court of appeals' decision respecting the procedural status of his habeas claim, saying only that parts of it were presented to the state court on direct appeal, and parts were presented in post-conviction, and that each sub-claim was decided on its merits in the state courts. (ECF No. 17, PageID 820.) That is patently untrue.

The state appellate court's discussion of the merits of McKnight's post-conviction claim is concerning for a couple of reasons. First, in the *Moreland* case, it's clear that some evidence of extensive pretrial publicity was included in his counsel's motion for a change of venue. *State v. Moreland*, No. 17557, 2000 WL 5933 at *8 (Ohio App. 2nd Dist. Jan. 7, 2000). According to McKnight, his trial counsel failed to supplement the motion for a change of venue with *any* supporting news articles. (ECF No. 127, PageID 15790.) Second, this Court's attention has not been directed to any evidence in the record that the trial judge was "well aware of the extent of pretrial publicity" by either party, and the court of appeals cited none in its opinion.

Nevertheless, that court unequivocally stated its reliance on Ohio's doctrine of *res judicata* in dismissing McKnight's claim as one that could have been brought on direct appeal, and McKnight neither challenges that finding nor offers cause and prejudice for the default. As has been stated throughout this Report, *res judicata* is an independent and adequate procedural rule which, when relied upon by the state court and without a demonstration of cause and prejudice, precludes federal habeas corpus review. *Coleman v. Mitchell*, 268 F.3d 417, 427-29 (6th Cir. 2001). Thus, to the extent McKnight argues his trial counsel were ineffective for failing to support the motion for a change of venue due to pretrial publicity, his claim should be denied as procedurally defaulted.

As for his claim that media updates on the cost of McKnight's defense deprived him of a fair trial, he has not directed this Court to anyplace in the record showing that claim was ever presented to the state courts. That matter was not mentioned in his ineffective assistance of trial counsel claim on direct appeal or in McKnight's post-conviction proceedings. Hence, it is procedurally defaulted, and McKnight offers no excusing cause or prejudice for the default. That part of his ineffective assistance of trial counsel claim should be denied as well.

McKnight also faults his trial counsel for failing to include race as a basis for their motion for a change of venue, alleging that in a county of approximately 12,806 persons, Caucasians comprised 98.1% of the total population, while African Americans made up only 0.4%, citing the United States Census Bureau's 2000 population statistics for Vinton County. (ECF No. 127, PageID 15792.) (Second Amended Post-Conviction Petition, ECF No. 108-5, PageID 10952-54.) Respondent acknowledges that McKnight raised the claim in his post-conviction

146

proceedings and that the state court decided the merits of the claim, but found it meritless. (ECF

No. 13, PageID 519-20.)

The Supreme Court of Ohio overruled McKnight's claim reasoning as follows:

> {¶ 89}  In his fourteenth claim for relief, McKnight contends that trial counsel rendered ineffective assistance by failing to argue for a change of venue based upon race.  He asserts that he could not receive a fair trial in an overwhelmingly white community.

> {¶ 90}  We . . . find that res judicata bars McKnight's fourteenth claim for relief.  McKnight does not offer any evidence that was unavailable for him to use on direct appeal.  He cites statistical evidence and testimony from the voir dire transcript to support this claim.  Both items were available for him to use on direct appeal.

> {¶ 91}  Additionally, McKnight's claim lacks substantive merit. In *State v. Elmore*, Licking App. No. 2005-CA-32, 2005-Ohio-5940, the court considered and rejected a similar argument.  In that case, the defendant, like McKnight, argued that trial counsel rendered ineffective assistance of counsel by failing to request a change of venue due to the lack of African-Americans in the available jury pool.  In rejecting this argument, the court explained:

>> As previously noted appellant failed to present evidence outside of the record to * * * indicate deliberate exclusion of 'distinctive groups' of the jury venire or jury panel involved. The statistical data and juror questionnaires do nothing to demonstrate intentional, systematic exclusion of minorities in the jury-selection process.

>> Moreover, each impaneled juror confirmed that he or she had not formed an opinion about the guilt or innocence of the accused, or could put aside any opinion, and that he or she could render a fair and impartial verdict based on the law and evidence.  *State v. Treesh* (2001), 90 Ohio St.3d 460, 464.

> *Id*. at ¶¶ 69-70; see, also, *State v. Braswell*, Miami App. No. 2001 CA22, 2002-Ohio-4468, at ¶ 8 (rejecting argument that trial court should have changed venue based upon racial composition when

147

> defendant failed to present evidence that the venire did not represent a fair cross section of the community or that any of the jurors who did serve was unable to render an impartial verdict); *State v. Jones* (2001), 91 Ohio St.3d 335, 341, (concluding that trial court did not err by denying defendant's motion to change venue based upon racial composition of county when defendant failed to show that jury venire failed to represent fair cross-section of the community).
>
> Similarly, here, McKnight failed to show that the jury venire failed to contain a representative cross-section of the community or that any of the seated jurors were unable to render an impartial verdict.
>
> Accordingly, we find that the trial court did not abuse its discretion by dismissing his fourteenth claim for relief.

*McKnight*, 2008-Ohio-2435.

First, the state court's finding that McKnight's claim is procedurally defaulted is in error. It is true that the statistical material McKnight uses to support his claim was available at the time of his trial, but his claim is that his attorneys were ineffective for not presenting that evidence before or during his trial.   As such, it was appropriate for McKnight to raise his ineffectiveness claim in post-conviction with supporting evidence.   As has been noted above, federal habeas corpus review survives a state court's misapplication of its own procedural rule.   Thus, this Court turns to the merits of McKnight's claim.

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community."  *Berghuis v. Smith*, 559 U.S. 314, 319 (2010), *citing Taylor v. Louisiana*, 419 U.S. 522 (1975).   In order to establish a prima facie violation of that right, a defendant must show:

> (1) that the group alleged to be included is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation

148

> to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). McKnight has not argued that he is included in a "distinctive" group in the Vinton County community in which he was tried, but even assuming that he is, he cannot show that the representation of that "distinctive" group on his jury was unreasonable in relation to the number of such persons in the community. He himself has alleged that the black or African-American population in Vinton County is 0.4%. (ECF No. 127, PageID 15792.) It is no surprise, then, that his jury was made up of white or Caucasian people, which make up 98.1% of the county's population. *Id.* Nor has he produced any evidence whatsoever that any black prospective jurors, if there were any, were systematically excluded from the venire. Thus, McKnight's attorneys were not ineffective for failing to argue for a change of venue due to the racial makeup of his jury venire.

To demonstrate endemic racism in Vinton County, McKnight cites the statistics just mentioned and contends they "indicate a social climate inherently hostile to a black capital defendant" especially where the victim was a white female. (ECF No. 127, PageID 15792.) He also cites *Turner v. Murray*, 476 U.S. 28, 35 (1976) for the proposition that "more subtle, less consciously held racial attitudes . . . could also influence a juror's decision in [a] case." *Id.* at PageID 15793.

The Supreme Court has long answered in the negative "the question whether a complex statistical study that indicates a risk that racial considerations enter into capital sentencing determinations proves that [a] petitioner's . . . capital sentence is unconstitutional under the Eighth

149

or Fourteenth Amendment." *McCleskey v. Kemp*, 481 U.S. 279, 282-83 (1987).  Here, the Court has no "complex statistical study" to even consider,[18] only McKnight's assertion that because the county in which he committed his crimes is overwhelmingly white, he was denied a fair and impartial jury and thus a fair trial and sentencing hearing.

McKnight alleges that racial bias was evident in the jury venire, quoting two prospective jurors who admitted racist attitudes.  (ECF No. 127, PageID 15793.)  While their statements are odious, both were properly dismissed for cause without objection by either party, and because the jurors were subjected to *voir dire* on their feelings about race individually, none of the other prospective jurors would have heard their objectionable opinions.  (Trial Tr., ECF No. 105-5, PageID 3733-44; ECF No. 105-8, 4351-54, 4369-70, 4376, 4387.)  Suffice it to say that the quotations from unidentified sources on the Internet also cited by McKnight for support of his claim do not even weakly accomplish that goal.  (ECF No. 127, PageID 15793.)  Accordingly, McKnight's claim that his counsel were ineffective for failing to include the alleged existence of "endemic" racism in Vinton County in their motion for a change of venue should be denied.

McKnight further alleges his attorneys provided ineffective assistance when they failed to adequately question an individual identified as Juror I-30 further about her husband's previous work as a law enforcement officer, her feelings about the death penalty and when it is appropriate, her purported prejudgment of McKnight's guilt, the importance of her religion in her life, her experiences as a crime victim, and her belief that defendants who are convicted of crimes are

---

[18] McKnight requested funds for a scientific jury study which the trial court denied stating his "generalized assertion does not qualify as the 'particularized showing' required by [*State v.*] *Mason*, 82 Ohio St.3d 144 [(1998)], syllabus. Furthermore, comprehensive voir dire examination of the seated jurors about pretrial publicity negated any need for a scientific jury survey of public opinion within Vinton County."  *McKnight*, 2005-Ohio-6046 at 66.

treated too leniently. (ECF No. 127, PageID 15797-98.) He further contends his counsel were ineffective when they did not challenge Juror I-30 because she stated she believed the defense had to prove that "that he did not do it in some way or shape or form or other the fact [sic] that he is not guilty." *Id*. at PageID 15799. McKnight states he was deprived of a fair trial because his attorneys failed to challenge Juror I-30. *Id*. at PageID 15800.

McKnight points to several statements Juror I-30 made in her juror questionnaire or during voir dire about which his counsel should have inquired further. The Court will take each in turn.

First, he contends his counsel should have explored how being the mother of two young daughters would affect Juror I-30's ability to be a fair and impartial juror. (ECF No. 127, PageID 15797.) Scanning some of the juror questionnaires, however, the Court finds that many of the prospective jurors had children, daughters included, and were not questioned about the impact their parenthood would have on their ability to be fair and impartial, yet McKnight does not contend his counsel were ineffective for failing to question those prospective jurors about any parental bias.

Next, McKnight takes issue with Juror I-30's husband's previous experience as a law enforcement officer. (ECF No. 127, PageID 15797.) On her questionnaire, Juror I-30 stated, "My husband was a policeman in the Army many years ago. Worked with drug sniffing dogs." (ECF No. 119-6, PageID 12980.) She also indicated that she did not know when her husband served in the military and that he had been a teacher at Vinton County Schools for the past six years. *Id*. at PageID 12981-82. Some of the other prospective jurors also indicated they had one or more relatives who worked in law enforcement or the security field, including the military.

151

Like Juror I-30, they were not questioned about how their relatives' experience might affect their ability to be fair and impartial if empaneled as a juror in McKnight's case.

McKnight also faults his attorneys for failing to question Juror I-30 further about her statement on her questionnaire that she believes the death penalty is appropriate if there is "no doubt that the person did the crime" and the permanence of that opinion. (ECF No. 127, PageID 15797 (emphasis in original).) His criticism of his attorneys here is puzzling because it sounds like Juror I-30 was prepared to hold the prosecution to a more stringent standard than the law requires. Nevertheless, during voir dire Juror I-30 acknowledged that she understood the prosecution would be held to the standard "beyond a reasonable doubt," and that she would hold the prosecution to that standard. (ECF No. 105-5, PageID 3869, 3879, 3884.)

Next, McKnight states his counsel should have questioned Juror I-30 further about her position on the death penalty. (ECF No. 127, PageID 15797.) When given the choice of checking "Favor," "Opposed," or "no opinion" as to her feelings, she checked "Favor." (ECF No. 119-6, PageID 12983.) In *voir dire*, however, she acknowledged that she could sign either a death verdict or a life sentence verdict after weighing the aggravating circumstance against the mitigating factors. (ECF No. 105-5, PageID 3871-72.)

McKnight also contends his attorneys were ineffective for failing to inquire further about Juror I-30's pre-trial opinion that he was guilty of the offenses charged. (ECF No. 127, PageID 15798.) He bases that allegation on Juror I-30's response to the questionnaire question, "Based on what you may have heard about this case, do you have an impression of opinion about what happened and who is responsible?" (ECF No. 119-6, PageID 12984.) Juror I-30 answered, "In

152

the case of the death of the girl, I believe the body was found on his premises, although this does not mean he did it, it doesn't look good for him (McKnight)[.]" *Id*. When questioned on voir dire about what she knew about the crimes, Juror I-30's answers showed that she had read or heard only the very basics of the murders and she stated she could base her verdict on the facts and evidence presented in court. (ECF No. 105-5, PageID 3873-76.)

McKnight then contends his attorneys should have questioned Juror I-30 about her religious life. (ECF No. 1127, PageID 15798.) On her questionnaire, she noted that she belongs to a "religious or spiritual group, denomination, or set of teachings," that she was "very" active, and that she had never "held a position of responsibility in her religious community." (ECF No. 119-6, PageID 12986.) Her recognition of the prosecution's burden to prove McKnight's guilt beyond a reasonable doubt and her confirmation that she would reach her verdict based on the evidence presented in court as noted in the previous paragraphs overcomes McKnight's suspicion that further questioning of Juror I-30's religious beliefs and activities would reveal bias on her part.

McKnight also faults his counsel for failing to question Juror I-30 about her having been the victim of a burglary and a bank robbery. (ECF No. 127, PageID 15798.) She indicated satisfaction with law enforcement's handling of the offenses, however, and stated those experiences had "no affect" [sic] on her impressions of the criminal justice system even though the home burglary was unsolved. (ECF No. 119-6, PageID 12987-88.) Juror I-30 expressed an understanding that "it would have been very hard to find the person [who burglarized her home] –

no witnesses, etc." *Id*. Thus, there was no reason to suspect bias on her part from those experiences, and thus, no call to question her further about them.

Juror I-30 should have been questioned about her "strong belief in punishment for those convicted of a crime," McKnight argues. (ECF No. 127, PageID 15798.) To the question asking her to describe her personal feelings concerning the issue of crime, Juror I-30 answered, "If you commit a crime you should be punished in some form or other." (ECF No. 119-6, PageID 12988.) Her answer is completely devoid of any hint of an unusual, unique, or excessively harsh attitude toward crime and punishment.

McKnight argues Juror I-30's opinion that people convicted of crimes are treated too leniently deserved more questioning by his counsel. (ECF No. 127, PageID 15798.) A quick scan of a few of the juror questionnaires reveals that is not an uncommon opinion. Juror I-30 expressed an understanding of her duties as a juror, an ability to judge the case based solely on evidence presented in the trial, and an ability to weigh the aggravating circumstances and mitigating factors to arrive at an appropriate sentence under the law. (ECF No. 105-5, PageID 3871-83.)

One final note. For each of the allegations in which McKnight contends his attorneys should have more thoroughly questioned Juror I-30, he offers no evidence that such questioning would have revealed bias on her part. He apparently has never tried to interview Juror I-30 to see if his suggestion that her questionnaire answers evidence such bias. Thus, for that reason and the reasons stated above, McKnight's claim that his attorneys were ineffective for not delving into Juror I-30's answers more thoroughly should be denied.

Next, McKnight claims his counsel should have objected to the trial court's preliminary instruction that "discrepancies in a witness' testimony, or between his testimony and that of others, if there are any, does not necessarily mean that you should disbelieve the witness, as people commonly forget facts or recollect them erroneously after the passage of time" and that their failing to do so rendered their performance deficient.    (ECF Nol. 127, PageID 15801-02.)

> [J]ury instructions typically are matters of state law that do not warrant federal relief [unless] the . . . instruction violate[s] a constitutional right.  *Estelle*, 502 U.S. at 72.   Upon review, a court must determine whether there is a reasonable likelihood that the jury applied the instruction in a way that prevents consideration of constitutionally relevant evidence.  *Boyde*, 494 U.S. at 380.   The impropriety of the instruction must be considered in the context of the instructions as a whole and of the entire record.   *Id.*   Since jury instruction errors typically are matters of state law, the standard for demonstrating that a jury instruction caused constitutional errors in a habeas proceeding "is even greater than the showing required to establish plain error on direct appeal."   *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977).

*Cunningham v. Hudson*, No. 3:06CV0167, 2010 WL 5092705 at *65 (N.D. Ohio Dec. 7, 2010), *vacated on other grounds and remanded*, 756 F.3d 477 (6th Cir. 2014).   McKnight argues that the trial court's instruction on discrepancies between witnesses' testimonies was "fatal" to his defense. (ECF No. 127, PageID 15802.)

McKnight presented the jury instruction claim to the Supreme Court of Ohio on direct review as his ninth proposition of law.   The court noted trial counsel's failure to object, evaluated the claim for plain error, and found none.   *McKnight*, 2005-Ohio-6046 at ¶¶ 221-23.   McKnight has not acknowledged the Supreme Court's observation in *Henderson* quoted above.   Moreover, the state courts have repeatedly found no error, plain or otherwise, when the same instruction has

been given in other cases.  *State v. Cunningham*, 105 Ohio St. 3d 197, 2004-Ohio-7007 at ¶¶ 554-56 (2004); *State v. Singleton*, No. 98301, 2013-Ohio-1440 at ¶ 31 (Ohio App. 8th Dist. Apr. 11, 2013); *State v. Williams,* No. 94616, 2011-Ohio-925 at ¶¶ 39-40(Ohio App. 8th Dist. Mar. 3, 2011); *State v. Holloway*, Nos. 99AP-1455, 99AP-1456, 2000 WL 1455686 at *8 (Ohio App. 10th Dist. Sept. 28, 2000); *State v. Dougherty*, No. 5-94-2,1996 WL 517300 at *30 (Ohio App. 3rd Dist. Sept. 12, 1996); *State v. Joseph*, No. 1-91-11, 1993 WL 531858 at *10 (Ohio App. 3rd Dist. Dec. 23, 1993); *State v. Scudder*, No. 91AP-506, 1992 WL 302432 at *14 (Ohio App. 10th Dist. Oct. 20, 1992).  Thus, even if McKnight's attorneys had objected to the instruction, it is unlikely the objection would have been sustained.  Failure to object when overruling is virtually assured does not constitute ineffective assistance of counsel.

McKnight alleges his counsel also provided ineffective assistance when they failed to object to "inflammatory victim impact testimony" offered by the prosecutor during the culpability phase of his trial.  (ECF No. 127, PageID 15803.)  Specifically, he contends his counsel should have objected to the prosecutor's statements about Emily's life and her personality characteristics, the impact of her murder on her family and friends, Emily's tattoo and its meaning, and the prosecutor's reiteration of that evidence in closing argument.  *Id*. at PageID 15803-6.  See also Ground For Relief Eleven, *supra*.  He raised this part of his ineffective assistance of trial counsel claim as part of his twenty-sixth proposition of law on direct appeal to the Supreme Court of Ohio.  (ECF No. 106-15, PageID 9614.)  As explained in the state court's opinion, each instance of alleged victim impact evidence was justified to show that Emily Murray was in close communication with her parents and roommates, would not spontaneously have left Gambier

156

without letting some or all of them know where she was going, and was religious, responsible, and generally content. *McKnight*, 2005-Ohio-6046 at ¶¶ 91-104. That evidence was relevant to the identification of her body and to the prosecution's response to the defense's theory of the case that Emily was unstable and had committed suicide. *Id*. The trial court had denied McKnight's motion *in limine* and it is unlikely that it would have sustained an objection during the trial even if one had been lodged by McKnight's counsel.

In his next argument, McKnight claims his counsel were rendered ineffective assistance when they failed to request a hearing pursuant to *Remmer v. United States*, 347 U.S. 227 (1954), after learning that Amy Warrix had alleged that Juror Stewart had discussed the case with her. (ECF No. 127, PageID 15806.) The underlying claim involving Warrix and Stewart was considered and recommended denied in McKnight's thirteenth ground for relief, *supra*. Thus, his ineffective assistance of counsel claim here should be denied as well.

Next, McKnight alleges his trial counsel were ineffective when they failed to request a curative instruction after a spectator reacted to defense counsel's suggestion that Emily and McKnight were considering a relationship by saying, "No." (ECF No. 127, PageID 15811, citing ECF No. 105-25, PageID 7179.) Here, too, McKnight argues he was entitled to a *Remmer* hearing, which his counsel did not request, further exacerbating their ineffectiveness. (ECF No. 127, PageID 15812.) He also mentions that a spectator expressed approval when the death sentence was announced, and that his counsel failed to address that "disruption." *Id*. at PageID 15815. As for the underlying claim about a spectator's saying "No" following the prosecutor's suggestion, denial of that matter was recommended in the Court's discussion of McKnight's

fifteenth ground for relief. For the reasons stated there, his counsel were not ineffective for failing to object to the spectator's comment. Furthermore, at the conclusion of the sentencing hearing in which the trial court adopted the jury's recommendation of death, a spectator said "Yes" upon announcement of the death sentence. (ECF No. 105-28, PageID 7631.) At that stage, there would be no reason for trial counsel to have objected to the spectator's statement since the jury had been excused several days prior, and the trial was at that very moment concluded. McKnight could have suffered no prejudice from the spectator's comment.

In addition, McKnight faults his attorneys for not objecting to allegedly gruesome photographs that "had no probative value and were highly prejudicial and inflammatory." (ECF No. 127, PageID 15815-16.) He claims that photographs of the crime scene, Emily's body as it was found inside McKnight's trailer, and autopsy photographs should have been objected to by his counsel but were not. (ECF No. 127, PageID 15815.)[19] The state supreme court found McKnight was not prejudiced by the admission of the photographs, *McKnight*, 2005-Ohio-6046 at ¶ 305, and McKnight has failed to demonstrate otherwise here.

In Ohio,

> Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number.

*State v. Maurer*, 15 Ohio St. 3d 239, paragraph seven of the syllabus (1984). Of course, in a

---

[19] In his motion in limine, in fact, McKnight requested that *all* photographs of his deceased victim be excluded at trial, a patently unreasonable request. (ECF No. 17, PageID 700.)

murder trial, photographs of the victim are likely to be gruesome, but they are necessary to prove that a murder was actually committed and the identity of the victim.  McKnight does not allege that any photographs admitted at his trial were repetitive, cumulative, or improperly authenticated. The Ohio court's finding that McKnight had suffered no prejudice from the photographs of Emily Murray in death admitted at his trial leads to the conclusion that McKnight's attorneys were not ineffective for failing to object to their admission.

McKnight argues that his trial counsel waived his presence during a critical phase of his trial, to wit, the in-chambers questioning of Juror Stewart respecting Amy Warrix's allegations, which constituted ineffective assistance.  *Id*. at PageID 15816.  He states that any waiver of his constitutional right to be present during that conversation must be in writing or orally on the record, and that no such waiver appears in the record.  *Id*. at PageID 15817.  McKnight presented the underlying claim to the state supreme court on direct appeal as his fourteenth proposition of law, claiming violations of his rights under federal constitutional amendments.  (ECF No. 106-15, PageID 9552-55.)   The Supreme Court of Ohio found as follows:

> We also reject appellant's argument that his counsel was [sic] ineffective by waiving appellant's presence at in-chambers proceedings without consulting him.  Appellant personally waived his presence at in-chambers proceedings, and this waiver was valid for the two in-chambers proceedings that he challenged.

*McKnight*, 2005-Ohio-6046 at ¶ 306.  McKnight raised the underlying claim as his nineteenth ground for relief here, and its denial is recommended above.  Because the underlying claim is meritless given McKnight's on-the-record waiver at his presence at in-chambers conferences, his trial counsel were not ineffective in relying on that waiver.

159

Finally, McKnight contends his trial counsel were ineffective when they failed to object to numerous instances of alleged prosecutorial misconduct. (ECF No. 127, PageID 15818-19.) He states that the prosecutor engaged in misconduct by

1. Presenting victim impact evidence and evidence about Emily's character,

2. Prejudicial other acts evidence and McKnight's reaction to police presence at a club,

3. Speculating on what Emily was thinking during the events that ended her life,

4. Attempted to improperly rebut defense arguments regarding blood and firearm evidence, and

5. Shifting the burden of proof by noting that the defense failed to present witnesses.

*Id*. at PageID 15819. In addition, McKnight argues that the cumulative effect of those instances of prosecutorial misconduct deprived him of a fair trial. *Id*. McKnight included each of these underlying instances of alleged prosecutorial misconduct in his twenty-seventh proposition of law on direct appeal to the Supreme Court of Ohio. *McKnight*, 2005-Ohio-6046 at ¶¶ 269-299. Each, with the exception of the fourth, was rejected because McKnight's counsel failed to object and the state court found no plain error, *id*, and each has been determined to have been procedurally defaulted for habeas corpus purposes, see Thirty-First Ground for Relief, *infra*. All that is left for this Court to consider in this ground for relief is whether McKnight has established the ineffectiveness of his trial counsel to excuse the procedural default of his sub-claims.

The first two of McKnight's assertions that his counsel were ineffective for not objecting to alleged prosecutorial misconduct were considered *de novo* in his eleventh ground for relief, *supra*,

160

and found meritless based upon the state supreme court's factual findings in relation to those matters. As has been previously stated, attorneys are not ineffective for failing to lodge an objection that is sure to be overruled.

The third allegation of ineffective assistance of trial counsel for failure to object to prosecutorial misconduct concerns the prosecutor's culpability-phase speculation in his rebuttal argument that Emily had returned to her dorm room to get her car keys so she could give McKnight a ride home from work, that being his home in Gambier, not the trailer in Ray, Ohio. When considering the underlying claim of prosecutorial misconduct, the Supreme Court of Ohio found as follows:

> [A]ppellant asserts that the prosecutor acted improperly when he speculated about what was in Murray's mind. Testimony was introduced that Murray returned to her dorm room on the night she disappeared and got her keys. The prosecutor argued that this was for the purpose of "giving Greg a ride home to Met O Wood Lane in Gambier, not to Vinton County. "That's what was in Emily's mind." This argument represented fair comment on the evidence and was not plain error.

*McKnight*, 2005-Ohio-6046 at ¶ 289. Also, the jury was instructed that "the opening statements and closing arguments of counsel are designed to assist you. They are not evidence." (ECF No. 105-25, PageID 7256.) In addition, in the prosecution's closing argument, as opposed to the rebuttal argument quoted above, the prosecutor stated, "We don't know what Emily Murray consented to with regard to Mr. McKnight in the early hours of November 3rd. We don't know whether she agreed to give him a ride home – by 'a ride home,' I mean a ride home in Gambier." *Id*. at PageID 7150. An attorney's failure to object to an improper but isolated statement by a prosecutor is recognized as a legitimate strategy to avoid drawing attention to the statement and

possibly anchoring it in the minds of the jurors. See *Campbell v. Warden*, No. 1-14-cv-13, 2015 WL 7710761 at *10 (S.D. Ohio Nov. 30, 2015) (Merz, Mag. J.). In many instances, a foregone objection "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. That, paired with the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, *id.*, means McKnight's claim of ineffective assistance of trial counsel for their failure to object to the prosecutor's isolated comment must fail.

Next, McKnight contends his counsel were ineffective when they failed to object to the prosecutor's alleged mischaracterization in closing arguments of a defense argument respecting a .357 Ruger firearm.

The Supreme Court of Ohio acknowledged trial counsel's failure to object and found no plain error, reasoning as follows:

> {¶ 290} [A]ppellant argues that the prosecutor's rebuttal improperly responded to defense arguments. During closing argument, trial counsel discussed the state's failure to test the DNA of blood found on the 357 Ruger that had belonged to Kimberly Zimmerman, the sister of Kathy McKnight[, Appellant's wife]. Counsel argued that even though "the gun was ruled out as the possible gun used in Emily Murray's case, why wouldn't [the police] check it for Julious?" According to the defense, the failure to conduct DNA testing was "a colossal blunder, * * * a deliberate act, and it ought to make you sick."
>
> {¶ 291} In rebuttal, the prosecutor reminded the jury, "This gun was tested ballistically. This gun was not the murder weapon that was held up to Emily Murray's head and shot through her skull." The prosecutor then argued, "How does this blow the whole case out of the water? It doesn't, not at all. This gun was at the Zimmermans' in May. 'Now, it wasn't tested, so that means that Kim Zimmerman did it, ha-ha.' Guess who else lived with the Zimmermans in May of 2000? This guy."

{¶ 292}   The defense opened the door to the prosecutor's rebuttal. The prosecutor's comment that the .357 Ruger was not linked to Murray's murder explained the absence of DNA testing of blood on the weapon. Furthermore, the prosecutor's statement that the failure to conduct DNA testing did not exculpate appellant as to the murder of Julious was not improper.   This was fair comment in the face of the defense argument that the state's failure to conduct DNA testing was a "colossal blunder" and a "deliberate act.   Moreover, "[p]rosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence."  *State v. Smith* (1997), 80 Ohio St.3d 89, 111.  Thus, we find no plain error.

*McKnight*, 2005-Ohio.  McKnight states that the supreme court's decision meets the requirements of 28 U.S.C. § 2254(d)(1) and (2), but that conclusory statement does not establish the unreasonableness of the state court's rejection of McKnight's claim.  McKnight's bare-bones argument fails to demonstrate his entitlement to habeas corpus relief.

McKnight then alleges that his trial counsel were ineffective when they failed to object to the prosecutor's questioning why the defense called no witnesses.   (ECF No.127, PageID 15838.) He contends the prosecutor's comment shifted the burden of proof to the defense, but as the Supreme Court of Ohio noted, "The prosecutor may comment upon the failure of the defense to offer evidence in support of its case."  *McKnight*, 2005-Ohio-6046 at ¶ 293, *citing State v. Clemons*, 82 Ohio St.3d 438, 452 (1998), and *State v. Bies*, 74 Ohio St.3d 320, 326 (1996).   Thus, even if defense counsel had objected to the prosecutor's comment, it would have been overruled. Counsel cannot have been ineffective for failing to lodge an objection that was sure to be overruled.

McKnight also alleges the cumulative effect of his counsel's failure to object to the stated instances of alleged prosecutorial misconduct amounts to a denial of due process.   As each

163

instance was either meritless or harmless, cumulation of their effect amounts to no effect. As such, and for all of the reasons stated, McKnight's claim that his counsel were ineffective during the culpability phase of his trial should be denied.

**Twenty-Seventh Ground for Relief**

In his twenty-seventh ground for relief, McKnight contends his trial counsel failed to provide effective assistance in the penalty phase of his trial when they neither investigated nor presented evidence showing the effect his father's abandonment had on him as a child, the circumstances surrounding McKnight's previous adjudication for a murder he committed at the age of fifteen, or his experiences during his incarceration for that murder which he posits could explain his subsequent behavior. (ECF No. 127, PageID 15822-23.) He also faults the mitigation investigation because the mitigation specialist never traveled to New York or Texas, two States in which McKnight had lived for a time as a child, to interview family members. *Id.* at PageID 15823. McKnight states that his trial counsel believed the guilt phase of his trial was unwinnable and that his case was a mitigation case from the beginning, which he alleges constitutes ineffective assistance. *Id.* In addition, he claims that the lack of a thorough investigation by either the mitigation specialist or a cultural expert into his Caribbean background, culture, and religious upbringing deprived him of an individualized sentencing hearing, and that his counsel misidentified him as an African-American. *Id.* at PageID 15825. All of these failures, he contends, violated the obligations established by the American Bar Association

164

Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 31 Hofstra

L. Rev 913, 1017 (2003), undermining the integrity and reliability of the sentencing determination.

*Id*. at PageID 15826.

Respondent does not address McKnight's twenty-seventh ground for relief in her return of

writ, but the Court observes that McKnight's claim in habeas is considerably broader than the one

presented to the state court in his post-conviction petition. In post-conviction, his ninth and

fifteenth claims focused on trial counsel's failure to present evidence in mitigation about his

father's abandonment of him in childhood, the lasting effects of that abandonment (ECF No.

107-8, PageID 10497-98), and his counsel's misidentification of him as an African-American; he

asserts he is properly identified as Caribbean-American. (ECF No. 108-5, PageID 10955-57).

The additional arguments here are consequently procedurally defaulted and McKnight offers no

excusing cause or prejudice for failing to present those sub-claims to the state court. The Ohio

Fourth District Court of Appeals addressed in post-conviction the merits of the claim of ineffective

assistance of trial counsel for failure to adequately investigate and present evidence on the

parental-abandonment issue:

> {¶ 66} In his ninth claim for relief, McKnight's trial counsel
> rendered ineffective assistance of counsel by failing "to present
> available, relevant, and compelling mitigating evidence to the jury."
> He claims that trial counsel failed to investigate, prepare, and
> present mitigating evidence regarding his character, history, and
> background, and in particular, his father's abandonment.
> McKnight alleges that the evidence would have humanized him and
> provided the jurors with reasons to spare his life. To support this
> claim, McKnight relies upon affidavits from his mother, his
> maternal aunt, and a family friend in which they asserted that
> McKnight's feelings of paternal abandonment and the lack of a
> father-figure [sic] in his life were dominant themes in his life. He

165

also refers to lead defense counsel's deposition in which he stated that he did not consider parental abandonment as a mitigating factor.

{¶ 67}   The state contends that trial counsel investigated McKnight'' background and decided not to present the evidence. The state points to a discussion held on the record where lead defense counsel related his thought that calling certain mitigation witnesses would open the door to McKnight's prior juvenile murder conviction.   The state thus asserts that counsel was not deficient but instead made a strategic decision.   The state further argues that McKnight did not suffer prejudice.

. . .

{¶ 72}   "The decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel."   [State v.] *Keith*[, 79 Ohio St.3d 514,] 536 [(1997)].   "Attorneys need not pursue every conceivable avenue; they are entitled to be selective   *State v. Murphy* [2001], 91 Ohio St.3d 516, 542, quoting *United States v. Davenport* (C.A.7, 1993), 986 F.2d 1047, 1049."   *State v. Davis*, 116 Ohio St.3d 494[, ___ (2008)].   Furthermore, [t]he presentation of mitigating evidence is a matter of trial strategy.   *Keith* at 530.   Moreover, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.   *State v. Bryan*, 101 Ohio St.3d, 2004-Ohio-971, at ¶ 189, quoting *Wiggins* at 521.

. . .

{¶ 75}   McKnight's argument that evidence regarding his paternal abandonment would have humanized him and caused the jury to vote for a life sentence is rank speculation.   Additionally, courts have upheld death sentences in spite of mitigation evidence that a defendant had a troubled childhood See, e.g., State v. LaMar, 95 Ohio St.3d 181 at ¶ 195[(2002)] . . .; *State v. Coley* (2001), 93 Ohio St.3d 253, 273 . . .; *State v. Hoffner* (Mar. 23, 2001), Lucas App. No. L-95-181 . . . .

{¶ 76}   Furthermore, counsel made a tactical decision not to present this mitigation evidence for fear that it would open the door to evidence regarding McKnight's prior juvenile murder adjudication.

. . .

> {¶ 77}  Here, had counsel chosen to present evidence regarding McKnight's background as a child, particularly his feelings of paternal abandonment, counsel would have opened the door to evidence regarding his prior juvenile murder adjudication, as the trial court properly warned.  Thus, as the record clearly indicates, McKnight's trial counsel's decision not to present mitigating evidence regarding childhood issues of paternal abandonment and the lack of a father figure was a strategic decision to avoid possibly opening the door to his prior juvenile murder adjudication.  After McKnight finished presenting mitigation evidence, the state requested the court to place on the record defense counsel's decision not to present additional mitigation evidence.

*McKnight*, 2008-Ohio-2435.  At that point, the state court quoted extensively from the trial transcript, wherein defense counsel explained that the defense team was "severely constrained, handcuffed, by the juvenile adjudication."  *Id*. at ¶ 77.  In addition, counsel stated that a relative of McKnight's from New York was present but would not be called because given the trial court's previous rulings on "certain matters," presumably the juvenile adjudication, he was confident that the witness' testimony would "open the door to all kinds of things."  The court of appeals concluded that "based on this record, we find that trial counsel made a strategic decision after full and fair consideration and investigation.  As such, trial counsel's performance was not deficient.  Consequently, trial counsel was not ineffective."  *Id*. at ¶ 78.

In addressing McKnight's claim that a cultural expert should have been obtained to testify on the cultural differences between African-Americans and Caribbean-Americans and the effect such testimony may have had on McKnight's jury, the state court of appeals reasoned as follows:

> {¶ 95}  McKnight claims that . . . the lack of a cultural expert deprived him of individualized sentencing . . . .   Specifically,

167

McKnight claims that the . . . summary derived from the cultural expert's report [submitted in support of his post-conviction claim] would have humanized him and helped sway the jury to vote for a life sentence, as opposed to a death sentence.

. . .

{¶ 98}    [W]hen a defendant challenges defense counsel's investigation of potential mitigating evidence, the focus is "on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." *Wiggins* at 523. "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.' ('[E]very effort [must] be made to eliminate the distorting effects of hindsight')." (Cites omitted.) Id.

{¶ 99}    Here, defense counsel made a tactical decision not to present further mitigation evidence.   Even assuming that in hindsight, introducing cultural mitigation evidence would have been an appropriate theory, we may not evaluate counsel's decision in hindsight.   Instead, we must consider counsel's decision at the time it was made and accord counsel's decision deference.   At the time counsel made the decision, they reasonably believed that presenting further mitigation evidence would open the door to McKnight's prior juvenile murder adjudication.   And counsel appears to have been correct in this regard.   In his postconviction deposition, Attorney Carson stated that the judge warned defense counsel that if they brought up anything that predated McKnight's detention as a juvenile, then they should open the door to his prior juvenile adjudication for murder, which the defense obviously wanted to avoid.    Therefore, McKnight cannot overcome the strong presumption that counsel made a reasonable strategic decision. Consequently, we do not find counsel's decision to decline to present further mitigation evidence deficient.   See *Darden v. Wainwright* (1986), 477 U.S. 168, 186 (concluding that counsel engaged in extensive preparation and that the decision to present a mitigation case would have resulted in the jury hearing evidence

168

that petitioner had been convicted of violent crime and spent much of his life in jail.

{¶ 100}  Additionally, McKnight merely speculates that evidence of his cultural background would have humanized him to the jury and led to a life sentence. . . .  [S]peculation is not sufficient to demonstrate prejudice.

{¶ 101}  Furthermore, other Ohio appellate courts have rejected claims that failure to use cultural mitigation evidence constitutes ineffective assistance of counsel.  See *State v. Issa* (Dec. 21, 2001), Hamilton App. No. C-000793 ("A postconviction claim does not show ineffective assistance of counsel merely because it presents a new expert opinion that is different from the theory used at trial. This claim involved nothing more than an alternative mitigation theory and did not provide substantive grounds for postconviction relief"); *State v. Murphy*, (Dec. 26, 2000), Franklin App. No. 00AP-233 ("Encouraging jurors to decide a defendant's sentence based on conclusions about groups of people, delineated by race or ethnicity, is [an] anathema to individualized sentencing. Sentencing in capital cases should be about the crime and the individual characteristics of the defendant.  There is no room for group guilt or group mitigation.").

*McKnight*, 2008-Ohio-2435.

McKnight presented the depositions of Herman Carson, Robert Aaron Miller, and Robert Toy, McKnight's trial counsel.  Herman Carson stated that the defense had engaged two mitigation specialists, Kelly Keiby and Jessica Love. (ECF No. 108-5, PageID 10996), but that counsel had been warned by the trial judge that if any evidence about McKnight's juvenile adjudication for murder was introduced, it would open the door for the prosecution to bring in the juvenile adjudication.  (ECF No. 108-5, PageID 10997-98.)  Robert Toy stated in his deposition that there would be "no hope" for McKnight if the juvenile adjudication were known to the jury. *Id*. at PageID 11127.  McKnight has not demonstrated that the evidence of his father's

169

abandonment and his Caribbean rather than African roots would have overcome the devastating impact of his previous adjudication for murder.   Nor does he offer support for his allegation that such evidence would have humanized him to the jurors or caused even one of them to vote for a life sentence.   It is difficult to imagine what amount or weight of evidence would overcome the fact of McKnight's previous adjudication for murder, in fact, but parental abandonment and being a cultural minority does not do so.   McKnight's trial counsel made a reasonable decision not to introduce such evidence and risk, in fact, guarantee, that his previous adjudication for murder would be presented to the jury by the prosecutor.   Accordingly, his twenty-seventh ground for relief should be denied.

**Twenty-Eighth Ground for Relief**

In his twenty-eighth ground for relief, McKnight contends his trial counsel were ineffective when they failed to object to the trial court's penalty-phase instruction that the jury should "consider all of the testimony and evidence relevant to the aggravating circumstance Gregory B. McKnight was found guilty of committing and mitigating factors raised at both phases of the trial and final arguments of counsel."   (ECF No. 127, PageID 15827.)   Respondent argues the claim is both procedurally defaulted and meritless.   (ECF No. 13, PageId 521.)   McKnight asserts that he presented his claim as part of his twenty-sixth proposition of law on direct appeal and thereby preserved it for habeas corpus review.   (ECF No. 17, PageID 874.)

170

After discussing in some detail various other ineffective assistance of trial counsel sub-claims that were included in McKnight's twenty-sixth proposition of law, the Supreme Court of Ohio addressed the instant sub-claim summarily:  "Appellant also suffered no prejudice from his counsel's failure to object to various . . . penalty-phase . . . instructions. . . .  None of appellant's claims establish ineffective assistance of counsel, and proposition XXVI is overruled." *McKnight*, 2005-Ohio-6046 at ¶¶ 305, 307.  Thus, the claim was properly presented to the state court, which decided it on the merits.

In his Traverse, McKnight relies primarily on *State v. Getsy*, where Getsy argued that it is the trial court's responsibility to determine what evidence is relevant, not the jury's, and the court agreed.  94 Ohio St.3d 180,201 (1998).  In *Getsy*, however, specific items of evidence were sought to be excluded from the evidence given to the jury during their penalty-phase deliberations. *Id*.  Here, McKnight has identified no item of evidence to which trial counsel should have objected and which was so prejudicial as to have compromised the fairness of the jury's penalty-phase verdict.  Without such specificity, this Court has no foundation upon which to find the state court's rejection of McKnight's ineffective assistance of trial counsel claim contrary to or an unreasonable application of federal law as determined by the United States Supreme Court. Thus, his claim that his trial counsel were ineffective in not objecting to the challenged jury instruction should be denied.

**Twenty-Ninth Ground for Relief**

In his twenty-ninth ground for relief, McKnight contends his trial counsel's failure to object to the jury verdict forms constituted ineffective assistance. (ECF No. 127, PageID 15831-32.) Respondent again argues the claim is both procedurally defaulted and meritless. (ECF No. 13, PageID 522.) McKnight counters that he raised the claim as part of his twenty-sixth proposition of law. (ECF No. 127, PageID 879.)

McKnight raised the underlying claim concerning the verdict forms in his twenty-fourth ground for relief in these proceedings. For the reasons stated there, trial counsel's failure to object to the forms was not deficient performance in any way. McKnight's twenty-ninth ground for relief should be denied.

**Thirtieth Ground for Relief**

Next, McKnight alleges his trial counsel were ineffective in failing to object to "flawed instructions given during the trial and penalty phase[s] of his trial[, p]articularly a flawed instruction as to reasonable doubt, releasing the victim in a safe place unharmed, and allowing the jury to select alternative felonies as elements." (ECF No. 127, PageID 15832.)

The underlying claims forming the basis for each of the three instances of alleged ineffective assistance of trial counsel McKnight includes in the instant ground for relief has been addressed in McKnight's twentieth ground for relief. Not only was the challenged instruction not

172

given at McKnight's trial, but the Sixth Circuit has repeatedly held that the instruction actually given in McKnight's case is neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court. Here, however, the question remains as to whether the state trial court would have sustained an objection to the instruction given and whether McKnight would have been prejudiced by his attorneys' failure to lodge the objection. The answer to that question is "No." The Supreme Court of Ohio has repeatedly rejected challenges to the instruction given in McKnight's case. *State v. Jones*, 91 Ohio St.3d 335, 347-48, 2001-Ohio-57 (stating, "We have repeatedly affirmed the constitutionality of R.C. 2901.05(D)'s definition of reasonable doubt. See *State v. Hessler* (2000), 90 Ohio St.3d 108, 115; *State v. Getsy* (1998), 84 Ohio St.3d 180, 202."). Thus, even if trial counsel would have objected to the reasonable doubt instruction, it would surely have been overruled. Counsel cannot have been ineffective for failing to lodge such an objection. Accordingly, McKnight's thirtieth ground for relief should be denied.

**Thirty-First Ground for Relief**

In his thirty-first ground for relief, McKnight contends several instances of prosecutorial misconduct violated his constitutional rights to due process and a fair trial. (ECF No. 127, PageID 15833-40.) Respondent argues the claim is partially procedurally defaulted insofar as McKnight claims a violation of his Fifth and Sixth Amendment rights, is meritless, and that McKnight has not provided any argument as to why the state court's decision on the claim was

unreasonable. (ECF No. 13, PageID 527.) In his Traverse, McKnight argues that his claim was not "fully adjudicated" by the state supreme court for two reasons: (1) the court's opinion does not address every instance of alleged prosecutorial misconduct he recites in his appellate brief, and (2) the court failed to consider the cumulative effect of the alleged prosecutorial misconduct. (ECF No. 17, PageID 890-907.)

Respondent's claim of procedural default as to McKnight's Fifth and Sixth Amendment rights claims is correct. He raised the present claim only as violations of his Eighth and Fourteenth Amendment rights. (ECF No. 106-15, PageID 9617-25.)

When addressing claims of prosecutorial misconduct, "the clearly established Federal law relevant here is our decision in *Darden v. Wainwright,* 77 U.S. 168 (1986), which explained that a prosecutor's improper comments will be held to violate the Constitution only if they so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Id.* at 181 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)." *Parker v. Matthews*, 567 U.S. 37, 45 (2012)(parallel citations and internal quotation marks omitted).

The specifics of McKnight's claim is that the prosecutors violated his Eighth and Fourteenth Amendment rights when they "saturated the trial with emotionally charged victim impact and character evidence," "introduced irrelevant and inflammatory evidence that McKnight engaged in infidelities during his marriage," "presented testimony . . . regarding McKnight's reaction to the presence of police at a club," elicited testimony that officers went to McKnight's trailer to serve an indictment for burglary on McKnight, "speculated as to what was in Murray's mind," made improper rebuttal respecting the blood on the .357 weapon, commented on the

defense's failure to present any witnesses in their case in chief, improperly included argument on the "escaping detection" aggravating circumstance in his penalty-phase argument after the trial court and excluded it from consideration, and referred to McKnight's marital infidelities in their penalty-phase closing argument. (ECF No. 127, PageID 15833-40.) Nowhere in his ground for relief does McKnight address the question before this Court, which is: How is the Supreme Court of Ohio's decision on these claims contrary to or an unreasonable application of federal law as determined by the United States Supreme Court or an unreasonable determination of the facts in light of the evidence presented in the state court. See 28 U.S.C. § 2254(d). He mentions in a footnote that the state supreme court found the sub-claim concerning his reaction to the police at the club was harmless, and he recites the language from the statute just cited in the final paragraph of his ground for relief, but that is inadequate to meet the standard required by the statute. In addition, all of these sub-claims were presented in McKnight's eleventh and twenty-second grounds for relief where he argued them without alluding to prosecutorial misconduct *per se*, and this Court recommended those grounds for relief be denied. The same facts and argument fair no better when scrutinized under the category of prosecutorial misconduct. Nor do they coagulate into cumulative error, as McKnight suggests.

McKnight's thirty-first ground for relief should be denied.

175

**Thirty-Second Ground for Relief**

In his thirty-second ground for relief, McKnight alleges juror misconduct in that two jurors improperly considered some facet of the "nature and circumstances of the crime" as an aggravating circumstance when deliberating on his sentence.   (ECF No. 127, PageID 15841-42.) Respondent argues the claim is partially procedurally defaulted and that the state court of appeals found it barred by the doctrine of *res judicata* in McKnight's post-conviction proceedings.   (ECF No. 13, PageID 539-45.)

McKnight presented the claim to the state courts as his fifth assignment of error in post-conviction, alleging the jurors' misconduct violated his Sixth, Eighth, and Fourteenth Amendment rights.  (ECF No. 107-7, PageID 10485-87.)   Respondent's defense of procedural default rests on McKnight's addition here of an allegation that his Fifth Amendment rights were also violated.   Because that part of his claim was not included in his state court proceedings, it is procedurally defaulted.

Without reciting the entirety of the state court of appeals' decision on the matter, it found as follows:

> {¶ 45}  To support his claim, McKnight submitted an affidavit from Assistant State Public Defender, Kathryn Sandford, who was present at interviews with two of McKnight's jurors following the trial.  Attorney Sandford stated that one of the jurors asserted that she voted for death because of the "brutality" of the crimes . . . . Attorney Sandford stated that the juror advised, "[T]he only factor that could have weighed in favor of a life sentence was if the defense had proven in any way that McKnight was not responsible for the crimes."

{¶ 46} . . . [A second] juror stated that the evidence of McKnight's guilt was "too strong to vote for life."

. . .

{¶ 48}   Evidence Rule 606(B) prohibits a party from using a juror's statement to impeach a verdict.   See *State v. Robb* (2000), 88 Ohio St.3d 59, 79. . . .

{¶ 49}   Thus, Evid.R. 606(B) prohibits both a juror's statements and hearsay testimony concerning the juror's statements provided in an affidavit unless evidence aliunde[20] exists; that is, evidence that is extraneous and independent, based upon the firsthand knowledge of one who is not a juror.   (Citations to state court cases omitted.) . . . The rule is vital not only to protect jurors from harassment by defeated parties, but to ensure finality of verdicts and preserve "the sanctity of the jury room and the deliberations therein."   *Wittman v. Akron*, Summit App. No. 21375, 2003-Ohio-56127, ¶ 10. . . .

. . .

{¶ 51}   Here, McKnight offered an affidavit containing Attorney Sandford's recollection of juror interviews attesting to their deliberations during the sentencing phase of McKnight's trial.   The statements constitute internal evidence of the jury's deliberations, which the aliunde rule flatly prohibits.   Therefore, the trial court properly concluded that Evid.R. 606(B) prohibited it from considering the affidavit when evaluating McKnight's postconviction petition.   Moreover, Sandford's affidavit attesting to what the jurors stated is complete hearsay.   (Citation omitted.)

. . .

{¶ 53}   Accordingly, we find that the trial court did not abuse its discretion by dismissing McKnight's fifth claim for relief.

*McKnight*, 2008-Ohio-2435.   Once again, McKnight has argued the merits of his juror

---

[20] **Aliunde** (ay-lee-**yən**-dee) *adj.* [Latin] (17c) From another source; from elsewhere. BLACK'S LAW DICTIONARY (11th ed. 2019).

misconduct claim rather than explaining what specific Supreme Court holding eviscerates the *aliunde* rule, which exists in both the Ohio and Federal Rules of Evidence. Simply repeating arguments made in the state court and concluding with a single sentence declaring that the state court's decision is contrary to or an unreasonable application of federal law, or an unreasonable determination of the facts in light of the evidence before the state court is woefully inadequate under 28 U.S.C. § 2254(d).

For the reasons stated above, it is recommended that McKnight's thirty-second ground for relief be denied.

**Thirty-Third Ground for Relief**

In his thirty-third ground for relief, McKnight contends his appellate counsel provided ineffective assistance on direct appeal to the Supreme Court of Ohio. (ECF No. 127, PageID 15843-44.) Specifically, he argues that his appellate counsel should have raised as error on direct appeal trial counsel's ineffectiveness in failing to challenge the allegedly false statements contained in the probable cause affidavit, and trial counsel's failure to seek a change of venue based on the racial bias of the venire that was revealed in voir dire. *Id.* at PageID 15844.

A criminal defendant is entitled to effective assistance of counsel on appeal as well as at trial, counsel who acts as an advocate rather than merely as a friend of the court. *Evitts v. Lucey*, 469 U.S. 387 (1985); *Penson v. Ohio*, 488 U.S. 75 (1988); *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). Counsel must be appointed on appeal of right for indigent criminal defendants.

178

*United States v. Cronic,* 466 U.S. 648 (1984); *Anders v. California*, 386 U.S. 738 (1967); *Douglas v. California*, 372 U.S. 353 (1963). The *Strickland* test applies to appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Burger v. Kemp,* 483 U.S. 776 (1987). To evaluate a claim of ineffective assistance of appellate counsel, then, the court must assess the strength of the claim that counsel failed to raise. *Henness v. Bagley*, 644 F.3d 308 (6th Cir. 2011), *citing Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008). Counsel's failure to raise an issue on appeal amounts to ineffective assistance only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal. *Id.*, *citing Wilson.*

The underlying issue forming the basis of the first of those arguments was discussed in McKnight's first and twenty-sixth grounds for relief, *supra*. There, this Court determined that the underlying claim was not cognizable in habeas corpus and, even if it were, it was meritless. Thus, appellate counsel were not ineffective for failing to include a proposition of law alleging trial counsel were ineffective in not attacking the veracity of the statements in the affidavit supporting the warrant. McKnight's thirty-third ground is meritless for that same reason.

**Thirty-Fourth Ground for Relief**

In his thirty-fourth ground for relief, McKnight contends there was insufficient evidence to convict him and that his convictions were against the manifest weight of the evidence. (ECF No. 127, PageID 15845.) Respondent acknowledges that the state supreme court addressed and denied the claim on its merits on direct appeal but notes this Court's obligation to defer to that

179

decision unless it clearly violates 28 U.S.C. § 2254(d).   (ECF No. 13, PageID 547-55.)

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.   *Jackson v. Virginia,* 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6ᵗʰ Cir. 2000); *Bagby v. Sowders*, 894 F.2d 792, 794 (6ᵗʰ Cir. 1990) (en banc).   In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt.   *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . .   This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007).   This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991).   Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt.   *In re Winship, supra.*   A sufficiency challenge should be assessed against the elements of the crime, not against the elements set forth in an erroneous jury instruction.   *Musacchio v. United States*, 577 U.S. ___, 136 S. Ct. 709, 193 L. Ed. 2d 639 (2016).

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the AEDPA, two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008). Notably, "a court may sustain a conviction based upon nothing more than circumstantial evidence." *Stewart v. Wolfenbarger,* 595 F.3d 647, 656 (6th Cir. 2010).

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565

181

> U.S. 1, ___, 132 S.Ct. 2, 181 L.Ed.2d 311, 313 (2011) (per curiam).
> And second, on habeas review, "a federal court may not overturn a
> state court decision rejecting a sufficiency of the evidence challenge
> simply because the federal court disagrees with the state court. The
> federal court instead may do so only if the state court decision was
> 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U.S.
> ___, ___, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 651, (2012)(per curiam); *Parker v. Matthews*, 567 U.S. 37, 43

(2012) (per curiam).   The federal courts do not make credibility determinations in reviewing

sufficiency of the evidence claims.   *Brooks v. Tennessee,* 626 F.3d 878, 887 (6th Cir. 2010).

McKnight specifically argues that the evidence resulting in his conviction on the

kidnapping charge as well as the associated aggravating circumstance attached to his aggravated

murder charge was insufficient to sustain his convictions.   (ECF No. 127, PageID 15845-48; ECF

No. 17, PageID 922-30.)   Before recounting the state supreme court's reasoning on the instant

claim, this Court observes that claims asserting that a petitioner's conviction is against the

manifest weight of the evidence are matters of state law and are not cognizable in habeas corpus.

*Nash v. Eberlin*, 437 F.3d 519, 522 (6th Cir. 2006); *Arnold v. Warden*, 832 F. Supp. 2d 853, 861

(S.D. Ohio 2011) (Black, J.); *Ob'Saint v. Warden*, 675 F. Supp. 2d 827, 832 (S.D. Ohio 2009)

(Beckwith, J.); *Huffman v. Brunsman*, 650 F. Supp. 2d 725, 735 (S.D. Ohio 2008) (Barrett, J.).

Thus, this Court confines itself to the claim of insufficient evidence.

The Supreme Court of Ohio reasoned as follows in rejecting McKnight's claim:

> {¶ 70}   In reviewing a claim of insufficient evidence, "[t]he
> relevant inquiry is whether, after viewing the evidence in a light
> most favorable to the prosecution, any rational trier of fact could
> have found the essential elements of the crime proven beyond a
> reasonable doubt."   *State v. Jenks* (1991), 61 Ohio St.3d 259,
> paragraph two of the syllabus, following *Jackson v. Virginia* (1979),

443 U.S. 307; see also, *State v. Thompkins* (1997), 78 Ohio St.3d 380.

. . .

{¶ 72}  Appellant argues that the state did not prove that he kidnapped Murray.  Appellant argues that no witnesses testified that they saw him remove or restrain Murray, and no evidence was presented about where she was murdered. . . .

{¶ 73}  We find that appellant's sufficiency claim[] lack[s] merit. The state proved that appellant kidnapped Murray by showing that Murray and appellant left work at approximately the same time on the night Murray disappeared, that Murray's car was found parked behind appellant's trailer, and that Murray's murdered body was found rolled in a carpet inside appellant's trailer.  Further, the evidence proved that Murray did not have her wallet, driver's licenses, and credit cards when she disappeared and that Murray did not tell anyone she was leaving the area, despite her habit of informing friends of her whereabouts.  Additionally, appellant lied when Murray's friend asked about her, and appellant also told a co-worker that she was "probably dead."  Appellant also falsely told Kimberly Zimmerman that the Subaru behind his trailer belonged to his boss or a friend, "and they were down there probably hunting."

{¶ 74}  The evidence also established that the location of Murray's murder was appellant's trailer.  A copper bullet jacket found in the living room of the trailer had Murray's DNA on it, and a bullet hole was discovered in the bloodstained living-room[sic] carpet.

{¶ 75}  We also reject appellant's claim that the evidence was insufficient because there were no eyewitnesses.  We have "long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt."  *State v. Heinish* (1990), 50 Ohio St.3d 231, 238.  Here, circumstantial evidence, forensic testimony, and appellant's own statements proved beyond a reasonable doubt that appellant kidnapped and murdered Murray.  Forensic evidence showed that the copper bullet jacket and bullets removed from a tree behind appellant's trailer were fired from the same firearm."

183

> Moreover, the fact that appellant used a gun for target practice on his property linked him to the weapon that killed Murray.
>
> {¶ 76} . . . Proposition 1 is overruled.

*McKnight*, 2005-Ohio-6046.

*McKnight* emphasizes that "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, **any** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]" 2005-Ohio-6046, *quoting Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis supplied).  In other words, a petitioner must demonstrate that no rational trier of fact, not even one, could find that the prosecutor met his or her burden of proving every element of the crime beyond a reasonable doubt.  That is a very high standard, and McKnight has not succeeded in meeting it.   Instead, he makes his argument as if to the state court on direct appeal, and concludes by simply stating that the state court's thorough evaluation of his claim is contrary to or an unreasonable application of federal law or an unreasonable determination of the facts given the evidence before the state court.   Such conclusory statements do not demonstrate any weakness or error in the Supreme Court of Ohio's decision quoted above.   As such, McKnight has not shown entitlement to federal habeas corpus relief, and his thirty-fourth ground for relief should be denied.

**Thirty-Fifth Ground for Relief**

In his thirty-fifth ground for relief, McKnight alleges that Ohio's appellate and proportionality review in death penalty cases violates his Fifth, Sixth, Eighth, and Fourteenth

Amendment rights.  (ECF No. 127, PageID 15849-55.)  Respondent counters that McKnight's claim is both meritless and procedurally defaulted.  (ECF No. 13, PageID 556-60.)  McKnight argues he raised the instant claim on direct appeal and that the state supreme court decided it on its merits.  (ECF No. As for the part of his claim alleging Ohio's death penalty statutes fail to provide a constitutionally valid proportionality review, that claim has been rejected over and over.  While "[t]he concept of proportionality is central to the Eighth Amendment," *Graham v. Florida*, 560 U.S. 48, 59 (2010), the Constitution does not require a proportionality review comparing one death penalty case to another, *Pulley v. Harris*, 465 U.S. 37, 42-43 (1984), something McKnight fails to acknowledge.  Since proportionality review takes place in Ohio as part of the trial court's sentencing procedure and in the Supreme Court of Ohio on direct appeal, McKnight's thirty-fifth ground for relief is without merit and should be denied.

**Thirty-Sixth Ground for Relief**

In his thirty-sixth ground for relief, McKnight argues the trial court and the Supreme Court of Ohio arbitrarily violated their duties to independently weigh the aggravating circumstance and mitigating factors in many ways:  (1) the supreme court refused to consider and give effect to "relevant and powerful mitigating evidence"; (2) the trial court refused to admit evidence in mitigation that Emily Murray's family was opposed to the death sentence for McKnight, and; (3) both courts ignored the obvious racism inherent in McKnight's case.  (ECF No. 127, PageID 15855-61.)  Respondent contends McKnight's claim is procedurally defaulted in part and also

185

repeats what appears to be the entire independent sentencing evaluation by the Supreme Court of Ohio.  (ECF No. 13, PageID 561-67.)   In both his Petition and his Traverse, McKnight essentially copies the claim as it was presented to the Supreme Court of Ohio on direct appeal, cf. Appellate Brief, ECF No. 106-15, PageID 9628-31; Petition, ECF No. 127, PageID 15855-61; and Traverse, ECF No. 17, PageID 943-49, adding that "[t]he Supreme Court of Ohio's failure to correct this arbitrary sentence is an unreasonable application of clearly established federal law as enunciated by the Supreme Court of the United States."   (ECF No. 127, PageID 15861.)

McKnight specifically argues the state courts failed to give appropriate weight, or in some cases even refused to consider, mitigating evidence that he supported and was devoted to his family, that he was a good father to his two young children, that he cared for his mother-in-law when she was sick, that he helped an acquaintance with her children, that McKnight had worth as a human being, and that he had held his job at the Pirate's Cover for three months and was in line for a promotion.  *Id.* at PageID 15857-61.   But the trial court's sentencing evaluation acknowledged most of those factors and gave them each "some weight."   (ECF No. 106-15, PageID 9307-08.) The factor not mentioned in the trial court's opinion is that McKnight helped a friend with her children.   The record shows that McKnight asked Dana Bostic if she needed diapers for her daughter or anything else for her children after Julious disappeared (Trial Tr., ECF No. 105-20, p. 1015, 1032), but nowhere does it indicate he brought anything to her household other than groceries on one occasion, *id.* at p. 1118, and the mitigatory effect of that one act of generosity after he had murdered Bostic's boyfriend/roommate, Julious, is very weak.[21]

---

[21]  There are other instances of "Greg" helping Bostic by taking care of her children while she was out of the home, but

McKnight also contends the trial court violated his right to "due process and a reliable review of the arbitrariness of his sentence of death" by failing to take into consideration numerous letters, etc., from family members and friends of Emily Murray's expressing her and their opposition to the death penalty as a general matter, and requesting that McKnight be sentenced to life imprisonment instead.  (ECF No. 127, PageID 15859.)  The United States Supreme Court has never held that evidence of a victim's or her family's opinions on the appropriate sentence is a requirement of due process in a capital case.   The opposite, in fact, is true:

> In *Booth v. Maryland,* 482 U.S. 496 (1987), this Court held that "the Eighth Amendment prohibits a capital sentencing jury from considering victim impact evidence" that does not "relate directly to the circumstances of the crime."  *Id.,* at 501–502, 507, n.10.  Four years later, in *Payne v. Tennessee,* 501 U.S. 808, (1991), the Court granted certiorari to reconsider that ban on "**'victim impact' evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family.**" *Id.,* at 817.   The Court held that *Booth* was wrong to conclude that the Eighth Amendment required such a ban.  *Payne,* 501 U.S. at 827. That holding was expressly "limited to" this particular type of victim impact testimony. *Id.,* at 830, n.2.   **"*Booth* also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment,"** but no such evidence was presented in *Payne,* so the Court had no occasion to reconsider that aspect of the decision. *Ibid.*
>
> The Oklahoma Court of Criminal Appeals has held that *Payne* "*implicitly* overruled that portion of *Booth* regarding characterizations of the defendant and opinions of the sentence." *Conover v. State,* 933 P.2d 904, 920 (1997) (emphasis added); see also *Ledbetter v. State,* 933 P.2d 880, 890–891 (Okla.Crim.App. 1997).   The decision below presents a straightforward application of that interpretation of *Payne*.   A jury convicted petitioner Shaun

---

it is clear from the record that that was Gregory Julious, not Gregory McKnight.   (*Se, e.g.*, ECF No. 105-20, p. 996, 1023.)

Michael Bosse of three counts of first-degree murder for the 2010 killing of Katrina Griffin and her two children. The State of Oklahoma sought the death penalty. Over Bosse's objection, the State asked three of the victims' relatives to recommend a sentence to the jury. All three recommended death, and the jury agreed. Bosse appealed, arguing that this testimony about the appropriate sentence violated the Eighth Amendment under *Booth*. The Oklahoma Court of Criminal Appeals affirmed his sentence, concluding that there was "no error." 2015 OK CR 14, ¶¶ 57–58, 360 P.3d 1203, 1226–1227. We grant certiorari and the motion for leave to proceed *in forma pauperis,* and now vacate the judgment of the Oklahoma Court of Criminal Appeals. . . .

The Oklahoma Court of Criminal Appeals has recognized that *Payne* "specifically acknowledged its holding did not affect" *Booth*'s prohibition on opinions about the crime, the defendant, and the appropriate punishment. *Ledbetter,* 933 P.2d at 890–891. That should have ended its inquiry into whether the Eighth Amendment bars such testimony; the court was wrong to go further and conclude that *Payne* implicitly overruled *Booth* in its entirety. "Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Hohn v. United States,* 524 U.S. 236, 252–253 (1998).

The Oklahoma Court of Criminal Appeals remains bound by *Booth*'s prohibition on characterizations and opinions from a victim's family members about the crime, the defendant, and the appropriate sentence unless this Court reconsiders that ban. The state court erred in concluding otherwise. . . .

The judgment of the Oklahoma Court of Criminal Appeals is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*Bosse v. Oklahoma*, 137 S.Ct. 1, 1-3 (2016) (*per curiam*). Thus, the state courts' exclusion of Murray's family's and friends' letters advocating for a life sentence for McKnight was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, and instead aligned perfectly with Supreme Court law.

188

McKnight also reiterates his proportionality arguments, but that matter has been fully considered in the Court's discussion of McKnight's previous ground for relief.

For the reasons stated, McKnight's thirty-sixth ground for relief should be denied.


**Thirty-Seventh Ground for Relief**


In his thirty-seventh ground for relief, McKnight challenges the constitutionality of Ohio's death penalty statutes.  (ECF No. 127, PageID 15861-64.)  The state supreme court considered the constitutionality of Ohio's death penalty statutes as a "settled issue" stating "In proposition of law XXX, appellant attacks the constitutionality of Ohio's death-penalty statutes.  This claim has . . . been resolved."  *McKnight*, 2005-Ohio-6046 at ¶ 309.   The Supreme Court has not held Ohio's or any other state's death penalty scheme violative of the Constitution since *Gregg v. Georgia*, 428 U.S. 153 (1976). *See, e.g.*, *Baze v. Rees*, 553 U.S. 35 (2008).   Thus, it is impossible for McKnight to demonstrate that the Supreme Court of Ohio's decision is contrary to or an unreasonable application of federal law as determined by the holdings of the United States Supreme Court.  28 U.S.C. § 2254(d)(1).  Accordingly, McKnight's thirty-seventh ground for relief should be denied.


**Thirty-Eighth Ground for Relief**


In his thirty-eighth ground for relief, McKnight contends execution by lethal injection, as

189

used in Ohio, violates the Eighth and Fourteenth Amendments to the Constitution.   (ECF No. 127,

PageID 15864-66.)   As a general matter, the Supreme Court has repeatedly upheld lethal injection

as a method of execution.  *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019); *Glossip v. Gross*, 576

U.S. 863 (2015); *Baze v. Rees,* 553 U.S. 35 (2008).   To the extent McKnight seeks to challenge

Ohio's method of lethal injection execution, that claim must be brought in an action under 42

U.S.C. § 1983 and is not cognizable in habeas corpus.   *In re Campbell,* 874 F.3d 454 (6th Cir.

2017).   Cases challenging Ohio's method of lethal injection execution under § 1983 have been

pending in this Court since shortly after the Supreme Court of the United States authorized such

suits in *Nelson v. Campbell,* 541 U.S. 637 (2004).   Those cases are currently consolidated in *In re*

*Ohio Execution Protocol Litig*., Case No. 2:11-cv-1016, and most Ohio death row inmates are

plaintiffs.   Although McKnight has never been a plaintiff in that case, nothing prevents him from

intervening or filing a separate suit, and thus litigating any method of execution claims.

McKnight's thirty-eighth ground for relief should be dismissed without prejudice as not

cognizable in habeas corpus.

**Thirty-Ninth Ground for Relief**

In his thirty-ninth ground for relief, McKnight alleges the unconstitutionality of Ohio's

system of post-conviction relief.   (ECF No. 127, PageID 15866-68.)   Post-conviction state

collateral review is not a constitutional right, even in capital cases.  *Murray v. Giarratano*, 492

U.S. 1 (1989); *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Estelle v. Dorrough*, 420 U.S. 534,

536 (1975); *Hugueley v. Mays*, 964 F.3d 489, 496 (6th Cir. 2020), *citing Lackawanna Cty. Dist. Att'y v. Coss,* 532 U.S. 394, 402 (2001) and *Murray*, 492 U.S. at 10; *Kirby v. Dutton,* 794 F.2d 245 (6th Cir. 1986) (claims of denial of due process and equal protection in collateral proceedings not cognizable in federal habeas because not constitutionally mandated). *Accord, Greer v. Mitchell,* 264 F. 3d 663, 681 (6th Cir. 2001); *Trevino v. Johnson*, 168 F.3d 173 (5th Cir.1999); *Johnson v. Collins,* No. 96-3513, 1998 WL 228029, 145 F.3d 1331 (TABLE) (6th Cir. 1998); *Zuern v. Tate*, 101 F. Supp. 2d 948 (S.D. Ohio 2000) (Rice, C.J.), *rev'd on other grounds*, 336 F.3d 478 (6th Cir. 2003).

**Fortieth Ground for Relief**

Here, McKnight alleges the cumulative effect of the foregoing grounds for relief amount to a violation of his right to due process, a fair trial, and a fair and reliable sentencing determination. (ECF No. 127, PageID 15868-69.) "The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir.), *opinion corrected on denial of reh'g*, 307 F.3d 459 (6th Cir. 2002). After *Lorraine*, the Sixth Circuit explicitly repudiated cases in which it had found cognizable in habeas corpus cumulative error resulting from distinct constitutional claims. *Moore v. Parker*, 425 F.3d 250, 256 n.4 (6th Cir. 2005). Consequently, McKnight has not established entitlement to habeas relief and his fortieth ground for relief should be denied.

**Forty-First Ground for Relief**

In his forty-first ground for relief, McKnight alleges that his execution under Ohio's current lethal injection protocol will subject him to cruel and unusual punishment in violation of the Eighth Amendment because it "presents an objectively intolerable risk of the wanton infliction of serious physical and psychological pain, as well as a torturous or lingering death resulting in an execution that will not be in accord with the "dignity of man." (Petition, ECF No. 127, PageID 15869).

This claim is not cognizable in habeas corpus for the same reasons given as to ground for relief thirty-eight and should be dismissed without prejudice on the same basis.

**Forty-Second Ground for Relief**

In his forty-second ground for relief, McKnight asserts that his execution pursuant to Ohio's current lethal injection protocol will, in various ways, deprive him of equal protection of the law in violation of the Equal Protection Clause of the Fourteenth Amendment. (Petition, ECF No. 127,PageID 15871.) This claim is not cognizable in habeas corpus on the same basis as grounds for relief thirty-eight and forty-one.

**Conclusion**

In accordance with the foregoing analysis, it is respectfully recommended that grounds for relief one through thirty-seven, thirty-nine, and forty be dismissed with prejudice and that grounds

192

for relief thirty-eight, forty-one, and forty-two be dismissed without prejudice.

Under Rule 11 of the Rules Governing § 2254 Cases, the Court must in any final judgment adverse to the Petitioner make a determination on whether a certificate of appealability should issue as to any claim. No recommendation is made on that question herein because the parties have not yet briefed the question. A schedule for such briefing will be set after any objections to this Report are resolved.

September 14, 2020.

s/ *Michael R. Merz*
United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. #